UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

TONY BURNETT,

                Plaintiff,

v.                                                                                  9:25-CV-0153
                                                                                    (DNH/ML)
COPPOLA; N. GENTILE; NICHOLAS
KIEFFER; MATHEW GALLIHER,
formerly doing business as Matthew
Gulliher; and CORRECTIONS
OFFICER SHAW,

                Defendants.

_____

APPEARANCES:                                                          OF COUNSEL:

TONY BURNETT
  *Pro Se* Plaintiff
Upstate Correctional Facility
Post Office Box 2001
Malone, New York 12953

LETITIA A. JAMES                                                  RACHAEL OUIMET, ESQ.
Attorney General for the State of New York        Assistant Attorney General
  Counsel for Defendants Coppola and Shaw[1]
The Capitol
Albany, New York 12224

LUIBRAND LAW FIRM, PLLC                                   KEVIN LUIBRAND, ESQ.
  Counsel for Defendant Galliher
950 New Loudon Road
Latham, New York 12110

---

[1]     The Clerk of the Court is directed to update the docket to reflect that the Attorney General's Office only represents Defendants Coppola and Shaw.  (Dkt. No. 34, Attach. 1 at 3 n.1; *see* Dkt. Nos. 17, 29; *see generally* Dkt. No. 27, docket sheet.)  It appears as though the time for Defendants Gentile and Kieffer to answer or otherwise respond to the Complaint expired on October 23, 2025.  (Dkt. No. 28.)  Notwithstanding, the undersigned recommends dismissal of the Complaint for the reasons set forth herein.  To the extent that the assigned District Judge

MIROSLAV LOVRIC, United States Magistrate Judge

## **REPORT and RECOMMENDATION**

Currently before the Court, in this civil rights action filed by Tony Burnett ("Plaintiff") against Coppola, N. Gentile, Nicholas Kieffer, Mathew Galliher, and Corrections Officer Shaw (collectively "Defendants"), is a motion for summary judgment filed by Defendants Coppola and Shaw (collectively "Moving Defendants").  (Dkt. No. 34.)  For the reasons set forth below, I recommend that Moving Defendants' motion for summary judgment be granted and the Complaint be dismissed in its entirety.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

The undersigned's Decision and Order dated March 31, 2025, thoroughly outlined the factual allegations set forth in the Complaint.  (Dkt. No. 10 at 5-6.)  Plaintiff asserts excessive force claims against Defendants pursuant to the Eight Amendment and 42 U.S.C. § 1983 related to an incident that took place on November 10, 2022.  (*See generally* Dkt. Nos. 1, 10.)

### B.    Parties' Briefing on Moving Defendants' Motion for Summary Judgment

#### 1.    Moving Defendants' Motion for Summary Judgment

Generally, in support of their motion for summary judgment Moving Defendants assert that Plaintiff failed to exhaust his available administrative remedies before commencing this action.  (*See generally* Dkt. No. 34, Attach. 1.)  More specifically, Moving Defendants assert that on November 29, 2022, Plaintiff filed a grievance regarding his claims in this action.  (Dkt. No.

---

rejects the recommendation contained herein, if he desires, Plaintiff may seek an entry of default pursuant to N.D.N.Y. L.R. 55.1.

34, Attach. 1 at 4.)  Moving Defendants argue that Plaintiff's grievance was immediately sent to the Superintendent because it alleged staff misconduct.  (*Id*.)  Moving Defendants assert that the Superintendent issued a disposition denying Plaintiff's grievance, which was provided to Plaintiff but that Plaintiff failed to appeal the Superintendent's denial to the Central Office Review Committee ("CORC") as required to exhaust his administrative remedies.  (*Id*. at 4, 8.)

### 2.     Plaintiff's Response in Opposition

Generally, in opposition to Moving Defendants' motion Plaintiff asserts that he did not appeal the Superintendent's denial of his grievance because Sergeant S. Cooney informed Plaintiff that his grievance would "not [be] going anywhere so take it back to your dorm."  (Dkt. No. 49 at 7; *accord* Dkt. No. 49 at 9, 16.)  Plaintiff argues that hence, the prison administrative procedure was unavailable to him.  (*Id*. at 7.)  In addition, Plaintiff asserts that he was in transit status at Midstate Correctional Facility ("Midstate C.F.") from November 10, 2022, to November 14, 2022; November 17, 2022, to January 17, 2023; and January 26, 2023, to June 21, 2023.  (*Id*. at 8.)  Plaintiff argues that he did not know how to utilize the grievance system at Midstate C.F. because he never attended an orientation there.  (*Id*.)  Moreover, Plaintiff argues that he did not receive a copy of the Superintendent's decision because he would have signed it.  (*Id*. at 9; *accord* Dkt. No. 49 at 15.)  Plaintiff argues that he filed an OSI Complaint because of "the threat of the officer[']s misconduct, intimidation, and retaliation from the grievance [he] filed."  (Dkt. No. 49 at 15-16.)

### 3.     Moving Defendants' Reply

Generally, in further support of their motion, Moving Defendants assert the following four arguments: (1) lack of understanding does not render the grievance process unavailable; (2) Plaintiff was never threatened or stopped from filing his appeal; (3) the Superintendent's late

receipt of a grievance and ultimate determination does not render the grievance system unavailable; and (4) Plaintiff's claims about OSI complaints do not prove that he properly exhausted his available administrative remedies. (*See generally* Dkt. No. 52.)

With respect to their first argument, Moving Defendants assert that because Plaintiff successfully submitted a grievance, this proves that Plaintiff knew about the grievance system and how to utilize it. (Dkt. No. 52 at 3-4.) Moving Defendants argue that Plaintiff's assertion that he attempted to appeal his grievance shows that he knew how to properly navigate the administrative grievance system. (*Id*. at 4.) Further, Moving Defendants assert that Plaintiff's claim that he did not attend facility orientation is belied by the record. (*Id*.)

With respect to their second argument, Moving Defendants assert that it is not a threat or intimidation if an officer merely tells an incarcerated individual that they should not grieve because their grievance would not be successful. (Dkt. No. 52 at 5.) Moving Defendants argue that Plaintiff does not allege that he was told he could not appeal his grievance or that if he did there would be retaliation. (*Id*. at 5-6.)

With respect to their third argument, Moving Defendants assert that to the extent that Plaintiff argues that the grievance process was unavailable to him because the Superintendent did not receive his grievance until after the 25-day timeframe to respond, it should be rejected. (Dkt. No. 52 at 6-7.) Moving Defendants argue that the Superintendent's untimely response was a constructive denial and thus, did not make the grievance system inaccessible to Plaintiff. (*Id*.)

Finally, Moving Defendants argue that any letter or complaint to OSI is not a grievance and cannot be used by an incarcerated individual to prove that he grieved his claims. (*Id*. at 7.)

4

#### C.    Moving Defendants' Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Moving Defendants in their Statement of Material Facts and not denied by Plaintiff in his response. (*Compare* Dkt. No. 34, Attach. 3, *with* Dkt. No. 49 at 1-4.)

1.    Plaintiff was housed at Marcy Correctional Facility ("Marcy C.F.") and Midstate Correctional Facility ("Midstate C.F.") during all times relevant to this matter.

2.    At all relevant times, incarcerated individuals at Marcy C.F. and Midstate C.F. were provided with full access to the New York State Department of Corrections and Community Supervision ("DOCCS") Incarcerated Grievance Program ("IGP").

3.    The IGP is governed by state regulation (7 N.Y.C.R.R. §§ 701.1-701.11) and administered through an agency-level directive (DOCCS Directive 4040).

4.    The IGP provides three levels of administrative review: (1) complaints to the Incarcerated Grievance Review Committee ("IGRC") at the facility-level; (2) appeals to the facility superintendent; and (3) appeals to the Central Office Review Committee ("CORC").

5.    For grievances alleging harassment (which includes harm allegedly sustained from facility employee misconduct), the IGP follows a separate, expedited procedure.

6.    For grievances alleging staff harassment and misconduct, upon receipt, the IGP directly forwards the grievance to the Superintendent upon filing by the close of business day, who has 25 calendar days to render a response.[2]

---

[2]    The Court deems this fact admitted because Plaintiff's response states "I admit paragraph 6 is true . . ." then improperly adds additional language intended to place the fact in context. (Dkt. No. 49 at 2); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) ("[T]he Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed.'"); *Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s

7.      If an incarcerated individual disagrees with the Superintendent's response, they must still appeal the decision to CORC to fully exhaust their administrative remedies.[3]

8.      If an incarcerated individual fails to receive a response to an expedited grievance from the Superintendent within 25 calendar days, the failure to respond may be construed as a denial, and the incarcerated individual can appeal to CORC to exhaust their administrative remedies.

9.      All grievances, whether they concern allegations of harassment or not, must be filed within 21 days of the alleged incident.

10.      Extensions of time to file a grievance may be granted, but only upon request in writing within 45 days of the alleged incident.

11.      CORC is the final appellate level of the IGP.

12.      Plaintiff was housed at Marcy C.F. from October 18, 2022,[4] to November 10, 2022; and November 14, 2022, to November 17, 2022.[5]

---

initial response in each instance is 'Admit'"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

[3]      *See*, *supra*, note 2.

[4]      Based on the undersigned's review of Plaintiff's chronological history display (Dkt. No. 34, Attach. 5 at 12), Plaintiff appears to have transferred to Marcy on October 18, 2022, not October 8, 2022, as set forth by Moving Defendants in their Statement of Material Facts and Ms. Pfendler's declaration. (*Compare* Dkt. No. 34, Attach. 3 at ¶ 12, *and* Dkt. No. 34, Attach. 5 at ¶ 18, *with* Dkt. No. 34, Attach. 5 at 12, *and* Dkt. No. 34, Attach. 6 at ¶ 11.)

[5]      Plaintiff denies this fact asserted and cites to Exhibit C of Mr. Tapia's Declaration. (Dkt. No. 49 at 3 [citing Dkt. No. 34, Attach. 4 at 14-21].) However, Exhibit C to Mr. Tapia's Declaration is a computer printout of grievances filed by Plaintiff and does not appear to reflect Plaintiff's location within DOCCS at any specific time. (Dkt. NO. 34, Attach. 4 at ¶ 24.)

13.     Plaintiff was housed at Midstate C.F. from November 10, 2022, to November 14, 2022; November 17, 2022, to January 17, 2023; and January 26, 2023, to August 18, 2023.[6]

14.     Plaintiff's claim that Moving Defendants used excessive force on him is the proper subject for a grievance through DOCCS' IGP.

15.     Plaintiff had until December 1, 2022, to file a timely grievance with the IGRC related to his claims of November 10, 2022.[7]

16.     Plaintiff had until December 25, 2022, to request an extension of time to file and supply mitigating circumstances, which is 45 days from the alleged incident on November 10, 2022.[8]

17.     DOCCS records maintained at Marcy C.F.'s grievance office show that Plaintiff did not file a relevant grievance regarding the alleged incident of November 10, 2022, while he was housed at Marcy C.F.[9]

---

[6]     *See, supra*, note 5.

[7]     Moving Defendants cite to Ms. Pfendler's declaration at paragraph 21 in support of this fact asserted.  (Dkt. No. 34, Attach. 3 at ¶ 15 [citing Dkt. No. 34, Attach. 5 at ¶ 21].)  However, support for this fact asserted is located in Ms. Pfendler's declaration at paragraph 20.  (Dkt. No. 34, Attach. 5 at ¶ 20.)

[8]     Moving Defendants cite to Ms. Pfendler's declaration at paragraph 22 in support of this fact asserted.  (Dkt. No. 34, Attach. 3 at ¶ 16 [citing Dkt. No. 34, Attach. 5 at ¶ 22].)  However, support for this fact asserted is located in Ms. Pfendler's declaration at paragraph 20.  (Dkt. No. 34, Attach. 5 at ¶ 21.)

[9]     Moving Defendants cite to Ms. Pfendler's declaration at paragraph 20 in support of this fact asserted.  (Dkt. No. 34, Attach. 3 at ¶ 17 [citing Dkt. No. 34, Attach. 5 at ¶ 20].)  However, support for this fact asserted is located in Ms. Pfendler's declaration at paragraph 22.  (Dkt. No. 34, Attach. 5 at ¶ 22.)

18.     DOCCS records maintained at Midstate C.F.'s grievance office show that, on November 29, 2022, Plaintiff filed a grievance ("Grievance No. MS-0349-22") concerning the alleged incident that occurred on November 10, 2022, at Marcy C.F.

19.     Grievance No. MS-0349-22 was logged, coded and titled, and forwarded to Midstate C.F.'s Superintendent for review as it contained allegations of staff misconduct.

20.     On February 7, 2023, the Superintendent issued a response denying Grievance No. MS-0349-22.

21.     On February 10, 2023, the Midstate C.F.'s grievance officer received the Superintendent's response denying Grievance No. MS-0349-22.

22.     Plaintiff was housed at Midstate C.F. from January 26, 2023, to August 18, 2023.

23.     On February 13, 2023, Plaintiff was sent the Superintendent's response to Grievance No. MS-0349-22.

24.     Plaintiff had seven days or until February 20, 2023, to appeal the Superintendent's decision.

25.     Plaintiff never sent an appeal of Grievance No. MS-0349-22 to the Midstate C.F.'s grievance office to be sent to CORC.[10]

26.     CORC never received an appeal of Grievance No. MS-0349-22.[11]

---

[10]     *See*, *supra*, note 2.

[11]     *See*, *supra*, note 2.

## II.     RELEVANT LEGAL STANDARDS

### A.     Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[12] As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ.

P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute–even if that non-

---

[12]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

movant is proceeding *pro se*.[13]  This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.[14]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[15]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

---

[13]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[14]    *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[15]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[16]–even when the non-movant was proceeding *pro se*.[17]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[18]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[16]    Among other things, Local Rule 56.1 (previously contained in Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

[17]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[18]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

11

**B.        Standard Governing Exhaustion of Administrative Remedies**

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 578 U.S. 632, 136 S. Ct. 1850, 1854-55, 195 L.Ed.2d 117 (2016) ("The [PLRA] mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions.").  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly.  *Jones*, 549 U.S. at 218, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (quoting *Woodford*, 548 U.S. at 90, 126 S.Ct. 2378) (exhaustion necessitates "'using all steps that the [government] agency holds out, and doing so properly'").  In New York State prisons, DOCCS has a well-established three-step incarcerated grievance program ("IGP"), in which, (1) the inmate must file a grievance with the IGRC within twenty-one days of the alleged occurrence, (2) the inmate must then appeal an adverse decision by the IGRC to the superintendent of the facility within seven days after receipt of the IGRC's response, and (3) the inmate must then appeal an adverse decision by the superintendent to the CORC within seven

12

days after receipt of the superintendent's response.  7 N.Y.C.R.R. § 701.5; *McGee v. McGready*, 16-CV-4187, 2018 WL 2045094, at *2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, 16-CV-8516, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021); *see* 7 N.Y.C.R.R. § 701.8.  Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance.  7 N.Y.C.R.R. § 701.8.  If the Superintendent fails to respond within twenty-five days, the inmate may appeal directly to CORC.  *Id.* § 701.8(g).  If the Superintendent does respond, the inmate has seven days from receipt of the response to appeal to CORC.  *Id.* § 701.8(h).  The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances.  *See id.* § 701.6(g). Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g)-(h).[19]  Inmates who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2).

"CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he 'should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.'" *Ruiz v. Link*, 20-CV-0235, 2022 WL 3020254, at *4 (S.D.N.Y. July 29, 2022)

---

[19]  The procedure to appeal to CORC under the normal, non-expedited procedures is the same.  7 N.Y.C.R.R. § 701.5(d)(1)(i).

(quoting 7 N.Y.C.R.R. § 701.5(d)(3)(i)).  The IGP requires CORC to respond to an appeal within thirty days of receipt.  7 N.Y.C.R.R. § 701.5(d)(3)(ii).  If CORC has received an appeal and fails to rule within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit.  *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotation marks and citations omitted).  In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA.  *Id.* at 1859-60.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.* at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id.*  Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1860.  In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]"  The

illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry.  *Mena v. City of New York*, 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to satisfy the exhaustion requirements.  *See Jones*, 549 U.S. at 216, 127 S.Ct. 910.  The plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*.  *Id.*

## III.   ANALYSIS

After carefully considering the matter, I recommend that Moving Defendants' motion for summary judgment be granted for the reasons stated in their memoranda of law.  (Dkt. No. 34, Attach. 1; Dkt. No. 52.)  The following is intended to supplement—not supplant—those reasons.

### A.   Exhaustion of Administrative Remedies

Plaintiff appears to concede that he did not exhaust his administrative remedies.  (Dkt. No. 49 at 7 ["I did not file an appeal to my grievance . . ."].)

Moreover, Moving Defendants submitted proof in admissible form by way of an affidavit from Erin Pfendler, the custodian for all grievance-related records at Marcy C.F.  (Dkt. No. 34, Attach. 5.)  In her affidavit, Ms. Pfendler stated that she conducted a search of DOCCS records for any grievances filed by Plaintiff related to his claims in this action.  (*Id*. at ¶ 22.)  Ms. Pfendler affirmed that her search revealed that Plaintiff never filed any grievances with Marcy C.F.'s grievance office while housed at Marcy C.F.  (*Id.*)

In addition, Moving Defendants submitted proof in admissible form by way of an affidavit from Christopher Tapia, the custodian for all grievance-related records at Midstate C.F.  (Dkt. No. 34, Attach. 4.)  In his affidavit, Mr. Tapia stated that he conducted a search of DOCCS records for any grievances filed by Plaintiff related to his claims in this action.  (*Id*. at ¶ 24.)  Mr.

Tapia affirmed that his search revealed that Plaintiff filed Grievance No. MS-0349-22 while housed at Midstate C.F. related to the incident that is the subject of this action. (*Id*. at ¶¶ 24-25.) Mr. Tapia affirmed that Plaintiff did not send an appeal of the Superintendent's denial of Grievance No. MS-0349-22 to the Midstate C.F. IGP office. (*Id*. at ¶ 31.)

Finally, Moving Defendants submitted proof in admissible form by way of an affidavit from Rachael Seguin, the custodian of records maintained by CORC. (Dkt. No. 34, Attach. 6.) In her affidavit, Ms. Seguin stated that she conducted a diligent search of DOCCS records for appeals received by CORC filed by Plaintiff, and her search revealed that Plaintiff failed to appeal any grievances to CORC. (*Id*. at ¶¶ 12-14.).

As a result, I find that Plaintiff has not exhausted his administrative remedies.

## B.    Availability of Administrative Remedies

As set forth above, the Supreme Court of the United States identified three circumstances in which a court may find administrative remedies are not "available" for purposes of exhaustion under the PLRA:

> [A]n administrative procedure is unavailable when it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use—i.e., some mechanism exists to provide relief, but no ordinary prisoner can navigate it. "And finally, a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, 578 U.S. at 643-44.

To the extent that Plaintiff's opposition is construed as arguing that the "dead end" exception applies, I reject that argument. To prove that a grievance process operated as a dead end, a plaintiff must show that the grievance process "could not lead to a change in the challenged prison policies." *Green Haven Prison Preparative Meeting of Religious Soc'y of*

16

*Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82 (2d Cir. 2021), *cert.*

*denied sub nom. Green Haven Preparative Meeting v. New York State Dep't of Corr. & Cmty.*

*Supervision*, 142 S. Ct. 2676 (2022). Plaintiff's assertion that an officer told him that his

grievance was "not going anywhere so take it back to your dorm," (Dkt. No. 49 at 7; *accord* Dkt.

No. 49 at 9, 15) does not create a genuine dispute of material fact as to whether the grievance

system could lead to a change in the challenged prison policies. Indeed, "a record of

administrative defeats for a single prisoner is not sufficient to effectively indict the system."

*McMillian v. Walters*, 16-CV-0277, 2018 WL 879270, at *3 (N.D.N.Y. Feb. 14, 2018)

(D'Agostino, J.). Moreover, the fact that Plaintiff filed Grievance No. MS-0349-22 is at least

some evidence that he did not view the process as a "dead end." *See Matthews v. Sweeney*, 17-

CV-0503, 2025 WL 447734, at *7 (N.D.N.Y. Feb. 10, 2025) (Suddaby, J.) (finding that the

plaintiff "chose to file a grievance at Sullivan C.F. regarding the claims at issue in this action on

June 30, 2015, . . . constitutes at least some evidence that [the plaintiff] did not view the process

as a 'dead end.'") (citing *See Walker v. Ball*, 16-CV-0437, 2018 WL 1415212, at *5 (N.D.N.Y.

Feb. 16, 2018) (Stewart, M.J.) ("While Plaintiff did not file any grievances regarding the alleged

misconduct of Noonan and St. Johns . . . , he did file grievances regarding other issues . . . . This

shows that Plaintiff did not view the filing of grievances as a dead end."), *report*

*recommendation adopted*, 2018 WL 1406632 (N.D.N.Y. Mar. 20, 2018) (Hurd, J.); *Lapierre v.*

*LaValley*, 15-CV-1499, 2019 WL 4015689, at *5 (N.D.N.Y. Aug. 26, 2019) (Stewart, M.J.)

(rejecting an asserted "dead end" exception and granting a motion for summary judgment

because the plaintiff's prior filings "show[ ] that [he] did not view the filing of grievances as a

dead end") (citation omitted), *report and recommendation adopted*, 2019 WL 4686415

(N.D.N.Y. Sept. 26, 2019) (D'Agostino, J.), *aff'd*, 847 F. App'x 47 (2d Cir. 2021)).

17

Next, the opaqueness exception also does not apply to cure Plaintiff's non-exhaustion. Administrative relief is unavailable where "[t]he regulations simply do not contemplate the situation in which the prisoner found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Williams*, 829 F.3d at 124. In other words, administrative relief is opaque when the procedure for the incarcerated person to procure relief under the circumstances is "so confusing that . . . no reasonable prisoner can use it." *Id.* (quoting *Ross*, 578 U.S. at 644).

Upon arrival to Marcy C.F. and Midstate C.F., Plaintiff attended orientation programs that included presentations on the grievance policies and procedures set forth in DOCCS Directive 4040.[20] (Dkt. No. 34, Attach. 4 at ¶¶ 5-6; Dkt. No. 34, Attach. 5 at ¶¶ 5-6.) Among the topics covered in the orientation presentation, Plaintiff was taught how to file and appeal grievance complaints. (Dkt. No. 34, Attach. 4 at ¶¶ 5-6; Dkt. No. 34, Attach. 5 at ¶¶ 5-6.) Mr. Tapia declared that from December 5, 2022, to December 11, 2022, Plaintiff attended and successfully completed the facility orientation at Midstate C.F. (Dkt. No. 34, Attach. 4 at ¶ 6; Dkt. No. 34, Attach. 4 at 10.) Moreover, Ms. Pfendler declared that from October 24, 2024, to October 30, 2024, Plaintiff attended and successfully completed the facility orientation at Marcy C.F. (Dkt. No. 34, Attach. 5 at ¶ 6; Dkt. No. 34, Attach. 5 at 10.) In addition, Title 7 of the Official Compilation of Codes, Rules, and Regulations of the State of New York and DOCCS

---

[20]     Although Plaintiff contends that he did not attend an orientation program at Midstate C.F. (Dkt. No. 49 at 8), the record belies that assertion. (Dkt. No. 34, Attach. 4 at ¶¶ 5-6; Dkt. No. 34, Attach. 4 at 10.) Plaintiff attended the orientation after he filed Grievance No. MS-0349-22 but before expiration of the deadline for the Superintendent to respond to the grievance and before the Superintendent denied the grievance. Hence, Plaintiff completed the orientation before the time for him to appeal Grievance No. MS-0349-22 began. Further, the fact that Plaintiff filed Grievance No. MS-0349-22 is reflective of his knowledge of the grievance process and exhaustion requirements.

Directive 4040 were available in the law libraries at Marcy C.F. and Midstate C.F.  (Dkt. No. 34, Attach. 4 at ¶ 4; Dkt. No. 34, Attach. 5 at ¶ 4.)

Plaintiff's conclusory assertion that he did not know how to utilize the grievance system (Dkt. No. 49 at 8) is insufficient to apply the opaqueness exception.  *See, e.g.*, *Jackson v. West*, 23-CV-0306, 2025 WL 1033787, at *9 (N.D.N.Y. Feb. 20, 2025) (Evangelista, M.J.) (holding that the grievance procedure was not opaque where plaintiff claimed that he did not understand how to appeal, but the plaintiff failed to seek assistance or pay attention at the facility's IGP orientation and the plaintiff successfully initiated the first step on several grievances).

Finally, Plaintiff's argument that Sergeant Cooney's statement discouraging Plaintiff from filing an appeal because the grievance "is not going anywhere" (Dkt. No. 49 at 15) is insufficient to raise a triable issue of fact as to unavailability through "machination, misrepresentation, or intimidation by prison officials."  *Ross*, 578 U.S. at 644.  As this Court has stated, "general and conclusory statements that [an incarcerated individual] was threatened are insufficient to raise a triable issue of fact as to the unavailability of the grievance procedure because of intimidation by prison administrators."  *Gibbs v. Gadway*, 19-CV-0281, 2019 WL 5191506, at *5 (N.D.N.Y. Oct. 15, 2019) (Stewart, M.J.), *report and recommendation adopted*, 2020 WL 1227156 (N.D.N.Y. Mar. 13, 2020) (Suddaby, C.J.) (quoting *Lewis v. Wasielewski*, 15-CV-0168, 2018 WL 4732755, at *6 (W.D.N.Y. July 10, 2018), *report and recommendation adopted*, 2018 WL 4692476 (W.D.N.Y. Oct. 1, 2018)).  As Moving Defendants assert, Plaintiff does not allege that he could not appeal his grievance or that if he did there would be retaliation. (Dkt. No 52 at 5-6); *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 312 (2d Cir. 2020) (holding that the plaintiff alleged "no more than a generalized fear of retaliation which is insufficient as a

matter of law to support a finding that the grievance process was unavailable in order to overcome her failure to exhaust administrative remedies under the PLRA.").

Further, the undersigned rejects Plaintiff's arguments that (1) his OSI complaint constituted exhaustion of his administrative remedies pursuant to the PLRA, *see Beauvoir v. Smith*, 14-CV-1495, 2017 WL 9511157, at \*7 (N.D.N.Y. Aug. 30, 2017) (Peebles, M.J.) (citing *Smith v. Kelly*, 985 F. Supp. 2d 275, 285 (N.D.N.Y. 2013)) ("For purposes of the PLRA, however, complaints filed by inmates with the OSI do not satisfy an inmate's obligation to exhaust administrative remedies."); and (2) that the Superintendent's late receipt of Grievance No. MS-0349-22 and ultimate determination rendered the grievance system unavailable, *see* 7 N.Y.C.R.R. § 701.8(g) (if the superintendent does not render a decision within twenty-five calendar days, the incarcerated individual "may appeal his/her grievance to CORC."); *Teaque v. Mullen*, 18-CV-1412, 2019 WL 8589277, at \*6 (N.D.N.Y. Dec. 17, 2019) (Hummel, M.J.) (collecting cases) ("Many courts in this District have held that where the inmate does not receive a timely response, an inmate must appeal the next step or make efforts to track their grievance.").

Therefore, the undersigned concludes that Plaintiff failed to exhaust his available administrative remedies before commencing this action.  I recommend that Moving Defendants' motion for summary judgment be granted.  *See*, *e.g.*, *Jenkins v. Short*, 19-CV-1352, 2020 WL 9264842, at \*7 (N.D.N.Y. Nov. 17, 2020) (Dancks, M.J.) (citing *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004)) (recommending granting the defendants' motion for summary judgment, where there was "no genuine issue of material fact that Plaintiff failed to exhaust his administrative remedies," and dismissal of the complaint *with prejudice*, explaining "dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust.").

Furthermore, with respect to Plaintiff's claims against Defendants Gentile, Keiffer, and Galliher, I recommend dismissal because Plaintiff failed to exhaust his administrative remedies. *See Webb v. Fessette*, 23-CV-1577, 2025 WL 1859012, at *4 n. 3 (N.D.N.Y. Jan. 22, 2025) (Dancks, M.J.) (recommending dismissal of the plaintiff's claims against John Doe defendants because, among other things, the plaintiff failed to exhaust his administrative remedies), *report and recommendation rejected on other grounds* 2025 WL 2711067 (N.D.N.Y. Sept. 23, 2025) (Coombe, J.).

As a result, I recommend that the Complaint be dismissed with prejudice.

**ACCORDINGLY**, it is

**RECOMMENDED** that the Court **GRANT** Moving Defendants' motion for summary judgment (Dkt. No. 34); and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED** in its entirety **with prejudice**; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[21]

---

[21]     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE**: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[22]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: May  5 , 2026
       Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[22]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).

2017 WL 9511157
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jimmy BEAUVOIR, Plaintiff,
v.
Kevin SMITH, et al., Defendants.

Civil Action No. 9:14-CV-1495 (MAD/DEP)
|
Signed 08/30/2017

**Attorneys and Law Firms**

JIMMY BEAUVOIR, 14-A-0367, Fishkill Correctional Facility, P.O. Box 1245, Beacon, NY 12508, pro se.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, OF COUNSEL: LOUIS JIM, ESQ., LOUIS JIM, ESQ., Assistant Attorney General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by *pro se* plaintiff Jimmy Beauvoir, a New York State prison inmate, against several individuals employed at the correctional facility in which he was confined at the relevant times. Although plaintiff's claims were much broader at the outset, they have been significantly narrowed as a result of the court's initial review of plaintiff's complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A. In the surviving claims, plaintiff asserts a cause of action for the use of excessive force and failure to intervene against defendants whose identities are known to him and two additional "Doe" defendants, and a false imprisonment claim against another defendant based upon the results of a disciplinary hearing conducted by that individual.

Currently pending in connection with the action is a summary judgment motion brought by defendants seeking dismissal of plaintiff's remaining claims. For the reasons set forth below, I recommend the motion be granted based on plaintiff's failure to exhaust available administrative remedies prior to commencing this lawsuit.

I. BACKGROUND [1]
Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. No. 16. At the times relevant to this action, plaintiff was confined in the Bare Hill Correctional Facility ("Bare Hill") located in Malone, New York. *Id.*

Plaintiff's claims center upon an incident that allegedly occurred on September 13, 2014, while plaintiff was being transferred by van to the Bare Hill Special Housing Unit ("SHU") for "being out of place." Dkt. No. 16 at 4. According to plaintiff, upon his arrival at the SHU at approximately 10:00 p.m., he was dragged out of the van and beaten by defendant Kevin Smith, a corrections officer, and John Doe #5, while defendants Lt. Bashaw, Sergeant Conto, and John Doe #6 witnessed the assault but failed to intervene. Dkt. No. 16-1 at 1-6. Plaintiff claims that, as a result of the assault, he sustained a broken nose, stomach pain, headaches, and bloody noses. [2] *Id.* at 2.

**\*2** Two disciplinary hearings were conducted by defendant Lieutenant LaGray on September 18, 2014, to address charges lodged against plaintiff. Dkt. No. 75-9 at 2-10; *see also* Dkt. No. 16-1 at 4. The first hearing was held to address a misbehavior report issued to plaintiff by M. Southworth on September 13, 2014, accusing him of being out of place and failure to comply with a prior hearing disposition. Dkt. No. 75-4 at 25. The second centered upon a misbehavior report authored by E. Phillips, accusing plaintiff of disobeying a direct order, being out of place, and failing to abide by a prior hearing disposition. *Id.* at 29. At those hearings, plaintiff pleaded guilty to all charges lodged against him. Dkt. No. 75-9 at 4, 8. Based upon those guilty pleas, defendant LaGray imposed penalties of thirty days of disciplinary confinement, together with a loss of recreation, packages, commissary, and telephone privileges for a corresponding period in each of the two cases. *Id.*

II. PROCEDURAL HISTORY
Plaintiff commenced this action on or about November 25, 2014, in the United States District Court for the Southern District of New York. Dkt. No. 1. The matter was subsequently transferred to this district by order issued by District Judge Loretta A. Preska on December 8, 2014. Dkt. No. 4. Plaintiff's original complaint was subsequently dismissed for failure to state a claim upon which relief may be

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 24 of 170

Beauvoir v. Smith, Not Reported in Fed. Supp. (2017)

granted, with leave to replead, based upon the court's initial review pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 13.

Plaintiff filed an amended complaint in the action on April 20, 2015. Dkt. No. 16. Upon review of that amended complaint, District Judge Mae A. D'Agostino issued a decision on June 1, 2015, dismissing several of plaintiff's newly pleaded claims. Dkt. No. 17. The claims now remaining in the action include the alleged use of excessive force and failure to protect plaintiff from harm asserted against defendants Smith, John Doe #5, John Doe #6, Bradshaw, and Conto, and a false imprisonment claim asserted against defendant LaGray concerning the sanctions imposed following the disciplinary hearings. Dkt. Nos. 17, 19.

On December 29, 2016, defendants moved for the entry of summary judgment dismissing plaintiff's remaining claims. Dkt. No. 75. In their motion, defendants argue that (1) plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies before commencing suit; (2) plaintiff's excessive force, failure to protect, and false imprisonment claims lack merit; (3) plaintiff's false imprisonment claim is precluded under New York Correction Law § 24; (4) all claims against the defendants in their official capacities are barred by the Eleventh Amendment; and (5) defendants are entitled to qualified immunity. *See generally* Dkt. No. 75-27. Plaintiff has failed to oppose defendants' motion, which is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III. DISCUSSION

A. Plaintiff's Failure to Oppose Defendants' Motion
Before turning to the merits of defendants' motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendants' motion, and specifically whether that failure should be construed as a consent to the dismissal of his amended complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendants' motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines

that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

**\*3** N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendants' motion. The motion was properly filed by defendants, and defendants, through their motion, have met their burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendants have met their burden, I note that the "burden of persuasion is lightened such that, in order to succeed, [the] motion need only be 'facially meritorious.' " *See Rodriguez v. Goord*, No. 04-CV-0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that determination of whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases) ).

Because defendants have accurately cited both proper legal authority and evidence in the record supporting the grounds on which their motion is based, and plaintiff has failed to respond in opposition to the motion, I find that defendants' motion is facially meritorious. *Jackson*, 766 F.3d at 194. Accordingly, I recommend that the court grant defendants' motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendants' Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 25 of 170

Beauvoir v. Smith, Not Reported in Fed. Supp. (2017)

does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. See, *e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendants' Local Rule 7.1 Statement, Dkt. No. 75-1, Dkt. No. 78 at 2, and he has failed to do so, I recommend that the court deem the facts contained in defendants' Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. See, *e.g., Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry*, 336 F.3d at 137.

### B. Summary Judgment Standard[3]

**\*4**  Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. Exhaustion of Administrative Remedies

Defendants contend that plaintiff's remaining causes of action are subject to dismissal because he failed to exhaust the available administrative remedies with respect to those claims prior to commencing this lawsuit. Dkt. No. 75-27 at 13-17.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1917e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 26 of 170

Beauvoir v. Smith, Not Reported in Fed. Supp. (2017)

to dismissal. *See* *Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, 661 Fed.Appx. 750 (2d Cir. 2016).[4] "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord*, *Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[5]

**\*5** In New York, state prison inmates have available to them a grievance procedure, which is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions.[6] 7 N.Y.C.R.R. §§ 701.1 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[7] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[8] *Id.* at § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." *Id.* at § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA.

*See* *Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted) ).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement' hinges on the availability of administrative remedies." (quotation marks omitted) ). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[9] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*6** In this case, there is no record evidence that plaintiff submitted an appeal of a grievance to the CORC regarding the events related to his claims asserted in this action. Jeffrey Hale, the Assistant Director of the IGP for the DOCCS, submitted a declaration in support of defendants' pending motion stating that his review of the relevant CORC records reflects that plaintiff did not appeal a grievance filed at Bare Hill to the CORC concerning either a use of force incident on September 13, 2014, or a disciplinary sanction imposed following a disciplinary hearing on September 18, 2014. Dkt.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 27 of 170

Beauvoir v. Smith, Not Reported in Fed. Supp. (2017)

No. 75-10 at 4; *see also* Dkt. No. 75-11. Indeed, according to Hale, plaintiff filed no appeals whatsoever to the CORC while he was confined at Bare Hill. *Id.*

Plaintiff alleges in his amended complaint that he filed a grievance regarding the allegations giving rise to this action following his transfer into the Greene Correctional Facility ("Greene") but that it was not successful. Dkt. No. 16 at 2-3. More specifically, plaintiff alleges that the "grievance office" at Greene denied his grievance because he is "not from Green[e] and [the incidents] did not happen in Green[e.]" *Id.* at 2. The amended complaint does not indicate whether, and there is otherwise no record evidence that, plaintiff appealed this denial to the CORC.

On or about November 13, 2014, plaintiff filed a complaint to the OSI regarding, *inter alia*, the use of force incident at Bare Hill. [10] Dkt. No. 75-18. For purposes of the PLRA, however, complaints filed by inmates with the OSI do not satisfy an inmate's obligation to exhaust administrative remedies. *See, e.g., Smith v. Kelly*, 985 F. Supp. 2d 875, 285 (N.D.N.Y. 2013) (Suddaby, J.) (collecting cases).

In light of the above-described record evidence, I find that there is no basis to conclude that plaintiff exhausted the administrative remedies by pursuing a grievance through to the CORC prior to filing this action.

In addition, there is no evidence to support a finding that the IGP was unavailable to plaintiff while he was incarcerated at Bare Hill or Greene. Under the IGP, inmates must file a grievance within twenty-one days of the occurrence forming the basis for the grievance. 7 N.Y.C.R.R. § 701.5(a)(1). Because plaintiff was confined in Bare Hill until October 17, 2014, Dkt. No. 75-23 at 2, the record reflects that the deadline to file a grievance concerning the use of force incident and

disciplinary hearing sanctions had expired by the date he was transferred. There is no evidence that the IGP was unavailable to plaintiff during the period between when the incidents occurred (September 14, 2014, and September 18, 2014) and when plaintiff was transferred. While the IGP provides a mechanism for requesting an extension of time to file a late grievance, 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a), there is no evidence that plaintiff availed himself of that opportunity while at Bare Hill or Greene. Because I find no basis to conclude that the IGP was rendered unavailable to plaintiff, I recommend that defendants' motion be granted based on plaintiff's failure to exhaust the available administrative remedies prior to commencing this action.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's surviving claims in this action are subject to the PLRA's exhaustion requirement. Because it is clear that plaintiff did not file any grievances concerning the events giving rise to his claims and pursue them to completion before the CORC, and no grounds exist to excuse the exhaustion requirement, his amended complaint is subject to dismissal in its entirety. Accordingly, it is here respectfully

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 75) be GRANTED, and that plaintiff's amended complaint in this action be DISMISSED for failure to exhaust available administrative remedies.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 9511157

---

**Footnotes**

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2    Plaintiff's medical records reflect that he was seen by medical personnel at the facility on September 13, 2014, at 10:40 p.m., but that no bruises or injuries were observed and that plaintiff denied any medical concerns or complaints at that time. Dkt. No. 76 at 4. In addition, in support of the pending motion, the defendants accused

of assaulting plaintiff have submitted declarations denying the use of excessive force. Dkt. No. 75-12 at 2; Dkt. No. 75-13 at 2; Dkt. No. 75-14 at 2. In his deposition plaintiff was vague and equivocal concerning the assault and those allegedly involved in it. *See, e.g.*, Dkt. No. 75-4 at 12-13. An investigation conducted by representatives of the DOCCS Office of Special Investigations ("OSI") into the incident resulted in a finding that plaintiff's allegations were without merit. Dkt. No. 75-17 at 2-3; Dkt. No. 75-22.

3        Although I have recommended dismissal of plaintiff's amended complaint on the basis of plaintiff's failure to respond to defendants' motion, I have addressed one ground upon which defendants' motion is based out of an abundance of caution.

4        All unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions have been deleted for online purposes.]

5        While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted) ).

6        The IGP is described in the declaration of Jeffrey Hale, Assistant Director of the DOCCS IGP, submitted in support of defendants' motion. *See* Dkt. No. 75-10.

7        The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

8        Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

9        According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

10       Following an investigation, Senior OSI Investigator Christopher Retrosi concluded that plaintiff's allegations were unsubstantiated. Dkt. No. 75-17 at 2-3; Dkt. No. 75-22.

---

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1611993
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

CA, INC., d/b/a CA Technologies, Plaintiff,

v.

NEW RELIC, INC., Defendant.

No. CV I2–5468(AKT).
|
Signed March 30, 2015.
|
Filed April 8, 2015.

**Attorneys and Law Firms**

Barry Shelton, Conor Civins, Matthew Gates, Pillsbury Winthrop Shaw Pittman LLP, Austin, TX, for Plaintiff.

Craig N. Dee, Elizabeth Mara Aboulafia, Elizabeth Usinger, Cullen and Dykman, LLP, Garden City, NY, Christa Anderson, Corey Johanningmeier, Elizabeth Egan, Elizabeth McCloskey, Jesse P. Basbaum, Matthew Mickle Werdegar, Matthias A. Kamber, Rebekah Punak, Robert A. Van Nest, Keker & Van Nest LLP, San Francisco, CA, for Defendant.

*MEMORANDUM AND ORDER*

A. KATHLEEN TOMLINSON, United States Magistrate Judge.

I. *PRELIMINARY STATEMENT*

 **\*1**  In this patent infringement action, plaintiff CA, Inc. ("CA") alleges that defendant New Relic, Inc. ("New Relic") has infringed three patents which deal with monitoring the performance of software applications, otherwise known as application performance management ("APM") software. *See generally* Compl. [DE 1]. New Relic asserted in its First Affirmative Defense that CA's three patents are invalid for failure to satisfy the conditions of patentability. *See* Answer to Compi. ¶ 62 [DE 8].

Presently before the Court is CA's motion for partial summary judgment seeking to strike New Relic's First Affirmative Defense as to two of the three patents at issue-U.S. Patent No. 7,225,361 B2 ("the ′361 Patent") and U.S. Patent No. 7,797,580 B2 ("the ′580 Patent")-and to estop New Relic

from contesting the validity of those two patents. *See* DE 116. CA's motion is premised on the equitable doctrine of assignor estoppel, which bars an inventor who assigned his or her patent to another for valuable consideration from later asserting that the patent is invalid. *See* Pl.'s Memorandum of Law in Support of its Motion For Partial Summary Judgment Based on the Doctrine of Assignor Estoppel ("Pl.'s Mem.") at 1 [DE 116–1]. The doctrine also bars companies in privity with the inventor from asserting the defense of invalidity where the company relied on the inventor's knowledge and assistance in creating products accused of infringing the inventor's patents. *See id.*

Lewis Cirne ("Cirne"), the sole founder and CEO of Defendant New Relic, is one of two named inventors of the ′361 and ′580 Patents. The parties do not dispute that Cirne would be personally estopped from asserting that the ′361 and ′580 Patents that he co-invented are invalid. *See* Defendant New Relic's Corrected Memorandum of Law in Opposition to CA's Motion for Partial Summary Judgment ("Def.'s Opp.") at 16 n. 11 [DE 119]; Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion ("Pl.'s Reply") at 2 [DE 128]. Rather, the sole issue before the Court is whether New Relic should be estopped from asserting an invalidity defense because it is in privity with Cirne under the doctrine of assignor estoppel.

Although the parties generally agree on the applicable law governing the doctrine of assignor estoppel, they dispute whether the record supports a finding, as a matter of law, of privity between New Relic and Cirne. CA argues the undisputed facts show that New Relic sufficiently availed itself of Cirne's knowledge and assistance in developing the accused products to justify finding privity between New Relic and Cirne. *See* Pl.'s Mem. at 15–16. New Relic, on the other hand, asserts that because New Relic did not rely on Cirne's knowledge or assistance in developing the specific infringing features of the accused products, there are genuine issues of material fact which preclude summary judgment on assignor estoppel grounds. *See* Def.'s Opp. at 16. Based upon a review of the parties' submissions and the relevant case law, the Court concludes that New Relic is in privity with Cirne and is therefore barred under the doctrine of assignor estoppel from asserting an invalidity defense against the ′361 and ′580 Patents. Accordingly, for reasons explained below, CA's motion for partial summary judgment is GRANTED.

II. *BACKGROUND*

**\*2** The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the instant motion for partial summary judgment, including: Plaintiffs Statement of Undisputed Material Facts In Support Of Motion For Partial Summary Judgment ("Pl.'s Rule 56.1 Stmt.") [DE 116–2]; Response to CA's Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment ("Def.'s Rule 56.1 Counterstmt.") [DE 119–1], as well as the affidavits, deposition testimony, and other exhibits attached to the motion papers. Where the parties' Rule 56.1 Statements contain specific citations to the record as support, those documents are incorporated by reference and the Court cites to the Rule 56.1 Statement, rather than the underlying citation to the record. Where the facts set forth in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied by a, conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* E.D.N.Y. Local Rule 56.1(c); *Petito v. Puritan's Pride, Inc.,* 35 F.Supp.3d 494, 497 (S.D.N.Y.2014). The Court construes the fact in the light most favorable to New Relic as the nonmoving party. *Viacom Intern., Inc. v. YouTube, Inc.,* 676 F.3d 19, 30 (2d Cir.2012); *Petito,* 35 F.Supp.3d at 502. The following facts are undisputed unless otherwise noted.

CA is a provider of enterprise technology management software and solutions. Plaintiff's Statement of Undisputed Material Facts In Support Of Motion For Partial Summary Judgment ("Pl.'s Rule 56.1 Stmt.") ¶ 1. [1] One of its software products, Introscope, is an APM tool which customers use to monitor and manage the performance of web applications written using Java or .NET software languages. *Id.* New Relic also provides an APM service that monitors web applications written in Java and .NET, as well as the Python, Ruby, and PHP software languages, among others. *Id.* ¶ 2. CA holds a number of patents related to its products, including two patents related to Introscope which are the subject of the instant motion. *Id.* ¶ 13. As noted, the patents at issue are the ′361 Patent, entitled "Detecting a Stalled Routine," and the ′580 Patent, entitled "Determining that a Routine has Stalled" (collectively, the "Stall Detection Patents"). [2] The Stall Detection Patents were issued to Jeffrey Cobb and Lewis Cirne in 2007 and 2010, respectively. *Id.* ¶¶ 19, 25.

Cirne is the founder and Chief Executive Officer of Defendant New Relic. *Id.* ¶ 7. [3] Prior to founding New Relic, Cirne started a company in 1998 called Wily Technologies, Inc. *Id.* ¶ 9. Cirne founded Wily in connection with his invention

of a new approach to APM and is considered a pioneer and driving innovative force in the APM field. *Id.* ¶¶ 10–11. Cirne served as Wily's CEO from 1998 to 2001, and as its Chief Technology Officer until approximately 2006. *Id.* ¶¶ 8–9. During his tenure at Wily, Cirne helped develop Introscope, which became Wily's flagship APM product, although the parties dispute the scope of Cirne's role in Introscope's development. *Id.* ¶ 12; *see* Def.'s Rule 56.1 Counterstmt. ¶ 12. Wily and its Introscope product were commercially successful. Pl.'s Rule 56.1 Stmt. ¶ 27.

**\*3** CA asserts that in 2001, during the development of the Introscope product, Cirne and Jeff Cobb solved an important technical issue raised by customers by creating a solution that helped customers understand when things were slowing down and backing up in their applications. *Id.* ¶ 13. The Stall Detection Patents were implemented in Introscope to address this problem and solve it. *See id.* New Relic disputes that the technical issue purportedly solved by the Stall Detection Patents was "an important one," noting that the stall detection feature in Introscope was not one of the most important features to customers. Def.'s Rule 56.1 Counterstmt. ¶ 13. According to New Relic, the Stall Detection Patents, "at most, patented one particular method of stall detection, and were therefore not an important solution." *Id.* [4]

On February 21, 2002, Wily filed an application with the United States Patent and Trademark Office ("USPTO") entitled "Detecting a Stalled Routine," which would eventually become the ′361 Patent. Pl.'s Rule 56.1 Stmt. ¶ 14. Cirne and Cobb are the named inventors on the ′361 patent application, *id.,* and Wily submitted a "Declaration for Patent Application" in support of the ′361 Application, *id.* ¶ 16. Cirne executed the declaration on May 7, 2002 and declared his belief that he was the first and joint inventor of the invention entitled: DETECTING A STALLED ROUTINE...." *Id.* ¶ 16. On June 27, 2005, Wily filed an application with the USPTO that would eventually become the ′580 Patent. *Id.* ¶ 20. Cirne and Cobb are the named inventors on the ′580 Application, which was filed as a continuation of the ′361 Patent. *Id.* Cirne executed an assignment of his rights to the intellectual property that would eventually become the Stall Detection Patents to Wily. *Id.* ¶¶ 18, 23, n. 7. The assignment of the subject matter of the ′361 Patent to Wily was executed on May, 7, 2002. *Id.* ¶ 18. Likewise, Cirne assigned to Wily for "good and valuable consideration" his rights to the intellectual property which would eventually become the ′580 Patent. *Id.* ¶ 23. [5] After the assignment, Cirne continued to work at Wily, where he received a salary, stock and other

benefits. *Id.* ¶¶ 18, 24. The Stall Detection Patents were issued to Cirne and Cobb on May 29, 2007 and September 14, 2010, respectively. *Id.* ¶¶ 19, 25.

In 2006, CA purchased 100 % of the stock in Wily for approximately $375 million and merged Wily into CA. *Id.* ¶ 28. According to CA, as part of the acquisition, (i) CA acquired Introscope-which it continues to sell today-as well as Wily's intellectual property, including the ′361 and ′580 Patents, and (ii) Wily assigned all its rights in the patents to CA. *Id.* ¶¶ 29–30. New Relic points out that the Stall Detection Patents did not issue until 2007 and 2010 and thus were pending patent applications, not issued patents, at the time CA acquired Wily. Def.'s Rule 56.1 Counterstmt. ¶ 29. [Redacted]. Pl.'s Rule 56.1 Stmt. ¶ 32; Def.'s Rule 56.1 Counterstmt. ¶ 32. After the acquisition, Cirne continued to serve as the Chief Technology Officer of CA's Wily Division. Pl.'s Rule 56.1 Stmt. ¶ 33.

**\*4** Cirne resigned from CA on July 31, 2007. *Id.* ¶ 34. In February 2008, Cirne authorized the incorporation of New Relic and installed himself as Chief Executive Officer (CEO), a position he holds to this day. *Id.* ¶¶ 38, 53; Def.'s Rule 56.1 Counterstmt. ¶ 38. As explained below, the parties dispute, among other things, when Cirne began developing the prototype for the product that eventually became New Relic's commercial APM service and whether Cirne's initial programming contributions still survive in New Relic's commercial offerings. However, there is no dispute that Cirne was the only person involved in developing the first prototype used to launch New Relic, demonstrating the prototype to third parties, and obtaining the first round of capital to fund New Relic. Pl.'s Rule 56.1 Stmt. ¶ 51; Def.'s Rule 56.1 Counterstmt. ¶ 51. Cirne also played a key role in obtaining subsequent rounds of financing for New Relic. Pl.'s Rule 56.1 Stmt. ¶ 52; Def.'s Rule 56.1 Counterstmt. ¶ 52. New Relic commercially released its Java agent in October 2009 and its .NET agent in October 2010. Pl.'s Rule 56.1 Stmt. ¶¶ 67–68. The parties agree that Cirne [Redacted] Pl.'s Rule 56.1 Stmt. ¶¶ 64–66; Def.'s Rule 56.1 Counterstmt. ¶¶ 64–66.

The parties' generally differ in their assessment of Cirne's involvement in the creation and development of New Relic's accused Java and .NET agents. The Court will now consider the party's respective factual recitations.

### A. CA's Recitation of the Facts

CA asserts that, while Cirne was still an employee at CA and approximately two months prior to his departure, he began experimenting with the idea of providing APM through a Software–as–a–Service, or "SaaS" delivery model, as opposed to the on-premise model used to deliver Introscope. Pl.'s Local Rule 56.1 Stmt. ¶ 35. [6] According to CA, Cirne began writing the code for his new company (New Relic) during that timeframe. *Id.* ¶ 36. Instead of disclosing his new invention to CA, Cirne resigned from CA and began demonstrating his prototype to third parties. *Id.* ¶ 37. Less than two months after leaving CA, Cirne formed an LLC in September 2007 (New Relic's predecessor) before formerly incorporating New Relic in February 2008. *Id.* ¶ 38.

CA maintains that New Relic's APM service and its accused Java and .NET agents "would not exist but for the knowledge and assistance provided to New Relic by Mr. Cirne." *Id.* if 44. In particular, CA points to the fact that Cirne alone founded New Relic, authorized the incorporation of the company, and installed himself as CEO. *Id.* ¶¶ 38, 45, 53. According to CA, Cirne conceived of the idea for New Relic and wrote the original code for the first prototype used to launch the company in approximately June 2007, while he was still employed at CA, and developed the first prototype used to launch the company. *Id.* ¶ 46. CA asserts that original code remains part of New Relic's commercial product today. *Id.* ¶ 47. CA also notes (and New Relic does not dispute) that prior to New Relic's incorporation, Cirne was the only person developing the original prototype for New Relic, demonstrating that prototype to third parties, and obtaining the first round of capital funding for New Relic. *Id.* ¶ 48– 49, 51; Def.'s Rule 56.1 Counterstmt. ¶¶ 48–49, 51. The parties also do not dispute that Cirne played a key role in obtaining New Relic's second, third, fourth, and fifth rounds of financing to fund New Relic's operations. Pl.'s Rule 56.1 Stmt. ¶ 52; Def.'s Rule 56.1 Counterstmt. ¶ 52. CA contends that the funding was used, among other things, to hire engineers to build Cirne's product. *Id.* ¶ 50. Cirne did, indeed, hire New Relic's first set of engineers as well as its first business development manager. *Id.* ¶ 54. [7] Of the first seven "key" personnel hired by Cirne, six were from CA. *Id.* if 55. The engineers from CA included Saxon D′Aubin and Jim Gochee, both of whom CA contends played a "critical role" in developing New Relic's accused Java and . NET agents. *Id.* ¶¶ 56. [8]

**\*5** CA further asserts that, from the inception of New Relic, Cirne has been "substantially involved in developing, or managing the development of, all of New Relic's products." *Id.* ¶ 60. In particular, CA alleges that Cirne made the decision to develop the Java agent in order to expand the company's

footprint beyond a single software language agent. *Id.* ¶ 71. Cirne also conducted the early research to determine whether New Relic could develop a Java agent compatible with its APM service, and then handed the project to D'Aubin and Gochee, two engineers whom Cirne recruited directly from CA. *Id.* ¶ 72. Cirne put D'Aubin and Gochee in charge of developing and managing New Relic's Java agent, and according to CA, Cirne has acknowledged that both engineers played a critical role in the development and release of the agent. *Id.* ¶ 73. CA also asserts that Cirne wrote code for the Java agent and was directly involved in reaching out to customers to test the Java agent prior to its release. *Id.* ¶ 74. Cirne also made the decision to develop and release New Relic's .NET agent. *Id.* ¶ 75.

### B. New Relic's Recitation of the Facts

New Relic generally asserts that it did not rely on Cirne's knowledge or assistance to develop the accused functionality in the Java and .NET agents. *See* Def.'s Rule 56.1 Counterstmt. ¶ 157. New Relic describes Cirne's history and involvement with the company as follows.

#### 1. New Relic's First Product: Ruby–on–Rails Performance Monitoring

With regard to Cirne's alleged experimentation while still working at CA, New Relic contends that, in late June or early July 2007, while on an unpaid leave of absence, Cirne "began to play around with a new programming language called Ruby–on–Rails" ("Ruby"). *Id.* ¶¶ 121. Cirne taught himself Ruby on his own time and on his own computer by experimenting and trying to write code. *Id.* ¶¶ 122–23. After experimenting with Ruby for a few weeks, Cirne "realized that he might want to pursue his Ruby idea so he promptly resigned from CA." *Id.* ¶ 129.

After resigning from CA, Cirne joined Benchmark Capital ("Benchmark") as an entrepreneur in residence because he "was not certain what his next step would be." *Id.* ¶ 130. By the end of 2007, Cirne's initial experimenting with Ruby became "more directional" toward a Ruby–on–Rails performance monitoring product delivered through an SaaS model. *Id.* ¶ 132. In February 2008, after Cirne obtained funding from Benchmark, New Relic was incorporated. *Id.* ¶ 138. New Relic released its first product, Rails Performance Monitoring ("RPM"), in June 2008. *Id* . ¶ 139. New Relic's RPM product was developed for the small and medium business market and developers interested in SaaS rather than on-premises delivery. *Id.* ¶ 140. According to New Relic,

Cirne's earlier experimentation with Ruby was the beginning of research toward what, after many revisions by many people, ultimately became the New Relic RPM product. *Id.* ¶ 125.

**\*6** In New Relic's view, Cirne was not obligated to disclose his early research related to CA because he was on unpaid leave of absence, and did the work on his own time and computer. *Id.* ¶ 37. Likewise, his idea for a Ruby product did not relate to CA's business. *Id.* Moreover, New Relic asserts that Cirne voluntarily discussed his plans and ideas related to Ruby with certain CA executives over the years in an effort to be "transparent" with CA. *Id.* ¶¶ 134, 136–37. The parties do not dispute that "CA does not accuse any version of New Relic's Ruby agent of infringement." *Id.* ¶ 149; *see* Plaintiff's Reply to Defendant's Rule 56.1 Counterstatement ("Pl.'s Rule 56.1 Reply") ¶ 149. New Relic further points out that CA does not currently have a Ruby APM product in development. Def.'s Rule 56.1 Counterstmt. ¶ 144.

#### 2. New Relic's Reliance on Cirne's Knowledge or Assistance in Developing New Relic's Java or .NET agents

##### a. The Java Agent

According to New Relic, CA accuses two features of New Relic's Java agent of infringing the Stall Detection Patents: (i) a former stall detection feature; and (ii) certain functionality relating to "Apdex," including byte code instrumentation and Apdex metric data accumulation for selected transactions. *Id.* ¶ 162. According to New Relic, D'Aubin wrote the Java agent with "no assistance whatsoever from Mr. Cirne with respect to the accused Java agent functionality." *Id.* ¶ 163.

More specifically, New Relic asserts that, as CEO of New Relic, Cirne's "role with respect to product development varied depending on the product or the feature." *Id.* ¶ 158. Cirne, Gochee, and Mike Malloy were all involved in the decision to develop the Java agent; however, Cirne was "the primary decision maker." *Id* . ¶ 159. Cirne did some early research work to "enable Java code to connect to [New Relic's] Ruby on Rails data collection service." *Id.* ¶ 160 (quotation marks omitted). Cirne then handed the Java project off to D'Aubin, the engineer primarily responsible for developing the Java agent. *Id.* ¶ 161. New Relic contends that D'Aubin wrote the accused Java agent himself with no assistance from Cirne "with respect to the accused Java agent functionality," *id.* ¶ 163, and that Cirne's "early research had nothing to do with the accused Java agent functionality," *id.*

¶ 164. New Relic further maintains that Cirne: (i) "never got involved in the development of the Java agent to the level of reviewing code," *id.* at ¶ 165; (ii) "did not supervise Mr. D'Aubin," who was supervised by Gochee, *id.* ¶¶ 166, 168; and (iii) "suggested Mr. D'Aubin for the [Java agent] project," but did not make "the ultimate decision" to assign him, *id.* ¶ 167.

According to New Relic, the allegedly infringing stall detection feature was so minor that D'Aubin wrote it into the code for the Java agent without discussing it with anyone. *Id.* ¶ 169. In fact, Cirne testified at his deposition that he was not aware that the stall detection feature was in the Java agent until this lawsuit. *Id.* ¶ 172. New Relic further states that, when it received notice of this lawsuit, it removed the stall detection feature in the Java agent "because it was such an unimportant feature there was no downside to removing it." *Id.* ¶ 182. According to New Relic, removal of the stall feature has "had no impact on customers or revenues." *Id.* ¶ 183.

**\*7** With regard to the Apdex functionality of the Java agent, New Relic similarly contends that D'Aubin wrote that functionality without any assistance from Cirne. *Id.* ¶ 163. As with the stall detection feature, New Relic argues that the Apdex functionality is not an important feature of the Java agent. *Id.* ¶ 186.

#### b. The .NET Agent

With regard to the .NET agent, New Relic asserts that CA accuses certain functionality related to the Apdex, including event monitoring and Apdex metric data accumulation for selected transactions. *Id.* ¶ 176. New Relic claims that sometime in early 2010, D'Aubin suggested that he should also write a NET agent. *Id.* ¶ 173. After discussions with Gochee and D'Aubin, Cirne, as CEO, ultimately approved the decision to develop the .NET agent, but "had no other involvement in its development," according to New Relic. *Id.* ¶ 174. New Relic Points out that "Cirne has never written a program in C sharp ("C# "), the programming language for .NET, so he could not have added any value to the technical development" of the agent. *Id.* ¶ 175. New Relic also asserts that D'Aubin wrote the agent in 2010, including the accused .NET agent functionality. *Id.* ¶¶ 176–77.

Finally, with respect to the accused features of both the Java and .NET agents, New Relic asserts that it has already determined that "there are a number of non-infringing alternatives" available. *Id.* ¶ 187. New Relic contends that it could implement any of these alternatives easily with no more than one month of engineering time, *id.* ¶¶ 187, 189, and that the cost do so would be "trivial," *id.* ¶ 190.

### III. *PROCEDURAL HISTORY*

CA commenced this action against New Relic on November 12, 2012. *See* DE 1. New Relic filed its Answer asserting an affirmative defense of invalidity on January 4, 2013. *See* DE 8. On February 21, 2013, the parties consented to the jurisdiction of a United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c). *See* DE 28, 29. Judge Wiliam D. Wall was then assigned to this case. Upon Judge Wall's retirement, the case was referred to the undersigned for all purposes. *See* DE 93. On May 13, 2014, the parties appeared before this Court for a status conference, during which time the Court set a briefing schedule on the parties' anticipated summary judgment motions. *See* DE 103. After the instant motion was fully briefed and filed under seal on ECF, *see* DE 116–120, 128, the Court heard oral argument and reserved decision, *see* DE 142.

### IV. *LEGAL STANDARD*

#### A. Summary Judgment

"The standard for summary judgment in a patent case is the same as in any other case." *CA, Inc. v. Simple.com, Inc.,* 780 F.Supp.2d 196, 208 (E.D.N.Y.2009) (citing *Desper Prods., Inc. v. QSound Labs, Inc.,* 157 F.3d 1325, 1332 (Fed.Cir.1998)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). In deciding a summary judgment motion, the role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *see, e.g., Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir.2006). A fact is "material" within the meaning of Rule 56 if its resolution "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. A dispute over a fact is "genuine" if "the evidence is such that a reasonable jury, could return a verdict for the nonmoving party." *Id.*

**\*8** The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 322–23; *see, e.g, Zalaski v. City of Bridgeport Police Dept.,* 613 F.3d 336, 340 (2d Cir.2010); *CA, Inc.,* 780 F.Supp.2d at 209 (quoting *Celotex,* 477 U.S. at 323). Once the movant has demonstrated that no genuine issue of material fact exists, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'* " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *Fed.R.Civ.P.* 56(e)) (emphasis in original). However, there must exist more than mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion. *Id.* at 586. That is, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. Thus, only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita,* 475 U.S. at 586. The court deciding a summary judgment motion must draw all reasonable inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 249 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (internal citation omitted).

### B. Assignor Estoppel

"[A]ssignor estoppel is an equitable doctrine that prohibits an assignor of a patent or patent application, or one in privity with him, from attacking the validity of that patent when he is sued for infringement by the assignee." *Semiconductor Energy Lab. Co. v. Nagata,* 706 F.3d 1365, 1369 (Fed.Cir.2013) (citing *Diamond Scientific Co. v. Amrico, Inc.,* 848 F.2d 1220, 1224 (Fed.Cir.1988) ("Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity.")); *see Shamrock Techs., Inc. v. Med. Sterilization, Inc.,* 903 F.2d 789, 793 (Fed.Cir.1990). "Under the doctrine, an assignor sued for infringement may not defend or counterclaim that the patent he assigned is invalid or unenforceable." *Semiconductor Energy,* 706 F.3d at 1370 (citing *Diamond Scientific,* 848 F.2d at 1226). The doctrine is premised upon the "implicit representation by the assignor that the patent rights he

is assigning (presumably for value) are not worthless." *Diamond Scientific,* 848 F.2d at 1224. Thus, "the primary consideration in ... applying the doctrine is the measure of unfairness and injustice that would be suffered by the assignee if the assignor were allowed to raise defenses of patent invalidity." *Id.* at 1225; *see Pandrol USA, LP v. Airboss Railway Products, Inc.,* 424 F.3d 1161, 1166 (Fed.Cir.2005). The decision to apply assignor estoppel in a particular case "requires a balancing of the equities between the parties," a determination which is "committed to the sound discretion of the trial court." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,* 15 F.3d 1573, 1579 (Fed.Cir.1993); *see Checkpoint Sys., Inc. v. All–Tag Sec. S.A.,* 412 F.3d 1331, 1337 (Fed.Cir.2005); *see also Diamond Scientifc,* 848 F.2d at 1225.

**\*9** The assignor estoppel doctrine "also prevents parties in privity with an estopped assignor from challenging the validity of the patent." *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.,* 150 F.3d 1374, 1379 (Fed.Cir.1998) (citing *Diamond Scientific,* 848 F.2d at 1224); *Checkpoint,* 412 F.3d at 1337 (same). "Privity, like the doctrine of assignor estoppel itself, is determined upon a balance of the equities" and is viewed in light of the alleged acts of infringement. *Shamrock,* 903 F.2d at 793; *see Mentor Graphics,* 150 F.3d at 1379. Privity can be found as a matter of law. *See, e.g., Shamrock,* 903 F.2d at 796 (upholding district court's grant of summary judgment on assignor estoppel); *L–3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.,* No. 10–CV–02868, 2014 WL 4695104, at \*5 (D.Colo. Sept. 22, 2014) (finding that the plaintiff is entitled to summary judgment on all but two of the defendants' "affirmative defenses of invalidity on the grounds of assignor estoppel"); *BASF Corp. v. Aristo, Inc.,* 872 F.Supp.2d 758, 774 (N.D.Ind.2012) (assignor estoppel and privity are "question[s] for the court to decide and which can be resolved through summary judgment.").

"Whether two parties are in privity depends on the nature of their relationship in light of the alleged infringement." *Mentor Graphics,* 150 F.3d at 1379; *see L–3 Commc'ns,* 2014 WL 4695104, at \*2 ("The question of privity examines the nature of the relationship between the assignor and the person sought to be estopped, in light of the alleged infringement."); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.,* No. 10–CV–03428, 2012 WL 2326064, at \*4 (N.D.Cal.2012). As the Federal Circuit explained in *Shamrock:*

> If an inventor assigns his invention to his employer Company A and leaves

to join Company B, whether company B is in privity and thus bound by the doctrine will depend on the equities dictated by the relationship between the inventor and company B in light of the act of infringement. The closer that relationship, the more the equities will favor applying the doctrine to company B.

*Shamrock,* 903 F.2d at 793 (emphasis added) (citation omitted); *see Mentor Graphics,* 150 F.3d at 1379. To determine if the relationship is sufficiently close, courts consider all contacts between the inventor-assignor and the defendant company. *See Mentor Graphics,* 150 F.3d at 1379; *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821, 838 (Fed.Cir.1991).

In making a privity determination, the central question is whether the defendant company availed itself of the inventor-assignor's "knowledge and assistance' to conduct the alleged infringement." *Intel Corp.,* 946 F.2d at 839 (quoting *Shamrock,* 903 F.2d at 794); *see. Checkpoint,* 412 F.3d at 1337 (same). "[T]he assignor's mere status as an employee of a competitor does not necessarily warrant a finding of privity," but "[p]rivity may exist in a corporation that is founded by the assignor." *L–3 Commc'ns,* 2014 WL 4695104, at *2 (citing *Shamrock,* 903 F.2d at 793); *see Nortel Networks Inc. v. Foundry Networks, Inc.,* 01–CV–10442, 2003 WL 26476584, at *8–9 (D.Mass. Mar.24, 2003); *see generally Diamond Scientific,* 848 F.2d at 1224 ("The estoppel also operates to bar other parties in privity with the assignor, such as a corporation founded by the assignor."). Moreover, "[p]rivity does not require that the assignor directly design the infringing features of the accused product What is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Brocade,* 2012 WL 2326064, at *5 (internal citations and quotation marks omitted); *see Mentor Graphics,* 150 F.3d at 1379 (finding privity between two companies, even though the assignor company did not assist in developing the accused product); *Synopsys, Inc. v. Magma Design Automation, Inc.,* No. C–04–3923, 2005 WL 1562779, at *6 (N.D.Cal. July 1, 2005) ("The Federal Circuit ... has not required that the assignor be personally involved in designing the allegedly infringing aspects of a product before finding the doctrine of assignor estoppel applicable").

**V. *DISCUSSION***

**\*10** Although the parties agree that Cirne himself is estopped from asserting that the Stall Detection Patents are invalid, *see* Pl.'s Mem. at 9–11; Def.'s Opp. at 16 n. 11; Pl.'s Reply at 2, they dispute whether the record evidence supports a finding of privity as a matter of law between Cirne and New Relic. In determining whether privity exists between an inventor/assignor and another entity for purposes of assignor estoppel, the Court must evaluate "all direct and indirect contacts," *see Mentor Graphics,* 150 F.3d at 1379, and evaluate the relationship between the inventor/assignor and the entity "in light of the act of infringement," *Shamrock,* 903 F.2d at 793. Critical to the determination of privity is whether the company "availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel Corp.,* 946 F.2d at 839 (quoting *Shamrock,* 903 F.2d at 794).

Here, the following facts are undisputed. Cirne is a listed inventor on the Stall Detection Patents which were assigned to CA when it acquired Cirne's previous company Wily. Cirne resigned from CA on July 31, 2007 and went on to found New Relic. Prior to New Relic's incorporation in February 2008, Cirne alone (i) worked on developing the prototype product used to launch the company, (ii) demonstrated that prototype to third parties, and (iii) obtained the initial capital to fund New Relic. Cirne also played a critical role in obtaining subsequent rounds of financing for New Relic's operations. After founding New Relic and becoming its CEO, Cirne hired New Relic's first engineers, including former CA engineers D'Aubin and Gochee. Significantly, Cirne conducted initial research on the accused Java agent before handing that project to New Relic engineers, and he served as "primary decision maker" during the development of that agent. Cirne also approved the decision to develop the accused .NET agent. New Relic commercially released its Java agent in October 2009 and its .NET agent in October 2010. Cirne [Redacted]

In light of these undisputed facts, CA argues that New Relic sufficiently availed itself of Cirne's knowledge and assistance "in developing its APM service and its Java and .NET agents" to justify a finding of privity as a matter of law. Pl.'s Mem. at 14. CA further asserts that Cirne's role as CEO and founder of New Relic, as well as his "significant equity ownership in the company"-both now and when New Relic was developing the accused Java and .NET agents-"establishes a sufficiently close connection, in and of itself, to warrant a finding of privity." *Id.* at 13–14 (citing *Mentor Graphics,* 150 F.3d at 1379). CA therefore maintains that the doctrine of assignor

estoppel bars New Relic from challenging the validity of the Stall Detection Patents.

In response, New Relic argues that, because the record shows that New Relic did not avail itself of Cirne's knowledge or assistance to develop the allegedly infringing functionalities of the accused Java and .NET agents, a genuine issue of fact exists which precludes the application of assignor estoppel against New Relic. *See* Def.'s Opp. at 16. New Relic further argues that where, at a minimum, the parties dispute whether New Relic relied on Cirne's knowledge or assistance to develop the accused functionalities, Cirne's role as founder and CEO of New Relic, by itself, is insufficient to establish privity. *Id.* at 17. New Relic also points to certain "equitable factors" that, in its view, favor denial of CA's motion, including New Relic's assertion that the accused features are minor and could be easily removed. *See id.* at 16.

**\*11** As a preliminary matter, the Court concludes that Cirne's undisputed status as founder and CEO of New Relic, as well as his considerable ownership stake in the company, are factors that weigh in favor of finding privity between Cirne and New Relic. *See Shamrock,* 903 F.2d at 794. In *Shamrock,* the Federal Circuit enumerated several factors which justified a finding of privity in that case, including that (i) the assignor/inventor left the plaintiff company for a highlevel position at the defendant company; and (ii) the assignor/inventor owned shares in the defendant company. *Id.; see Brocade,* 2012 WL 2326064 at \*5. Here, it is undisputed that Cirne left CA and founded New Relic, where he serves as CEO and has acted as the "primary decision maker" in the development of New Relic's accused Java and .NET agents. As in *Shamrock,* the fact that Cirne is "far more than a mere employee" of New Relic supports a finding of privity between the company and Cirne. 903 F.2d at 794; *see Nortel,* 2003 WL 26476584, at \*9 (noting that inventor/assignor's "involvement in the founding of the [defendant] company" as a factor favoring privity under *Shamrock* ); *Eagle Comtronics,* 1991 WL 247551, at \*5 (considering the undisputed fact that the inventor/assignor was a co-founder of the defendant company as a factor leading the court "to the inevitable conclusion that privity exists"); *see also L–3 Commc'ns,* 2014 WL 4695104, at \*3 (finding "fairly clear evidence of privity" between the defendant company and three assignors/inventors who left the plaintiff company to serve in high-level positions with the defendant company, where they "perform the same functions" as they did for the plaintiff); *Brocade,* 2012 WL 2326064, at \*5 (finding that the defendant company "failed to raise a genuine dispute of material fact as to the first *Shamrock* factor" where the

assignor/inventor left the plaintiff company to serve as the defendant's Chief Technology Officer). Moreover, the parties agree that Cirne [Redacted] Although "the Federal Circuit has not set a minimum percentage ownership threshold for a finding of privity," *Brocade,* 2012 WL 2326064, at \*6, it has noted that "[e]ven a party that owns less than a majority of a company's stock can still exercise effective control over the company's operations," which may justify a finding of privity. *Mentor Graphics,* 150 F.3d at 1379; *see also Shamrock,* 903 F.2d at 794 (finding the inventor/assignor's ownership of 50,000 shares of the defendant company's stock, was a factor favoring privity without considering the percentage of ownership). In light of this precedent, the Court finds that Cirne's current and previous ownership stake in New Relic weighs in favor of finding privity between Cirne and New Relic. *See Brocade,* 2012 WL 2326064, at \*6 (finding that, although inventor/assignor's "one million shares or options to purchase shares" constituted "a less than 1% ownership stake" of the defendant company, the factor still "weigh[ed] in favor of a finding of privity"); *Eagle Comtronics, Inc. v. Ne. Filter Co.,* No. 90–CV–573, 1991 WL 247551, at \*5 (N.D.N.Y. Nov.22, 1991) (considering the undisputed fact that the inventor/assignor "was at all times at least a 50% shareholder" as a factor leading the court to conclude that privity exists); *see generally L–3 Commc'ns,* 2014 WL 4695104, at \*3 (considering in the privity analysis the fact that the three inventors/assignors hold stock in the defendant company). [9] Accordingly, the Court concludes that, because New Relic has failed to raise a genuine issue of fact regarding Cirne's status as founder and CEO of New Relic and his ownership stake in the company, these factors support the existence of privity between Cirne and New Relic under the doctrine of assignor estoppel.

**\*12** As noted, the most "significant" factor in the privity analysis "is whether the ultimate infringer availed itself of the inventor's knowledge and assistance to conduct infringement." *Intel Corp.,* 946 F.2d at 839 (quoting *Shamrock,* 903 F.2d at 794). Here, Cirne founded New Relic, conducted initial research on the Java agent, and created the first prototype product eventually used to launch the company. After incorporating New Relic, Cirne acted as the "primary decision maker" in the development of New Relic's accused Java agent, and, as CEO, he approved the decision to develop the accused .NET agent. In other words, Cirne held a "key role" in developing New Relic's Java and .NET agents that are alleged to infringe the Stall Detection Patents. *Synopsys,* 2005 WL 1562779, at \*8. In light of these undisputed facts, the Court concludes that New

Relic sufficiently availed itself of Cirne's knowledge and assistance in developing the accused Java and .NET agents so as to support a finding of privity between New Relic and Cirne.

New Relic contends that, because the parties dispute whether New Relic availed itself of Cirne's knowledge and assistance in developing the alleged infringing functionalities of the accused agents, the Court should decline to find privity between New Relic and Cirne as a matter of law. *See* Def.'s Opp. at 16. However, "[t]he Federal Circuit does not require that the assignor directly design infringing features of an accused product in order to find privity between the assignor and the defendant company." *Brocade,* 2012 WL 2326064, at \*7 (citing *Mentor Graphics,* 150 F.3d at 1379); *see Synopsis,* 2005 WL 1562779, at \*6. This view originates from the Federal Circuit's decision in *Mentor Graphics,* in which the court found privity between two companies even though the assignor, Mentor, had no involvement in the creation of the allegedly infringing product, but only in the marketing and distribution of the product. 105 F.3d at 1376. In that case, Mentor had assigned a patent for hardware emulation technology ("the ′473 patent") to another company, Quicktum. *See id.* Thereafter, Mentor bought a company, Meta, which had developed hardware emulation technology independent of Mentor and Quicktum. *See id.* When Quicktum asserted that Meta's technology infringed the ′473 patent Quicktum had purchased from Mentor, Mentor filed an action for a declaratory judgment of invalidity of the ′473 patent. *See id.* at 1377. The Federal Circuit applied the doctrine of assignor estoppel to bar both Mentor and Meta from challenging the ′473 patent. *See id.* at 1378–79. In doing so, the Federal Circuit found Mentor was barred because it had assigned the patent to Quicktum for value, and that Meta was also barred because it was in privity with Mentor. *See id.* at 1378–79. The court reasoned that privity existed between the two companies because: Mentor owned all of Meta's stock, "giving Mentor considerable control over Meta's operations"; the two companies shared personnel; and Mentor approved Meta's budget. *Id.* at 1379. The court also noted that Mentor acquired Meta for the purpose of marketing the allegedly infringing device in the United States. *Id.* Thus, even though Mentor had no role in creating the allegedly infringing product, other than its marketing and distribution, the Court found Mentor was in privity with Meta for purposes of assignor estoppel. *See id.*

**\*13** Courts applying *Mentor* have consistently held that "[p]rivity does not require that the assignor directly design

the infringing features of the accused product." *Brocade,* 2012 WL 2326064, at \*7 (citing *Mentor Graphics,* 150 F.3d at 1379); *Synopsis,* 2005 WL 1562779, at \*7 (holding that, although the defendant company "contends ... the patent assignor[ ] had little involvement in creating the precise components that are alleged to infringe, *Mentor* demonstrates that assignor estoppel may apply even where the assignor had no involvement at all in creating the infringing technology."); *see also Nortel,* 2003 WL 26476584, at \*8–9 (finding privity between the assignor-founder and his company where the founder oversaw the design of the product's hardware, but the alleged infringement occurred in the product's software, where the assignor was actively involved in the design of his company's products during the relevant time period). Significantly, the district court in *Brocade* further stated that the assignor need not have written code for the infringing device to warrant a finding of privity between the assignor and his company. *See* 2012 WL 2326064, at \*5 ("Moreover, whether or not [the inventor-assignor] actually wrote the code to the accused AX Series is also immaterial.") (citing *BASF Corp.,* 2012 WL 1933700, at \*15 (finding privity between consultant and defendant company, even though consultant did not "actually sit down and operate the [infringing product]")).

In light of this line of cases, New Relic has failed to raise a genuine issue of material fact regarding Cirne's role in alleged infringement which would preclude a finding of privity between New Relic and Cirne. It is undisputed that Cirne, as founder and CEO of New Relic, created the prototype of New Relic's first product, obtained funding so that New Relic could develop that. product, contributed research toward the accused Java agent, and was substantially involved in the decision to develop both of the company's accused agents. Under the circumstances of this case, "[n]o more is required for the application of assignor estoppel." *Synopsys,* 2005 WL 1562779, at \*8. New Relic asserts that it did not avail itself of Cirne's knowledge and assistance to develop the infringing features of the accused agents. However, the relevant case law simply does not require that Cirne be personally and directly involved in developing the infringing functionalities for assignor estoppel to apply against New Relic. Thus, even assuming as true New Relic's assertions that (i) D′Aubin wrote the code for both the stall detection and Apdex functionalities of the accused Java agent without Cirne's involvement; (ii) Cirne was not aware that the accused stall detection feature was in the Java agent until New Relic received notice of this lawsuit; and (iii) Cirne neither wrote code nor assisted D'Aubin in the development

of the .NET agent, Def.'s Opp. at 16–17 (citing Def.'s Rule 56.1 Counterstmt. ¶¶ 157–68, 172, 175, 178), these assertions do not preclude a finding of privity between New Relic and Cirne. *See, e.g., Brocade,* 2012 WL 2326064, at *5, *7. [10] In other words, even if the Court resolved the parties' dispute over Cirne's role in the development of the alleged infringing features in New Relic's favor, this issue would not "affect the outcome of the suit under the governing law" or cause a reasonable jury to return a verdict in favor of New Relic. *Anderson,* 477 U.S. at 248. Accordingly, the Court concludes that, in light of the critical and substantial role Cirne played in founding New Relic (*i.e.,* creating its first prototype and authorizing the development of the accused agents, among other undisputed facts), the record evidence provides sufficient grounds to support a finding that New Relic is in privity with Cirne under the doctrine of assignor estoppel.

**\*14** In further arguing against privity, New Relic asks the Court to consider the broader equities between Cirne and CA, and identifies facts that, in New Relic's view, "tip the equitable balance in favor of New Relic and against application of the assignor estoppel doctrine." Def.'s Opp. at 16. In particular, New Relic points out that

> (i) New Relic kept CA apprised of its product development, (ii) New Relic intentionally focused its products on a different and emerging market, (iii) the allegedly infringing features were known to CA for years before CA accused those features of infringement, and (iv) the accused features are minor and could be easily removed or redesigned[.]

*Id.; see also id.* at 21–22. However, as CA notes in its reply, the determination whether a defendant company is in privity with the inventor and therefore bound by the doctrine of assignor estoppel "depend[s] on the equities dictated *by the relationship between the inventor and [defendant] company,* not the relationship between the inventor and the plaintiff. *Shamrock,* 903 F.2d at 793 (emphasis added). Moreover, "the primary consideration" in applying the doctrine of assignor estoppel is preventing unfairness and injustice to the assignee, *i.e.,* a plaintiff company like CA. *Diamond Scientific,* 848 F.2d at 1225. Here, the Court determines that, for the reasons explained above, the balance of equities as well as the relationship between Cirne and New Relic favor the application of assignor estoppel to bar New Relic from asserting that the Stall Detection Patents are invalid.

In sum, considering the undisputed facts and drawing all reasonable inferences in favor of New Relic as the non-moving party, the Court concludes there is no genuine issue of material fact on the matter of New Relic being in privity with Cirne under the doctrine of assignor estoppel. Accordingly, CA is entitled to partial summary judgment striking New Relic's affirmative defense of invalidity with respect to the Stall Detection Patents based on the principle of assignor estoppel. [11]

### VI. *CONCLUSION*

For the foregoing reasons, CA's motion for partial summary judgment striking New Relic's First Affirmative Defense with respect to the Stall Detection Patents is GRANTED.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1611993

---

**Footnotes**

1       Although New Relic does not dispute this statement of fact, it contends that the evidence cited by CA does not support its factual assertion. Def.'s Rule 56.1 Counterstmt. ¶ 1. New Relic makes this claim in response to several of CA's other statements of fact as well. *See id.* ¶¶ 3, 8, 14, 20. Having reviewed the evidence cited in support of these statements of fact and on the motion as a whole, the Court is satisfied that the

record supports CA's assertions. *See Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003)).

2    This litigation also concerns a third patent held by CA–U.S. Patent No. 7,512,935 B1 (the #935 patent)-which is not in dispute on the instant motion.

3    Here, and in multiple instances throughout its Rule 56.1 Counterstatement, New Relic responds to CA's statement of the facts by stating that the facts are "Undisputed" but that "New Relic objects to and asks the Court to disregard of strike" certain exhibits cited by CA to support its statement and/or certain facts contained within those exhibits. *See, e.g.,* Def.'s Rule 56.1 Counterstmt. ¶¶ 7, 9, 10, 11, 27, 30, 33, 43, 45, 62, 67, 68. Where this occurs, the Court will consider the statement provided by CA as undisputed because New Relic's initial response in each instance is, in fact, "Undisputed." *See Washington v. City of New York,* No. 05 CIV. 8884, 2009 WL 1585947, at *1 n. 2 (S.D.N.Y. June 5, 2009) (taking the statement of relevant facts provided by the defendants "as true" where the plaintiffs initial response in each instance was "Admit, but deny to the extent the statement cites to inadmissible evidence" and finding that, in any event, the challenged evidence "would undoubtedly be admissible at trial"). Furthermore, the Court observes that, to the extent New Relic objects to CA's use of printed statements from New Relic's own website as exhibits-which bear both a time-and-date stamp and URL, and which have been authenticated in a declaration by CA's counsel, *see* Decl. of Matthew K. Gates [DE 118]-those documents are admissible in evidence. *See In re Vitamin C Antitrust Li tig.,* No. 06–MD–1738, 2013 WL 504257, at *5 (E.D.N.Y. Feb. 8, 2013) ("Statements on a website can be considered business records within the scope of Rule 803(6).") (citing *Doctors Med. Ctr. of Modesto v. Global Excel Mgmt., Inc.,* No 08–CV–1231, 2009 WL 2500546, at *9 (E.D.Cal.Aug.14, 2009) (concluding that statements on a party's website were admissible, despite hearsay objections, under the business records exception and as party admissions)); *see also Langbord v. U.S. Dep't of Treasury,* No. CIV.A. 06–5315, 2011 WL 2621310, at *4 (E.D.Pa. July 5, 2011) (holding that "a 2007 printout from the Mint's website listing the 1933 Double Eagle as a circulating coin, is admissible as a statement of a party opponent, no matter what the Mint intended by posting the information.").

4    On this point, New Relic further asserts in its Rule 56.1 Counterstatement that "[t]here are many prior art methods for detecting a stall," Def.'s Rule 56.1 Counterstmt. ¶ 93, and that the Stall Detection Patents, at most, patented specific methods of stall detection, *id.* ¶ 92.

5    This assignment took place in 2002. The #580 Patent, which is a continuation of the #361 Patent, was conveyed to Wily by Cime as part of the assignment of the #361 application. Pl's Rule 56.1 Stmt. ¶ 23 n. 7.

6    According to CA, "[t]he fundamental difference between SaaS and on-premise is that SaaS allows customers to monitor their applications by downloading software agents through a remotely hosted website, whereas on-premise software must be physically installed on the customers' computers in order to monitor their web applications." Pl.'s Rule 56.1 Stmt. ¶ 35 n. 11.

7    Although the parties agree that Cime hired New Relic's first engineers, New Relic disputes CA's characterization that the engineers were "needed to develop New Relic's APM service." Pl.'s Rule 56.1 Stmt. ¶ 54; Def.'s Rule 56.1 Counterstmt. ¶ 54.

8    New Relic agrees with CA's assertion only to the extent that D'Aubin played a critical role in the development of New Relic's Java agent. Def.'s Rule 56.1 Counterstmt. ¶ 56.

9    New Relic correctly notes that Cirne's role as founder/CEO and ownership interest in New Relic alone would not be sufficient to warrant the application of assignor estoppel, which requires the balancing of multiple equitable factors. *See* Def.'s Opp. at 20 n. 17. However, as the Court discusses below, New Relic also availed

itself of Cirne's knowledge and assistance in developing the accused Java and .NET agents, which tips the equitable balance in favor of privity.

10    The Court is unpersuaded by New Relic's attempt to distinguish Cirne from one of the assignors at issue in *Brocade,* who held the title of "Chief Architect" of the defendant company. *See* Def.'s Opp. at 20 20, 20 n. 16. New Relic asserts that the court in *Brocade* found it "immaterial" that the Chief Architect-assignor did not write code for the accused product because, unlike in this case, "the defendant [company] still availed itself of [the assignor's] knowledge and assistance to develop the accused product." *Id.* at n. 16. However, the Court finds that, like the assignor in *Brocade,* New Relic did, in fact, rely on Cirne's knowledge and assistance to conduct the alleged infringement-*i.e.,* to create and develop the accused agents-despite whether Cirne himself developed the infringing features of those agents.

11    New Relic argues in the alternative that, even if it is bound by the doctrine of assignor estoppel, it may still rely on "anticipatory prior art" to defend against CA's infringement claims at trial. Def.'s Opp. at 22–25. CA responds that "[t]his argument is for another day" and notes that, should New Relic attempt to rely on prior art "as a defense to infringement (or for any other purpose), CA will file a motion in limine to exclude that evidence in accordance with the Court's schedule, and New Relic will have an opportunity to respond at that time." CA Reply at 7. Having considered these arguments, the Court concludes that the issue of whether (and to what extent) New Relic may rely on anticipatory prior art as a defense at trial is not ripe for adjudication on this motion.

---

**End of Document**                                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Neural Magic, Inc. v. Meta Platforms, Inc.,   D.Mass., March 6, 2023

2004 WL 3691343

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION

d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.

|

Nov. 29, 2004.

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant, Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion................................................................ 4

A. Standard for Admissibility of Expert Evidence............................... 6

1. Deborah L. Sweeney.......................................................... 9

a. Qualified?................................................................. 9

2. Kevin W. George, M.D........................................................ 10

3. James T. O'Donnell.......................................................... 13

a. General Causation.......................................................... 14

i. Qualified?................................................................. 14

ii. Reliability of Testimony?................................................. 17

b. Specific Causation......................................................... 19

c. Warnings................................................................... 19

i. Qualified?................................................................. 20

ii. Reliability of Testimony?................................................. 22

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

II. Summary Judgment Motion........................................................................................ 24

### Introduction

**\*1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd .,* No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004) (granting defense motion to preclude testimony of plaintiff's expert and declining to consider his report on summary judgment motion).

I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation," i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T. O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse

Case 9:25-cv-00153-DNH-ML     Document 53     Filed 05/05/26     Page 43 of 170

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' ' because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' ' *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts* than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." ' *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community."

Case 9:25-cv-00153-DNH-ML     Document 53     Filed 05/05/26     Page 44 of 170

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

*Id.* (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test." ' *Id.* (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing *Kuhmo,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." ' *Amorgianos,* 303 F.3d at 265 (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]" ' *Id.* at 266 (quoting *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

### 1. Deborah L. Sweeney

#### a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D .N.Y. May 27, 2003) (granting

motion to preclude where plaintiff defaulted); *see also Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

### 2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or

to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

 **\*5**  Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label*

to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way, ...,* of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at \*19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis." ')

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 46 of 170

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

### 3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine—general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

#### a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

#### i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. *Id. at 679.* There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24–25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25–26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967

Case 9:25-cv-00153-DNH-ML     Document 53     Filed 05/05/26     Page 47 of 170

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

### ii. Reliability of Testimony?

**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report at 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only

(1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

### b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

### c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 48 of 170

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

  i. Qualified?
O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See Nora Beverages,* 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See*

Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

 **\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See Kumho Tire,* 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at \*4 (internal quotation marks and citations

omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

ii. Reliability of Testimony?

 **\*11** Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmocologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil] causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert.' " *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

 **\*12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the of doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 50 of 170

Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2004 WL 3691343

---

**Footnotes**

1       The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation, 296 F.Supp.2d 1374* (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel) had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2       During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3       O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." *Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    10

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1   **Social Security** 🔑 Exhaustion of other
    remedies

Representative for a social security payee
failed to exhaust her administrative remedies
before filing her claim since there was no
final decision after a hearing. The Social
Security Administration (SSA) garnished the
representative's wages after attempting to work
out a repayment plan since the representative
was overpaid on behalf of the payee. The
representative contacted the SSA to complain
about the garnishment and shortly thereafter, the
representative filed the action with the Small
Claims Court, without having a hearing or final
order from the Commissioner of Social Security.
Social Security Act, § 205(g), 42 U.S.C.A. §
405(g).

29 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the
Northern District of New York, William H. Pease, Esq.,
Assistant U.S. Attorney, of Counsel, Syracuse, NY.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* action filed
by Donna Este–Green ("Plaintiff") to recover funds allegedly
owed to her by the Social Security Administration, is a motion
by Michael J. Astrue, Commissioner of Social Security
("Defendant") to dismiss the action pursuant to Fed.R.Civ.P.
12(b)(1) for lack of subject matter jurisdiction due to
Plaintiff's failure to exhaust her administrative remedies
before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the
motion. For the reasons set forth below, Defendant's motion
is granted, and Plaintiff's Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**
On or around May 27, 2009, Plaintiff brought this
action in Small Claims Court, City of Ithaca, County
of Tompkins ("Small Claims Court"), naming the Social
Security Administration ("SSA") as Defendant. (Dkt. No. 1,
Part 3.) Liberally construed, Plaintiff's Complaint alleges that
the SSA wrongfully garnished her wages in the amount of
five hundred seventy-one dollars ($571.00). (*Id.*) On June 24,
2009, the United States Attorney's Office for the Northern
District of New York removed this case from the Small
Claims Court, pursuant to the exclusive original jurisdiction
of the District Court under 42 U.S.C. §§ 405(g)-(h) and
1383(c)(3), "because Plaintiff's claim appeared to relate to the
payment of Social Security benefits to her as representative
payee for the account of Albertina King." (Dkt. No. 3.)

**B. Relevant Facts**
In 1999, Plaintiff had been acting as representative payee
for Albertina King, who had been receiving Social Security
benefits under Title II of the Act. (Dkt. No. 3.) In October
1999, the SSA issued an overpayment to Plaintiff on Albertina
King's account. (*Id.*) In March 2001, the SSA and Plaintiff
arranged a repayment plan pursuant to which Plaintiff agreed
to repay the amount due the SSA in fifty-dollar installments
beginning on April 15, 2001. (*Id.*) In October 2007, the
SSA sent a letter to Plaintiff, in which the SSA stated the
following: (1) Plaintiff had been overpaid as representative
payee; (2) Plaintiff had the right to question the decision
about her overpayment and to ask that the SSA not recover

the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of

Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing this action. [4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

Este-Green v. Astrue, Not Reported in F.Supp.2d (2009)

---

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is *DISMISSED.* The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

---

**Footnotes**

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 5191506
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bryant GIBBS, Plaintiff,
v.
Christopher GADWAY, Defendant.

9:19-CV-281 (GTS/DJS)
|
Signed 10/15/2019

**Attorneys and Law Firms**

BRYANT GIBBS, 11-R-0220, Plaintiff, Pro Se, Five Points Correctional Facility, Caller Box 119, Romulus, New York 14541.

HON. LETITIA JAMES, Attorney General of the State of New York, OF COUNSEL: NICHOLAS L. ZAPP, ESQ., Assistant Attorney General, Attorney for Defendant, The Capitol, Albany, New York 12224.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** Plaintiff, presently an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this *pro se* action pursuant to 42 U.S.C. § 1983, alleging the violation of his constitutional rights. Dkt. No. 1, Compl. Following initial review of the Complaint under 28 U.S.C. §§ 1915(e) and 1915A, all claims other than an Eighth Amendment excessive force claim against Defendant Gadway were dismissed. Dkt. No. 7. In lieu of answering the Complaint, Defendant has moved for summary judgment based on Plaintiff's alleged failure to exhaust his administrative remedies. Dkt. No. 14. Plaintiff opposes the Motion. Dkt. No. 17 ("Pl.'s Opp."). Defendant has filed a Reply. Dkt. No. 18. For the reasons which follow, the Court recommends that the Motion for Summary Judgment be granted.

## I. BACKGROUND

Plaintiff alleges that he was assaulted by Defendant Gadway in June 2016. Compl. at p. 2. That same month Plaintiff filed an administrative grievance making this same allegation. Dkt. No. 14-3, Declaration of Christine Gregory ("Gregory Decl.") at Ex. B. Given that the grievance concerned alleged staff misconduct the grievance was forwarded directly to the facility Superintendent. Gregory Decl. at ¶ 12. On July 16, 2016, the Superintendent responded to the grievance. *Id.* at ¶ 12 & Ex. C. Plaintiff alleges that he then appealed the Superintendent's determination to DOCCS' Central Office Review Committee. Pl.'s Opp. at pp. 4-5. DOCCS has no record of any such appeal. Gregory Decl. at ¶ 15; Dkt. No. 14-4, Declaration of Rachael Seguin ("Seguin Decl."), ¶ 9 & Ex. A.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

**\*2** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.

Gibbs v. Gadway, Not Reported in Fed. Supp. (2019)

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 55 of 170

1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Defendant seeks summary judgment on the ground that Plaintiff failed to exhaust his available administrative remedies by failing to appeal the facility-level denial of his grievance. Dkt. No. 14-1, Def.'s Mem. of Law at pp. 6-7. Plaintiff counters that he attempted to exhaust his administrative remedies and that, even if he did not, he should be excused from the exhaustion requirement. Pl.'s Opp. at pp. 4-5.

### A. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of

the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999).

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

**\*3** An expedited procedure exists for grievances regarding alleged harassment; this procedure also requires the grievant receive a response from CORC in order to exhaust. 7 N.Y.C.R.R. § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a bona fide case of harassment. *Id.* at §§ 701.8(b) & (c).

### B. Plaintiff's Failure to Exhaust Administrative Remedies

*1. Whether Plaintiff Actually Filed a Grievance*

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 56 of 170

Gibbs v. Gadway, Not Reported in Fed. Supp. (2019)

The record before the Court establishes that while DOCCS has a record of Plaintiff's initial grievance, there is no record of any appeal of the decision on that grievance to CORC. Gregory Decl. at ¶ 15; Seguin Decl., ¶ 9 & Ex. A. "Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit." *White v. Drake*, 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011), *report and recommendation adopted*, 2011 WL 4478921 (N.D.N.Y. Sept. 26, 2011); *see also Berkley v. Ware*, 2018 WL 3736791, at *5 (N.D.N.Y. July 6, 2018), *report and recommendation adopted*, 2018 WL 3730173 (N.D.N.Y. Aug. 6, 2018) (citing cases).

Plaintiff makes a purely conclusory allegation that he appealed the grievance denial to CORC. Pl.'s Opp. at p. 4 ("Plaintiff appealed to the CORC"). [1] Significantly, Plaintiff has not provided a copy of the grievance appeal or even asserted on what date he filed the appeal. *Gough v. Morris*, 2018 WL 7199494, at *3 (N.D.N.Y. Dec. 14, 2018), *report and recommendation adopted*, 2019 WL 416150 (N.D.N.Y. Feb. 1, 2019) ("there is no evidence in Plaintiff's opposition, or any other submission, of ... Plaintiff's alleged appeal to CORC."). In light of the documented proof that no such appeal was filed, such a conclusory statement is insufficient to create a material question of fact on this Motion. *Toliver v. Stefinik*, 2016 WL 3349316, at *6 (N.D.N.Y. June 15, 2016); *Richardson v. Eberth*, 2016 WL 1271078, at *4 (W.D.N.Y. Mar. 29, 2016).

Under these circumstances, the record before the Court establishes that Plaintiff did not fully appeal his grievance regarding the alleged assault by Gadway. He, therefore, did not exhaust his administrative remedies.

### 2. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court stated in *Ross*, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where

the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

**\*4** Plaintiff appears to make two arguments for finding that administrative remedies were unavailable to him: the lack of guidance in DOCCS' grievance procedure and alleged threats made against him. Pl.'s Opp. at p. 5. Neither is sufficient to defeat the pending Motion.

Plaintiff first claims that when he became aware that the appeal he claims to have filed was never received by CORC he looked to DOCCS's grievance procedure "for guidance on what to do ... and found no guidance whatsoever on what the next step would be." Pl.'s Opp. at p. 5. Relying on *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016), he contends he should be excused from the exhaustion requirement. *See* Pl.'s Opp. at p. 3.

At the outset, this case presents a readily distinguishable fact pattern from that which the Second Circuit was confronted with in *Williams*. In that case, the District Court had dismissed the complaint based on lack of exhaustion because Plaintiff had not administratively appealed his grievance, even though the grievance had never been officially filed by DOCCS personnel at the correctional facility. *Williams v. Priatno*, 829 F.3d at 121. The Second Circuit reversed, finding that DOCCS' grievance procedures "do not describe a mechanism for appealing a grievance that was never filed." *Id.* at 126. On the contrary here, there is no dispute that Plaintiff filed a grievance at the facility and that he received a response. Gregory Decl., Exs. B & C. It is also clear that DOCCS regulations specifically address what should have been done in a situation such as this when an appeal has allegedly been filed, but not responded to. Specifically, the applicable regulation provides that "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC." 7 N.Y.C.R.R. § 701.5(d)(3)(i). This provision provided specific guidance to Plaintiff on how to proceed - when he did not receive notice that his appeal had been received by CORC he should have contacted the facility inmate grievance staff to verify that his appeal had been received and processed. There is no evidence that Plaintiff did so here and his failure cannot provide the basis for excusing him from the exhaustion requirement. This is not a situation,

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 57 of 170

Gibbs v. Gadway, Not Reported in Fed. Supp. (2019)

as in *Williams*, where the procedure was "so opaque and confusing" that the Plaintiff could have not understood how to proceed. *Williams v. Prianto*, 829 F.3d at 126.

Finding Plaintiff's claims unexhausted is consistent with the decision in *Gizewski v. New York State Dep't of Corr. and Cmty. Supervision* which found that an inmate's claim is not exhausted if he fails to avail himself of the procedure in section 701.5(d)(3)(i). 2016 WL 3661434, at *13 (N.D.N.Y. July 5, 2016). In *Gizewski*, the record established that the plaintiff had filed an administrative appeal, but DOCCS personnel had failed to timely forward it to CORC. *Id.* at *3. Plaintiff then filed his federal lawsuit before receiving a decision on the appeal from CORC. *Id.* at *13. The Court acknowledged DOCCS' failure to properly process the appeal, but nonetheless granted judgment to defendants in part because "Plaintiff [wa]s also at fault for not taking any further action" pursuant to section 701.5. *Id.* Plaintiff here has a less compelling case than in *Gizewski* since there is no admissible evidence that he ever, in fact, filed an appeal to CORC.

 **\*5**  Plaintiff also claims that he was threatened and retaliated against by Defendant. Pl.'s Opp. at p. 5. Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. *Ross v. Blake*, 136 S. Ct. at 1860, n.3. Plaintiff's allegations are entirely conclusory, however. Plaintiff's Complaint claimed he was threatened only *after* filing the grievance, Compl. at p. 1, and he makes no claim that this alleged threat impacted his ability to appeal the grievance. *McGinnis v. Crissell*, 2019 WL 4395410, at *6 (N.D.N.Y. Apr. 26, 2019), *report and recommendation adopted*, 2019 WL 3228867 (N.D.N.Y. July 18, 2019) (citing cases). There is no specific allegation made by Plaintiff at all that any retaliatory action was ever taken against him as a result of filing the grievance. Such "general and conclusory statements that he was threatened are insufficient to raise a triable issue of fact as to the unavailability of the grievance procedure because of intimidation by prison administrators." *Lewis v. Wasielewski*, 2018 WL 4732755, at *6 (W.D.N.Y. July 10, 2018), *report and recommendation adopted*, 2018 WL 4692476 (W.D.N.Y. Oct. 1, 2018) (citing cases). Plaintiff's conclusory claims, therefore, are no basis for denying summary judgment.

To the extent Plaintiff attempts to argue that his grievance appeal may have been tampered with, Pl.'s Opp. at p. 5 ("Once [inmate mail] is picked up plaintiff no longer has any control over what happens to that piece of mail."), his conclusory allegation in this regard is not sufficient to defeat summary judgment. "Courts have consistently held [ ] that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." *Rosado v. Fessetto*, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010); *see also Rodriguez v. Cross*, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations."); *Artis v. Dishaw*, 2016 WL 11266599, n.13 (N.D.N.Y. Sept. 12, 2016) (finding that plaintiff's failure to exhaust was not excusable, in part because, while the plaintiff "state[d] that some grievances were destroyed, but he has not submitted any copies of these grievances, nor does he specify when he attempted to file them.").

Accordingly, the Court finds that Plaintiff has not established an issue of material fact as to the availability of administrative remedies. The Court therefore recommends that Defendants' Motion be **granted** based upon Plaintiff's failure to exhaust.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 14) be **GRANTED**; and it is further

**RECOMMENDED**, that the Complaint be **DISMISSED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**Gibbs v. Gadway, Not Reported in Fed. Supp. (2019)**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5191506

---

## Footnotes

1    Plaintiff did not submit a sworn statement attesting to the fact that he filed an appeal. Nor did he file a response to Defendant's Statement of Material Facts. Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Marino v. Watts*, 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018), *report and recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018), *aff'd*, 764 Fed. Appx. 73 (2d Cir. 2019). The Court therefore will deem the facts as set forth in Defendant's Statement of Material Facts admitted, to the extent they are properly supported by the record.

---

**End of Document**                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 59 of 170

Gibbs v. Gadway, Not Reported in Fed. Supp. (2020)

**2020 WL 1227156**
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bryant GIBBS, Plaintiff,
v.
Christopher L. GADWAY, Corr.
Officer, Clinton Corr. Fac., Defendant.

9:19-CV-0281 (GTS/DJS)
|
Signed 03/13/2020

**Attorneys and Law Firms**

BRYANT GIBBS, 11-R-0220, Plaintiff, Pro Se, Five Points
Correctional Facility, Caller Box 119, Romulus, New York
14541.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, OF COUNSEL: NICHOLAS LUKE ZAPP,
ESQ., Assistant Attorney General, Counsel for Defendant,
The Capitol, Albany, New York 12224.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

 **\*1**  Currently before the Court, in this *pro se* prisoner
civil rights action filed by Bryant Gibbs ("Plaintiff")
against Christopher L. Gadway, a corrections officer
at Clinton Correctional Facility ("Defendant"), are (1)
United States Magistrate Judge Daniel J. Stewart's Report-
Recommendation recommending that Defendant's motion for
summary judgment be granted, and (2) Plaintiff's Objection
thereto. (Dkt. Nos. 19, 22.) For the reasons set forth below,
the Report-Recommendation is accepted and adopted in its
entirety, and Defendant's motion is granted.

As a threshold matter, the Court finds that Plaintiff's Objection
is untimely. Although the Objection is undated (Dkt. No.
22, at 20), its envelope is post-marked November 5, 2019
(Dkt. No. 22, Attach. 1, at 1). Even if the Court were to
assume that Plaintiff handed the envelope to correctional
officer for mailing before November 5, 2019, he could not
have done so before November 2, 2019, which is the date on
which he had an enclosed affidavit and affirmative of service
notarized (Dkt. No. 22, at 24, 26). The deadline for Plaintiff's

Objection to the Report-Recommendation (which was mailed
to him on October 15, 2019), was November 1, 2019. [1]  As
a result, no timely Objection has been filed to the Report-
Recommendation; and the Objection is thus entitled to merely
a clear-error review, [2]  which the Court finds it easily satisfies
for the cogent reasons stated therein (*see generally* Dkt. No.
19).

In any event, even if the Court were to accept Plaintiff's
untimely Objection, the Court would still accept and adopt the
Report-Recommendation. The thrust of Plaintiff's Objection
is an attempt to adduce evidence (specifically, sworn
testimony and a letter) showing that he had submitted to
the Central Office Review Committee (or "CORC") a timely
appeal from the superintendent's denial of his grievance.
(*See, e.g.,* Dkt. No. 22, at 21-24 [containing Plf.'s Affidavit];
Dkt. No. 22, at 25 [containing a letter from Plaintiff to
CORC]; Dkt. No. 22, at 1-20 [containing Plf.'s verified
Objections].) However, none of this evidence was submitted
to Magistrate Judge Stewart. (*Compare id. with* Dkt. No. 17
[Plf.'s Response to Def.'s Motion for Summary Judgment].)
This failure is inexcusable given the specific notice that
Plaintiff was *twice* given of the consequences of evidentiary
deficiencies in his response to Defendant's motion. (Dkt. No.
14, at 3; Dkt. No. 15.) A district court may, and ordinarily
does, refuse to consider evidentiary material that could have
been, but was not, presented to the magistrate judge in the first
instance. [3]  Although Plaintiff asserts that "[i]t wasn't until
recently that [he] ... found a copy of the ... letter that he ...
[had] written to the Central Office Review Committee" (Dkt.
No. 22, at 14), he makes no showing that his failure to
discover the letter sooner occurred despite his exercise of
due diligence. Moreover, he does not even attempt to excuse
his failure to submit his sworn testimony to Magistrate
Judge Stewart. Under the circumstances, the Court finds
that considering Plaintiff's late-blossoming evidence would
frustrate the purpose of the Federal Magistrates Act of 1968.

 **\*2**  Finally, even if the Court were to consider this late-
blossoming evidence, the Court would be forced to reject it.
Ordinarily, of course, a district court may not make credibility
determinations on a motion for summary judgment. However,
that general rule contains an exception: where, as here,
the non-movant has adduced evidence that is so internally
contradictory that no reasonable juror would undertake the
suspension of disbelief necessary to credit the non-movant's
allegations. *See Jeffreys v. City of New York,* 426 F.3d 549,
554-55 (2d Cir. 2005) (setting forth applicable standard
for when to disregard testimony on motion for summary

Gibbs v. Gadway, Not Reported in Fed. Supp. (2020)

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 60 of 170

judgment). In such a circumstance, the district court *must* make a credibility determination because the very act of considering the portion of evidence that would create a genuine dispute of material fact would constitute a rejection of the contradictory evidence as not credible. Here, the facts are analogous to the extreme facts present in *Jeffreys*. Plaintiff has adduced evidence that purports to show both (1) that immediately *after* the superintendent's denial of his grievance on July 16, 2016, Plaintiff filed an appeal with CORC (Dkt. No. 22, at 3, 22), and (2) "over two months" *before* July 16, 2016, Plaintiff filed his appeal with CORC, then (approximately a month later) sent a letter complaining about its non-response to his appeal, and then (on July 16, 2016) sent a second such letter (Dkt. No. 22, at 25). It is undisputed that Plaintiff filed his grievance on June 13, 2016. (Dkt. No. 14, Attach. 2, at ¶ 17.) It is also undisputed that the superintendent denied that grievance on July 16, 2016. (*Id.* at ¶ 19.) It is simply impossible that Plaintiff appealed that denial two months *before* July 16, 2016 (or on or about May 16, 2016).

For each of these three alternative reasons, the Court rejects Plaintiff's Objection and accepts and adopts Magistrate Judge Stewart's Report-Recommendation.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Stewart's Report-Recommendation (Dkt. No. 19) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 14) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1227156

---

## Footnotes

1    Under the applicable rules, the time period for the filing of an Objection is fourteen (14) calendar days from the date of filing of the Report-Recommendation (unless the fourteenth day is a Saturday, Sunday, or legal holiday, in which case the period continues to run until then end of the next day that is not a Saturday, Sunday, or legal holiday), plus three (3) calendar days if the Report-Recommendation was served on the objecting party by mail. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); N.D.N.Y. L.R. 72.1(c); Fed. R. Civ. P. 6(a)(1)(C); Fed. R. Civ. P. 6(d).

2    "When no timely objection [to a recommendation] is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, the court is permitted to adopt the sections reviewed "so long as those sections are not facially erroneous." *See Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.").

3    *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in

the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1906029
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Diane F. GOLDSTICK, Plaintiff,
v.
THE HARTFORD, INC., et ano., Defendants.

No. 00 Civ. 8577(LAK)
|
Aug. 19, 2002.

**Synopsis**
Defendants moved to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint. The District Court, Kaplan, J., held that statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative.

Motion granted in part.

West Headnotes (1)

[1] **Summary Judgment** ⚷ Form and requisites

Plaintiff's statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative, the object of which was to "spin" the impact of the admissions plaintiff had been compelled to make; additionally, statement was 41 pages long, a manifest evasion of the page limitation. Local Civ. R. 56.1.

76 Cases that cite this headnote

ORDER

KAPLAN, J.

**\*1** Defendants move to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint, on the ground that it fails to comply with Local Civ. R. 56.1 in that it goes beyond admitting or denying that the propositions of fact set forth in defendants' Rule 56.1 Statement in fact are undisputed and contains a great deal of extraneous, argumentative material, much allegedly based on inadmissible evidence.

"A proper 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to the movant's 56.1 statement, much like an answer to a complaint. If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention. It is permissible for the non-movant to provide a separate statement, apart from this paragraph-by-paragraph response, in which it lists other facts it claims to be in dispute. However, this separate statement is *not* a substitute for the paragraph-by-paragraph response. The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from this separate statement the pieces of evidence which would support the contentions of the non-movant asserted in its paragraph-by-paragraph response without citation.

"*Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions, and they should be neither the source nor the result of 'cut-and-paste' efforts with the memorandum of law. A rule 56.1 statement that contains the same turns of phrase, if not the identical whole paragraphs, as the memorandum of law is improper." *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP,) 1999 WL 459813, \*1 n. 3 (S.D.N.Y. June 29, 1999).

The plaintiff's Rule 56.1 Statement here does not comply with the rule. While in most cases it does admit or deny defendants' descriptions of the allegedly uncontested facts on a paragraph-by-paragraph basis, it adds argumentative and often lengthy narrative in almost every case the object of which is to "spin" the impact of the admissions plaintiff has been compelled to make. In consequence, the response to the 84 number assertions set forth in defendants' Rule 56.1 Statement is 41 pages long and, whether so intended or not, a manifest evasion of the page limitation on plaintiff's memorandum in opposition to the motion for summary judgment.

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 63 of 170

**Goldstick v. The Hartford, Inc., Not Reported in Fed. Supp. (2002)**

Accordingly, defendants' motion is granted to the extent that so much of plaintiff's responses as consists of anything more than (a) the admission or denial of the assertions set forth in defendants' Rule 56.1 Statement and the citations to the record, and (b) the section headed "additional facts" is stricken. It is denied in all other respects.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2002 WL 1906029

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 64 of 170

2021 WL 981849
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Robert JACKSON, Plaintiff,
v.
C.O. Angela JACKSON, et al., Defendants.

16-CV-08516 (PMH)
|
Signed 03/16/2021

**Attorneys and Law Firms**

Robert Jackson, Beacon, NY, pro se.

Amanda Yoon, NYS Office of the Attorney General, New York, NY, Rebecca Lynn Johannesen, Colorado Department of Law, Denver, CO, for Defendants.

### MEMORANDUM OPINION AND ORDER

PHILIP M. HALPERN, United States District Judge:

**\*1** Plaintiff Robert Jackson ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, brings this action under 42 U.S.C. § 1983 against Correction Officers Angela Jackson, M. Walker, and J. James (collectively, "Defendants"). (Doc. 2, "Compl."). Specifically, Plaintiff alleges that in June 2015 —while incarcerated at Sing Sing Correctional Facility in Ossining, New York ("Sing Sing")—Defendants violated his constitutional rights by: (1) using excessive force against him, in violation of the Eighth Amendment; and (2) filing a false internal complaint against him, in violation of the Fourteenth Amendment. (*See generally id.*).

On July 10, 2017, Defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's due process claim along with all claims for monetary damages against them in their official capacities. (Doc. 16). By Opinion & Order dated April 20, 2018, Judge Román granted Defendants' motion and granted Plaintiff leave "to file an Amended Complaint ... on or before June 19, 2018." (Doc. 19 at 8). Despite securing an extension of the time within which to file his amended pleading, Plaintiff failed to do so. Consequently, the only claim remaining in this action is one for excessive force against Defendants in their individual capacities.

Defendants filed an Answer on August 30, 2018 (Doc. 22) and, with leave of Court, filed an Amended Answer on October 2, 2019. (Doc. 29, "Am. Ans."). Shortly thereafter, in an Order issued on October 22, 2019, Judge Román "waive[d] the Initial Pre-trial Conference and direct[ed] the parties to confer and complete a Case Management Plan and Scheduling Order...." (Doc. 30). Although Plaintiff filed a proposed discovery plan on November 19, 2019 (Doc. 32), Defendants filed a letter the following day to request both an extension of time within which to submit a proposed discovery schedule and a pre-motion conference to discuss an anticipated motion for summary judgment on the sole issue of administrative exhaustion (Doc. 31). There was no further activity on the docket in this case until it was reassigned to this Court in April 2020. [1]

On April 13, 2020, the Court granted Defendants' request, set a briefing schedule for the extant summary judgment motion, and directed Defendants to mail a copy of that Order to Plaintiff; Defendants filed an affidavit of service the same day. (Doc. 33; Doc. 34). Approximately one month later, on May 6, 2020, Defendants filed a letter requesting an extension of the briefing schedule. (Doc. 36). In that letter, Defendants noted also that upon "conferr[ing] with the New York State Division of Parole," they had learned that Plaintiff had been released from custody and was believed to be residing at an address in New York, New York. (*Id.*). In an endorsement dated May 7, 2020, the Court granted Defendants' request to extend the briefing schedule and directed Defendants to serve a copy of that Order on Plaintiff; Defendants filed an affidavit of service the next day indicating that the Order had been mailed to Plaintiff's address in New York City. (Doc. 37; Doc. 38).

**\*2** Defendants filed their motion for summary judgment on June 15, 2020. (Doc. 39; Doc. 40, "Def. Br."). On July 23, 2020, Defendants filed a letter noting that Plaintiff's time to oppose the pending motion had passed and requesting that the Court consider the motion unopposed. (Doc. 44). The Court endorsed the letter on July 24, 2020, extended Plaintiff's time to file an opposition to August 24, 2020 *sua sponte*, and advised that "[i]f plaintiff fails to file his opposition by August 24, 2020, the motion will be deemed fully submitted and unopposed." (Doc. 45). The Court also instructed Defendants to serve a copy of that Order on Plaintiffs (*id.*); Defendants filed an affidavit of service that reflected mailings to both Fishkill and the address in New York City shortly thereafter. (Doc. 46). The Court has received no communications from

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 65 of 170

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

Plaintiff since November 2019 and, as such, considers the motion fully submitted and unopposed.

For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

The facts, as recited below, are taken from the Complaint, Defendants' Local Civil Rule 56.1 Statement (Doc. 42, "56.1 Stmt."), and the admissible evidence submitted by the parties. [2]

### I. The Underlying Incident

Plaintiff's factual allegations, *in toto*, are as follows:

> After an arguement [sic] with C.O. Jackson in the messhall[,] I was taken to the bridge area where the defendants beat me into a seizure, then fabricated a misbehavior report to justify their actions.

(Compl. at 4). Plaintiff maintains that this incident occurred on June 4, 2015. (*Id.*).

### II. Plaintiff's Grievance

Plaintiff filed the Grievance on June 17, 2015. (Quick Aff. ¶ 9; Quick Ex. B). Therein, Plaintiff complained that as he "was walking out [of] the messhall" on June 4, 2015, "C.O. Ms. Jackson and ... other[s] ... beat me down...." (Quick Ex. B). On August 14, 2015, following an investigation into Plaintiff's complaint, the Sing Sing Superintendent issued a written decision denying the Grievance. (Quick Aff. ¶ 11; Quick Ex. C). In full, the Superintendent's written decision reads as follows:

Grievant claims staff harassment.

The grievant was interviewed by a supervisor. The grievant had nothing further to add to his original complaint and provided no witnesses.

Staff involved were interviewed and provided a written report denying the allegations of wrongdoing or harassing the grievant.

Based on the investigation conducted, insufficient evidence could be found to substantiate the grievant [sic] allegations. Grievance is denied.

(Quick Ex. C). The Superintendent's decision advised that Plaintiff had seven days to appeal the determination to CORC, should he choose to do so (*id.*); however, there is no record that Plaintiff ever appealed to CORC (Quick Aff. ¶ 12; Seguin Aff. ¶¶ 6-7; Seguin Ex. B).

## STANDARD OF REVIEW

**\*3** Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at \*1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial...." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 66 of 170

"resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts...." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when ... law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant ... is proper"). This standard applies equally to claims for relief and affirmative defenses. *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010) ("The same standard applies whether summary judgment is granted on the merits or on an affirmative defense...."). [3]

 **\*4** The Court is, of course, mindful that "[*p*]*ro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." *Mortimer v. City of New York*, No. 15-CV-7186, 2018 WL 1605982, at *9 (S.D.N.Y. Mar. 29, 2018) (internal quotation marks omitted). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff," *Adams v. George*, No. 18-CV-2630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020), but the mere fact that a litigant is *pro se* "does not relieve the plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment," *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50

(2d Cir. 2003) (internal quotation marks omitted). Where, as here, a *pro se* litigant fails to oppose a motion for summary judgment, the motion may be granted as unopposed only "if: (1) the plaintiff has received adequate notice that failure to file any opposition may result in dismissal of the case; and (2) the Court is satisfied that the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *McNair v. Ponte*, No. 17-CV-2976, 2020 WL 3402815, at *3 (S.D.N.Y. June 18, 2020) (quoting *Warren v. Chem. Bank*, No. 96-CV-6075, 1999 WL 1256249, at *2 (S.D.N.Y. Dec. 22, 1999)). [4]

## ANALYSIS

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted." 42 U.S.C. § 1997e(a). This provision "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," *Hernández v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), and it is " 'mandatory': [a]n inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S.Ct. 1850, 1856 (2016) (citation omitted). "Moreover, the PLRA 'requires proper exhaustion, which means using all steps that the prison grievance system holds out.' " *Ayala-Rosario v. Westchester Cty.*, No. 19-CV-3052, 2020 WL 3618190, at *4 (S.D.N.Y. July 2, 2020) (quoting *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016)). This "means that 'prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself.' " *Gottesfeld v. Anderson*, No. 18-CV-10836, 2020 WL 1082590, at *6 (S.D.N.Y. Mar. 6, 2020) (quoting *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012)). Accordingly, the Court looks to the process available to Plaintiff. *See Dinkins v. New York*, No. 19-CV-08447, 2020 WL 5659554, at *6 (S.D.N.Y. Sept. 23, 2020).

There are three levels of review for inmate grievances at Sing Sing. *See generally Amador v. Andrews*, 655 F.3d 89, 96-97 (2d Cir. 2011) (outlining the three-step process). First, a grievance is reviewed by the Inmate Grievance Resolution Committee ("IGRC"), a facility-level body consisting of

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 67 of 170

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

inmates and facility staff members. (Quick Ex. A §§ 701.4, 701.5(a)-(b); Senguin Ex. A §§ 701.4, 701.5(a)-(b)). Second, should the inmate be dissatisfied with the IGRC's determination, he may appeal that decision to the Superintendent. (Quick Ex. A § 701.5(c); Senguin Ex. A § 701.5(c)). Finally, if the Superintendent's conclusions are unfavorable, the inmate may appeal that decision to CORC. (Quick Ex. A § 701.5(d); Senguin Ex. A § 701.5(d)). However, when a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance. (*See* Quick Ex. A § 701.8; Senguin Ex. A § 701.8). Both the Superintendent and CORC are required to "date stamp all" grievances or appeals forwarded to them for review (Quick Ex. A §§ 701.5(c)(3), 701.5(d)(3)(i); Senguin Ex. A §§ 701.5(c)(3), 701.5(d)(3)(i)) and require entities to maintain files "for the current calendar year plus the previous four calendar years" (Quick Ex. A § 701.6(k)(3); Senguin Ex. A § 701.6(k)(3)).

 **\*5** Quick represents, as custodian of records maintained by the IGP at Sing Sing, that grievances "are collected from the IGRC mailbox and processed" daily, in accordance with DOCCS procedures. (Quick Aff. ¶ 5). Quick's records reveal that Plaintiff filed the Grievance on June 17, 2015, that the Grievance was forwarded directly to the Superintendent as one concerning staff harassment, and that the Superintendent performed an investigation and issued a written decision denying the Grievance on August 14, 2015. (*Id.* ¶¶ 9-11;

Quick Ex. B). However, both Quick and Seguin represent affirmatively that they have no record of Plaintiff taking the final step of appealing the Superintendent's decision to CORC. (Quick Aff. ¶12; Seguin Aff. ¶¶ 6-7).

Even while granting Plaintiff—who filed nothing in opposition to this motion, and, in fact, has filed nothing in this case at all since November 2019 (*see* Doc. 32)—every conceivable benefit of the doubt to which a *pro se* litigant is entitled, there is no genuine issue of material fact on the instant motion. Consequently, summary judgment is proper here because: (1) Defendants established that Plaintiff failed to exhaust his administrative remedies and, as such, also their entitlement to summary judgment on the affirmative defense of Plaintiff's failure to exhaust his administrative remedies as required by the PLRA; and (2) Plaintiff was warned that failure to file an opposition would result in the Court concluding that the motion was unopposed. [5]

## CONCLUSION

Based upon the foregoing, the motion for summary judgment is GRANTED.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 981849

---

### Footnotes

1    There are two docket entries reflecting reassignment of this matter from Judge Román to this Court on different dates. (*See* Apr. 3, 2020 Entry; Apr. 13, 2020 Entry).

2    In support of the instant motion, defense counsel filed a Declaration annexing two affidavits (with exhibits) for the Court's consideration. (Doc. 41). The first affidavit is from Quandera T. Quick ("Quick"), the Inmate Grievance Program ("IGP") Supervisor at Sing Sing. (Doc. 41-1, "Quick Aff." ¶ 1). This affidavit attaches as exhibits copies of: (1) New York State Department of Corrections and Community Supervision Directive ("DOCCS") No. 4040 (*id.* 5-21, "Quick Ex. A"); (2) Plaintiff's June 4, 2015 Grievance ("Grievance") (*id.* at 22-23, "Quick Ex. B"); and (3) the written decision issued by Michael Capra, Sing Sing's Superintendent, on August 14, 2015 (*id.* at 24-25, "Quick Ex. C"). The second affidavit is from Rachael Seguin ("Seguin"), the Assistant Director of the IGP for DOCCS and custodian of records for the Central Office Review Committee ("CORC"). (Doc. 41-2, "Seguin Aff."). This affidavit attaches as exhibits copies of: (1) DOCCS Directive No.

4040 (*id.* at 4-20, "Seguin Ex. A"); and (2) the results of a search for appeals filed with the CORC (*id.* at 21-23, "Seguin Ex. B").

3    "[T]he failure to exhaust administrative remedies in compliance with the [Prison Litigation Reform Act] is an affirmative defense" and it "may be waived" by a defendant who fails to raise it. *Banks v. Cty. of Westchester*, 168 F. Supp. 3d 682, 693 n.3 (S.D.N.Y. 2016) (internal quotation marks omitted). Here, Defendants' Fourth Affirmative Defense was failure to comply with 42 U.S.C. § 1997e. (Am. Ans. ¶ 14).

4    Given the Court's conclusion that there is no genuine issue of material fact as to exhaustion, it does not need to reach Defendants' request for an evidentiary hearing should the Court find otherwise.

5    Even if the Court did not grant Defendants' motion for summary judgment, it would dismiss the action with prejudice under Federal Rule of Civil Procedure 41(b) as a result of Plaintiff's failure to prosecute this action. Indeed, Plaintiff has not filed anything in this case since he filed a proposed discovery schedule more than a year ago.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1033787
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Craig A. JACKSON, Plaintiff,
v.
Sergeant WEST, et al., Defendants.

No. 9:23-CV-0306 (LEK/PJE)
|
Signed February 20, 2025

**Attorneys and Law Firms**

Craig A. Jackson, 22-B-0406, Cayuga Correctional Facility, P.O. Box 1186, Moravia, New York 13118, Plaintiff pro se.

ALEXANDRA L. GALUS, ESQ., LAUREN R. ROSENBERG, ESQ., NYS Office of the Attorney General State Capitol, Albany, New York 12224, Attorneys for defendants.

**REPORT-RECOMMENDATION AND ORDER**

PAUL J. EVANGELISTA, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff pro se Craig A. Jackson ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Sergeant West and D. Fenlong ("defendants") violated his constitutional rights under the Eighth Amendment. See Dkt. No. 1 ("Compl."). Presently before the Court is defendants' motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 26. Plaintiff did not oppose. For the following reasons, it is recommended that defendants' motion be granted.

I. **Background** [1]

On a motion for summary judgment, the facts are related in the light most favorable to the nonmoving party. See Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all

ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.").

On June 13, 2024, the Court served upon plaintiff forms titled, "Notice of Due Date to Respond to Motion for Summary Judgment" and "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion. Dkt. No. 27. These forms advise plaintiff of his deadline to respond to defendants' motion and advise him that if he "do[es] not submit a proper response to the defendants' statement of material facts, the Court may deem [plaintiff] to have admitted the defendants' factual statements." Dkt. No. 27 at 1-2; see also N.D.N.Y. L.R. 56.1(b). Plaintiff did not respond to defendants' Statement of Material Facts.

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994). Where a non-movant does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's statement of material facts; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. See Giannullo v. City of N.Y., 322 F.3d 139, 143 n.5 (2d Cir. 2003). Therefore, the Court will, for purposes of this motion, deem as true all *properly-supported* facts stated in defendants' Statement of Material Facts. See Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998) (accepting as true the material facts contained in unopposed statement of material facts); see also Demuth v. Cutting, No. 9:18-CV-789 (LEK/TWD), 2020 WL 957381, at *1 (N.D.N.Y. Feb. 3, 2020), *report and recommendation adopted*, No. 9:18-CV-0789 (LEK/TWD), 2020 WL 950229 (N.D.N.Y. Feb. 27, 2020) ("Plaintiff's failure to oppose Defendant's motion results in the admission of properly supported facts, however the Court must still ensure those facts show Defendant is entitled to judgment as a matter of law.").

A. **Facts**

**\*2** Defendants provide that plaintiff was housed at Gouverneur from April 11, 2022, to June 13, 2022. See Dkt. No. 26-2 at 2. Gouverneur had a fully-functioning inmate grievance program during plaintiff's period of incarceration. See id. (citing Dkt. No. 26-4 at ¶11). Plaintiff's claims are

proper subjects for a grievance under 7 NYCRR § 701.1, *et seq. See* Dkt. No. 26-2 at 2.

Plaintiff filed four grievances, from April 12, 2022, through April 17, 2022, alleging that defendants West and Fenlong assaulted him on April 11, 2022. *See id.* (citing Dkt. No. 26-4 at ¶14). The four grievances were consolidated into Grievance No. GOV-0087022. *See id.* Due to the nature of the grievance, it was forwarded to the Superintendent. *See id.* at 3. On May 5, 2022, the Superintendent issued a determination denying plaintiff's grievance. *See id.* at 3 (citing Dkt. No. 26-4 at ¶28). Defendants contend that plaintiff did not appeal the grievance denial to CORC. *See id.* (citing Dkt. No. 26-4 at ¶13).

## II. **Legal Standards**

Fed. R. Civ. P. 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, summary judgment cannot be granted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Taggart v. Time, Inc.*, 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."). The party seeking summary judgment bears the burden of informing a court of the basis for its motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

After the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" to defeat summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not rely on "mere conclusory allegations, speculation, or conjecture," *Fischer v. Forrest*, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" to support its claims, *Anderson*, 477 U.S. at 252. At the same time, a court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *See Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S 133, 150 (2000). The Court "may not make any credibility determinations or weigh the evidence." *Id.* Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a plaintiff proceeds pro se, the court must grant him "special solicitude," construe his submissions "liberally," and read such submissions "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (internal quotation marks omitted) (citing *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994)). This is because "a pro se litigant generally lacks both legal training and experience and, accordingly, is likely to forfeit important rights through inadvertence if [ ] not afforded some degree of protection." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (citing *Triestman*, 470 F.3d at 475).

**\*3** However, the Second Circuit has cautioned district courts that they "cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest." *Triestman*, 470 F.3d at 477 (citations omitted). Further, the "special solicitude" standard does not excuse "frivolous or vexatious filings by pro se litigants," nor does it "exempt a party from compliance with relevant rules of procedural and substantive law." *Id.*

## III. **Discussion**

### A. **Argument**

Defendants argue that this case must be dismissed because plaintiff did not exhaust his administrative remedies prior to commencing this action because he did not appeal the Superintendent's denial of his grievance to CORC. *See* Dkt. No. 26-1 at 5. Although plaintiff does not oppose this motion, in his deposition, he contended that he appealed the Superintendent's denial to CORC but did not receive a response. *See* Dkt. No. 26-5 at 92-93.

### B. **Analysis**

### 1. **Exhaustion Standards**

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Exhaustion is required even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. *See id.* at 524. "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he is incarcerated." *Adams v. Annucci,* 537 F. Supp. 3d 475, 477-78 (W.D.N.Y. 2021); *see Jones v. Bock,* 549 U.S. 199, 218 (2007). "In accordance with the PLRA ... [DOCCS] has made available a well-established inmate grievance program ... [which] involves [ ] following [a] three-step procedure for the filing of grievances." *Smith v. Kelly,* 985 F. Supp. 2d 275, 280 (N.D.N.Y. 2013) (citing 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7).

"Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir. 2011). Nonetheless, "the defendants have the burden of proving that [the plaintiff's] claim has not been exhausted[.]" *Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted). A defendant satisfies this burden by "establishing ... that a grievance process exists" and that the plaintiff failed to use the grievance procedure. *Hubbs v. Suffolk Cnty. Sheriff's Dep't,* 788 F.3d 54, 59 (2d Cir. 2015) (citing *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir. 2003), and *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir. 1999)).

"[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) (quotation marks and citations omitted). "[O]nce a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter

the defendant's proof by showing that, as to him or her, the remedy was unavailable." *Coleman v. Nolan,* No. 9:15-CV-40 (ATB), 2018 WL 4732778, at *4 (N.D.N.Y. Oct. 2, 2018) (citing *Smith v. Kelly,* 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013)). Availability means "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.' " *Ross v. Blake,* 578 U.S. 632, 642 (2016) (quoting *Booth v. Churner,* 532 U.S. 731, 738 (2001)). "An inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.*

**\*4** There are "three kinds of circumstances in which an administrative remedy ... is not capable of use to obtain relief." *Ross,* 578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* (citing *Booth,* 532 U.S. at 736). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

### 2. **Declarations & Plaintiff's Deposition Testimony**

Defendants submit a declaration from Laura Hutchins, the Incarcerated Grievance Program Supervisor at Gouverneur Correctional Facility. *See* Dkt. No. 25-3. Ms. Hutchins declared that plaintiff successfully completed "shop facility orientation" on May 16, 2022, through May 22, 2022, during which time he was given a presentation on how to file and exhaust grievances. *See* Dkt. No. 26-3 at 2, 9. Ms. Hutchins located records of plaintiff having filed four grievances in April 2022, regarding a staff assault on April 11, 2022, and that these grievances were consolidated into Grievance No. GOV-0087-22. *See id.* at 6.

Gouverneur's records further reveal that the Superintendent denied plaintiff's consolidated grievance on May 5, 2022. *See* Dkt. No. 26-3 at 6 (citing Dkt. No. 26-3 at 16). The denial form advised plaintiff that "[i]f you wish to appeal the above decision of the Superintendent, please sign below and return this copy to the IGRC at the facility where the grievance was filed. You have seven (7) calendar days from the receipt of this notice to file your appeal. Please provide a reason why

you are appealing this decision to CORC." *Id.* Ms. Hutchins declared that Gouverneur's records further show that plaintiff never appealed the Superintendent's denial of his consolidated grievance. *See* Dkt. No. 26-3 at 9.

Defendants further submit a declaration from Rachael Seguin, Director of the Incarcerated Grievance Program for DOCCS. *See* Dkt. No. 26-4 at 1. Ms. Seguin declares that DOCCS Directive 4040 provides that DOCCS must "maintain grievance files for the current calendar year and the previous four calendar years," that DOCCS maintains such files, and that "she searched DOCCS records for any appeals received by CORC relating to plaintiff's instant allegation." Dkt. No. 26-4 at 4. The records revealed that plaintiff "has not appealed any grievances to CORC pertaining to allegations of Eighth Amendment violations against Defendants Fenlong and West, while Plaintiff was housed at Gouverneur C.F. in DOCCS custody under DIN: 22-B-0405." *Id.*

Defendants note that plaintiff testified at his deposition that he " 'filed the appeal at Gouverneur in May, like two days after' he received the determination." Dkt. No. 26-1 at 9. Defendants contend that this assertion is incorrect because DOCCS and Gouverneur records show that plaintiff never appealed the Superintendent's denial. *See id.* Defendants anticipate a potential argument, based on statements plaintiff made in his deposition, of the existence of "some type of conspiracy on behalf of the facility to hide or destroy his paperwork," but contend that "such allegations are conclusory and are not sufficient to defeat a motion for summary judgment." *Id.* Thus, defendants argue that this matter must be dismissed for plaintiff's failure to exhaust his administrative remedies before commencing this action.

As plaintiff has not responded to the motion for summary judgment, the Court does not have before it any of plaintiff's positions regarding exhaustion. Out of special solicitude to plaintiff and in an attempt to view the facts in the light most favorable to the nonmoving party, the undersigned has searched the record for potential arguments regarding exhaustion. In his deposition, when asked if he "understand[s] what the grievance process is at ... the DOCCS facility," plaintiff acknowledged that he attended an orientation about grievances and stated that he "somewhat" understood the process. Dkt. No. 26-5 at 79. Plaintiff testified that his understanding of the grievance process is that he needs to "follow the necessary steps. I have to follow these specific steps." *Id.* He states, "what I can do is I can bring it to the officer's attention.... If that don't work, maybe speak to a

sergeant or something like that. If that don't get nowhere, I write a grievance." *Id.* at 79. When plaintiff was asked how he knew to file a grievance, plaintiff stated, "This isn't my first time in jail. I just – you know, I – I—and these grievances that I've written, these are the first grievances I ever written in my whole life. I just – I just knew that, you know what I mean, I had to report it." *Id.* at 80. When asked further how he knew how to file a grievance, plaintiff responded, "I mean, I had a bunkie in the box. I just wrote out – it wasn't no specific thing. I just – I just took a piece of paper and just wrote down what happened and sent it – and sent it to grievance." *Id.* at 81. When the AAG asked how he knew where to send the grievance, plaintiff testified,

> **\*5**  it's no specific place. I was in the box. It's no specific place you have to send a grievance. You just slide it underneath your door. They come and get the mail. It is not like, no, I could go and put this in a grievance box. No, we're locked in already. We're in a box.

*Id.*

The AAG inquired about the grievance orientation plaintiff attended, to which plaintiff stated, "I am not sure about that, man. I am not even going to even – I – I can't answer it." Dkt. No. 26-5 at 81-82. Plaintiff testified that he filed "like five" grievances with respect to the issues underlying this action. *Id.* at 82. When asked if he heard back about his grievances, plaintiff testified, "I received a letter in the mail ... facility mail, stating me that -- it was stating that it would – they had shut it down. They – they – they shut down my grievance. It wasn't accepted." *Id.* at 83. In response to the AAG's question whether he heard back from the grievance office about his grievances, plaintiff testified, "yes." *Id.* at 83. Plaintiff acknowledged the Superintendent's denial and stated that he understood the denial to mean, "it wasn't going to be nothing that was done about the incident and that it was going to be swept under the rug." *Id.* at 84. He further testified that he understood the Superintendent's denial to mean that "it wasn't found valid. It was – it was shut down. It wasn't going through.... Basically, ... it's denied." *Id.* at 92.

Plaintiff testified that he "filed the appeal at Gouverneur in May, like two days after I got – right after I got that paper in the mail, right, I filed – I filed my appeal for it." Dkt. No. 26-5

at 92. He states he did not receive a response to his appeal of the Superintendent's decision. *See id.* at 92-93. When asked if it was his "understanding that the appeal you filed was going to go to CORC," plaintiff testified that he "didn't know where it was going." *Id.* He testified affirmatively that he filled out the bottom portion of the Superintendent's denial form and sent it in. *See id.* at 93. When plaintiff did not hear back on his appeal of the Superintendent's denial, he did not file another grievance or follow up with any kind of request to the grievance office. *See id.* at 94. When asked why he did not follow up, plaintiff stated, "I was still in that facility right there. And a lot of the paperwork, a lot of stuff, it was all against me over there. You get what I'm saying. I really didn't have a – like I said, I put in five grievances. You showed me four. I'm missing a grievance. You get what I'm saying?" *Id.* at 94-95. Plaintiff contended that he was "refused medical over there. I did not feel safe over there. Any type of paperwork that I do have and that I was able to escape with out of that facility, like I'm blessed to have it. Like I – I – I didn't have no control." *Id.*

When questioned about how he filed the appeal of his grievance denial, plaintiff testified that he "had another fellow peer help me out in here because I'm – I'm really not law library savvy like that. So I actually paid somebody to help me put this whole thing together ... [s]o I could get the help that I need because I – I – like I said, I've never been involved in this type of stuff before .... I don't know what I am doing .... I told my story to a couple guys ... and they helped me to get this far. And I -- I'm struggling here, man." Dkt. No. 26-5 at 96.

**\*6** Plaintiff testified that, to file his appeal of the Superintendent's denial, he went to the law library with another inmate who "basically did everything. I signed it and – and we sent it out." Dkt. No. 26-5 at 97. Plaintiff testified that he sent his appeal to "Albany – it went to this same address that I get all this mail from. It went to office of the attorney – it went to you." *Id.* When asked to clarify if plaintiff was stating that he sent his appeal of the Superintendent's decision to the Attorney General's Office, plaintiff stated, "It went to the – all that – that's all in the same building in Albany, right? The Attorney General's office and everything is in Albany, two twenty – I believe it's two twenty." *Id.* at 97. When confronted with the fact that the Superintendent's denial of his grievance contained instructions stating that any appeal of the Superintendent's decision is to be sent to the Inmate Grievance Resolution Committee ("IGRC") at the facility where the grievance is filed, but that he testified he sent it to the Attorney General's Office, plaintiff stated that

he was "not even sure" where he sent it. Dkt. No. 26-5 at 97. He stated that he is "pretty sure I sent it to the grievance. I am not sure where it went, man. I know I sent it out. I did every little piece of paperwork I was supposed to do." *Id.* at 98-99. When asked whether he was "fearful that your grievance somehow wouldn't be listened to at that facility, plaintiff replied "Grievance? I was – was more fearful for my life." *Id.* at 99.

Plaintiff testified that when he was transferred out of Gouverneur to Cayuga, he did not follow up with the grievance office at Cayuga or attempt to pursue his grievance further. *See* Dkt. No. 26-5 at 95. Plaintiff testified that he "didn't know I had to" as he already filed five grievances at Gouverneur and "they shut it down." *Id.* at 95. "I put the appeal in. I didn't hear nothing about the appeal." *Id.* He says when he was transferred to Cayuga, he also did not hear anything about his appeal. *See id.* Plaintiff then testified that he did not attempt to seek the status of his grievance once he was transferred to Cayuga because he "was happy to get out of that facility .... it's a whole different environment in the facility I am in now than Gouverneur. You could – you could feel the fear over there." *Id.* at 100. Plaintiff testified that once he was transferred to Cayuga, "I could start fresh and then go about my business, do my time, and get home. I wasn't really like – I didn't want the whole state against me, man. I didn't want to leave one jail and then go to another jail and I got the police all over me there neither. So I wanted to like kind of fly under the radar." *Id.* at 101.

Plaintiff states that upon transfer to Cayuga, he did not complete another orientation about the grievance procedure. *See* Dkt. No. 26-5 at 102. As he had completed a full orientation at Gouverneur, "the grievance thing was not discussed" at Cayuga; he underwent a more streamlined orientation. *Id.* When asked whether the original orientation at Gouverneur covered grievances, plaintiff then testified, "I'm not sure about all that, man. I – that's not something that I am paying attention to, man. I came to jail to do my time, man. Not write grievances, man. You get what I'm saying? That's – that's – that's just what it boils down to." *Id.* at 102. When asked to clarify whether he was testifying that he never attended an orientation that went over the grievance process, plaintiff again stated, "I'm not sure, man. I – maybe don't be paying attention to a lot of shit. If it – if it don't – if it don't affect me or something like that, I'm just not paying attention to everything. I have a short attention span on certain things." *Id.*

Plaintiff testified that once he was transferred to Cayuga, he was in general population, but when asked whether plaintiff could have "stopped by the grievance office at any point in time," he testified, "I mean, yeah. Yes, I guess. I'm not even sure if we even have a grievance building here at all." Dkt. No. 26-5 at 105. Plaintiff further testified that while at Cayuga, he was not "intimidated all," "assaulted at all," or "in fear for [his] life at all," by Cayuga staff. *Id.*

### 3. Exhaustion of Administrative Remedies

Here, the record is clear that plaintiff did not exhaust his administrative remedies before commencing this action. Although plaintiff testified that he appealed the Superintendent's denial of his grievance with help from a fellow inmate, he testified that was unsure if he sent the appeal to the IGRC or to the Attorney General's Office or another agency in Albany. The Court has before it no proof of his alleged appeal.

**\*7** Plaintiff's testimony on exhaustion is littered with contradictions and lacks support. Plaintiff testified that he never received a response to his appeal, but did not follow up while he was at Gouverneur or Cayuga. Plaintiff's testimony was conflicting as to why plaintiff did not follow up. He indicated that he did not fully understand the grievance procedure, stating that he was not fully sure whether he was given a presentation about the grievance process at Gouverneur's orientation because he stopped paying attention based on his belief that it was not applicable to him or due to his short attention span. *See* Dkt. No. 26-5 at 102. Elsewhere in his deposition plaintiff suggests he was in fear for his life while at Gouverneur, but when asked if he feared filing an appeal to CORC, he indicated he had a *general* fear for his life at Gouverneur rather than a specific fear of proceeding with the grievance procedure. *See* Dkt. No. 26-5 at 99. Yet, plaintiff conceded that he did file four to five grievances while at Gouverneur. Plaintiff testified that he did not follow up on the grievance or pursue anything further when transferred to Cayuga because he did not know he was supposed to. *See id.* at 101. However, he also testified that he did not follow up on his grievance once at Cayuga because he was trying to fly under the radar, complete his time in custody, and go home. *See* Dkt. No. 26-5 at 100-101.

In support of their motion for summary judgment, defendants provide the declarations of Ms. Hutchins and Ms. Seguin, who both declared that they checked records at both Gouverneur

and DOCCS and there is no record of his appeal. *See* Dkt. Nos. 26-3, 26-4. Plaintiff does not counter defendants' proof with supported arguments or evidence; he does not provide to the Court a copy of his appeal or any clarity on where he alleges to have sent the appeal. *See* Dkt. No. 26-5 at 12; *See Gibbs v. Gadway*, No. 9:19-CV-281 (GTS/DJS), 2019 WL 5191506, at \*3 (N.D.N.Y. Oct. 15, 2019), *report and recommendation adopted*, No. 9:19-CV-0281 (GTS/DJS), 2020 WL 1227156 (N.D.N.Y. Mar. 13, 2020) ("Plaintiff makes a purely conclusory allegation that he appealed the grievance denial to CORC. Significantly, plaintiff has not provided a copy of the grievance appeal or even asserted on what date he filed the appeal. In light of the documented proof that no such appeal was filed, such a conclusory statement is insufficient to create a material question of fact on this Motion."); *see also Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at \*6 (N.D.N.Y. Oct. 4, 2019), *report-recommendation adopted*, No. 9:18-CV-1008 (DNH/CFH), 2020 WL 58613 (N.D.N.Y. Jan. 6, 2020) ("Even considering that plaintiff swore under penalty of perjury that he mailed a grievance within the allotted time frame, he did not provide any evidence to substantiate his allegations. [ ] Therefore, plaintiff's unsupported allegations cannot give rise to an issue of material fact sufficient to defeat a motion for summary judgement.") (citations omitted)). "In short, '[g]iven the lack of evidence that Plaintiff's appeal to CORC was ever filed, or ever followed up on, it is not that the full scope of administrative remedies was not available to Plaintiff – rather, Plaintiff failed to fully exhaust the administrative remedies available to him.' " *Shabazz v. Bailey*, No. 9:20-CV-00057 (LEK/TWD), 2023 WL 5779533, at \*7 (N.D.N.Y. June 28, 2023), *report and recommendation adopted*, No. 9:20-CV-57 (LEK/TWD), 2023 WL 5622049 (N.D.N.Y. Aug. 31, 2023), *aff'd*, No. 23-7252, 2025 WL 272602 (2d Cir. Jan. 23, 2025) (quoting *Houston v. Coveny*, No. 14-CV-6609, 2020 WL 2494439, at \*3 (W.D.N.Y. May 14, 2020) and citing *Litchmore v. Williams*, No. 11-CV-7546, 2013 WL 3975956, at \*6 (S.D.N.Y. Aug. 5, 2013) ("no 'sufficient basis in the record to find that administrative remedies were unavailable' where, among other things, there was 'no evidence here that the plaintiff's appeal was actually mailed, intercepted, or ignored' and 'DOCCS has no record of any appeal filed with CORC' ")). "If a prisoner has failed to properly follow each of the applicable steps before commencing litigation, he has failed to exhaust his administrative remedies." *Scott v. Uhler*, No. 9:16-CV-403 (TJM/CFH), 2019 WL 5197139, at \*5 (N.D.N.Y. July 31, 2019), *report and recommendation adopted*, 2019 WL 4667495 (N.D.N.Y. Sept. 25, 2019). Accordingly, the undersigned concludes that plaintiff has

failed to exhaust his administrative remedies in that he has not raised a material question of fact as to whether he appealed the Superintendent's denial of his grievance to CORC. Thus, the undersigned must next assess whether administrative remedies were available to plaintiff.

### 4. Availability of Administrative Remedies

**\*8** New York law establishes a three-step grievance and appeal process for prisoners. *See* N.Y. Comp. Codes R. & Regs. tit. 7 ("7 N.Y.C.R.R."), § 701.5. That process consists of the following: (1) "[a]n inmate must submit a complaint" with the Inmate Grievance Resolution Committee, *id.* § 701.5(a)-(b); (2) if the inmate disagrees with the response to the grievance, the inmate must "appeal to the superintendent," *id.* § 701.5(c); and (3) if the inmate disagrees with the superintendent's findings, he must "appeal to the CORC ... within seven calendar days after receipt of the superintendent's written response to the grievance," *id.* § 701.5(d). "A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." Toussaint, 660 F. Supp. 2d at 523 (cleaned up). The statute also states, "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC." 7 N.Y.C.R.R. § 701.5(d)(3).

*Foskey v. Paige*, No. 9:20-CV-504 (LEK/TWD), 2024 WL 2109150, at \*3 (N.D.N.Y. May 10, 2024).[2] Applying special solicitude, it is arguable that plaintiff is contending that administrative remedies were unavailable on several grounds, some of them conflicting. The Supreme Court of the United States has identified three circumstances in which a court may find administrative remedies are not "available" for PLRA purposes:

> First, ... an administrative procedure is unavailable when ... it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.... Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation,

> some mechanism exists to provide relief, but no ordinary prisoner can navigate it .... And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Ross*, 578 U.S. at 643-44. The Second Circuit has interpreted these three circumstances as nonexhaustive as *Ross* focused on the "three kinds of circumstances that were 'relevant' to the facts of that case." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 124 n.2 (2d Cir. 2016) (citing *Ross*, 578 U.S. at 643).

### 5. Was the Grievance Process Opaque?

#### a. Did Not Know How to Grieve

First, plaintiff's deposition testimony suggests that he did not fully exhaust because was not sure how to complete the grievance process. He testified that he had been incarcerated in state facilities before his incarceration at Gouverneur in 2022 but never had filed a grievance before the ones he submitted in this action. Plaintiff admits that he attended Gouverneur's "shop facility orientation," but states that he was unaware if he was taught how to exhaust administrative remedies because he did not pay attention. *See* Dkt. No. 26-5 at 102

The undersigned observes that the underlying incidents are alleged to have occurred on April 11, 2022. Plaintiff filed his four or five grievances in April 2022, which were consolidated. The Superintendent denied plaintiff's consolidated grievance on May 5, 2022. Plaintiff attended "shop facility orientation" from May 16, 2022, to May 22, 2022. *See* Dkt. No. 26-3 at 9. Plaintiff alleges to have appealed[3] to CORC within two days of receiving his denial, meaning this all occurred before he competed his facility orientation training regarding how to file and exhaust grievances on May 16-22, 2022. *See* Dkt. No. 25-3 at 16; Dkt. No. 26-3 at 9.

**\*9** The undersigned assesses whether plaintiff's statement that he did not know how to grieve is sufficient to raise

a valid argument as to opaqueness. The Second Circuit recently explained the "opaqueness" exception to the PLRA's exhaustion requirement applies where "[t]he regulations simply do not contemplate the situation in which [the prisoner] found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Williams v. Priatno*, 829 F.3d 118, 124 (2d Cir. 2016).

Liberally read, plaintiff's deposition testimony suggests that he did not understand the grievance procedure at any stage. However, even accepting as true that plaintiff did not fully understand what steps needed to be taken to exhaust his administrative remedies, plaintiff does not demonstrate that his ignorance of the grievance process rendered administrative remedies "opaque" as that term is contemplated by precedent.

To the extent plaintiff appears to have testified that he did not know how to proceed with the grievance process, plaintiff conceded that he: was aware that a grievance process existed; knew he had to "follow the necessary steps. I have to follow these specific steps"; knew that if informal methods of resolution were unsuccessful, he should file a grievance; asked his "bunkie" to help him file grievances; filed at least four grievances with respect to the underlying incident; and hired a fellow inmate to assist him. Dkt. No. 26-5 at 79. "[S]ince Plaintiff was able to discern and navigate the first two steps of the grievance process, there is nothing to suggest that the third step, the appeal to CORC, was opaque to such a point that it became incapable of use." *Beauvoir v. Smith*, No. 9:14-CV-1495 (MAD/DEP), 2017 WL 4271636, at *3 (N.D.N.Y. Sept. 26, 2017).

Defendants submit records from Gouverneur demonstrating that plaintiff successfully completed shop facility orientation which included training on how to file a grievance and exhaust administrative remedies. When asked about such training, plaintiff gave vague and dismissive answers, suggesting he was unsure if he learned about how to proceed with a grievance and the various steps required because he did not pay attention, believing that it was not relevant to him and/or because he did not have a sufficient attention span to focus. Plaintiff testified that he did not know how to grieve and properly exhaust his grievance does demonstrate that administrative remedies were unavailable to him. Plaintiff concedes that he attended the orientation, but that he was unsure if he was taught how to proceed through the grievance process because he did not pay attention as he felt the information was not relevant to him or he zoned out due to attention span issues.

Similarly, when confronted at his deposition with the fact that the Superintendent's denial of his grievance included instructions that advised him that if he wished to appeal the denial, he was to sign and return the appeal section to the IGRC, plaintiff did not deny that the form contained such instruction, but responded that he was "not even sure" where he sent the appeal and was "pretty sure I sent it to the grievance. I am not sure where it went, man. I know I sent it out. I did every little piece of paperwork I was supposed to do." Dkt. No. 26-5 at 97-99. Plaintiff's choosing not to pay attention to the training needed to learn how to exhaust or declining to seek assistance does not demonstrate that the grievance process was "essentially unknowable." *Hill v. Tisch*, No. 02-CV-390, 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) (finding that the plaintiff failed to demonstrate that the grievance "procedures were essentially unknowable"). It demonstrates that plaintiff actively chose against educating himself or allowing his facility to educate him as to the grievance procedure.

**\*10** The undersigned recognizes that plaintiff's orientation took place after he filed his grievances and received the Superintendent's denial. Thus, although he may have been untrained regarding the grievance process at the time he filed his grievances and received the Superintendent's denial, he attended such training by May 22, 2022, at the latest. Upon completing the orientation, he could have reached out to the IGRC or CORC and requested an extension [4] of time to appeal to CORC, citing mitigating circumstances, but failed to do so. *See* 7 NYCRR § 701.6(g);[5] *see generally Valverde v. Folks*, No. 1:19-CV-08080-MKV, 2022 WL 836310, at *7 (S.D.N.Y. Mar. 21, 2022) ("As such, it is possible that if Plaintiff had sought an extension to file an appeal from CORC, he could have received one. Plaintiff never did so."), *aff'd*, No. 22-848-PR, 2023 WL 2439876 (2d Cir. Mar. 10, 2023). Plaintiff's failure to avail himself of the grievance procedure is based on his ignorance of the training and failure to seek out resources rather than the opacity of the procedure.

"Courts within the Second Circuit are split regarding whether a failure to respond by CORC constitutes unavailability excusing a plaintiff's failure to exhaust." *High v. Switz*, No. 9:17-CV-1067 (LEK/DJS), 2018 WL 3736794, at *4 (N.D.N.Y. July 9, 2018), *report and recommendation adopted sub nom. High v. PA Switz*, No. 9:17-CV-1067 (LEK/DJS), 2018 WL 3730175 (N.D.N.Y. Aug. 6, 2018). Indeed, the

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

regulations " 'do not describe a mechanism' for appealing or advancing a grievance when a grievant does not receive a response from CORC." *Id.* at \*5 (quoting *Williams*, 829 F.3d at 124).

Plaintiff's case differs from those in which courts held administrative remedies were unavailable where a plaintiff appealed to CORC, but CORC never responded or failed to respond within a reasonable period of time. *See, e.g.*, *High*, 2018 WL 3736794, at \*4 (excluding the plaintiff's failure to exhaust where the plaintiff appealed to CORC but never received a response, finding administrative remedies were unavailable when CORC failed to respond). Unlike in those cases, [6] where the Court found that administrative remedies were unavailable because the regulations did not explain what an inmate should do if he appealed to CORC but receives no response, in those cases there did not appear to be a question whether the plaintiffs actually appealed to CORC. Here, plaintiff presents no details nor any proof of his alleged appeal to CORC beyond his conclusory claim during his deposition. He testified that he appealed the Superintendent's denial, but offered conflicting testimony over where the appeal was sent – either to the Attorney General's Office or another agency "in Albany" or to the IGRC, did not provide a copy of the appeal, and did not indicate that he ever attempted to follow up with CORC or the IGRC after failing to receive any response from his appeal. *See Valverde v. Folks*, No. 1:19-CV-08080 (MKV), 2022 WL 836310, at \*8 (S.D.N.Y. Mar. 21, 2022), *aff'd*, No. 22-848-PR, 2023 WL 2439876 (2d Cir. Mar. 10, 2023) ("Here, unlike *Williams* [*v. Priatno*], Plaintiff concedes that his initial grievance was processed and answered. [ ] .... Plaintiff had an avenue to appeal the denial of his grievance, however he filed the appeal form improperly and it does not appear that he made any attempt to ever ask the grievance supervisor for confirmation that his appeal was received.").

 **\*11**  Plaintiff proffered no argument or evidence that he "received written notice that the appeal was filed or that he attempted to contact CORC of the IGRC ... regarding the status of his appeal before commencing this action." *Bowie v. Woodruff*, No. 9:1-8CV-0266 (BKS/ML), 2019 WL 7606078, at \*6 (N.D.N.Y. Sept. 20, 2019), *report and recommendation adopted*, No. 9:18-CV-00266 (BKS/ML), 2019 WL 5445519 (N.D.N.Y. Oct. 23, 2019) (citing *Fox v. Lee*, 9:15-CV-0390 (TJM/CFH), 2018 WL 8576600, at \*7 ("granting summary judgment because the plaintiff did not proffer evidence that he wrote to the IGRC or CORC inquiring as to the status of his appeals" and " 'never contacted Eastern's [IGP supervisor] in writing ... to confirm that any of his

appeals were filed and transmitted to CORC.' ") *vacated in part on other grounds* 2023 WL 7481423 (2d. Cir. Nov. 13, 2023); *see* § 701.5(d)(3)(i) (noting that the IGRC dates all CORC appeals and will forward the inmate a copy of the receipt, and that "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC."). Indeed, "[t]he record is devoid of any indication that Plaintiff followed up with the [facility] IGP supervisor 'to confirm that the appeal was filed and transmitted to CORC' when he did not receive written confirmation within forty-five days that his appeal was received." *Shabazz*, 2023 WL 5779533, at \*7 (quoting 7 N.Y.C.R.R. § 701.5(d)(3)(i) and citing *Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at \*9 (N.D.N.Y. Dec. 29, 2021)) ("granting summary judgment on exhaustion grounds where plaintiff 'provided no specifics regarding when the grievances were written, their content, or the steps he took to provide them to an officer to send to the grievance office' and there was no documentary evidence to corroborate the fact plaintiff attempted to file a grievance, such as follow-up correspondences."); *see Gizewski v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-124, 2016 WL 3661434, at \*13 (N.D.N. Y July 5, 2016) (concluding that the plaintiff did not exhaust his administrative remedies because he failed to take further action under § 701.5(d)(3)(i) when he did not receive written notice of receipt by the CORC within 45 days of filing his appeal; he did not contact the Inmate Grievance Program to ascertain whether CORC received his appeal), *aff'd*, 692 F. App'x 668 (2d Cir. 2017)).

By contrast, defendants produce records from both Gouverneur and DOCCS, along with declarations from the officials who maintain such records, showing that they have no record of plaintiff having ever filed an appeal of the Superintendent's denial of his grievance. *See* Dkt. Nos. 26-3, 26-4 at 7-8. Accordingly, plaintiff has failed to demonstrate that his lack of understanding of grievance process amounts to the grievance process being so opaque to be rendered incapable of use.

#### b. **Transfer**

Further, plaintiff's transfer from Gouverneur to Cayuga "does not excuse his failure to exhaust, as the grievance process is identical in all New York state-run facilities." *Campbell v. Prue*, No. 9:16-CV-0004 (MAD/CFH), 2018

WL 4635708, at *5 (N.D.N.Y. July 3, 2018), *report and recommendation adopted*, No. 9:16-CV-0004 (MAD/CFH), 2018 WL 3574871 (N.D.N.Y. July 25, 2018) (citing *Hartry v. Cnty. of Suffolk*, 755 F.Supp. 2d 422, 434 (E.D.N.Y. 2010)) ("[S]ome courts [ ] have found that transfer within correctional facilities governed by the same governmental agency will not excuse exhaustion, regardless of whether the inmate had an opportunity to pursue the remedy while at the facility where the claim arose.") (additional citations omitted).

Plaintiff testified at his deposition that he did not attempt to follow up on his grievance after being transferred to Cayuga. Plaintiff offered conflicting testimony for his reasoning behind declining to follow up once he reached Cayuga. First, plaintiff testified that he did not follow up at Cayuga regarding his grievance because he did not know he was supposed to follow up there. However, he later testified that he decided not to pursue his grievance once at Cayuga because he wanted to be able to serve out his time at Cayuga without being "noticed." Dkt. No. 26-5 at 101. Second, plaintiff made clear that he was not in any fear while incarcerated at Cayuga. Thus, he was not prevented from pursuing his grievance at Cayuga. Further, as noted, plaintiff received the Superintendent's denial of his grievance on May 5, 2022, and remained at Gouverneur until June 13, 2022, giving him sufficient time to pursue an appeal at Gouverneur before his transfer. *See* Dkt. No. 26-2 at 2. Plaintiff's conclusory and conflicting statements that he did not know how to use the grievance procedure fails to demonstrate that, as a result of his transfer to Cayuga, administrative remedies were so opaque they were rendered incapable of use.

#### 6. Grievance Process as a Dead End

**\*12** Plaintiff testified that he did not know the next step he was supposed to take when he did not receive a response from his alleged appeal to CORC. Plaintiff further testified that he filed a fifth grievance regarding "medical" while at Gouverneur but that he did not receive a response. Dkt. No. 26-5 at 94-95. Applying a very liberal reading of this testimony, plaintiff's statements could be interpreted as arguing that the grievance procedure operated as a "dead end." However, plaintiff's testimony on this point fails to raise a material question of fact for the reasons discussed below.

Courts have rejected arguments that the grievance procedure was a "dead end" where the plaintiffs chose to participate in the grievance procedure in some way, even in unrelated matters, concluding that such participation demonstrates that the plaintiffs did not view the grievance procedure as a dead end. *See Luke Matthews, et al. v. L. Sweeny, Clinton Corr. Sergeant, et al.*, No. 9:17-CV-0503 (GTS/ML), 2025 WL 447734, at *7, *7 n.13 (N.D.N.Y. Feb. 10, 2025) (citing *Walker v. Ball*, 16-CV-0437, 2018 WL 1415212, at *5 (N.D.N.Y. Feb. 16, 2018)) ("While Plaintiff did not file any grievances regarding the alleged misconduct of Noonan and St. Johns ..., he did file grievances regarding other issues .... This shows that Plaintiff did not view the filing of grievances as a dead end."), *report recommendation adopted*, 2018 WL 1406632 (N.D.N.Y. Mar. 20, 2018) (and others); *see Barrett v. Ballard*, No. 9:23-CV-113 (DNH/DJS), 2024 WL 4627511, at *4 (N.D.N.Y. Oct. 4, 2024), *report and recommendation adopted*, No. 9:23-CV-113, 2024 WL 4627801 (N.D.N.Y. Oct. 30, 2024) ("Plaintiff makes no argument that the grievance process was unavailable to him and cannot carry that burden especially since he claims that he did, in fact pursue, at least at the outset, to resolve this issue through the grievance process."). Here, plaintiff filed at least four grievances regarding the issues underlying this complaint; thus, any argument suggesting that he believed the grievance procedure to be a dead end is without force.

To the extent plaintiff's testimony that he filed a fifth grievance that went "missing" could suggest that he believed the grievance process was a dead end, "Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' " *Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *5 (N.D.N.Y. Oct. 4, 2019) (quoting *Rodriguez v. Cross*, No. 9:15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *5 (N.D.N.Y. May 9, 2017) *report and recommendation adopted*, 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2019)). Plaintiff offers no proof that he filed a fifth grievance relating to the matters underlying this suit or any support for his conclusory claim that the fifth grievance was filed and went missing. *See Rodriguez*, 2017 WL 2791063, at *5 n.13 (finding that the plaintiff's failure to exhaust was not excused because, although the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them.").

In sum, the undersigned concludes that plaintiff has failed to demonstrate a material question of fact as to whether

the grievance process amounted to a "dead end" such that administrative remedies were unavailable to him.

### 7. **Fear**

Plaintiff testified that he was in fear for his life while he was incarcerated at Gouverneur. *See* Dkt. No. 26-5 at 99. When asked for clarification as to whether he was afraid to file a grievance, plaintiff stated, "Grievance? I was – was more fearful for my life." *Id.* Plaintiff testified, however, that he was not in fear once he was transferred to Cayuga. *See id.* at 100. He testified that he did not pursue his grievance after not receiving a response to his alleged appeal because he did not know he was "supposed to" but also because he "didn't want the whole state against me, man. I didn't want to leave one jail and then go to another jail and I got the police all over me there neither. So I wanted to like kind of fly under the radar." *Id.* at 101.

**\*13** Administrative remedies may be unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

> However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. *Salmon v. Bellinger*, No. 9:14-CV-0827 (LEK/DJS), 2016 WL 4411338, at \*5 (N.D.N.Y. July 5, 2016). Estoppel is found where "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" occur showing that defendants acted affirmatively to prevent an inmate from availing him or herself of the grievance procedures. Id. at \*5 (quoting *Amador v. Andrews*, 655 F.3d 89, 103 (2d Cir. 2011)).

*Pridgen v. Beatie*, No. 9:16-CV-535 (DNH/CFH), 2018 WL 1402049, at \*8 (N.D.N.Y. Jan. 17, 2018), *report and recommendation adopted*, No. 9:16-C-V535 (DNH/CFH), 2018 WL 1394146 (N.D.N.Y. Mar. 19, 2018).

Here, plaintiff's generalized, conclusory arguments about being in fear while at Gouverneur fail to state a viable unavailability argument under the "machination, misrepresentation, or intimidation" exception. *Ross*, 136 S. Ct. at 1860. Plaintiff does not assert that any specific individual at Gouverneur prevented him from filing an appeal by threatening or intimidating him. Plaintiff offers no argument or proof that defendants or other prison officials "affirmatively or misleadingly prevented Plaintiff from filing

the appeal to CORC" or otherwise pursuing his administrative remedies." *Shabazz*, 2023 WL 5779533, at \*7. Further, when asked if he were afraid of filing a grievance, his response suggested that he was fearful, generally, during his time at Gouverneur, and suggested that he was not specifically afraid of proceeding with his grievance. *See* Dkt. No. 26-5 at 99.

Significantly, the undisputed facts in this case belie any claims of fear. Plaintiff filed four – and argues he filed five – grievances at Gouverneur, defeating an argument that he was too afraid for his life to take advantage of his administrative remedies. *See, e.g., McNab v. Doe*, 686 F. App'x 49, 51 (2d Cir. 2019) (summary order) (affirming summary judgment dismissing the plaintiff's complaint for failure to exhaust where although the plaintiff asserted that the defendants tried to intimidate him because "none of the actions allegedly taken by the defendants actually prevented [him] from submitting his complaint letter."); *Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016) (summary order) (finding that the defendants' alleged threats of retaliation did not interfere with the plaintiff's exhaustion efforts because, following a threat, the plaintiff "thereafter submitted ... [a] grievance in spite of this alleged threat"); *Hall v. Annucci*, No. 19-CV-5521 (KMK), 2022 WL 3903255, at \*10 (S.D.N.Y. Aug. 30, 2022), *aff'd*, No. 22-2031, 2023 WL 7212156 (2d Cir. Nov. 2, 2023) ("[w]here an inmate files a grievance or appeals a grievance determination after having received threats or suffered retaliation, the inmate's conduct 'directly cuts against' ... [an] argument that ... administrative remedies were unavailable.") (citation omitted).

**\*14** Accordingly, the undersigned concludes that plaintiff fails to demonstrate that administrative remedies were unavailable to him on the ground that "prison administrators thwart[ed] [him] from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643-44.

### C. **Doe Defendants**

The undersigned observes that plaintiff has failed to identify or serve process on John Does 1-8, as required by Rule 4(m) and N.D.N.Y. Local Rule 4.1, despite having ample time and opportunity. Plaintiff commenced this action on March 8, 2023. *See* Compl. Discovery in this action expired in March 2024. *See* Dkt. No. 22. Plaintiff has had a substantial amount of time to identify and serve the Doe defendants, "and the Court is under no obligation to extend the deadline

indefinitely." *Santiagocruz v. Doe #4*, No. 9:21-CV-0806 (TJM/ML), 2023 WL 9600956, at *1 n.1 (N.D.N.Y. Dec. 15, 2023*), report and recommendation adopted sub nom. Santiagocruz v. Gordon*, No. 9:21-CV-806, 2024 WL 532499 (N.D.N.Y. Feb. 8, 2024) (citation omitted); *see Waldo v. Goord*, 97-CV-1385, 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (Kahn, J.) (dismissing claims against Doe defendants pursuant to Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve the Doe defendants within a year of commencing the action).

"All discovery is complete and thus, [P]laintiff's failure to identify the 'John Doe' defendant[s] mandates dismissal." *Epps v. City of Schenectady*, No. 10-CV-1101, 2013 WL 717915, at *5 (N.D.N.Y. Feb. 27, 2013). Accordingly, the undersigned recommends sua sponte dismissal of defendants John Does 1-8 from this action without prejudice.

### D. **Dismissal**

The Second Circuit has "recognized that failure to exhaust administrative remedies is usually a 'curable, procedural flaw' that can be fixed by exhausting those remedies and then reinstituting the suit." *Neal v. Goord*, 267 F.3d 116, 123 (2d Cir. 2001) (quoting *Snider v. Melindez*, 199 F.3d 108, 111-12 (2d Cir. 1999)), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002). Thus, where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik*, 366 F.3d 85, 86-87 (2d Cir. 2004); *see Pettus v. McCoy*, 04-CV-0471, 2006 WL 2639369, at *1-2 (N.D.N.Y. Sept. 13, 2006) (dismissing a complaint without prejudice for failure to exhaust). However, if a prisoner has failed to exhaust available administrative remedies and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust would be futile. *See Berry v. Kerik,* 366 F.3d 85, 86 (2d Cir. 2004); *see, e.g.*, *Hilbert v. Fischer*, 12-CV-3843, 2013 WL 4774731, at *7 (S.D.N.Y. Sept. 5, 2013) (collecting cases).

Here, plaintiff received the Superintendent's denial on May 3, 2022, and he commenced this action March 8, 2023. As plaintiff's time to exhaust his administrative remedies has expired, it is recommended that his complaint be dismissed with prejudice.

### IV. **Conclusion**

**WHEREFORE**, for the reasons set forth herein, it is hereby

**RECOMMENDED**, that defendants' West and Fenlong's Motion for Summary Judgment, Dkt. No. 26, be **GRANTED in its entirety with prejudice**; and it is further

**\*15  RECOMMENDED**, that the claims against the Doe defendants be **DISMISSED without prejudice** based on plaintiff's failure to timely identify and serve those defendants; and it is

**ORDERED**, that the Clerk serve this Report-Recommendation & Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. See Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).[7]

### All Citations

Slip Copy, 2025 WL 1033787

---

**Footnotes**

1    Unless otherwise noted, the Court has provided plaintiff with copies of all unpublished cases cited herein.

2    As in this case,

> There are ... special procedures that may be used when the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is recorded and given a number, must be sent directly to the Superintendent, and the Superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

> *Ayers v. Trombley*, No. 9:17-CV-01229 (DNH/TWD), 2019 WL 3892864, at *10 (N.D.N.Y. July 8, 2019), *report and recommendation adopted*, No. 9:17-CV-1229 (DNH/TWD), 2019 WL 3891027 (N.D.N.Y. Aug. 19, 2019).

3    As concluded, *supra*, the undersigned has found that plaintiff failed to demonstrate that he appealed the Superintendent's denial to CORC.

4    The regulations provide that an individual who wishes to appeal a Superintendent's denial in the expedited procedure has seven calendar days after receipt of the denial to do so. *See* 7 N.Y.C.R.R. 701.6(h)(2). The Superintendent's denial of his grievance is dated May 5, 2022. It is unclear when he received the Superintendent's denial, but the undersigned recognizes that his training likely came after the seven-day period had expired. However, plaintiff demonstrates that his absence of formal training at Gouverneur did not stop him from successfully navigating the grievance procedure at the earlier stages.

5    A request for an extension of time to file an appeal to CORC may be requested in writing, but "an exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence." N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(1)(i)(a), (b). An inmate may choose to file a separate grievance if a request for an extension is denied. *See id.* § 701.6(1)(i)(b). Plaintiff completed the shop facility orientation on May 22, 2022, within forty-five days after the alleged occurrence on April 11, 2022. Thus, even if he was untrained on how proceed with the grievance process after receiving the Superintendent's denial until after he completed training, he still had time to request an extension to do so after receiving training. In such training, he would have likely also been advised to write to CORC or the IGRC if he did not receive confirmation of receipt of an appeal.

6    Further, in some cases addressing unavailability when an appeal to CORC is unanswered, the court found administrative remedies unavailable where the inmate plaintiff was transferred before receiving a response; here, however, plaintiff received the Superintendent's denial before being transferred and remained at Gouverneur for over a month after receipt of the denial. *See, e.g., Robinson v. Ballard,* 9:13-CV-01213 (TJM/ TWD), 2017 WL 979047, at *12 (N.D.N.Y. Feb. 3, 2017), *report and recommendation adopted*, 2017 WL 979039 (N.D.N.Y. Mar. 13, 2017) (citing *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016)) ("as in *Williams*, Plaintiff in this case was transferred to a new facility before receiving a response to his grievance and failed to receive a response after the transfer."); *See* Dkt. No. 26-2 at 2.

7    If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. *See* FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. *See id.* § 6(a)(1)(C).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 9264842
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Darell JENKINS, Plaintiff,

v.

Sergeant SHORT, et al., Defendants.

9:19-cv-01352 (GTS/TWD)
|
Signed 11/16/2020
|
Filed 11/17/2020

**Attorneys and Law Firms**

DARELL JENKINS, Plaintiff, pro se, 18-A-0025, Southport Correctional Facility, PO Box 2000, Pine City, NY 14871.

OF COUNSEL: LAUREN ROSE EVERSLY, ESQ., Assistant Attorney General, HON. LETITIA JAMES, Attorney General for the State of New York, Attorney for Defendants, The Capitol, Albany, NY 12224.

### ORDER AND REPORT-RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## I. INTRODUCTION

**\*1** This matter was referred for a Report and Recommendation by the Honorable Glenn T. Suddaby, Chief U.S. District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Darell Jenkins, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this *pro se* civil action under 42 U.S.C. § 1983, asserting claims arising out of his incarceration at Mid-State Correctional Facility ("Mid-State"). (Dkt. No. 1.) The suit was originally filed in the United States District Court for the Western District of New York ("W.D.N.Y."), but was later transferred to this District. (Dkt. No. 6.) The District Court reviewed the complaint in accordance with 28 U.S.C. § 1915, and found only Plaintiff's First Amendment free exercise claims against Defendants Correctional Officer ("C.O.") Lindermayer, Sergeant ("Sgt.") Short, and C.O. O'Neil survived initial review and required a response. (Dkt. No. 10.)

Defendants now move for summary judgment, in lieu of an answer, pursuant to Rule 56 of the Federal Rules of Civil Procedure arguing Plaintiff failed to exhaust his administrative remedies prior to commencing this action. (Dkt. No. 21.) Plaintiff has not responded to Defendants' motion and the time to do so has expired. (*See* Dkt. Nos. 25, 26, 27, 28.) For the reasons set forth below, the Court recommends that Defendants' motion be granted.

## II. BACKGROUND

Plaintiff alleges that on September 1, 2019, at approximately 9:30AM, while Defendants were inside his cell, C.O. Lindermayer "kneeled down on the floor above [Plaintiff's] altar of Santeria, & threw [his] offerings & water away[.] (Dkt. No. 1 at 5. [1]) C.O. O'Neil then described Plaintiff's religion as "voodoo." *Id.* C.O. Lindermayer, Sgt. Short, and C.O. O'Neil told Plaintiff he was not permitted to offer "any food to [his] saints on [his] altar" and that he was not permitted to have frankincense oils. *Id.*

Plaintiff filed a grievance but the grievance officer "Tapia" [2] "never answered [him]" and he "couldn't do anything because the grievance officer [did] not respond[.]" *Id.* Attached to Plaintiff's complaint is a letter dated September 27, 2019, from C. Tapia, IGP, acknowledging receipt of five pages of correspondence, assigned Grievance No. MS-24259-19. *Id.* at 8. The letter indicates Grievance No. MS-24259-19 was "forwarded to the Superintendent in accordance with Directive #4040" and that Plaintiff would be "notified of the results." *Id.* The letter stated to "Please refer to this grievance # with any future inquires." *Id.*

**\*2** Plaintiff's complaint is dated September 27, 2019. *Id.* at 7. It was notarized on October 3, 2019, and was stamped received by the Clerk for the W.D.N.Y. on October 11, 2019. *Id.* The matter was subsequently transferred to this District by Order of U.S. District Judge Elizabeth A. Wolford, issued on October 15, 2019. (Dkt. No. 5.) Upon receipt of the action, this Court issued a Decision and Order denying Plaintiff's *in forma pauperis* ("IFP") application as incomplete. (Dkt. No. 7.) Plaintiff filed a second IFP application and pursuant to the District Court's March 30, 2020, Decision and Order, Plaintiff's First Amendment free exercise claims against Defendants C.O. Lindermayer, Sgt. Short, and C.O. O'Neil survived initial review, and summonses were issued as to them. (Dkt. Nos. 8, 10, 11.)

Defendants have not answered the complaint and instead move for summary judgment based solely on exhaustion grounds. (Dkt. No. 21-1.) To that end, Defendants have submitted sworn declarations from Rachel Seguin, the Assistant Director of the IGP for DOCCS, and Christopher Tapia, Supervisor of the IGP at Mid-State, describing DOCCS' administrative exhaustion process. (Dkt. Nos. 29-2, 29-3.) Defendants offer evidence that on or about September 4, 2019, Plaintiff filed a series of letters that were consolidated into Grievance No. MS-24269-19, which alleged that on September 1, 2019, during a cell integrity check, C.O. Lindermayer threw out the sacrifices at his altar. (Dkt. No. 21-2 at ¶ 6.) The letters also alleged that, at some point between September 1, 2019 and September 3, 2019, C.O. O'Neil referred to Plaintiff's religion as "voodoo," and that Sgt. Short also interfered with his religious practice. *Id.* The first page of Grievance No. MS-24269-19, was stamped received by the "IGP Office" on September 4, 2019. (*See* Dkt. No. 21-3 at 8.) Due to the nature of the allegations, Grievance No. MS-24269-19 was forwarded to the Superintendent. (Dkt. No. 21-2 at ¶ 7.) On or about April 30, 2020, the Superintendent issued a determination denying Grievance No. MS-24269-19. *Id.* There is no record of Plaintiff appealing Grievance No. MS-24269-19 to the Central Office Review Committee ("CORC"). *Id.* at ¶¶ 9, 13. Thus, Defendants argue summary judgment is appropriate in this case because Plaintiff failed to fully exhaust his administrative remedies prior to the commencement of this action. (Dkt. No. 21-1.) As noted above, Plaintiff has failed to submit any opposition to Defendants' motion.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

A court shall grant summary judgment only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). A verified complaint, as Plaintiff has filed in this case, is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist[.]") (citations omitted).

**\*3** Where a party is proceeding *pro se*, the court must "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at \*3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

As noted, Plaintiff did not respond to Defendants' motion for summary judgment. Defendants' motion advised Plaintiff of the consequences of failing to respond to the motion. (Dkt. No. 21 at 3.) The Clerk of the Court provided Plaintiff a similar notice. (Dkt. No. 24.) When Plaintiff failed to timely respond to the motion, the Court *sua sponte* granted Plaintiff additional time in which to do so, again advising Plaintiff of the consequences of failing to respond. (*See* Dkt. Nos. 25, 26, 27, 28.)

"The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, when a motion for summary judgment is unopposed, the court may "grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3); *see also* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion."). Moreover, all properly supported facts set forth in Defendants' Statement of Material Facts that have not been specifically controverted shall be deemed admitted. N.D.N.Y. L.R. 7.1(a)(3).

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA"), provides, in pertinent part, "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "[E]xhaustion is mandatory under the PLRA and ... unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement).

To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the institution to which they are confined. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

 **\*4** In New York State prisons, DOCCS has a well-established three-step administrative review process. *See* 7 N.Y.C.R.R. § 701.5. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* § 701.5(a). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's Superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the Superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii).

Third, a grievant may appeal to CORC within seven working days of receipt of the Superintendent's written decision. *Id.* §

701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Where the grievance involves allegations of employee misconduct, as alleged here, there is an expedited administrative process. *See id.* § 701.8. Complaints of harassment, once given a number and recorded by the IGP clerk, are forwarded directly to the Superintendent of the facility. *Id.* In such cases the Superintendent is required to order an investigation and render a decision within twenty-five calendar days. *Id.* § 701(a)-(f). If the Superintendent fails to respond within the required twenty-five day time limit, the inmate may appeal his grievance to CORC. *Id.* § 701.8(g). Disagreement with the Superintendent's decision in the expedited review process also requires an appeal to the CORC. *See id.* § 701.8-(g)-(h); *see also Espinal v. Goord*, 588 F.3d 119, 125 (2d Cir. 2009) (explaining IGP and the expedited procedure for harassment claims and its appeal mechanism through the CORC). Thereafter, CORC must render a written decision within thirty days of receipt of the appeal. *Id.* § 701.8(i). The Second Circuit has long recognized this procedure as an "available remedy" for purposes of the PLRA. *See Hall v. Cty. of Saratoga*, No. 10-CV-1120 (NAM/CFH), 2013 WL 838284, at \*1-2 (N.D.N.Y. Mar. 6, 2013).

At each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or Superintendent do not timely respond, an inmate must appeal to 'the next step,' " assuming there is a "next step" in the grievance process. *Eleby v. Smith*, No. 9:15-CV-0281(TJM/DEP), 2017 WL 986123, at \*4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required steps prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks and citations omitted)).

Nevertheless, while the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, Section 1997e(a) provides only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *Ross*, 136 S. Ct. at 1858

("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotation marks and citations omitted)). In the PLRA context, the Supreme Court has determined "availability" means "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

**\*5** The *Ross* Court identified three circumstances in which a court may find internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Because failure to exhaust is an affirmative defense, the defendants bears the burden of showing that an inmate has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). Whether the plaintiff has exhausted his administrative remedies is a question of law. *See Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999). Thus, an inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment in lieu of an answer. *Crichlow v. Fischer*, No. 6:15-CV-06252 EAW, 2017 WL 920753, at \*5 (W.D.N.Y. Mar. 7, 2017) (citing *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (granting a motion for summary judgment *made in lieu of* an answer where inmate failed to exhaust administrative remedies)).

Here, it is undisputed Plaintiff failed to avail himself of the full panoply of administrative remedies prior to commencing this action. (Dkt. No. 21-2.) The record before the Court demonstrates Plaintiff completed only the first step of the grievance process before commencing this lawsuit. *Id.* As stated above, Plaintiff filed a series of letters that were consolidated into Grievance No. MS-24269-19. *Id.* at ¶ 7. Due to the nature of the allegations, Grievance No. MS-24269-19 was forwarded to the Superintendent for investigation in accordance with DOCCS policy on or about September 4, 2019. *Id.* at ¶ 8. On April 30, 2020, the Superintendent issued

a determination denying Grievance No. MS-24269-19. *Id.* at ¶ 9. However, Plaintiff did not appeal the Superintendent's denial of Grievance No. MS-24269-19 to CORC. *Id.* at ¶ 10.

For these reasons, the Court finds Plaintiff failed to exhaust his administrative remedies. *See Bennett v. Fletcher*, No. 9:17-CV-849 (GTS/CFH), 2020 WL 872491, at \*7 (N.D.N.Y. Jan. 16, 2020) (citing *Omaro v. Annucci*, 68 F. Supp. 3d 359, 364 (W.D.N.Y. 2014) ("It is well-established that an inmate who does not appeal to CORC has failed to exhaust his administrative remedies.")), *report-recommendation adopted by* 2020 WL 871156 (N.D.N.Y. Feb. 21, 2020); *see, e.g., Hamm v. Farney*, No. 9:13-CV-1302 (BKS/CFH), 2017 WL 8894723, at \*5 (N.D.N.Y. Dec. 22, 2017), *report and recommendation adopted by* 2018 WL 922149 (N.D.N.Y. Feb. 16, 2018) (dismissing the plaintiff's complaint for failure to exhaust where the IGP supervisor and DOCCS Assistant Director of IGP both declared that "a search of the DOCCS database confirmed plaintiff's original grievance, as well as an appeal to the Superintendent, but produced no record of an appeal to CORC"); *see also Teaque v. Mullen*, No. 9:18-CV-01412 (GTS/CFH), 2019 WL 8589277, at \*7 (N.D.N.Y. Dec. 17, 2019) ("Because plaintiff commenced this action before receiving a response from the Superintendent of Mid-State regarding his grievance, plaintiff did not fully exhaust his administrative remedies before commencing this action."), *report and recommendation adopted by* 2020 WL 858355 (N.D.N.Y. Feb. 21, 2020).

**\*6** "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability" under *Ross. Ferrer v. Racette*, No. 14-cv-1370 (GTS/DJS), 2017 WL 6459525, at \*12 (N.D.N.Y. Dec. 18, 2017) (citation omitted); *see Perez v. Colon*, No. 9:19-CV-722 (GTS/DJS), 2020 WL 4549206, at \*4 (N.D.N.Y. June 16, 2020) ("finding no basis appeared on the record for concluding that DOCCS' grievance procedure was unavailable to the plaintiff given he failed to respond to the defendants' motion"), *report and recommendation adopted by* 2020 WL 4530602 (N.D.N.Y. Aug. 6, 2020).

Although he did not respond to Defendants' motion, Plaintiff's verified complaint suggests administrative remedies were unavailable to him at the time he commenced this action because the "grievance officer [did] not respond[.]" (Dkt. No. 1 at 7.) Defendants recognize the Superintendent's decision was issued beyond the 25 calendar

days set forth in 7 N.Y.C.R.R. § 701.8(f). (Dkt. No. 21-1 at 7-8.) However, it is well-settled that where an inmate does not receive a response to a grievance, the inmate must appeal to the next level of review notwithstanding a lack of response at any level of review. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, C.J.) ("[Any failure by the IGRC or the Superintendent to timely respond to a grievance ... can—and must—be appealed to the next level ... to complete the grievance process.").

Here, when the Superintendent did not render a decision on Plaintiff's grievance within 25 days (i.e., by September 29, 2019), Plaintiff had the ability to file an appeal with CORC. *See* 7 N.Y.C.R.R. § 701.8(g). "[I]nstead of doing so, [Plaintiff] rushed to Court, without attempting to appeal (the Superintendent's non-response) to [CORC] eviscerating the purpose of the administrative remedy process." *Teaque v. Mullen*, 2020 WL 858355, at *4 (citing *Woodford*, 548 U.S. at 89 (articulating two main purposes of exhaustion of administrative remedies)). Thus, because Plaintiff failed to appeal the Superintendent's non-response to the next level, he cannot be excused from the grievance process. *See Heyliger v. Gebler*, 624 F. App'x 780, 782 (2d Cir. 2015) (summary order) ("Under the regulations ..., if at any step of the grievance process, an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to 'appeal[ ] to the next step.' ") (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2) (2015)).

Based on the foregoing, the Court agrees with Defendants that Plaintiff failed to avail himself of the full panoply of administrative remedies prior to commencing this action. *See James v. Doty*, No. 9:17-CV-1145 (MAD/CFH), 2019 WL 1474309, at *5 (N.D.N.Y. Jan. 4, 2019) ("Plaintiff does not suggest, and the record does not demonstrate, that plaintiff appealed the non-response to CORC."), *report and recommendation adopted by* 2019 WL 457694 (N.D.N.Y. Feb. 6, 2019).

Moreover, there is no evidence in the record showing the grievance procedure "operate[d] as a simple dead end" to Plaintiff, nor is there any evidence to establish an issue of fact as to unavailability due to an "opaque" administrate scheme. *See Ross*, 136 S. Ct. at 1859-60. As pointed out by Defendants, Plaintiff filed and appealed the denial of an unrelated grievance (Grievance No. MS-24271-19) to CORC on or about November 7, 2019. (Dkt. No. 21-2 at ¶ 10.) *See also Gonzalez v. Coburn*, No. 6:16-cv-6174, 2017 WL 6512859, at *6 (W.D.N.Y. Dec. 20, 2017) (finding the

plaintiff's decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was neither a dead-end nor so opaque that he could not avail himself of it). Lastly, the record does not demonstrate prison administrators prevented Plaintiff from using the grievance procedure due to "machination, misrepresentation, or intimidation." *See Ross*, 136 S. Ct. at 1859-60. Thus, given the record and considering the evidence in the light most favorable to Plaintiff, the Court finds there is no genuine dispute of fact that administrative remedies were available.

**\*7** In light of the foregoing, the Court recommends granting Defendants' motion for summary judgment, as there is no genuine issue of material fact that Plaintiff failed to exhaust his administrative remedies. Generally, a dismissal for failure to exhaust administrative remedies is without prejudice, so that the inmate-plaintiff can cure the defect by exhausting his administrative remedies and then reinstituting his suit. *See Snider v. Melindez*, 199 F. 3d 108, 111-12 (2d Cir. 1999). However, dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004).

Here, more than six months have passed since Plaintiff should have appealed Grievance No. MS-24269-19 to CORC. (*See* Dkt. No. 21-2 at ¶¶ 8, 9, 13.) As Plaintiff's failure to exhaust his administrative remedies is incurable at this point, the Court recommends dismissing Plaintiff's complaint with prejudice. *See Castineiras v. Helms*, No. 9:17-CV-1084 (BKS/ATB), 2019 WL 2870300, at *5-6 (N.D.N.Y. June 6, 2019).

## IV. CONCLUSION

After carefully considering the record, the Court finds Plaintiff failed to exhaust his administrative remedies.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 21) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies

Case 9:25-cv-00153-DNH-ML     Document 53     Filed 05/05/26     Page 88 of 170

**Jenkins v. Short, Not Reported in Fed. Supp. (2020)**

of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[3] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

**All Citations**

Not Reported in Fed. Supp., 2020 WL 9264842

---

### Footnotes

1       Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs. Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

2       Christopher Tapia is the Inmate Grievance Program ("IGP") Supervisor at Mid-State. (Dkt. No. 23-1 at ¶ 3.)

3       If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

847 Fed.Appx. 47
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Mark A. LAPIERRE, Plaintiff-Appellant,
v.
Corrections Officer Chad LAVALLEY, Clinton
Correctional Facility, fka E. LaValley, Sergeant
Delisle, Clinton Correctional Facility, Sergeant Michael
Guynup, Clinton Correctional Facility, fka Terry
Guynup, Doctor Krishna Kumar Vadlamudi, Marcy
Correctional Facility, Corrections Officer Randy Russell,
Clinton Correctional Facility, Defendants-Appellees,
Catherine Leahy-Scott, New York State Inspector
General, Commissioner Anthony J. Annucci,
New York State Department of Corrections and
Community Supervision (DOCCS), Defendants.

19-3318
|
March 3, 2021

**Synopsis**
**Background:** Inmate brought § 1983 action against several
employees of New York State Department of Corrections and
Community Supervision, including corrections officers and
inmate's physician, alleging Eighth Amendment violations.
The United States District Court for the Northern District
of New York, Mae A. D'Agostino, J., 2019 WL 4686415,
adopted recommendation of Daniel J. Stewart, United States
Magistrate Judge, 2019 WL 4015689, and granted summary
judgment for defendants. Inmate appealed.

**Holdings:** The Court of Appeals held that:

[1] inmate failed to exhaust administrative remedies, and

[2] failure to exhaust administrative remedies was not
excused.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (2)

[1]    **Civil Rights**    Criminal law enforcement;
       prisons
       Inmate    failed    to    exhaust    administrative
       remedies   prior   to   bringing   §   1983   action
       against   employees   of   New   York   State
       Department of Corrections and Community
       Supervision,   despite   inmate's   claim   that   he
       submitted   a   handwritten   complaint   to   an
       unspecified correction officer and the complaint
       subsequently   went   missing;   inmate   failed   to
       properly file his complaint with the inmate
       grievance clerk so that it would be numbered
       and logged at the time of receipt, failed to take
       any additional measures to ensure that complaint
       was   received,   and   later   made   contradictory
       statements at his deposition regarding whether he
       actually filed a grievance. 42 U.S.C.A. § 1983.

       1 Case that cites this headnote

[2]    **Civil Rights**    Criminal law enforcement;
       prisons
       Any absence of grievance forms at correctional
       facility   did   not   excuse   inmate's   failure   to
       exhaust    administrative    remedies    prior    to
       bringing   §   1983   action   against   employees   of
       New York State Department of Corrections
       and Community Supervision; inmate grievance
       program regulations provided that a complaint
       could be submitted on plain paper if a grievance
       form was not readily available. 42 U.S.C.A. §

1983; N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a)(1).

4 Cases that cite this headnote

**\*48** Appeal from a judgment of the United States District Court for the Northern District of New York (D'Agostino, *J.*; Stewart, *M.J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

For Plaintiff-Appellant: Mark A. LaPierre, pro se, Comstock, NY.

For Defendants-Appellees: Barbara D. Underwood, Solicitor General, Victor Paladino, Senior Assistant Solicitor General, and Brian D. Ginsberg, Assistant Solicitor General, for Letitia James, Attorney General of the State of New York, Albany, NY.

Present: Debra Ann Livingston, Chief Judge, Denny Chin, Joseph F. Bianco, Circuit Judges.

## **\*49 SUMMARY ORDER**

Mark LaPierre, pro se and incarcerated, sued several employees of the New York State Department of Corrections and Community Supervision ("DOCCS")— including corrections officers and his physician, Dr. Krishna Vadlamudi—under 42 U.S.C. § 1983, alleging Eighth Amendment violations. First, LaPierre claimed that, on December 21, 2012, while he was imprisoned at Clinton Correctional Facility ("Clinton"), the officers beat him while others failed to intervene ("the Clinton incident"). Second, LaPierre claimed that, while he was imprisoned at the Marcy Correctional Facility ("Marcy"), Vadlamudi was deliberately indifferent to his medical needs by denying him suitable pain medication and refusing to order diagnostic testing. The defendants moved for summary judgment, arguing that LaPierre failed to exhaust his administrative remedies before filing suit over the Clinton incident and, while he properly exhausted his claim against Vadlamudi, LaPierre's disagreement with Vadlamudi's treatment did not amount to a constitutional violation. The district court granted the

defendants' motion and LaPierre timely appealed. As to LaPierre's Eighth Amendment claim against Vadlamudi, we affirm for substantially the reasons set forth by the district court. We address whether LaPierre properly exhausted his administrative remedies regarding the Clinton incident herein, and assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

* * *

We review a grant of summary judgment de novo, "resolv[ing] all ambiguities and draw[ing] all inferences against the moving party." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126–27 (2d Cir. 2013) (per curiam). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). As relevant here, the Prison Litigation Reform Act ("PLRA") provides that incarcerated plaintiffs must exhaust administrative remedies before filing a claim under § 1983 "or any other Federal law." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, ––– U.S. ––––, 136 S. Ct. 1850, 1856, 195 L.Ed.2d 117 (2016). The PLRA requires "proper exhaustion," meaning exhaustion in "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). As an inmate of DOCCS, LaPierre was required to submit his grievance through the Inmate Grievance Program.

**[1]** The district court found no material issue of fact had been raised as to LaPierre's failure to exhaust the administrative remedies that were available to him regarding the Clinton incident. We agree. In his verified complaint and affidavit, LaPierre claims that on or around December 29, 2012, he submitted a handwritten complaint to an unspecified correction officer and the complaint subsequently went missing. However, having failed to properly file his complaint with the Inmate Grievance Clerk so that it would be numbered and logged at the time of receipt, LaPierre stated that he took no additional measures to ensure that his complaint was received. Moreover, at his deposition, LaPierre testified that he did *not* file a grievance concerning the Clinton incident. He also affirmed at his deposition that "[he] tried to file a grievance" but did not actually do so, because no grievance forms **\*50** were available.[1] Doc. 91-2 at 5. In such circumstances, LaPierre's shifting and contradictory

statements "transcend credibility concerns and go to the heart" of whether LaPierre raised a genuine issue of material fact as to exhaustion. *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[I]n the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court must "mak[e] some assessment of the plaintiff's account" despite "the duty of district courts not to weigh the credibility of the parties at the summary judgment stage"). We see no error in the district court's determination that LaPierre failed to do so.

[2] Nor does the mere absence of grievance forms attested to by LaPierre during his deposition excuse his failure to exhaust administrative remedies. An administrative procedure is unavailable when (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation,

or intimidation." *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123–24 (2d Cir. 2016) (quoting *Ross*, 136 S.Ct. at 1859–60). The Inmate Grievance Program regulations provide that if the grievance "form is not readily available, a complaint may be submitted on plain paper." 7 N.Y.C.R.R. § 701.5(a)(1). Moreover, to the extent LaPierre argues that the administrative procedure was unavailable for other reasons —either because it was opaque or because he was thwarted from using it—we have considered these arguments and find them to be without support in the record for substantially the reasons provided by the district court.

\* \* \*

We have considered LaPierre's remaining arguments and find them to be without merit.[2] Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

847 Fed.Appx. 47

---

## Footnotes

1      The record reflects that LaPierre wrote letters to then-DOCCS Commissioner Brian Fischer on January 1, 2013, and letters to the Inspector General's Office on March 21, 2013 and June 9, 2013, which resulted in an investigation by the Inspector General. These letters, however, are not the equivalent of a grievance and did not exhaust LaPierre's administrative remedies. *See* 7 N.Y.C.R.R. § 701.2(a); *see also Ross*, 136 S.Ct. at 1855 (applying Maryland law).

2      LaPierre's pending motion for assignment of counsel, submitted after the briefing period ended, is denied as moot.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 92 of 170

LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)

2019 WL 4686415
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark LAPIERRE, Plaintiff,
v.
Chad LAVALLEY, et al., Defendants.

9:15-CV-1499 (MAD/DJS)
|
Signed 09/26/2019

**Attorneys and Law Firms**

MARK A. LAPIERRE, 15-A-1283, Washington Correctional Facility, Box 180, 72 Lock 11 Lane, Comstock, New York 12821, Plaintiff, pro se.

OF COUNSEL: CHRISTOPHER LIBERATI-CONANT, AAG, OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, The Capitol, Albany, New York 12224, Attorneys for Defendants.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge:

## I. INTRODUCTION

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983, asserting claims arising from his confinement at both Clinton Correctional Facility ("Clinton") and Marcy Correctional Facility ("Marcy"). *See* Dkt. No. 1. Following initial review of the complaint and after receiving leave from the Court, Plaintiff filed his amended complaint on November 30, 2017, which removed previously dismissed Defendants and added Officer Randy Russell as a named Defendant. *See* Dkt. No. 68. Plaintiff's amended complaint contains five causes of action arising from an incident that allegedly occurred on December 21, 2012, and medical treatment for injuries associated with that same incident. *See id.* at 9-10.

On November 13, 2018, Defendants moved for summary judgment. *See* Dkt. No. 79. In their motion, Defendants contend that Plaintiff's four causes of action relating to the December 21, 2012 use of force incident must be dismissed

because Plaintiff failed to exhaust administrative remedies. *See* Dkt. No. 79-1 at 6-10. As to his deliberate medical indifference claim against Defendant Vadlamudi, Defendants argue that the claim fails on the merits. *See id.* at 10-14.

In an August 26, 2019 Report-Recommendation and Order, Magistrate Judge Stewart recommended that the Court grant Defendants' motion in its entirety and dismiss this action. *See* Dkt. No. 96. Specifically, Magistrate Judge Stewart found that Plaintiff failed to file a grievance regarding the December 2012 incident and that Plaintiff failed to demonstrate that his failure to exhaust should be excused because administrative remedies were available to him. *See id.* at 8-14. As to the claim of deliberate medical indifference against Defendant Vadlamudi, Magistrate Judge Stewart found that the facts in the record fail to demonstrate that he acted with the requisite deliberate indifference to Plaintiff's serious medical needs. *See id.* at 17-21. Rather, the Report-Recommendation and Order found that Plaintiff's claim that Defendant Vadlamudi was deliberately indifferent is nothing more than a difference of opinion as to the appropriate medical treatment. *See id.*

Currently before the Court is Magistrate Judge Stewart's Report-Recommendation and Order and Plaintiff's objections thereto.

## II. BACKGROUND

For a complete recitation of the relevant factual background, the Court refers the parties to Magistrate Judge Stewart's August 26, 2019 Report-Recommendation and Order.

## III. DISCUSSION

### A. Standard of Review

When a party files specific objections to a magistrate judge's order and report-recommendation, the district court "make[s] a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[g]eneral or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error." *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, \*2 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part,

LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 93 of 170

the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**\*2** A court may grant a motion for summary judgment only if "the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party. *See id.* at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the nonmovant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's statement of material facts; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003).

"Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment." *Id.* (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, at \*1 (S.D.N.Y. May 16, 2001)). Moreover, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment. *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**B. Exhaustion**

The Prison Litigation Reform Act ("PLRA") states that "[no] action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, 136 S. Ct. 1850 (2016). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

**\*3** The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See Woodford*, 548 U.S. at 90-103.

New York State has a three-step administrative review process. First, a grievance is submitted to the IGRC which reviews and investigates the formal complaint before issuing a written determination. *See* 7 N.Y.C.R.R. § 701.5(b). Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* at § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to the CORC, which makes the final determination within the administrative review process. *See id.* at § 701.5(d).

If an inmate's grievance contains issues of employee harassment, then the grievance bypasses the first step of IGRC review and is forwarded directly to the Superintendent. *See id.* at § 701.8(b)(c). The Superintendent must render a written decision within twenty-five days of receipt of the grievance. *See id.* at § 701.8(g). An inmate may appeal such a decision to the CORC within seven days of its receipt. *See id.* at § 701.8(h).

Case 9:25-cv-00153-DNH-ML   Document 53   Filed 05/05/26   Page 94 of 170

LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)

If all three levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to section 1983. *See Bridgeforth v. DSP Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter*, 534 U.S. at 524); *Singh v. Goord*, 520 F. Supp. 2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)).

To the extent a civil rights claim must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by the CORC, must be completed before an action asserting that claim may be filed in court. *See*, *e.g.*, *Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision from CORC *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice") (citing *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds, Porter v. Nussle*, 534 U.S. 516 (2002)); *Rodriguez v. Rosner*, No. 12-CV-958, 2012 WL 7160117, *8 (N.D.N.Y. Dec. 5, 2012). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, *11 (N.D.N.Y. Jan. 21, 2015) (citing *Neal*, 267 F.3d at 122) (other citation omitted).

Although administrative remedies generally must be exhausted, a prisoner need not exhaust remedies if they are not "available." *Ross*, 136 S. Ct. at 1855. "First, an administrative remedy may be unavailable when 'it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' " *Williams*, 829 F.3d at 123 (quoting *Ross*, 136 S. Ct. at 1859). "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859). "In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' " *Id.* at 123-24 (quoting *Ross*, 136 S. Ct. at 1859). "Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

**\*4** In the present matter, the Court finds that Magistrate Judge Stewart correctly determined that Plaintiff failed to exhaust his administrative remedies that were available to

him regarding the December 2012 incident that occurred at Clinton. Initially, as Magistrate Judge Stewart correctly noted, Plaintiff's conclusory allegation that he filed a handwritten grievance that "disappeared" is insufficient to raise a question of fact regarding exhaustion. In his objections, Plaintiff claims that on or about December 29, 2012, Plaintiff "submitted the hand-written complaint/grievance because the Infirmary officers did not have official grievance forms." Dkt. No. 97 at 9. "Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations." *Rodriquez v. Cross*, No. 9:15-cv-1079, 2017 WL 2791063, *7 (N.D.N.Y. May 9, 2017) (citations omitted). Plaintiff has not provided the Court with any evidence, other than his own conclusory allegation, to support his claim that he attempted to file a grievance.

Moreover, in a January 1, 2013 letter Plaintiff sent to then DOCCS Commissioner Brian Fischer, Plaintiff mentions the assault and asks that his security designation be changed so that he would not have to be housed at Clinton later in the month when he had another court date scheduled. *See* Dkt. No. 79-5 at 1-3. In that letter, no mention is made of Plaintiff's alleged attempt to file a grievance. *See id.* Similarly, no mention is made of any alleged grievance in the other documents Plaintiff submitted to DOCCS officials around the time of the alleged assault. *See, e.g.*, Dkt. No. 57-2 at 35. Additionally, Plaintiff did cause an investigation by the Inspector General through filing non-grievance complaints. *See* Dkt. No. 79-5 at 5-9. In documents generated as part of that investigation and by Plaintiff, again no mention is made of any grievance. *See id.*; *see also* Dkt. No. 36-1 at 28. Moreover, while Plaintiff repeatedly checked on the status of the Inspector General's investigation into the incident, Plaintiff made no inquiries into the status of the grievance he now alleges that he attempted to file. *See* Dkt. No. 79-5 at 5-9.

Previously, courts in the Second Circuit had held that " 'a letter to the Superintendent who then commences an Inspector General investigation can constitute "special circumstances" that satisfy the PLRA requirement that prison officials be afforded time and opportunity to address prison complaints internally.' " *Winfield v. Bishop*, No. 9:09-cv-1055, 2013 WL 4736378, *6 (N.D.N.Y. Sept. 3, 2013) (quotation omitted). As discussed above, however, the Supreme Court recently rejected the Second Circuit's "special circumstances" exception to the PLRA's exhaustion requirement. Therefore, Plaintiff's complaints to the Inspector General's Office and

LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 95 of 170

Commissioner Fischer, which do not constitute complete and proper exhaustion under New York's grievance scheme, cannot excuse his failure to exhaust. *See Kearney v. Gebo*, No. 9:15-cv-253, 2017 WL 61951, \*6 (N.D.N.Y. Jan. 4, 2017). [1]

Plaintiff also argues that he was "threatened with further beatings and stabbing, (murder) should he complain, file a grievance, or seek medical attention." Plaintiff further alleged in his amended complaint that he "was threatened with Assault and Murder if I sought medical attention or filed a Grievance or complaint between December 21, 2012 and December 28, 2012, while at Clinton Correctional Facility." Dkt. No. 68 at 3-4. Yet Plaintiff was transferred to Downstate Correctional Facility on December 28, 2012. The record is clear that once there, Plaintiff was not deterred from raising complaints about the alleged December 21, 2012 incident. Nor was Plaintiff deterred from filing a grievance regarding his medical treatment, in which he reiterated his claim that he had been the victim of assault by staff. *See* Dkt. No. 79-9. The only threats Plaintiff claims to have received were from officers at Clinton. Since Plaintiff was transferred back to Downstate on December 28, 2012, and had until January 21, 2013 to file his grievance, Plaintiff was not prevented from exhausting his administrative remedies by anyone at DOCCS. *See McNab v. Doe*, 686 Fed. Appx. 49, 51 (2d Cir. 2017); *Riles v. Buchanan*, 656 Fed. Appx. 577, 581 (2d Cir. 2016) (holding that where the plaintiff filed a grievance, despite being threatened by a corrections officer, "it cannot be said that the threat interfered with his exhaustion. He was not deterred from exhausting, he simply did not exhaust in accordance with the procedures"). Thus, Plaintiff expressed fear of reprisal or retaliation for filing a grievance is "inconsistent with Plaintiff's assertion that he did properly grieve the assault, and with Plaintiff's filing of grievances after that time." *Gough v. Morris*, No. 9:16-cv-1107, 2018 WL 7199494, \*5 (N.D.N.Y. Dec. 14, 2018) (citation omitted).

 **\*5**  Plaintiff also contends that DOCCS employees told him that the issue was not grievable and that it was "taken care of." Dkt. No. 90 at 12. However, Plaintiff allegation that he filed a grievance undermines his contention that he was misled regarding the grievability of the issue. *See McNab*, 686 Fed. Appx. at 51. Moreover, DOCCS Directive 4040 clearly instructs that "[i]f an inmate is unsure whether an issue is grievable, he or she should file a grievance and the question will be decided through the grievance process[.]" Dkt. No. 79-8 at 2.

Accordingly, the Court finds that the undisputed facts establish that Plaintiff failed to exhaust administrative remedies that were available to him and, therefore, Magistrate Judge Stewart correctly determined that Defendants are entitled to summary judgment on Plaintiff's claims relating to the December 21, 2012 incident.

### C. Deliberate Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Hathaway*, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66.

The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *See id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (quotation omitted). Since there is no distinct litmus test, whether a medical condition is serious depends on certain factors, such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). The court should also judge the severity of the denial of care within the context of the surrounding facts and circumstances of the case. *See Smith*, 316 F.3d at 185.

LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 96 of 170

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance*, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id. at 703; Chance*, 143 F.3d at 703 (finding that mere disagreement with the prescribed treatment does not amount to deliberate indifference to a serious medical need). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

**\*6** Finally, while "[c]ruel and unusual punishment may consist of prison officials delaying an inmate['s] access to needed medical care," *Kaminsky v. Rosenblum*, 929 F.2d 922, 926 (2d Cir. 1991), the case law of this Circuit "has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (table) (affirming summary judgment for the defendants where the plaintiff received knee surgery approximately three years after sustaining the underlying injury) (internal citations omitted).

In the present matter, the Court finds that Magistrate Judge Stewart correctly determined that Defendant Vadlamudi did not act with the requisite deliberate indifference to Plaintiff's serious medical need. Rather, the record demonstrates that Plaintiff's claim amounts to nothing more than a difference in opinion as to the medical treatment Plaintiff required.

Initially, Plaintiff claims that Magistrate Judge Stewart improperly relied on Defendant Vadlamudi's declaration "to the exclusion of all other evidence." Dkt. No. 97 at 17. Plaintiff also alleges that the report incorrectly states that Defendant Vadlamudi examined Plaintiff on January 18, 2013 and that he ordered Tylenol 3 for Plaintiff and ordered that he be permitted to use the bottom bunk. *See id.* Plaintiff claims that he arrived at Marcy on January 18, 2013 with a prescription for Tylenol 3 from the doctor at Downstate and that he was only seen by a nurse that first day, who consulted with Defendant Vadlamudi by telephone. *See id.* Plaintiff claims that Defendant Vadlamudi directed that Plaintiff's

Tylenol 3 prescription not be renewed, and that he only had seven days of medication remaining. *See id.* Plaintiff complains that Defendant Vadlamudi "had a long reputation of cancelling other doctor's prescriptions, as well as being rude, forgetful[ ], and unable to see or hear well." *Id.*

When Defendant Vadlamudi saw Plaintiff for the first time on January 22, 2013, Plaintiff takes issue with the limited examination that was actually performed, claiming that he only "listened to Plaintiff's heart and lungs with a stethiscope [sic] and tested Plaintiff's knee reflexes." *Id.* at 18. Moreover, Plaintiff claims that he informed Defendant Vadlamudi that the doctor at Downstate informed him that he would need an MRI and that it could be ordered once Plaintiff arrived at his permanent facility, *i.e.*, Marcy. *See id.* Despite being so informed, Defendant Vadlamudi refused to order an MRI. *See id.*

Plaintiff also notes that on two occasions, he was transferred to Franklin Correctional Facility ("Franklin") for scheduled court appearances. *See id.* at 19. On both occasions, the doctor at Franklin prescribed Tylenol 3 for Plaintiff "due to his obvious severe pain." *Id.* Upon his return to Marcy, Plaintiff claims that Dr. Vadlamudi again cancelled his prescription for Tylenol 3. *See id.*

As Plaintiff's objections make clear, his deliberate medical indifference claim is based exclusively on his disagreement with Defendant Vadlamudi's prescribed treatment. *See Chance*, 143 F.3d at 703. In his declaration, upon which the Court may properly rely, Defendant Vadlamudi indicates that he did not believe that an MRI was medically indicated and that nothing more than regular Tylenol or Ibuprofen and ice were needed to treat Plaintiff's symptoms. *See* Dkt. No. 79-13 at ¶¶ 8-10. He further determined that Tylenol 3, which contains codeine, was inappropriate for Plaintiff's treatment, in part, because Plaintiff had a history of opiate-seeking behavior, which was documented in his medical records. *See id.* at ¶¶ 11-12. [2]

**\*7** As Plaintiff's medical records make clear, Plaintiff was seen and treated by the medical staff at Marcy on a regular basis. He was never denied treatment, he was simply denied the treatment that he wanted. Accordingly, the Court finds that Magistrate Judge Stewart correctly determined that Defendants' motion for summary judgment should be granted as to Plaintiff's deliberate medical indifference claim.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 97 of 170

**LaPierre v. LaValley, Not Reported in Fed. Supp. (2019)**

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Daniel J. Stewart's August 26, 2019 Report-Recommendation and Order (Dkt. No. 96) is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 79) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance in the Local Rules.

### IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 4686415

---

### Footnotes

1    In his objections, Plaintiff contends that his "written complaint/grievance" was forwarded to Lieutenant Horan, who interviewed him on January 9, 2013. *See* Dkt. No. 97 at 11. The "written complaint/grievance" that Plaintiff is referring to is his January 1, 2013 letter to Commissioner Fischer which, as discussed, does not constitute complete and proper exhaustion. *See* Dkt. No. 79-5 at 1-4.

2    Plaintiff indicates in his objections that it is DOCCS policy that medical records to not travel with an inmate who is sent to a temporary facility for short periods of time. *See* Dkt. No. 97 at 19. Since it was noted in Plaintiff's medical record at Marcy that he has a history of opiate seeking behavior, it is not surprising that he would be able to obtain a new prescription from a non-treating physician, unfamiliar with his past attempts at obtaining opiates.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4732755
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Alfredo LEWIS, Plaintiff,
v.
Lynn WASIELEWSKI, Rebecca McDaniel, Paul Burke, Dennis Becker and Sabato Parisi, Defendants.

15-CV-0168-RJA-MJR
|
Signed 07/09/2018
|
Filed 07/10/2018

**Attorneys and Law Firms**

Alfredo Lewis, Uniondale, NY, pro se.

David J. Sleight, Office of the Attorney General, Buffalo, NY, for Defendants.

REPORT AND RECOMMENDATION

HONORABLE MICHAEL J. ROEMER, United States Magistrate Judge

## INTRODUCTION

**\*1** This case has been referred to the undersigned pursuant to Section 636(b)(1) of Title 28 of the United States Code, by the Honorable Richard J. Arcara, for hearing and reporting on dispositive motions for consideration by the District Court. Before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 61). For the following reasons, it is recommended that defendants' motion for summary judgment be granted and the complaint dismissed.

## PROCEDURAL BACKGROUND

Plaintiff Alfredo Lewis ("plaintiff"), an inmate in the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS") who is proceeding *pro se*, claims that his constitutional rights were violated, in contravention of Section 1983 of the Title 28 of the United States Code, when he was retaliated against and assaulted as a result of writing letters of complaint while incarcerated at Gowanda Correctional Facility ("Gowanda"). (Dkt. No. 1). Plaintiff sued Gowanda and a number of individuals employed by DOCCS as counselors and correction officers during the relevant time period. (Dkt. No. 1). On August 28, 2015, the Court granted plaintiff's request to proceed *in forma pauperis*. (Dkt. No. 10). The Court also dismissed, with prejudice, plaintiff's claims against Gowanda, Supervisor Counselor Cabeara, and all other individual defendants in their official capacities. (*Id.*). The remaining defendants, sued in their individual capacities, include Lynn Wasielewski, Rebecca McDaniel, Paul Burke, Dennis Becker, and Sabato Parisi. In addition to the complaint, plaintiff submitted a number of other documents and exhibits in support of his claims. (Dkt. Nos. 11, 13, 14, 22 and 33). Defendants filed answers to the complaint and the Court held a preliminary pretrial conference on August 16, 2016, at which time it entered a Case Management Order. (Dkt. Nos. 25, 28, 31, 34, 37, 39). The parties proceeded with discovery which included Rule 26 disclosures, document and interrogatory requests by plaintiff, and a deposition of plaintiff by defendants. (Dkt. Nos. 40, 43, 48, 58, 64).

Defendants filed the instant motion for summary judgment on November 26, 2017. (Dkt. Nos. 61-63). Plaintiff submitted a number of responses in opposition to the motion (Dkt. Nos. 65, 66, 69), and defendants filed a reply on December 22, 2017 (Dkt. No. 67).

## RELEVANT FACTS

At the time of the incidents relevant to this lawsuit, plaintiff was an inmate in the care and custody of DOCCS.[1] (Dkt. No. 62, ¶¶ 1-2; Dkt. No. 1, pg. 2). Also at the time of the events alleged in the complaint, defendant Lynn Wasielewski was employed by DOCCS as a social worker at Gowanda, defendant Rebecca McDaniel was employed by DOCCS as an Offender Rehabilitation Coordinator at Gowanda, defendants Paul Burke and Dennis Becker were employed by DOCCS as correction officers at Gowanda, and defendant Sabato Parisi was employed by DOCCS as a correction sergeant at Gowanda. (Dkt. No. 62 at ¶¶ 3-7; Dkt. No. 1, pg. 2).

**\*2** *Plaintiff's Arrival at Gowanda*
Plaintiff was transferred to Gowanda from Bare Hill Correctional Facility on or around January 20, 2015. (Dkt. No. 62-2; Dkt. No. 68, pg. 8). The conviction that resulted

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 99 of 170

Lewis v. Wasielewski, Not Reported in Fed. Supp. (2018)

in plaintiff's placement in DOCCS custody at that time was stalking in the second degree. (Dkt. No. 68, pg. 5) Plaintiff testified that upon arrival at Gowanda, he learned that he had been transferred there in order to participate in the Sex Offender Treatment Program ("SOP"). (*Id.* at 10). Plaintiff was interviewed by McDaniel, a counselor assisting with the SOP, on the day he arrived at Gowanda. (*Id.* at 8, 11). Plaintiff testified that he informed McDaniel that because he was not incarcerated for a sex offense, he was not required to complete the SOP. (*Id.*). Plaintiff contends that McDaniel informed him that unless he signed a paper enrolling himself in the SOP, he would be required to serve his maximum sentence of incarceration. (*Id.* at 9-11). Plaintiff emphasized to McDaniel that the SOP was not consistent with his "merit board" and that it would interfere with his ability to enroll in other programs. [2] (*Id.* at 9, 11). Plaintiff indicates that McDaniel became very agitated with him during the interview as result of his opposition to participate in the SOP. (*Id.* at 11-12). Nonetheless, plaintiff was enrolled in the SOP and began participating. (Dkt. No. 66, pg. 21; Dkt. No. 64, pgs. 27, 31).

In early February of 2015, plaintiff wrote letters of complaint to Cabrera and Wasielewski. (Dkt. No. 1, pgs. 3-5; Dkt. No. 69, pgs. 9-18). Plaintiff indicates that both of these individuals were supervisors at Gowanda. (*Id.*). Specifically, plaintiff complained about his placement in the SOP and McDaniel's refusal to place him in other programs. (*Id.*). He complained that during the SOP meetings McDaniel asked him inappropriate questions about his parents' sexual relationship. (*Id.*). He further complained that McDaniel would have outbursts during meetings if he or other inmates did not provide certain answers to her questions, which caused them to fabricate stories. (*Id.*).

*Alleged Assault on February 6, 2015*

Plaintiff contends that on February 6, 2015, Wasielewski confronted him immediately prior to a SOP meeting. (Dkt. No. 68, pgs. 14-15; Dkt. No. 1, pg. 6). Wasielewski was upset that plaintiff "went over her head and McDaniel's head by writing to Cabrera." (Dkt. No. 68, pg. 15). Plaintiff states that he returned to the meeting and that after it ended, he was approached by a correction officer who indicated that a sergeant wanted to speak with him. (Dkt. No. 68, pg. 17; Dkt. No. 1, pg. 6). Plaintiff reported to Parisi, the correction sergeant. (Dkt. No. 62, ¶ 15). Plaintiff states that he was then taken to a stairwell, told to put his hands on the wall, and handcuffed. (Dkt. No. 68, pg. 18; Dkt. No. pg. 6). Plaintiff

claims that Parisi pulled his hair and repeatedly punched him in the ribs. (Dkt. No. 68, pgs. 18-19; Dkt. No. pg. 6). Plaintiff contends that Parisi stated "what the hell do [you] think [you are] doing writing letters" and accused him of trying to get staff members fired. (Dkt. No. 68, pg. 19; Dkt. No. 1, pg. 6). Plaintiff alleges that Parisi stated to him: "I'm going to put your black ass in the SHU box" and to another officer in plaintiff's presence: "[Plaintiff is] lucky he don't put [plaintiff] somewhere [his] body can't be found." (Dkt. No. 1, pg. 6).

**\*3** Plaintiff received an inmate misbehavior report that same day charging him with harassment, lying and stalking. (Dkt. No. 68, pg. 17; Dkt. No. 1, pg. 6-7). The misbehavior report, which was written by K. Hoth and signed by Parisi, alleged that plaintiff harassed McDaniel and included inappropriate comments about her in his letters of complaint causing her to fear for her safety. (Dkt. No. 69, pg. 21-22; Dkt. No. 62-5). Plaintiff contends that the charges were fabricated by McDaniel and Wasielewski to retaliate against him for his complaints. (Dkt. No. 1; pg. 6-7). Plaintiff was found guilty of all three charges at a disciplinary hearing held on February 20, 2015. (Dkt. No. 68 pg. 24; Dkt. Nos. 62-6, 62-7). Plaintiff was sentenced to ninety days in the special housing unit ("SHU") and ninety days loss of recreation, packages, commissary, phone and special events. (Dkt. No. 62, ¶ 17). Plaintiff appealed the hearing determination to the DOCSS Commissioner in Albany, New York. (Dkt. No. 68, pg. 25; Dkt. No. 11). On or around March 6, 2015, plaintiff was transferred to Upstate Correctional Facility ("Upstate"). (Dkt. No. 68, pg. 27; Dkt. No. 62-2). As a result of his appeal, plaintiff's convictions for making a false statement and stalking were dismissed on April 23, 2015. (Dkt. No. 68, pgs. 24-25, 27; Dkt. No. 11). His sentence was reduced to thirty days in SHU. (*Id.*).

*Use of DOCCS' Grievance Procedures*

In his federal court complaint, plaintiff states that he did not file a grievance regarding the assault on February 6, 2015 "in order to keep [himself] safe from staff." (Dkt. No. 1, pg. 7). He further states in the complaint that "Albany was sent a complaint by mail on what ha[d] taken place." (*Id.*). However, plaintiff provided contradictory testimony during his deposition. Specifically, plaintiff testified during his deposition that he filed a grievance about the February 6, 2016 incident but never received a response. (Dkt. No. 68, pg. 20). Plaintiff also testified that he wrote a letter to the State Commission of Corrections about the incident. (*Id.* at 21; Dkt. No. 62-9). When asked for clarification by defense counsel,

plaintiff testified, "I wrote to grievance on a few different people ... I don't think I put exactly what happened because I didn't know if it would actually be, you know, passed off to the wrong person ... I didn't want to let too much be known after the threats I was getting." (Dkt. No. 68, pg. 22). Later during the same deposition, defense counsel asked plaintiff about his statement in his federal court complaint indicating that he did *not* grieve the incident. Plaintiff testified, in contradiction to his earlier statement during the deposition that he filed a grievance, that he did *not* file a grievance because he was fearful that officers would further harm him. (*Id.* at 29-30). Plaintiff further testified that officers harassed and threatened him and that when he was being taken to SHU an officer stated "go ahead and run your mouth" and "your other hand will be broken." (*Id.* at 22-23, 31-32). However, plaintiff did not specify which officers threatened him nor is it clear exactly when these alleged threats occurred.

Also during his deposition, plaintiff acknowledged that he filed the instant lawsuit on February 25, 2015, less than thirty days after the alleged assault and while he was still incarcerated at Gowanda. (Dkt. No. 68, pgs. 29-30). When asked by defense counsel why he was afraid to file a grievance but was not afraid to file a lawsuit, plaintiff testified that he believed he would be transferred out of Gowanda soon after his disciplinary hearing. (*Id.* at 30). Plaintiff further testified that he did not believe the grievance process was effective, since he "knew it would be intercepted someway", he did not "see [the officers] investigating themselves" and he "wanted somebody to come from the outside to investigate this." (*Id.* at 30-31). Plaintiff also testified that he did not file a grievance after his transfer to Upstate because he described the alleged assault during the appeal of his disciplinary charges. (*Id.* at 33). Plaintiff testified that he is familiar with inmate grievance procedures. (*Id.* at 22). A review of the inmate grievance records from DOCCS shows no record of a grievance or appeal filed by plaintiff while at Gowanda alleging retaliation or assault by defendants. (Dkt. No. 62, ¶ 21, Dkt. No. 62-8).

## DISCUSSION

**\*4** Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56. A genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d

Cir. 2008). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991). When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact. *Linares v. McLaughlin*, 423 Fed. Appx. 84, 86 (2d Cir. 2011). In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material facts genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988). Where a plaintiff is proceeding *pro se*, the court must "construe the complaint liberally and interpret it to raise the strongest arguments that [it] suggest[s]." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). However, even a *pro se* litigant cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations unsupported by facts. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

*Plaintiff's Failure to Exhaust Administrative Remedies*
The Prison Litigation Reform Act of 1995 (the "PLRA") requires an inmate to exhaust available administrative remedies before bringing suit to complain of prison conditions or actions taken by prison officials, such as retaliation or excessive force. *See* 42 U.S.C. § 1997e(a); *Ross v. Black*, 136 S. Ct. 1850, 1854-55 (2016). Exhaustion under the PLRA is mandatory, and must occur before the filing of a lawsuit in federal district court. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). In order to exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. *Jones v. Bock*, 549 U.S. 199, 218 (2007). DOCCS provides a detailed administrative review and appeals system for inmate grievances in New York. *Nji v. Heath*, 13 Civ. 200, 2014 U.S. Dist. LEXIS 163060, *7-6 (SDNY Nov. 10, 2014); *accord* 7 N.Y. Comp. Codes R. & Regs. § 701.5. In order to exhaust administrative remedies, the inmate must file a grievance with his or her facility's Inmate Grievance Resolution Committee ("IGRC") within 21 calendar days of the alleged occurrence. *Id.* If the IGRC denies the grievance, the inmate must file an appeal of the decision to the superintendent of his or her facility. *Id.* If the appeal to the superintendent is denied, the inmate must then appeal that determination to the Central Office Review Committee ("CORC") located in Albany, New York.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 101 of 170

Lewis v. Wasielewski, Not Reported in Fed. Supp. (2018)

*Id.*; *accord Espinal v. Goord*, 558 F.3d 119, 125-26 (2d Cir. 2009).

The record before the Court establishes that plaintiff did not exhaust his administrative remedies before filing the instant lawsuit. Plaintiff states in his complaint that he did *not* file a grievance as to the incident on February 6, 2015. He then provided contradictory statements during his deposition as to whether he filed a grievance. Plaintiff initially testified during his deposition that he filed a grievance but did not receive a response. He later attempted to clarify the statement by explaining that he "wrote to grievance on a few people" but that he did not "put exactly what happened." Plaintiff then testified during the same deposition that he did *not* file a grievance because he feared retaliation by officers. He later testified that he did *not* file a grievance because he believed the grievance process was ineffective. Indeed, a review of DOCCS records confirms that plaintiff did *not* file a grievance or appeal of the February 6, 2015 incident.

Despite plaintiff's initial statement in his deposition that he filed a grievance, the evidence in the record reflects that no grievance was filed as to the February 6, 2015 incident. This evidence includes plaintiff's statements in his complaint, the majority of plaintiff's deposition testimony wherein he indicates that he did *not* file a grievance, plaintiff's deposition testimony as to the various reasons he did *not* file a grievance, and DOCCS' records, which confirm that no grievance or appeal were filed. Thus, the Court finds that plaintiff has not raised a genuine issue of material fact as to whether he filed a grievance. *See Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) (summary judgment in favor of defendant upheld where nothing in the record supported plaintiff's allegations other than his own contradictory and incomplete testimony); *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) ("self-serving" deposition testimony cannot, by itself, defeat summary judgment); *Burwell v. Payton*, 5:12-cv-166, 2015 U.S. Dist. LEXIS 152745 (D. Vt. Nov. 9, 2015) (where plaintiff's deposition testimony was contradicted by the video recording, his own statement of undisputed facts, and the allegations of his complaint, plaintiff failed to identify a genuine issue of material fact that would justify reconsideration).

**\*5**  Moreover, even if the Court were to credit plaintiff's initial statement during his deposition that he filed a grievance, it remains clear that plaintiff did not fully exhaust his administrative remedies. Plaintiff testified that he did not receive a response to the grievance. DOCCS records

reflect that no grievance *or appeal* was filed regarding the February 6, 2015 incident. Indeed, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constituted a failure to exhaust administrative remedies." *Garvin v. Rivera*, 13-cv-7054, 2015 U.S. Dist. LEXIS 84675, \*7-8 (SDNY June 29, 2015). *See also Johnson v. New York City Dep't of Correction*, 13-cv-6799, 2014 U.S. Dist. LEXIS 85444 (SDNY June 16, 2014) ("Assuming that Plaintiff filed a timely grievance ... and received no response within five business days[,] ... Plaintiff ... could have taken the next step and requested a hearing.").

Finally, plaintiff's assertions that he sent a copy of his federal court complaint to Albany, wrote to the State Commission of Corrections, and that he complained about the February 6, 2015 incident during the appeal of his disciplinary hearing determination do not constitute exhaustion under the PLRA. The Second Circuit has held that alerting prison officials, through informal steps, as to the nature of the wrong for which redress is sought does not constitute proper exhaustion. *Macias v. Zenk*, 495 F.3d 37, 43-44 (2d Cir. 2007). *See e.g., Nji*, 2014 U.S. Dist. LEXIS 163060, \*9 ("[s]ending letters to persons outside the grievance process is insufficient to establish exhaustion because it is well settled that complaints and communications made outside of formal grievance procedures do not satisfy the PLRA's exhaustion requirement") (internal citations and quotations omitted); *David v. Doe*, 9:16-cv-0994, 2017 U.S. Dist. LEXIS 213704 (NDNY Dec. 29, 2017) (prisoner who did not file a grievance as to his constitutional claims, but instead submitted a disciplinary appeal and told a representative of the Office of the Inspector General about the facts alleged in his lawsuit, did not properly exhaust his administrative remedies under the PLRA).

*Exceptions to the Exhaustion Requirement Do Not Apply*

Having concluded that plaintiff failed to exhaust his administrative remedies under the PLRA, the Court next considers whether there is any basis for excusing plaintiff's failure to exhaust. In *Ross v. Blake*, the Supreme Court significantly narrowed the exceptions a court may afford a prisoner who does not comply with the exhaustion requirement in the PLRA. 136 S. Ct. 1850 (2016). Therein, the Supreme Court rejected the prior "special circumstances" exceptions to the exhaustion requirement which had previously been recognized by the Second Circuit. *Id.* at 1862. The Supreme Court held instead that the PLRA includes only a single "textual exception", in that an inmate

need not exhaust administrative remedies not available to him or her. *Id.* at 1858. The Supreme Court went on to cite three scenarios in which an administrative grievance procedure would be unavailable to an inmate: (1) "[the procedure] operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) the procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

Here, the record before the Court fails to demonstrate that administrative remedies were unavailable to plaintiff. There is no evidence that the grievance procedures were opaque or incapable of use. As described above, DOCCS has a clear, detailed procedure for inmate grievances. Moreover, plaintiff testified that he was familiar with the DOCCS' grievance procedure. Plaintiff testified that he believed the grievance procedure was ineffective because he did not "see the officers investigating themselves" and that he "wanted somebody to come from the outside to investigate this." (Dkt. No. 64, pg. 63). However, these conclusory statements, which reflect only plaintiff's subjective beliefs, are insufficient to raise a triable issue of fact as to the availability of administrative remedies. In *Woodward v. Ngo*, the Supreme Court noted that "exhaustion requirements are designed to deal with parties who do not want to exhaust", including those who "conclude —correctly or incorrectly—that exhaustion is not efficient in that party's particular case." 548 U.S. 81, 89-90 (2006). *See also Harrison v. Goord*, 07 Civ. 1806, 2009 U.S. Dist. LEXIS 48478, *15 (SDNY June 9, 2009) ("Prisoners are required to exhaust their administrative remedies even if they believe that administrative remedies would be ineffective or futile.") (internal citations omitted); *McMillian v. Walters*, 9:16-CV-0277, 2017 U.S. Dist. LEXIS 208444, *7-8 (NDNY Dec. 18, 2017) ("An inmate's belief that administrative remedies would be futile is not a valid excuse establishing the unavailability of such remedies."). Moreover, there is no evidence in the record to indicate that DOCCS' complaint or grievance procedures were either opaque or operated as a dead end. To the contrary, plaintiff was able to successfully file an appeal of his disciplinary hearing determination to the Commissioner in Albany, New York. His appeal resulted in a dismissal of two charges and reduction of the amount of time he was sentenced to SHU.

**\*6** Plaintiff also stated in his complaint and during his deposition that he did not file a grievance as to the incident on

February 6, 2015 because he feared retaliation from officers at Gowanda. However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. *Brown v. Napoli*, 687 F. Supp. 2d 295, 297-98 (WDNY 2009); *Harrison v. Stallone*, 9:06-CV-902, 2007 U.S. Dist. LEXIS 98742 (NDNY Sept. 24, 2007) ("If an inmate could simply state that he feared retaliation, there would be no point in having a grievance procedure[.]"). During his deposition, plaintiff stated in a general and conclusory manner that he was threatened and harassed. He also testified that on one occasion an officer escorting him to SHU told him that his hand would be broken if he "ran his mouth". However, plaintiff does not indicate who made this statement nor does he indicate the date or time it occurred. Plaintiff also fails to provide any further details as to the alleged threat or how it was specifically connected to his use of grievance procedures. Similarly, in *Henry v. Cty. of Nassau*, an inmate argued that administrative remedies were unavailable because defendants threatened to have him killed or assaulted if he reported various incidents of failure to intervene, and that on one occasion they threatened to "jump" him if he reported an incident. CV 13-7427, 2017 U.S. Dist. LEXIS 125443 (EDNY Aug. 7, 2017). The Eastern District of New York Court rejected these assertions and concluded that "[p]laintiff's statements, devoid of any specifics, including which defendants were involved, are insufficient to defeat summary judgment." *Id.* Likewise here, plaintiff's general and conclusory statements that he was threatened are insufficient to raise a triable issue of fact as to the unavailability of the grievance procedure because of intimidation by prison administrators. *See e.g., Rodriguez v. Cross*, 15-CV-1079, 2017 U.S. Dist. LEXIS 71337 (NDNY May 9, 2017) (plaintiff's conclusory allegations that he "was beaten" while attempting to access grievance procedures were insufficient to excuse his failure to exhaust under *Ross*, where he does not state "how any specific threat or subsequent act of violence impacted his ability to exhaust administrative remedies[.]"); *Johnson v. Frazier*, 16-CV-6096, 2016 U.S. Dist. LEXIS 165987 (WDNY Dec. 1, 2016) (plaintiff's allegations that grievance procedures were not available due to threats from staff were "entirely conclusory, since [plaintiff did] not indicate who threatened him, when he was threatened or how he was threatened.").

Further, plaintiff's actions after the February 6, 2015 incident directly contradict his claim that he did not file a grievance because he feared retaliation by officers at Gowanda. Plaintiff both wrote a letter about the incident to the State Commissioner of Corrections and filed the instant

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 103 of 170

Lewis v. Wasielewski, Not Reported in Fed. Supp. (2018)

federal lawsuit in February of 2015, while he was still incarcerated at Gowanda. *See Rodriguez,* 2017 U.S. Dist. LEXIS 71337 ("[P]laintiff's failure to follow the grievance procedures cannot be excused by fears or intimidation, when he simultaneously made his complaints known through other means" such as informing a nurse that officers beat him and "air[ing] his complaints and concerns in writing outside of the grievance procedures[.]"); *Johnson,* 2016 U.S. Dist. LEXIS 165987, *13-14 (rejecting plaintiff's contention that administrative remedies were unavailable to him because he was threatened by correction officers but continued to make and send formal complaints to prison officers and other New York State officials). Indeed, plaintiff's own deposition testimony belies his claim that he was afraid to grieve the February 6, 2015 incident. Plaintiff testified during his deposition that he was not afraid to file a federal lawsuit while still incarcerated at Gowanda, despite alleged threats or harassment, because he was informed that he would be transferred to a different facility immediately after his disciplinary hearing. It defies logic that plaintiff would be unafraid to file a lawsuit because he believed a transfer of facilities was imminent, but that he would still be fearful of filing a grievance. Additional inconsistencies and contradictions in plaintiff's deposition testimony cast further doubt on his claim that he was afraid to file a grievance. Not only does plaintiff contradict himself as to whether he filed a grievance, but he also provides varying rationales as to why he did not file one. Plaintiff testified that he did not file a grievance because he was fearful of the officers. However, he also testified that he did not file a grievance because he believed the process was ineffective and he wanted someone from the "outside" to investigate. *See Dailey v. Fuller,* 9:15-cv-1051, 2016 U.S. Dist. LEXIS 168482 (NDNY Dec. 5, 2016) ("Even where a complaint or affidavit contains specific assertions, the allegations may still be deemed conclusory if they are: (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of belief necessary to credit the allegations[.]") (internal citations and quotations omitted).

**\*7** Finally, even if the Court were to conclude that plaintiff had been threatened at Gowanda and that those threats prevented him from filing a grievance, there has been no showing that administrative remedies remained unavailable to plaintiff after he was transferred to Upstate. DOCCS procedures provides that an inmate may request an extension of the time limit to file a grievance within forty-five days of the date of the alleged occurrence. *See* N.Y. Comp.

Codes R. & Regs., § 701.6(g). Here, the alleged assault took place on February 6, 2015 and plaintiff was transferred to Upstate on or about March 6, 2015. When plaintiff arrived at Upstate, approximately twenty-nine days had elapsed since the alleged assault, and plaintiff could have timely requested an extension of time to file a grievance. In fact, plaintiff had an additional seventeen days after arriving at Upstate to request an extension of time. *See Bookman v. Linstrand,* 9:15-CV-1542, 2018 U.S. Dist. LEXIS 25157 (NDNY February 14, 2018) ("Even assuming that [plaintiff's allegations] could be construed as creating an issue of fact with respect to the grievance process at GMCF, it does not create an issue of fact with respect to the availability of the grievance process at Clinton, where plaintiff was housed in the immediate aftermath of the alleged assault."); *Smith v. Costello,* 9:15-CV-0401, 2017 U.S. Dist. LEXIS 31341 (NDNY March 3, 2017) (specific threats against plaintiff with respect to filing a grievance did not excuse his failure to exhaust administrative remedies where plaintiff had thirty-three days to request an extension of time to file after his transfer from the facility where the threats occurred); *Wallace v. Fisher,* 9:13-CV-1208, 2015 U.S. Dist. LEXIS 169256 (NDNY Dec. 18, 2015) (concluding that even if plaintiff's administrative remedies were unavailable at Watertown Correctional Facility, plaintiff did not persuade the Court that his administrative remedies continued to be unavailable after his transfer to Gouverneur Correctional Facility, since after his transfer plaintiff had twelve days in which to request an extension of the twenty-one day deadline for filing a grievance). Thus, the Court finds no basis in the record to excuse plaintiff's failure to exhaust his administrative remedies.

## CONCLUSION

For the foregoing reasons, it is recommended that defendants Lynn Wasielewski's, Rebecca McDaniel's, Paul Burke's, Dennis Becker's and Sabato Parisi's motion for summary judgment be granted and the complaint dismissed. (Dkt. No. 61).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED** that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Arcara.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4732755

---

## Footnotes

1    The facts described herein are taken from pleadings, motion papers, discovery and exhibits filed in this lawsuit. Also, because plaintiff is proceeding *pro se*, the Court has considered all of his submissions in support of his complaint and in opposition to defendants' motion for summary judgment, regardless of the form in which they have been submitted.

2    A DOCCS Directive dated November 12, 2011 provides that inmates serving sentences for certain nonviolent crimes may receive merit time allowances against their sentences provided they have, *inter alia*, "achieved certain significant programmatic objections." (Dkt. No. 69, pg. 5).

---

**End of Document**     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 105 of 170

2018 WL 4692476
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Alfredo LEWIS, Plaintiff,
v.
Lynn WASIELEWSKI, Rebecca McDaniel Paul
Burke, Dennis Becker and Sabato Parisi, Defendants.

15-CV-168-A
|
Signed 10/01/2018

**Attorneys and Law Firms**

Alfredo Lewis, Uniondale, NY, pro se.

David J. Sleight, Office of the Attorney General, Buffalo, NY, for Defendants.

### DECISION AND ORDER

HONORABLE RICHARD J. ARCARA, UNITED STATES DISTRICT JUDGE

 **\*1**  This *pro se* civil rights case was referred to Magistrate Judge Michael J. Roemer for the conduct of pretrial proceedings pursuant to 28 U.S.C. § 636(b)(1). On July 10, 2018, the Magistrate Judge filed a Report and Recommendation (Dkt. No. 71) recommending that defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 61) be granted.

On September 10, 2018, *pro se* plaintiff Alfredo Lewis filed objections to the Report and Recommendation. (Dkt. No. 75). Defendants filed a response on September 10, 2018. (Dkt. No. 76). Oral argument is unnecessary.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which *pro se* plaintiff Lewis has objected. Upon *de novo* review after reviewing the submissions of the parties, the Court adopts the Magistrate Judge's findings and conclusions. It is therefore

**ORDERED**, pursuant to 28 U.S.C. § 636(b)(1), and for the reasons stated in the Report and Recommendation (Dkt. No. 71), that the defendants' Rule 56 motion for summary judgment (Dkt. No. 61) is granted. The Clerk of the Court shall enter judgment on behalf of defendants Lynn Wasielewski, Rebecca McDaniel, Paul Burke, Dennis Becker, and Sabato Parisi and shall close the case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4692476

**End of Document**                                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 447734
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Luke MATTHEWS; Carlos Gomez; Gentl Bonds;
Robert Smith; and Kasiem Chaves, Plaintiffs,

v.

L. SWEENEY, Clinton Corr. Sergeant; Michael Guynup,
Clinton Corr. Lieutenant; Corr. Emergency Response
Team ("CERT") Officer 44-3; CERT Officer 44-4; CERT
Officer 44-5; and CERT Officer 44-29, Defendants.

9:17-CV-0503 (GTS/ML)
|
Signed February 10, 2025

**Attorneys and Law Firms**

DAVID B. RANKIN, ESQ., JONATHAN C. MOORE, ESQ., MARC A. CANNAN, ESQ., BEDLOCK, LEVINE & HOFFMAN, Counsel for Plaintiffs, 99 Park Avenue, 26th Floor, New York, NY 10016.

DAVID C. WHITE, ESQ., THOMAS A. CULLEN, ESQ., MARK G. MITCHELL, ESQ., HON. LETITIA A. JAMES, Attorney General for the State of New York, Counsel for Defendants, The Capitol, Albany, NY 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

**\*1** The trial in this prisoner civil rights case, filed by the five above-captioned individuals ("Plaintiffs") against the six above-captioned employees of the New York State Department of Corrections and Community Supervision ("Defendants") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on February 5, 2025, regarding the affirmative defense of Defendants that Plaintiffs Gomez, Smith and Bonds failed to exhaust their available administrative remedies, as required by the Prison Litigation Reform Act, before filing this case on June 6, 2016 (their "exhaustion defense"). At the hearing, documentary evidence was admitted, and testimony was taken of Defendants' witnesses (particularly, Cory Proscia, Rachael Seguin, and Jonathan Nocera), as well as Plaintiffs' witnesses (particularly, Plaintiff Gomez, Plaintiff Smith, and non-party Manuel Nunez),[1] each of whom was able to be cross-examined by opposing counsel. At the conclusion of the hearing, the undersigned indicated that a written decision and order would follow. This is that written decision and order. For the reasons stated below, the claims of Plaintiffs Gomez, Bonds, and Smith are dismissed because of their failure to exhaust their available administrative remedies before filing this action.

**I. RELEVANT BACKGROUND**

**A. Plaintiffs' Claims and Case's Relevant Procedural History**

Generally, the surviving claims in this case assert violations of the Eighth Amendment and Title VI of the Civil Rights Act of 1964 by Defendants during an investigation, at Clinton Correctional Facility ("Clinton C.F."), in Dannemora, New York, into the escape of two inmates (David Sweat and Richard Matt) from Clinton C.F., in June of 2015, before those Plaintiff were transferred to Upstate Correctional Facility ("Upstate C.F.") and Sullivan Correctional Facility ("Sullivan C.F."). (*See generally* Dkt. No. 298 [Plfs.' Third Am. Compl.].)

Generally, his Decision and Order of March 18, 2022, Senior U.S. District Judge Thomas J. McAvoy[2] left to be determined, through an evidentiary hearing, Defendants' exhaustion defense against the claims of Plaintiffs Gomez, Bonds, and Smith. (Dkt. No. 325, at 19.)[3] *Not* addressed at the evidentiary hearing are the following: (1) any exhaustion defense against the claims of Plaintiff Negron, which (although mentioned in Judge McAvoy's Decision and Order) were voluntarily discontinued on January 4, 2022 (Dkt. No. 310); (2) any exhaustion defense against the claims of Plaintiff Matthews, with regard to which Judge McAvoy denied Defendants' motion for summary judgment (*id.* at 13-16, 19), and Defendants have since effectively abandoned their exhaustion defense against the claims of Matthews (Dkt. No. 364);[4] and (3) any exhaustion defense against the claims of Plaintiff Chaves, with regard to which Defendants never moved for summary judgment (*see generally* Dkt. No. 254, Attach. 1, at 14 [attaching page "11" of Defs. Memo. of Law, stating, "At this time, defendants do not assert a failure to exhaust argument with respect to Chaves' sole surviving claim"]), and in any event Defendants have since effectively abandoned their exhaustion defense against the claims of Chaves (Dkt. No. 364).[5]

**\*2**  Because this Decision and Order is intended primarily for the review of the parties, the Court will presume the reader's familiarity with further details regarding Plaintiffs' claims and the relevant procedural history of this case.

### B. Parties' Arguments

#### 1. Defendants' Arguments

Generally, Defendants assert four arguments. First, Defendants argue, Plaintiff Gomez never filed grievances at either Clinton C.F. or Upstate C.F., regarding his current claims of mistreatment at Clinton C.F. on June 6, 2015, and June 16, 2015; and, although he filed two grievances at Sullivan C.F. on December 2, 2015, neither of those grievances regarded the claims asserted in this case. (Dkt. No. 254, Attach. 1, at 9-10 [attaching pages "6" and "7" of Defs.' Memo. of Law].) In any event, Defendants argue, Plaintiff Gomez never filed a grievance appeal regarding the claims he asserts. (*Id.*)

Second, Defendants argue, Plaintiff Bonds never filed grievances at either Clinton C.F. or Upstate C.F., regarding his current claims of mistreatment at Clinton C.F. on June 15, 2015; and, although, while at Sullivan C.F., he filed a grievance regarding his current claims, that grievance was denied by the Superintendent of Sullivan C.F., and Plaintiff Bonds never appealed that denial. (*Id.* at 10-11 [attaching pages "7" and "8" of Defs.' Memo. of Law].) [6]

Third, Defendants argue, Plaintiff Smith never filed grievances at Clinton C.F., Upstate C.F., or Sullivan C.F., regarding his current claims of mistreatment at Clinton C.F. on June 15, 2016, nor did he appeal the denial of any such grievances. (*Id.* at 12-13 [attaching pages "9" and "10" of Defs.' Memo. of Law].)

Fourth, Defendants argue, any argument that these Plaintiffs were not required to exhaust because the administrative procedure offered to them operated as a "simple dead end" is conclusory in nature. (Dkt. No. 286, at 7 [attaching page "5" of Defs.' Reply Memo. of Law].)

#### 2. Plaintiffs' Arguments

Generally, Plaintiffs assert three arguments. First, Plaintiffs argue, Plaintiffs Gomez, Bonds and Smith should be excused from having to exhaust their available administrative remedies because the administrative procedure offered by the New York State Department of Corrections and Community Supervision operated as a "simple dead end" for plaintiffs making the types of complaints in question (due to officers being consistently unwilling to provide any relief to aggrieved inmates). (Dkt. No. 281, at 11-19 [attaching pages "7" through "15" of Plfs.' Opp'n Memo. of Law]; Dkt. No. 372, at 2 [Plfs.' Ltr. Motion].) More specifically, Plaintiffs argue that Office of Special Investigations ("OSI") Investigator John Nocera was tasked with conducting "the majority" of the OSI's investigation of inmate grievances and allegations of assault that resulted from the June 2015 escape investigation (including interviews of several corrections officers and/or CERT officers), but that Nocera either did not conduct those investigations or misrepresented evidence that was provided to him during them. (*Id.*) As a result, Plaintiffs argue, OSI recommended that all inmate allegations of assault against the CERT Officers and other corrections officers be unsubstantiated. (*Id.*)

### II. GOVERNING LEGAL STANDARD

**\*3**  The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e.

The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two main purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford*, 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Corrections and Community Supervision ("DOCCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7. [7]

First, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [8] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing.

Second, a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal.

**\*4** Third, a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

These procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she can apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application is denied, the inmate can file a complaint complaining that the application was wrongfully denied. [9] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, *may* be appealed to the next level, including CORC, in order to complete the grievance process. [10]

The Court hastens to add, however, that, although an unprocessed grievance (i.e., a grievance that has not been assigned a grievance number) may technically be appealed, it need not be appealed in order for exhaustion to occur, because the regulatory scheme advising the inmate of that right has been found to be "too opaque." *See Williams v. Corr. Officer Priatno*, 829 F.3d 118, 126 (2d Cir. 2016) (finding that, "even if Williams technically could have appealed his [unprocesseed] grievance, we conclude that the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner can use [it pursuant to *Ross v. Blake*, 136 S. Ct. 1850 (2016)]").

**\*5** Moreover, it is important to note that DOCCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

"An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93; *Porter*, 534 U.S. at 524; *Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry. This is because certain exceptions exist to the exhaustion requirement.

In particularly, in 2004, in *Hemphill v. State of New York*, the Second Circuit held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004), *accord*, *Ruggiero*, 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

However, in 2016, in *Ross v. Blake*, the Supreme Court abrogated *Hemphill*'s third prong and effectively enveloped its second prong within its first prong. *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). More specifically, under *Ross*, any

inquiry that previously would have been considered under the second or third prongs of *Hemphill* is now considered entirely within the context of whether administrative remedies were actually available to the aggrieved inmate. *Ross*, 136 S. Ct. at 1858. This is because, the Supreme Court explained, the PLRA "contains its own, textual exception to mandatory exhaustion." *Id.* In particular, 42 U.S.C. § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. *Id.* In the PLRA context, the Supreme Court determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (quotation marks omitted).

**\*6** To guide courts in this new analysis, the Supreme Court has identified three kinds of circumstances in which an administrative remedy, "although officially on the books," is not "available." *Ross*, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end–with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Finally, two additional points bear mentioning regarding exhaustion hearings. First, the Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord*, 652 F.3d 305, 308-10 (2d Cir. 2011). Second, given that non-exhaustion is an affirmative defense, the defendant bears the burden of proving that a prisoner has failed to exhaust his available administrative remedies.[11] However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by persuading the Court of either exhaustion or unavailability.[12] As a result, practically speaking, while the burden of proving this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it.

## III. ANALYSIS

After carefully considering the admissible record evidence adduced at the exhaustion hearing, the Court renders the following three factual findings: (1) Defendants have met their burden of proving that Plaintiffs Gomez, Smith and Bonds failed to exhaust their administrative remedies regarding the claims in question before filing this action; (2) Defendants have also met their burden of proving that administrative remedies were generally available to those Plaintiffs during the time in question (e.g., that the grievance procedure was working at Upstate C.F. and Sullivan C.F. during the time in question); and (3) Plaintiffs have *not* persuaded the Court that, at Upstate C.F. and Sullivan C.F. during the time in question, the grievance procedure operated as a "simple dead end" (with officers unable or consistently unwilling to provide any relief to aggrieved inmates).

In support of the first factual finding, the Court relies on the following: (1) the fact that Plaintiffs' counsel conceded at the exhaustion hearing that Plaintiffs Gomez, Smith and Bonds failed to exhaust their administrative remedies regarding the claims in question before filing this action; and (2) alternatively, the hearing exhibits admitted during the hearing testimony on that subject by Cory Proscia and Rachael Seguin, as well as those witnesses' convincing demeanor and body language (including, but not limited to, their tone of voice, facial expressions, and eye contact).

**\*7** In support of the second factual finding, the Court relies on the following: (1) the fact that Plaintiffs' counsel conceded at the exhaustion hearing that Plaintiff Chaves, Plaintiff Matthews, and non-party Manuel Nunez were able to exhaust their available administrative remedies regarding claims of excessive force during their removal from Clinton C.F.;[13] and (2) alternatively, the hearing exhibits admitted during the hearing testimony on that subject by Cory Proscia and Rachael Seguin, as well as those witnesses' convincing demeanor and body language (including, but not limited to, their tone of voice, facial expressions, and eye contact).

In support of the third factual finding, the Court relies on the following: (1) the hearing exhibits admitted during and after [14] the hearing testimony of OSI Investigator Jonathan Nocera, as well as his convincing demeanor and body language (including, but not limited to, his tone of voice, facial expressions, and eye contact); (2) the unconvincing demeanor and body language of non-party Manuel Nunez, Plaintiff Gomez,[15] and Plaintiff Smith,[16] during their

hearing testimony (including, but not limited to, their tone of voice, facial expressions, and eye contact or lack thereof); (3) the fact that, at the exhaustion hearing, Plaintiff Bonds chose to not even testify that he viewed the process as a "dead end" (much less subject himself to cross-examination on the issue);[17] and (4) alternatively, the fact that, on June 30, 2015, Plaintiffs Bonds chose to file a grievance at Sullivan C.F. regarding the claims at issue in this action on June 30, 2015,[18] which constitutes at least some evidence that Bonds did not view the process as a "dead end."[19]

**\*8** In addition, the Court makes the following three points. First, the Court rejects Plaintiffs' post-hearing argument that "the purpose of the [exhaustion] hearing was not to assess whether Mr. Bonds failed to exhaust administrative remedies" but "to assess the weight of Plaintiffs' evidence that DOCCS's summarily rejected inmate complaints of harassment during the 2015 escape investigation and the credibility of the DOCCS employee who conducted the majority of that investigation—John Nocera." (Dkt. No. 378, at 1-2.) Contrary to Plaintiffs' interpretation of Judge McAvoy's Decision and Order of March 18, 2022, his finding that "Plaintiffs have met their burden of demonstrating that DOCCS personnel rejected grievances of employee harassment arising from [the] 2015 escape investigation regardless of the merits of those grievances" was merely a ground to deny Defendants' motion for summary judgment on the issue of exhaustion (the success of which turned on whether Plaintiffs failed to exhaust as a matter of law). (Dkt. No. 325, at 12.)[20] The question of fact that remained for the exhaustion hearing (the outcome of which turns on a mere preponderance of the evidence) was "whether Plaintiffs' administrative remedies were available to them with respect to grievances against DOCCS personnel surrounding the escape investigation, or whether the IGP related to these grievances was a simple dead end." (*Id.*) Simply stated, the rejection-of-grievances-regardless-of-the-merits fact identified by Plaintiffs was left to be proven by them at the exhaustion hearing, unless it was conceded by Defendants (which it was not). Furthermore, although the Court has certainly considered Plaintiffs' hearing evidence as applying to *all* Plaintiffs (including Plaintiffs Bonds), the Court simply finds that evidence unconvincing for the reasons stated above and below.

Second, to prove that a grievance process operated as a dead end, a plaintiff must show that the grievance process "could not lead to a change in the challenged prison policies." *Green Haven Prison Preparative Meeting of Religious Soc'y*

*of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82 (2d Cir. 2021), *cert. denied sub nom. Green Haven Preparative Meeting v. New York State Dep't of Corr. & Cmty. Supervision*, 142 S. Ct. 2676 (2022). As the Second Circuit explained in *Green Haven*,

> Plaintiffs ... appear to make a futility argument, claiming that the grievance process was 'a dead end' such that they were not required to exhaust administrative remedies .... The bar for the availability of remedies, however, is low. To constitute an 'available' remedy, a process requires only 'the *possibility* of some relief.' *Ross v. Blake*, 578 U.S. 632, 643, 136 S. Ct. 1850, 195 L.Ed.2d 117 (2016) (emphasis added) (quotation marks omitted). Here, the Incarcerated Plaintiffs provide no evidence that a grievance asserting that a prisoner's religious liberty has been violated by a limitation on the number or timing of religious services or celebrations could not lead to a change in the challenged prison policies. Plaintiffs are thus unable to avoid the exhaustion requirement, and the Incarcerated Plaintiffs' RLUIPA claims fail.

*Green Haven*, 16 F.4th at 82 [emphasis in original]. A plaintiff has not met this burden simply by *arguing* that DOCCS never approved a grievance similar to the sort at issue in his case. *See Wright v. Georgia Dep't of Corr.*, 820 F. App'x 841, 845 (11th Cir. 2020) ("Wright argued that the grievance process was an unavailable dead end because the wardens had never approved an inmate grievance involving medical treatment; however, he provided no factual support for this assertion. Accordingly, the district court did not err in concluding that the defendants satisfied their burden to show the failure to exhaust an available remedy and Wright failed to show that the remedy was effectively unavailable to him.").

Third, the fact that Mr. Nunez may have experienced a problem submitting his claim to Investigator Nocera – particularly when Nocera was trying to investigate the claim of Plaintiff Matthews [21] – hardly establishes that the problem asserted by Nunez was systematic. *See Barksdale v. Annucci*, 15-CV-0560, 2016 WL 4708235, at *3 (N.D.N.Y. Aug. 4, 2016) (Stewart, M.J.) ("As evidence of systematic delays, Plaintiff cites several grievances filed by other inmates, which he notes were not stamped as received until as long as a week and a half after they were dated .... [T]his evidence is insufficient to establish a pattern of systematic delays in the processing of grievances at Coxsackie."), *report-recommendation adopted*, 2016 WL 4703740 (N.D.N.Y. Sept. 8, 2016) (Kahn, J.). This is particularly true given that, contrary to Plaintiff's argument that Investigator Nocera was tasked with conducting the "majority" of the OSI's investigation of inmate grievances and allegations of assault that resulted from the June 2015 escape investigation (Dkt. No. 372, at 2 [Plfs.' Ltr. Motion]; Dkt. No. 281, at 6-7 [attaching pages "2" and "3" of Plfs.' Opp'n Memo. of Law]), in fact, it appears (based on the available record evidence) that Nocera conducted fewer than half of those investigations. [22] In any event, regardless of whether Nocera conducted more than half of the investigations, the fact that other investigators existed further weakens Mr. Nunez's claim that Investigator Nocera's (purported) inaction rendered the entire procedure a "dead end."

**\*9**  For each of these numerous alternative reasons, the claims of Plaintiffs Gomez, Smith and Bonds are dismissed.

**ACCORDINGLY**, it is

**ORDERED** that the claims of Plaintiffs Gomez, Smith and Bond in their Third Amended Complaint (Dkt. No. 298) are **DISMISSED** for failure to exhaust their available administrative remedies before filing suit.

**All Citations**

Slip Copy, 2025 WL 447734

**Footnotes**

1    Plaintiff Bonds did not testify. His proffered reason for not appearing was "I was given 20 minutes to ready [sic]. First made aware of leaving on the day I had to leave. I was physically incapable of [sic]." (Dkt. No. 373 [Refusal/Waiver of Right to Be Physically Present at Court].) The Order to appear was served on Plaintiff's counsel on January 15, 2025. (Dkt. No. 368.) At the exhaustion hearing, his counsel stated that, after speaking with Plaintiff Bonds on February 4, 2025, counsel had learned as follows: (1) Plaintiff Bonds claims that, in his 15 years' experience being incarcerated he "usually" gets a day's notice before he is transported to court; (2) here, he did not receive that one day's notice, but only twenty or thirty minutes' notice; and (3) as a result, he was not "prepared" because he had not showered and was not "groomed," and because he just suffered an injury in the gym so he had a "pain issue" as well. (Exhaust. Hrg. Tr.)

2    This case was reassigned from Judge McAvoy to the undersigned on February 13, 2024. (Dkt. No. 356.)

3    Although Judge McAvoy also stated in his Decision and Order that "Defendants may renew their summary judgment motion following the conclusion of this hearing" (Dkt. No. 325, at 19), such a renewed motion for summary judgment is unnecessary given the preponderance-of-the-evidence standard that governs the Court's determination in an exhaustion hearing, as stated in the undersigned's Text Order of February 2, 2024 (Dkt. No. 366).

4    In addition, the Court notes that, on January 15, 2025, the undersigned's Courtroom Deputy, Shelly Muller, received an email message from defense counsel confirming the fact that Defendants will not be pursuing their exhaustion defense against the claims of Plaintiffs Matthews or Chaves at the exhaustion hearing.

5    *See, supra,* note 4 of this Decision and Order.

6    Defendant argues that Plaintiff Bonds initially submitted this grievance to the Superintendent of Clinton C.F., who responded (through a representative) that it must be filed at Sullivan C.F. (Dkt. No. 254, Attach. 1, at 10-11 [attaching pages "7" and "8" of Defs.' Memo. of Law].)

7    *See also Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *1 & n.1 (N.D.N.Y. March 31, 2010) [citation omitted].

8    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

9    *See Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *2 & n.3 (N.D.N.Y. March 31, 2010) (citing *Groves v. Knight*, 05-CV-0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight*, No. 09-3641, Mandate [2d Cir. filed Jan. 15, 2010].)

10   *See* 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray,* 2010 WL 1235591, at *2 & n.4 [collecting cases]; *cf.* 7 N.Y.C.R.R. § 701.8(g) ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC.").

11   *Id.* at *4 [citation omitted].

12   *Id.* at *4 & n.17 [citing cases]; *see also Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004)* (noting that special circumstances must be "plausibly alleged[,] ... justify[ing] the prisoner's failure to comply with administrative

procedural requirements"); *Grant v. Kopp*, 17-CV-1224, 2019 WL 368378, at *4 (N.D.N.Y. Jan. 3, 2019) (Peebles, M.J.) ("I conclude that although the burden of proof on this affirmative defense remains with the defendant at all times, the plaintiff can be required to produce evidence in order to defeat it.") (citing cases), *adopted*, 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019) (Sharpe, J.).

13      The Court notes that the fact that Plaintiff Chaves, Plaintiff Matthews, and non-party Nunez were able to exhaust their administrative remedies regarding their treatment during transfer from Clinton C.F. to Upstate C.F. is at least some evidence that that the grievance process was available during the time in question. *See Moreau v. Ellsworth*, No. 21-2997, 2023 WL 3477153, at *2 (2d Cir. May 16, 2023) ("[T]he record evidence demonstrates that Moreau and other inmates at Eastern were able to appeal from several unfavorable IGRC decisions during the same period. There is thus no basis to conclude that the inmate-grievance process was unavailable.").

14      The Court notes that, after the hearing testimony of Nocera, Plaintiffs' counsel submitted into evidence selected portions of the deposition testimony of several CERT Officers testifying that they do not recall having been interviewed by OSI or DOCCS regarding the allegations in question in 2015 (at Hrg. Exs. P-10, P-11, P-12, P-13, and P-14). Defendants' counsel objected to the admission of these selected portions of the deposition testimony, and the Court reserved decision on this issue. After carefully considering the matter, the Court admits these exhibits into the record, because they do not change the outcome of the Court's decision. In addition to the fact that nearly six years passed between the interviews and the depositions, the Court is persuaded by the credible testimony of Nocera that the interviews occurred (as well as the corroborating documentary evidence).

15      For example, the Court does not find credible Plaintiff Gomez's hearing testimony that (1) he tried to file a grievance at Upstate C.F. regarding the claims at issue but was unable to do so because of a sign on his cell gate, and (2) he did not try to file such a grievance at Sullivan C.F. because he was threatened by unidentified officers (or anyone else) there. (Exhaust. Hrg. Tr.) The Court notes that it has carefully considered this testimony as potentially relevant to both the first circumstance of unavailability described in *Ross*, 136 S. Ct. at 1859-60 (regarding when the administrative procedure operates as a "simple dead end" because officers are "unable or consistently unwilling to provide any relief to aggrieved inmates") and the third circumstance of unavailability described in *Ross* (regarding when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation").

16      For example, the Court does not find credible Plaintiff Smith's hearing testimony that he did not file a grievance at Upstate C.F. regarding the claims at issue because of a sign on his cell gate and/or because CERT officers had instructed medical staff not to give him treatment. (Exhaust. Hrg. Tr.) Again, the Court has carefully considered this testimony as potentially relevant to both the first and third circumstances of unavailability described in *Ross*, 136 S. Ct. at 1859-60. *See, supra,* note 9 of this Decision and Order.

17      *See Woodward v. Lytle*, 16-CV-1174, 2019 WL 2527342, at *8 (N.D.N.Y. May 24, 2019) (Peebles, M.J.) (recommending dismissal for failure to exhaust, because "plaintiff who bore the burden of production to demonstrate unavailability of the grievance process failed to meet that burden in failing to present any evidence [at the exhaustion hearing], including his own testimony, that would indicate that Ms. Hartz, or any defendants, refused to file a grievance while he was housed in the SHU at Cape Vincent"), *report-recommendation adopted*, 2019 WL 2524756, at *1 (N.D.N.Y. June 19, 2019) (Mordue, J.).

18      (*See* Dkt. No. 254, Attach. 2, at 12 [Ex. C to Pinsonnault Decl., attaching copy of grievance from Bonds dated June 30, 2015]; Exhaust. Hrg. Ex. D-10.)

19      *See Walker v. Ball*, 16-CV-0437, 2018 WL 1415212, at *5 (N.D.N.Y. Feb. 16, 2018) (Stewart, M.J.) ("While Plaintiff did not file any grievances regarding the alleged misconduct of Noonan and St. Johns ..., he did file

grievances regarding other issues .... This shows that Plaintiff did not view the filing of grievances as a dead end."), *report recommendation adopted*, 2018 WL 1406632 (N.D.N.Y. Mar. 20, 2018) (Hurd, J.); *Lapierre v. LaValley*, 15-CV-1499, 2019 WL 4015689, at *5 (N.D.N.Y. Aug. 26, 2019) (Stewart, M.J.) (rejecting an asserted "dead end" exception and granting a motion for summary judgment because the plaintiff's prior filings "show[ ] that [he] did not view the filing of grievances as a dead end") (citation omitted), *report and recommendation adopted*, 2019 WL 4686415 (N.D.N.Y. Sept. 26, 2019) (D'Agostino, J.), *aff'd*, 847 F. App'x 47 (2d Cir. 2021). The Court notes that the fact that Plaintiff Bonds lost this grievance is not evidence that it was a dead end. *See McMillian v. Walters*, 16-CV-0277, 2018 WL 879270, at *3 (N.D.N.Y. Feb. 14, 2018) (D'Agostino, J.) ("Plaintiff did not provide any evidence that would suggest that the administrative procedures act as a dead end. Although Plaintiff stated in his deposition that the grievance process 'didn't do anything' for him in the past ..., a record of administrative defeats for a single prisoner is not sufficient evidence to effectively indict the system.").

20    To be clear, the "burden" referenced by Judge McAvoy regarded Plaintiffs' modest burden in opposing Defendants' motion for summary judgment, not their shifted burden of persuasion at a subsequent exhaustion hearing (during which the Court might evaluate the credibility of Plaintiffs' testimony under cross-examination). *See, supra,* Part II of this Decision and Order (setting forth legal standard).

21    The Court notes that, at the exhaustion hearing, Mr. Nunez testified that, as Investigator Nocera was attempting to question him regarding the claim by Plaintiff Matthews on July 2 or 3, 2015, at Sing Sing C.F, Mr. Nunez attempted to remind Plaintiff about his own claim and did not receive a satisfactory response. (Exhaust. Hrg. Tr.)

22    More specifically, it appears that, of the 35 OSI Interview Statements in the record that indicate the name of the investigating officer, 16 of those statements identify that officer as Jonathan Nocera, seven identify him as James Lovelace, four identify him as Christopher Payant, three identify him as Scott Lustan, three identify him as Ryan Graziano, one identifies him as Felix Cotto, and one identifies him as Investigator Retrosi. (Dkt. No. 281, Attach. 9, at 3-8, 10, 12-17, 19, 20, 22-24, 26, 28, 30, 32, 33, 36, 38, 40, 42-45, 47, 49, 52, 55, 56 [Ex. 7 to Cannan Decl., attaching "OSI Interview Statements"].)

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 115 of 170

McGee v. McGready, Not Reported in Fed. Supp. (2018)

2018 WL 2045094
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tony MCGEE, Plaintiff,
v.
Correction Officer MCGREADY, et al., Defendants.

16-CV-4187 (NSR)
|
Signed 04/30/2018

**Attorneys and Law Firms**

Tony McGee, Brooklyn, NY, pro se.

Colleen Kelly Faherty, State of New York Office of the Attorney General, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff, Tony McGee ("Plaintiff"), an incarcerated pro se inmate at Sing Sing Correctional Facility, brings this action pursuant 42 U.S.C. § 1983 against Inmate Grievance Supervisor Anthony Black ("Black"), former Corrections Counselor Mary Jackson ("Jackson"), Sergeant Murray or Murphy ("Sgt. Murray"), Sergeant Poole ("Sgt. Poole") and several other corrections officers.[1] Before this court is Defendant Black and Jackson's motion to dismiss the amended complaint as against them based on failure to plead a plausible claim, failure to exhaust administrative remedies, and qualified immunity. For the foregoing reasons, the motion is GRANTED.

**FACTUAL BACKGROUND**

The following facts are taken from Plaintiff's Amended Complaint and are deemed true for the purpose of this motion.

Plaintiff alleges that on or about July 22, 2013, while in the mess hall he was assaulted by a fellow "gang related Hispanic inmate" who made a derogatory or offensive statement. In response to the statement, Plaintiff punched the inmate in the face resulting in an altercation. During the fight, Plaintiff was repeatedly punched about the face causing several lacerations. Plaintiff alleges that a "Black Correction Officer"[2] was present in the mess hall, observed the incident, and failed to prevent it and/or failed to intervene.

On or about July 11, 2013, approximately eleven days prior to the altercation, Plaintiff spoke to Jackson and requested that he be placed in protective custody because he was threatened and being targeted by "gang-related Hispanic inmates." Jackson purportedly prepared a request for "voluntary protective custody," and informed Plaintiff he would be contacted sometime later. Later that day, Plaintiff was interviewed by Sgt. Murray concerning his request for protective custody. Plaintiff purportedly informed Sgt. Murray of the threats and being targeted. Plaintiff was once again informed he would be contacted sometime later. Plaintiff's request was not granted. Plaintiff suggests had he been placed in protective custody, as requested, he would not have been assaulted and injured. Additionally, Plaintiff asserts that Defendant Black failed to process multiple sick-call grievances by failing to forward them to Central Office Review Committee ("CORC"). Plaintiff asserts claims under the Eight and Fourteenth Amendments.

**STANDARD OF REVIEW**

**Rule 12(b)(6)**

On a 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

**\*2** Where a pro se Plaintiff is concerned, Courts must construe the pleadings in a particularly liberal fashion. *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009). The Court must therefore interpret the pleading "to raise the strongest arguments that [it] suggest[s]." *Harris v. City of N.Y.,* 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation omitted). Nevertheless, a pro se plaintiff's pleading must contain factual allegations that sufficiently "raise a right to

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 116 of 170

McGee v. McGready, Not Reported in Fed. Supp. (2018)

relief above the speculative level" (*Jackson v. N. Y.S. Dep't of Labor,* 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) ), and the Court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write it." *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

**Exhaustion**

The Prison Litigation Reform Act ("PLRA") precludes the filing of an action "with respect to prison conditions under [42 US.C. § 1983] ... by a prisoner confined in any jail, prison or other correction facility until such administrative remedies as are available are exhausted." *Williams v. Corr. Officer Priatno,* 829 F.3d 118, 122 (2d Cir. 2016) (internal quotations omitted). Whether an inmate has exhausted all administrative remedies turns on a review of "the state prison procedures [available] and the prisoner's grievance...." *See Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir. 2009) citing *Jones v. Bock,* 549 U.S. 199, 218 (2007). Grievances at DOCCS are governed by the Inmate Grievance Program ("IGP"), which is based on a three-tiered system. *Id.* at 125. To adjudicate an inmate complaint: "(1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the CORC. *Id.;* see also N.Y. Comp. Codes. R. & Regs., tit. 7, § 701.7 (1999).

Notably, exhaustion is an affirmative defense, not a pleading requirement; thus, inmate plaintiffs need not "specially plead or demonstrate exhaustion in their complaints." *Jones,* 549 U.S. at 216. Instead, Defendants must demonstrate lack of exhaustion. *Colon v. N. Y.S. Dep't of Corr. & Cmty. Supervision,* No. 15-CV-7432(NSR), 2017 WL 4157372, at *5 (S.D.N.Y. Sept. 15, 2017) citing *Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009).

Dismissal on a 12(b)(6) motion for failure to exhaust is permissible where "it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Williams,* 829 F.3d at 122; see also *Parris v. N.Y.S. Dep't Corr. Sews.,* 947 F. Supp. 2d 354, 261 (S.D.N.Y. 2013) (citing *Johnson v. Westchester Cnty. Dep't of Con: Med. Dep't,* No. 10-CV-6309, 2011 WL 2946168, at *2 (S.D.N.Y. July 19, 2011) for proposition that denial of motion was appropriate where complaint was ambiguous as to exhaustion). Further, on such a motion, where a court is confined to the four corners of the complaint, the documents attached thereto, and things of which it is entitled to take

judicial notice (see, e.g., *Kleinman v. Elan Corp.,* 706 F.3d 145, 152 (2d Cir. 2013); *Gonzalez v. Hasty,* 651 F.3d 318, 321 (2d Cir. 2011) ), a court is only permitted to consider outside documents related to exhaustion and submitted by defendants under limited circumstances. See, *Smith v. Miller,* No. 15-CV-9561 (NSR), 2017 WL 4838322, at *5 (S.D.N.Y. Oct. 23, 2017) (noting courts can take judicial notice of administrative records in Section 1983 cases in limited circumstances). Those include instances where "the complaint a) was the standard pro se form complaint that has a check-box regarding exhaustion, b) contained allegations clearly stating that the inmate had exhausted his administrative remedies, or c) clearly pointed to the fact that the inmate had, in fact, not exhausted." *Cohn,* 2017 WL 4157372, at *5.

**Qualified Immunity**

 **\*3** "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011) citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818-19. It is within the Court's discretion to determine the order in which the two prongs are analyzed. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

DISCUSSION

Plaintiff asserts § 1983 claims under the Eighth Amendment against Defendants Black and Johnson. The essence of Plaintiff's claim is a failure to protect. Plaintiff's complaint suggest that Defendants' failure in processing or approving his request for voluntary confinement resulted in his subsequent assault. Or, construing the allegations liberally as the Court is required to do, but for Defendants' failure in placing him in voluntary protective custody, Plaintiff would not have been attacked and injured by a fellow inmate.

Plaintiff's 1983 complaint is that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the States by the Fourteenth. See *Estelle v. Gamble,* 429 U.S, 97, 102 (1976) citing *Robinson v. California,* 370 U.S. 660 (1962). "To prevail on an Eighth Amendment claim, an inmate must first show that his injury

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 117 of 170

McGee v. McGready, Not Reported in Fed. Supp. (2018)

is objectively a 'sufficiently serious' one." *Brims v. Burdi,* No. 03-CV-3159 (WHP), 2014 WL 1403281, at *2 (S.D.N.Y. June 23, 2004) quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998). Additionally, a plaintiff must "show that the defendant had knowledge of [the] prisoner's problem and was deliberately indifferent to [the] prisoner's plight." *Calhoun v. N. Y State Div. of Parole Officers,* 999 F.2d 647, 654 (2d Cir. 1993) citing *Sample v. Diecks,* 885 F.2d 1099, 1110 (3d Cir. 1989).

Deliberate indifference requires a showing that the conditions of incarceration posed a substantial risk of serious harm, and that prison officials possessed sufficient culpable intent. *Hayes v. New York City Dep't Of Corr.,* 84 F.3d 614, 620 (2d Cir. 1996) citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).The deliberate indifference requires a two prongs analysis: substantial risk of serious harm, objective prong; and sufficient culpable intent, subjective prong. *Farmer,* 511 U.S. at 834; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996). Here, the objective prong is meet and not disputed.

Subjectively, the prison official acts with the requisite sufficient culpable state of mind when he (or she) "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes,* 84 F.3d at 620. Courts have denied deliberate indifference claims based upon surprise attacks. See *Fernandez v. N.Y.C. Dep't of Corr.,* No. 08-CV-4294 (KMW), 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010); *Zimmerman v. Macomber,* No. 95-CV-0882(DAB), 2001 WL 946383 (S.D.N.Y. Aug. 21, 2001). Plaintiff alleges he provided advance notice to Jackson and Black of threats and a possible attack. Plaintiff's allegation also suggest he identified the attacker(s), "gang related Hispanic inmates" at the facility. Plaintiff's allegations suggest that Black and Jackson failed to take reasonable measures to abate the impending attack. Thus, Plaintiff has pled a plausible Eighth Amendment claim.

**\*4** Plaintiff's Eighth Amendment claim, however, fails for failure to exhaust his administrative remedies. This case involves the use of the pro se form complaint which contains the equivalent of a check-box exhaustion section. The amended complaint is clear as to whether Plaintiff alleges he grieved his claims. Plaintiff explicitly states he filed grievances concerning, *inter alia,* the "5 sick call request," the "non-protection grievances" and the "foreseeable assault." (See Amended Compl., Sect. IV., E (1).) Because the exhaustion issue is an integral part of the

prisoner's claims, the Court may refer to materials outside of the complaint on a 12(b)(6) motion in determining whether a plaintiff has exhausted. See *Smart v. Goode,* No. 04-CV-8850 (RWS), 2008 WL 591230, at *2 (S.D.N.Y. Mar. 3, 2008) (recognizing that the Court's previous opinion "[did] not faithfully capture the subtlety of exhaustion doctrine in the Second Circuit" and that the Court should have addressed non-exhaustion as an affirmative defense).

In support of their motion, Defendants submit a declaration from Karen Bellamy ("Bellamy"), the Director of the Inmate Grievance Program ("IGP"). Bellamy avers that she is the custodian of records maintained by the CORC, which is tasked with rendering administrative decisions on grievances filed by inmates. Based upon her review of the records, she found that Plaintiff made other complaints concerning meals, conditions of the facility, and "problems with security staff" on December 17, 2013. Plaintiff, however, did not file a grievance concerning the July 22nd incident nor his request for voluntary confinement. Though Plaintiff attempts to rebut Defendants' showing, mere conclusory statements in opposition is insufficient. Accordingly, Plaintiff's Eighth Amendment claims must be dismissed.

Plaintiff also asserts a claim based on Defendant Black's failure to process his grievances, including his "5 sick call grievances." It is well settled that in order to succeed on a § 1983 claim, Plaintiff must show that he has been deprived of a constitutional or other federal right. 42 U.S.C. § 1983. Inmate grievances procedures are undertaken voluntarily by the states and are not constitutionally required. *Johnson v. New York City Dep't of Health,* No. 06-CV-13699 (BSJ) (FM), 2008 WL 5378124, at *3 (S.D.N.Y. Dec. 22, 2008) (internal citation omitted). Accordingly, a failure to process a prisoner's grievance(s) does not in itself give rise to a constitutional claim. *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (internal citations omitted). This claim must therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part. Plaintiff's Eighth Amendment and claims premised on the failure to process his grievances are dismissed. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 29. The parties are directed to confer, complete and submit to the Court a

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 118 of 170

McGee v. McGready, Not Reported in Fed. Supp. (2018)

completed case management plan (blank form attached) within thirty (30) days of the date of this opinion.

**SO ORDERED.**

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rev. Jan. 2012

-------------------------------------------------------X

Plaintiff(s),

- against -

**CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER**

Defendant(s).          _____ CV _____ (NSR)

-------------------------------------------------------X

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1. All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2. This case [is] [is not] to be tried to a jury.

3. Joinder of additional parties must be accomplished by _____.

4. Amended pleadings may be filed until _____.

5. Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6. First request for production of documents, if any, shall be served no later than _____.

7. Non-expert depositions shall be completed by _____.

   a. Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

   b. Depositions shall proceed concurrently.

   c. Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8. Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9. Requests to Admit, if any, shall be served no later than _____.

10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15. Any motions shall be filed in accordance with the Court's Individual Practices.

16. This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17. The Magistrate Judge assigned to this case is the Hon. _____.

18. If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19. The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)

SO ORDERED.

Dated: White Plains, New York
_____

_____
Nelson S. Román, U.S. District Judge

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2045094

---

**Footnotes**

1    The operative complaint is the Amended Complaint filed February 2, 2017. (ECF No. 22.)

2    In his complaint, Plaintiff appears to identify the "Black Correction Officer" as C.O. Javier Caban.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 119 of 170

McMillian v. Walters, Not Reported in Fed. Supp. (2018)

2018 WL 879270
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Herman Carlee MCMILLIAN, Plaintiff,
v.
Daniel WALTERS, Correctional Officer, Defendant.

9:16-cv-277 (MAD/DJS)
|
Signed 02/14/2018

**Attorneys and Law Firms**

HERMAN CARLEE MCMILLIAN, 90-T-5238, Auburn Correctional Facility, P.O. Box 618, Auburn, New York 13021, pro se.

OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, OF COUNSEL: MICHAEL F. MCCARTIN, AAG, The Capitol, Albany, New York 12224, Attorneys for Defendant.

### ORDER

Mae A. D'Agostino, U.S. District Judge

**\*1** Plaintiff *pro se* Herman Carlee McMillian, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action against Defendant Daniel Walters ("Defendant") pursuant to 42 U.S.C. § 1983 asserting claims arising from an incident that allegedly occurred while he was incarcerated at the Auburn Correctional Facility ("Auburn"). *See generally* Dkt. No. 82.

On March 7, 2017, Defendant filed a motion for summary judgment seeking dismissal of Plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims. *See* Dkt. No. 44. Defendant argues that Plaintiff failed to exhaust all administrative remedies available to him under the Prison Litigation Reform Act ("PLRA"). *See* Dkt. No. 44-2, 1937 WL 30643 at 8. [1] In a December 2017 Report-Recommendation and Order, Magistrate Judge Stewart recommended granting Defendant's motion for summary judgment after finding that it was uncontested that Plaintiff failed to initiate any administrative proceeding prior to filing his complaint in federal court. *See* Dkt. No. 82 at 2.

In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party makes specific objections to a magistrate judge's report, the district court engages in *de novo* review of the issues raised in the objections. *See id.*; *Farid v. Bouey*, 554 F.Supp.2d 301, 307 (N.D.N.Y. 2008). When a party fails to make specific objections, the court reviews the magistrate judge's report for clear error. *See Farid*, 554 F.Supp.2d at 307; *see also Gamble v. Barnhart*, No. 02-CV-1126, 2004 WL 2725126, \*1 (S.D.N.Y. Nov. 29, 2004).

On December 27, 2017, Plaintiff submitted objections to Magistrate Judge Stewart's Report-Recommendation and Order. *See* Dkt. No. 84. The first paragraph of Plaintiff's objections addressed the issue of exhaustion. *See id.* at 1. Plaintiff argued that he was not required to file an administrative grievance because this is a civil action based upon a violation of his constitutional rights which "is not an administration violation." *Id.* at 1. The remainder of the objections dealt with the merits of Plaintiff's constitutional claims, which are irrelevant to the issues before the Court.

A court may grant a motion for summary judgment only if "the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36-37 (quotation and other citation omitted).

**\*2** In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party. *See id.* at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's statement of material facts; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003).

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 120 of 170

McMillian v. Walters, Not Reported in Fed. Supp. (2018)

Moreover, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F.Supp.2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed. 2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Govan*, 289 F.Supp.2d at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment." *Id.* (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, at *1 (S.D.N.Y. May 16, 2001)).

The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life, including allegations of constitutional deprivations such as "excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, —— U.S. ——, 136 S.Ct. 1850, 195 L.Ed.2d 117 (2016). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *Key v. Toussaint*, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See Woodford*, 548 U.S. at 90-103, 126 S.Ct. 2378.

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* 7 N.Y.C.R.R. § 701.5(b). Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* at § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to Central Office Review Committee ("CORC"), which makes the final determination within the administrative review process. *See id.* at § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to section 1983. *See Bridgeforth v. DSP Bartlett*, 686 F.Supp.2d 238, 239 (W.D.N.Y. 2010) (citing *Porter*, 534 U.S. at 524, 122 S.Ct. 983); *Singh v. Goord*, 520 F.Supp.2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). When a plaintiff presents a claim arising "directly out of a disciplinary or administrative segregation hearing ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F.Supp.2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009).

**\*3** Although administrative remedies generally must be exhausted, a prisoner need not exhaust remedies if they are not "available." *Ross v. Blake*, —— U.S. ——, 136 S.Ct. 1850, 1855, 195 L.Ed.2d 117 (2016). "First, an administrative remedy may be unavailable when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' " *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S.Ct. at 1859). "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' " *Id.* (quoting *Ross*, 136 S.Ct. at 1859). "In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' " *Id.* at 123-24 (quoting *Ross*, 136 S.Ct. at 1859). "Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Id.* at 124 (quoting *Ross*, 136 S.Ct. at 1860). [2]

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 121 of 170

McMillian v. Walters, Not Reported in Fed. Supp. (2018)

After *de novo* review, it is clear that Plaintiff was required to exhaust his administrative remedies. As a general matter, the Supreme Court in *Porter* established that even civil claims based on constitutional deprivations still require inmates to exhaust administrative remedies. *See Porter*, 534 U.S. at 532, 122 S.Ct. 983. Turning to the recognized exceptions to the administrative exhaustion requirement, Plaintiff has failed to establish that any of them apply. Plaintiff did not provide any evidence that would suggest that the administrative procedures act as a dead end. Although Plaintiff stated in his deposition that the grievance process "didn't do anything" for him in the past, Dkt. No. 44-10 at 29:22-23, a record of administrative defeats for a single prisoner is not sufficient evidence to effectively indict the system. Similarly, the fact that Plaintiff had initiated the grievance procedures in the past but failed to do so here demonstrates that at least the initial step of the process, which Plaintiff failed to engage in, was not so opaque as to be unavailable. *See id.*; Dkt. No. 44-6 at 3. Finally, Plaintiff has failed to provide any evidence suggesting that the prison administrators thwarted his attempts to utilize the process. Instead, Plaintiff admits that he actively chose to forgo the IGRC processes because he believed the nature of the crime underlying his incarceration would prejudice the IGRC against him. *See* Dkt. No. 44-10 at 31:2-17. However, other than this statement, which merely demonstrates Plaintiff's subjective belief of bias, Plaintiff introduced no evidence to support this belief. As such, the Court is unable to find a question of fact over whether the administrators were interfering with Plaintiff's access to administrative remedies. Therefore, after *de novo* review, the Court concludes that Plaintiff was not excused from exhausting his administrative remedies prior to bringing this action in federal court. As it is undisputed that Plaintiff did not exhaust his administrative remedies, the Court adopts Magistrate Judge Stewart's Report-Recommendation and Order.

**\*4** Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Stewart's Report-Recommendation and Order (Dkt. No. 82) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 44) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 879270

---

### Footnotes

1    The cited page numbers for docket entries in this Order refer to those assigned by the Court's electronic filing system ("ECF").

2    In *Ross*, the Court rejected the Second Circuit's "extra-textual" exception to the PLRA's exhaustion requirement which allowed the taking into account of "special circumstances" to justify a prisoner's failure to comply with administrative procedural requirements. *See Ross*, 136 S.Ct. at 1856-57. Rather, it held that the only limit to the PLRA's exhaustion requirement "is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.' " *Id.* at 1862; *see also Williams*, 829 F.3d at 123 (recognizing that the framework set forth in *Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) and *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), setting forth a "special circumstances" exception to the PLRA's exhaustion requirement has been abrogated in part by *Ross*). As such, the Supreme Court specifically found that an inmate's mistaken belief that he has exhausted his administrative remedies, even where that belief seems reasonable, does not make the administrative remedy unavailable. *See id.* at 1858.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 122 of 170

McMillian v. Walters, Not Reported in Fed. Supp. (2018)

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 123 of 170

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

## I. BACKGROUND

### A. Facts [1]

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (*See id.* at 4.) Consequently, he asked Defendant, who was on duty, to

transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 124 of 170

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

## B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as

to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at \*3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund,* No.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 125 of 170

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

### III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7

(S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

 **\*4**  At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 126 of 170

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D)(9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g., Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 127 of 170

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

---

## Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00153-DNH-ML   Document 53    Filed 05/05/26    Page 128 of 170

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

2022 WL 3020254
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael RUIZ, Plaintiff,
v.
P. LINK, J. Reyes, Patrick Squire, Michael Blot,
Deborah Macdonald, and John Does #1-3, Defendants.

No. 20-CV-235 (CS)
|
Signed July 29, 2022

**Attorneys and Law Firms**

Michael Ruiz, Comstock, New York, Pro Se Plaintiff.

Kathryn Martin, Assistant Attorney General, Office of the Attorney General of the State of New York, White Plains, New York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, District Judge

**\*1** Before the Court is Defendants' motion for summary judgment. (ECF No. 66.) For the reasons set forth below, Defendants' motion is GRANTED.

**I. BACKGROUND**
The following facts are based on Defendants' Local Civil Rule 56.1 Statement, (ECF No. 68 ("D's 56.1 Stmt.")), and supporting materials, and are undisputed unless otherwise noted. [1]

**A. Facts**
Plaintiff Michael Ruiz is incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). (D's 56.1 Stmt. ¶ 1.) Plaintiff's claims arose while he was held at Green Haven Correctional Facility. (*Id.* ¶ 2.) Plaintiff brings this lawsuit in connection with an altercation in the prison yard on April 6, 2019 and the medical treatment he received thereafter. (*Id.* ¶¶ 3-4.) He alleges excessive force claims against Defendants Link, Reyes, Squire and Blot, and a claim of deliberate indifference to medical needs against Defendant MacDonald. [2]

**\*2** The altercation and medical treatment at issue occurred on April 6, 2019. (Ds' 56.1 Stmt. ¶¶ 3-4.) That same day, Plaintiff was transferred from Green Haven to Sing Sing Correctional Facility. (*Id.* ¶ 22.) While at Sing Sing, Plaintiff filed a grievance, dated April 9, 2019, [3] alleging that on April 6, 2019, correction officers used excessive force against him, and medical staff failed to properly treat him. (D's 56.1 Stmt. ¶ 24; *see* ECF No. 71-6.) The grievance was denied by the Sing Sing Superintendent on July 26, 2019. (D's 56.1 Stmt. ¶ 25; ECF No. 71-7.) Plaintiff testified at his deposition that he did not receive a copy of the Superintendent's denial until October 9, 2019, when he received a memo from Sing Sing's Inmate Grievance Program ("IGP") Supervisor, dated August 30, 2019. (P's Depo. at 79:22-80:13; *see* ECF No. 65-6.) The letter informed Plaintiff that his grievance had been answered on July 26, 2019 and forwarded to Plaintiff at that time; the Supervisor included with the memo a copy of the Superintendent's July 26 denial. (*Id.*) The bottom portion of the Superintendent's denial letter is a form the inmate can fill out if he wishes to appeal; it states, "[R]eturn this copy to your Inmate Grievance Clerk." (ECF No. 71-7.) [4] By the time Plaintiff received the letter and the copy of the Superintendent's denial on October 9, Plaintiff had been transferred out of Sing Sing and was being held in the Special Housing Unit ("SHU") at Elmira Correctional Facility. (Ds' 56.1 Stmt. ¶ 26; P's Depo. at 78:8-19, 78:25-79:21.) [5]

DOCCS records reflect that the Central Office Review Committee ("CORC") never received any appeal of the Superintendent's denial of Plaintiff's grievance. (D's 56.1 Stmt. ¶ 28.) Further, DOCCS records reflect that CORC did not receive any correspondence from Plaintiff at all during 2019 or 2020. (*Id.* ¶ 29; *see* ECF No. 70 ("Seguin Decl.") ¶ 13.) Plaintiff asserted in his deposition that he filled out the appeal form on October 10, 2019 and "forwarded it to CORC ... [b]y mail." (P's Depo. at 80:24-81:4; *see id.* at 82:20-83:7.) Plaintiff did not specify the address to which he mailed the appeal, but stated that he requested and received the address from the law library. (*Id.* at 82:3-19.) Plaintiff did not receive an acknowledgement of receipt or answer from CORC. (*Id.* at 81:5-7.) After several months, he filed this lawsuit. (*Id.* at 81:8-13.)

**B. Procedural History**
Plaintiff filed his original complaint on January 8, 2020, bringing claims under 42 U.S.C. § 1983 against eight Green Haven employees in their individual capacities for violations

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 129 of 170

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

of the Eighth Amendment. (ECF No. 2.) The case was reassigned to me on February 14, 2020. At a pre-motion conference on August 28, 2020 in anticipation of a potential motion to dismiss, I granted Plaintiff leave to amend his Complaint. (*See* Minute Entry dated Aug. 28, 2020.) The Amended Complaint was filed on September 25, 2020. (ECF No. 30.) Defendants answered on April 8, 2021. (ECF No. 44.)

On May 11, 2021, I held a status conference and set a discovery schedule, (ECF No. 51), which was extended twice, (ECF Nos. 57, 60). At the close of discovery, Defendants filed a pre-motion letter in anticipation of their motion for summary judgment. (ECF No. 64.)[6] I held a pre-motion conference on November 16, 2021 and set a briefing schedule for Defendants' motion. (*See* Minute Entry dated Nov. 16, 2021.) On December 29, 2021, Defendants filed their motion papers. (ECF Nos. 66-71.) Plaintiff's opposition was initially due on January 27, 2022. Approximately one to two weeks before the due date Plaintiff left two phone messages with my chambers, requesting an extension of the briefing schedule and permission to file a motion to obtain counsel. (*See* ECF No. 74.) On January 19, 2022, I entered an Order extending Plaintiff's time to respond to the motion to February 28, 2022, and advising him of his right to file a motion asking the Court to seek volunteer counsel. (*Id.*) On March 18, 2022, I received a letter from Plaintiff (dated March 14, 2022), indicating that his opposition was ready, and he just wanted permission to file it late; I granted an extension to April 6, 2022, and noted there would be no further extensions. (ECF No. 76.) On April 28, 2022, after no opposition was received, I deemed the motion fully submitted. (ECF No. 78.)

## II. LEGAL STANDARD

**\*3** Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the ... declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). Where, as here, the non-moving party fails to respond to the movant's summary judgment motion, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (cleaned up). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment

must be denied even if no opposing evidentiary matter is presented." *Id.* (cleaned up) (emphasis omitted).

## III. DISCUSSION

### A. Exhaustion Under the PLRA

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA mandates that a plaintiff use "all steps that the agency holds out, and do[ ] so properly" – that is, in accordance with the applicable agency rules. *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (cleaned up). Exhaustion of available administrative remedies "must be complete prior to commencement of suit" and "[t]he fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not salvage an otherwise premature filing." *Chalif v. Spitzer*, No. 05-CV-1355, 2008 WL 1848650, at *13 (N.D.N.Y. Apr. 23, 2008) (cleaned up).

**\*4** For inmates in New York State prison, administrative exhaustion requires compliance with DOCCS' three-tiered IGP, in which (1) the inmate must file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence, (2) the inmate must then appeal an adverse decision by the IGRC to the superintendent of the facility within seven days after receipt of the IGRC's response, and (3) the inmate must then appeal an adverse decision by the superintendent to the CORC within seven days after receipt of the superintendent's response. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2022); *McGee v. McGready*, No. 16-CV-4187, 2018 WL 2045094, at *2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, No. 16-CV-8516, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021); *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8. Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(f). If the Superintendent fails to respond

within twenty-five days, the inmate may appeal directly to CORC. *Id.* § 701.8(g). If the Superintendent does respond, the inmate has seven days from receipt of the response to appeal to CORC. *Id.* § 701.8(h). The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances. *See id.* § 701.6(g). Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g)-(h). [7] Inmates who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2).

CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he "should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC." *Id.* § 701.5(d)(3)(i). The IGP requires CORC to respond to an appeal within thirty days of receipt. *Id.* § 701.5(d)(3)(ii). If CORC has received an appeal and fails to rule within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit. *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

### B. Plaintiff's Failure to Exhaust

Defendants have met their burden to demonstrate that Plaintiff failed to follow IGP procedures with regard to his CORC appeal and that CORC never received Plaintiff's appeal. Accordingly, Plaintiff failed to "properly" exhaust administrative remedies prior to filing suit. *See Amador*, 655 F.3d at 96.

Plaintiff testified that once he received the Superintendent's adverse decision on October 9, 2021, he filled out the appeal statement and "forwarded it to CORC ... [b]y mail." (P's Depo. at 80:24-81:4.) He never received confirmation that his appeal was received or any response from CORC, and after a few months he filed this lawsuit. (*Id.* at 81:8-13.)

The IGP required Plaintiff to forward the appeal to the Inmate Grievance Clerk. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(g)-(h). The form at the bottom of the Superintendent's letter also notified Plaintiff that the appeal to CORC had to be transmitted via the Inmate Grievance Clerk. (*See* ECF No. 71-7.) The IGP specifically provides that Plaintiff, having

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:25-cv-00153-DNH-ML   Document 53   Filed 05/05/26   Page 131 of 170

been transferred to a different facility from that in which he originally filed his grievance, should get his appeal to the proper Inmate Grievance Clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2). Nothing in the record indicates that Plaintiff followed this procedure; rather, it appears he tried to mail his appeal directly to CORC, and CORC never received the document. (*See* Seguin Decl. ¶¶ 12-13 (CORC never received appeal of Plaintiff's grievance, nor did it receive any other correspondence from Plaintiff during 2019 or 2020); ECF No. 71-8 (CORC records showing no receipt of appeal)).

**\*5** Accordingly, Plaintiff failed to properly follow the grievance procedure and has failed to exhaust his administrative remedies. *See Valverde v. Folks*, No. 19-CV-8080, 2022 WL 836310, at \*6 (S.D.N.Y. Mar. 21, 2022) ("Plaintiff did not properly comply with [the] prison grievance procedural rules. Plaintiff ... mailed his appeal statement directly to CORC. However, to appeal a decision denying a grievance, an inmate must submit the appeal, not directly to CORC, but to the grievance supervisor of the facility where the grievance was originally filed for forwarding to that facility's grievance clerk."); *Wilkinson v. Banks*, No. 2-CV-361, 2007 WL 2693636, at \*6 (W.D.N.Y. Sep. 10, 2007) ("[N]o dispute exists that [the *pro se* plaintiff] did not follow correct procedure in attempting to appeal that grievance to CORC. He did not file his appeal with the Inmate Grievance Clerk as required by the regulations, but rather mailed it directly to CORC.") (cleaned up).

### C. Availability of Administrative Remedies

Although the Supreme Court has deemed exhaustion mandatory, there are circumstances under which administrative remedies may be deemed "unavailable" to an inmate, such that an inmate is not required to exhaust. *Ross v. Blake*, 578 U.S. 632, 642 (2016). The Supreme Court identified three circumstances where administrative remedies may be unavailable. *See id.* at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. "If the defendant has met its burden

of establishing the existence and applicability of the grievance policy, the *plaintiff* bears the burden of establishing *de facto* unavailability." *Saeli v. Chautauqua County*, 36 F.4th 445, 453 (2d Cir. 2022) (emphasis in original).

Plaintiff has submitted no opposition to the instant motion and has not argued that administrative procedures were unavailable to him. *See Dowling v. Barkman*, No. 17-CV-647, 2019 WL 7971868, at \*5 (N.D.N.Y. Dec. 20, 2019) ("Given Plaintiff's failure to oppose the Motion, no basis appears on the record for concluding that DOCCS' grievance procedure was unavailable to him."), *report and recommendation adopted sub nom. Dowling v. Schleicher*, 2020 WL 103480 (N.D.N.Y. Jan. 8, 2020). Even if that were not the case, the record does not reflect that any of the above-listed circumstances apply.

First, nothing in the record suggests that Plaintiff did not receive a response from CORC because the grievance process was operating as a "dead end" – rather, it appears that CORC never received Plaintiff's appeal because of Plaintiff's failure to send the appeal to the appropriate official. (*See* P's Depo. at 80:24-81:4; Seguin Decl. ¶¶ 12-13; ECF No. 71-8.) Similarly, the record is bereft of evidence that the IGP is unavailable to inmates generally. *See White v. Veile*, 709 F. App'x 35, 38 (2d Cir. 2017) (summary order) (affirming summary judgment for failure to exhaust administrative remedies where plaintiff did not "present[ ] any evidence about the outcomes in the grievance system in general" or "show[ ] that prison officials are consistently unwilling to grant relief").

Second, as set out above, the relevant procedures are not opaque. The IGP clearly sets out the process for appealing a grievance to CORC through the Inmate Grievance Clerk – including the instructions under § 701.6(h)(2) for an inmate who has been transferred from one facility to another to send an appeal to the appropriate facility's IGP Supervisor. Plaintiff testified that he is familiar with the grievance process, (*see* P's Depo. at 18:3-19:6), and the Superintendent's denial stated that the appeal to CORC had to go through the Inmate Grievance Clerk, (*see* ECF No. 71-7).

**\*6** Third, while there is some evidence in the record that Plaintiff sought information from the "law library officer" while he was in the SHU at Elmira and appears to have been given a mailing address for CORC, [8] this fact alone is insufficient to establish that a prison official thwarted his ability to successfully appeal to CORC. Plaintiff has not suggested that he asked how to appeal and was told to mail his

appeal to CORC, or that he asked the law library officer for anything other than the address of CORC. There is simply no evidence of machination, intimidation or misrepresentation.

That the breakdown of the grievance procedure here was due to Plaintiff's failure to follow it, rather than to its unavailability, is highlighted by the fact that when Plaintiff did not receive confirmation that CORC was in possession of his appeal within the forty-five days envisioned by the regulations, instead of following the IGP and writing to Sing Sing's IGP Supervisor – an official with whom he had recently communicated, (*see* P's Depo. at 79:22-80:13, 81:14-21) – to confirm that the appeal was filed, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(i), he simply waited a few months and then filed this lawsuit. (P's Depo. at 79:25-80:8, 81:5-13). [9]

In short, "[g]iven the lack of evidence that Plaintiff's appeal to CORC was ever filed, or ever followed up on, it is not that the full scope of administrative remedies was not available to Plaintiff – rather, Plaintiff failed to fully exhaust the administrative remedies available to him." *Houston v. Coveny*, No. 14-CV-6609, 2020 WL 2494439, at *3 (W.D.N.Y. May 14, 2020); *see Litchmore v. Williams*, No. 11-CV-7546, 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (no "sufficient basis in the record to find that administrative remedies were unavailable" where, among other things, there was "no evidence here that the plaintiff's appeal was actually mailed, intercepted, or ignored" and "DOCCS has no record of any appeal filed with CORC"). [10]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 83), enter judgment for Defendants, and close the case.

## SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3020254

---

### Footnotes

1  Plaintiff did not file a responsive Rule 56.1 Statement or any papers in opposition to this motion. Local Civil Rule 56.1 requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require a trial. L.R. 56.1(b). Under the Local Rule, "[i]f the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)). *Pro se* litigants are not excused from this requirement. *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011). As Defendants served Plaintiff with the requisite notice pursuant to Local Civil Rule 56.2, (*see* ECF No. 72), I have discretion to consider any properly supported facts in Defendants' Local Civil Rule 56.1 Statement admitted. (The Court will send Plaintiff copies of any unpublished decisions cited in this Opinion and Order.) But granting Plaintiff solicitude, I have considered his deposition testimony, (ECF No. 71-2 ("P's Depo.")), statements in his complaint and amended complaint, both of which are sworn under penalty of perjury pursuant to 28 U.S.C. § 1746, (ECF Nos. 2, 30), and his letter in response to Defendants' pre-motion letter, (ECF No. 65). *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (cleaned up).

2  Defendants move for summary judgment on all of Plaintiff's claims on the ground that he failed to exhaust his administrative remedies, and in the alternative for summary judgment only on Plaintiff's deliberate medical

indifference claim. (*See* ECF No. 67 at 1.) Because I resolve the motion on the basis of failure to exhaust administrative remedies, I do not describe the specific allegations further.

3    Defendants state in their Rule 56.1 statement that Plaintiff's grievance is dated April 22, 2019, but that is the date on which the grievance was stamped as received by the facility. (*See* ECF No. 71-6.)

4    The form is captioned "Appeal Statement," and below the caption it reads: "If you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk. You have seven (7) calendar days from your receipt of this notice to file your appeal.* Please state why you are appealing this decision to C.O.R.C." The asterisk leads to a statement about how to request an exception to the time limit. Below the language quoted above are several lines for the inmate to explain why he is appealing, and then signature lines for the inmate and the Grievance Clerk.

5    Plaintiff notes that it is possible he had not previously received the Superintendent's denial because much of the time he was at Sing Sing he was housed in the Office of Mental Health ("OMH") unit after several suicide attempts between June and September of 2019. (P's Depo. at 78:5-19.)

6    Plaintiff responded by letter dated November 8, 2021, but that letter was not received and docketed until November 24, 2021. (*See* ECF No. 65.)

7    The procedure to appeal to CORC under the normal, non-expedited procedures is the same. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(1)(i).

8    Plaintiff testified as his deposition as follows:

[Q.] So how do you know where to send the grievance appeal? ...

A. You can actually get the address from the law library that they provide in the facility. They have all the information of addresses, names, stuff like that.

Q. And is that what you did? You went to the law library?

A. Yes, ma'am. I was in the special housing unit at the time, so the law library officer will actually come to you and take your request and then return the request by the next day.

(P's Depo. at 82:6-19.)

9    Plaintiff's response to the question whether he ever followed up with CORC – that he "tried checking [the appeal], but it had already been months they hadn't responded, so I proceeded with my civil Complaint," (P's Depo. at 81:8-13) – not only contains no information about what he did to check, but suggests at most that he asked about the status of his appeal at or about the same time that he filed this lawsuit.

10    Having so found, I need not and do not address the merits of Plaintiff's medical indifference claim.

---

**End of Document**     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,

v.

Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq., Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel, Syracuse, NY, for Defendants Gunilla De Montaigu and Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

*MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-captioned action is a motion by Defendants containing two alternative requests for relief: (1) a request for reconsideration of Part III.D.5 of the Court's Decision and Order of May 5, 2009, denying Defendants' request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens;* and (2) a request for dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code. (Dkt. No. 61.) For the reasons set forth below, Defendants' motion is granted in part, and denied in part.

**I. REQUEST FOR RECONSIDERATION**
To the extent that Defendants' motion requests reconsideration of the Court's decision to denying their

request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No. 61.) The Order of which reconsideration was sought was entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y. L.R. 7.1(g) (setting ten-day deadline for motions for reconsideration). Defendants' attempt to characterize the Order of which reconsideration is sought as being the Court's Text Order of May 29, 2009, is unconvincing. That Text Order merely indicates the extent to which Plaintiffs' signed Third Amended Complaint fails to comport with the Court's Decision and Order of May 5, 2009 (and was issued in response to Plaintiffs' request for guidance). Even liberally construed, Defendants' motion for reconsideration expressly and repeatedly challenges the substance of the Court's Order of May 5, 2009 (specifically, Part III.D.5. thereof), and only that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61, Part 4, Points II and III.)

In any event, even if the Court were to consider the merits of Defendants' motion for reconsideration, the Court would deny that motion as without cause: there has been no intervening change of controlling law, no previously unavailable evidence, and there exists no clear error of law or manifest injustice with regard to the relevant portion of the prior decision in question.

For these reasons, Defendants' request for reconsideration is denied.

**II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF ACTION**
To the extent that Defendants' motion alternatively requests the dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response papers, to oppose this request. (*See* Dkt. No. 63.) The closest that Plaintiffs come to opposing this request is when, in a supplemental letter request, they (correctly) point out that Defendants have improperly broadened the target of their Panamanian-statute-of-limitations argument from Plaintiffs' First Cause of Action to all of Plaintiffs' causes of action. (Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is *GRANTED* **in part,** and *DENIED* **in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is *DENIED,* however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is *DISMISSED* as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

---

### Footnotes

1    *See Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at \*7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at \*9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

---

**End of Document**                               © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 8589277
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Derrick TEAQUE, Plaintiff,
v.
K.L. MULLEN, et al., Defendants.

9:18-CV-01412 (GTS/CFH)
|
Signed 12/17/2019

**Attorneys and Law Firms**

Derrick Teaque, 16-A-2967, Collins Correctional Facility, P.O. Box 340, Collins, New York 14034, Plaintiff pro se.

Hon. Letitia James, Attorney General for the State of New York, OF COUNSEL: NICHOLAS LUKE ZAPP, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224, Attorneys for Defendants.

**REPORT-RECOMMENDATION & ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Derrick Teaque ("plaintiff"), an inmate who was at all relevant times in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action on December 4, 2018, pursuant to 42 U.S.C. § 1983. Dkt. No. 1 ("Compl."); Dkt. No. 27 ("Am. Compl."). Plaintiff contends that defendants deprived him of his constitutional rights under the Eighth Amendment. See Am. Compl. Defendants move, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, to dismiss the amended complaint. Dkt. No. 32. Plaintiff opposes defendants' motion. Dkt. No. 34. For the following reasons, it is recommended that defendants' motion be granted, and plaintiff's amended complaint be dismissed in its entirety without prejudice.

**I. Background**

**A. Facts**

Plaintiff alleges that at Mid-State Correctional Facility ("Mid-State") on October 11, 2018, at approximately 9:22 P.M., he was pepper-sprayed, "physically mutilated," and harassed by multiple corrections officers. Am. Compl. at 5. [2] While walking through a housing area, plaintiff alleges that he stopped to give another inmate a writing pen. See id. As a result, Defendant Mullen indicated that she would be "writing a misbehavior report for cube visiting[.]" Id. Defendant Mullen also "grab[bed] [plaintiff] by [his] shirt with full force[,]" and when plaintiff tried to pull himself away from Defendant Mullen, she pepper-sprayed him. See id. at 6. Plaintiff contends that after he was pepper-sprayed, several other corrections officers approached the area and "physically mutilated harassed and beat [him] to the point that [he] had bruises on [his] face, neck, back, and scrapes and cuts on [his] feet, knees and behind [his] ears." Id. As a result of this incident, plaintiff was sent to the hospital and required five stitches in his right eye. See id. at 6, 20. Plaintiff contends that Defendants Sexton, O'Donnell, and Ingraham saw and heard this incident, and failed to intervene. See id. at 23, 25.

On October 22, 2018, plaintiff filed grievance #MS-23743-18 regarding the October 11, 2018, incident involving Defendants Mullen, Sexton, Ingraham, and O'Donnell. See Dkt. No. 32-3 ("Tapia Decl.") ¶ 10. In his Amended Complaint, filed on May 22, 2019, plaintiff noted that: (1) his grievance was " 'pending' being investigated by Superintendent of Midstate Correctional Facility"; (2) his grievance was "[f]orwarded to Superintendent for investigation"; (3) he grieved/appealed his claim; (4) "seventy-three days have passed since grievance was filed, still no response from grievance department"; and (5) he grieved/appealed his claim, his grievance was denied, he appealed the denial, and the appeal is now "pending ..." Am. Compl. at 5-7, 13, 14, 20.

**\*2** As plaintiff's grievance qualified as a harassment grievance, it was immediately forwarded to the superintendent for investigation; however, the superintendent did not render a determination regarding grievance MS-23743-18 until February 20, 2019, when plaintiff's grievance was denied. See Tapia Decl. ¶ 11. Plaintiff signed and appealed the superintendent's decision to the Central Office Review Committee ("CORC") on March 5, 2019. See id. ¶¶ 12, 13. CORC received plaintiff's appeal regarding grievance MS-2743-18 on March 18, 2019. See Dkt. No. 32-4 ("Seguin Decl.") ¶ 10. Plaintiff received a "response" from CORC in a letter dated April 25, 2019. See Dkt. No. 34 at

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 137 of 170

Teague v. Mullen, Not Reported in Fed. Supp. (2019)

1. As of June 21, 2019, it does not appear that CORC had decided plaintiff's appeal. See generally Tapia Decl.

## B. Procedural History

On December 4, 2018, the Court docketed the Complaint[3] in the within action, accompanied by an application to proceed in forma pauperis ("IFP"). See Compl.; Dkt. No. 2. Plaintiff subsequently filed numerous documents, including two additional IFP applications and a "supplemental complaint."[4] See Dkt. Nos. 5, 8, 10, 11. On February 1, 2019, Chief District Judge Glenn T. Suddaby issued a Decision and Order granting plaintiff's third IFP application and accepting plaintiff's failure-to-intervene claims against defendants Mullen, Sexton, and Ingram, and directed defendants to respond. See Dkt. No. 13 at 2, 8. On May 22, 2019, Judge Suddaby issued a Decision and Order granting in part and denying in part plaintiff's motion to amend his complaint; (1) adding as a defendant S. O'Donnell, Corrections Officer; (2) directing defendants to answer plaintiff's amended complaint; and (3) dismissing several defendants without prejudice. See Dkt. No. 26 at 13. Plaintiff filed his Amended Complaint on May 22, 2019, dkt. no. 27, and defendants filed their Motion for Summary Judgment in lieu of an answer on June 21, 2019, seeking to dismiss plaintiff's claim in its entirety for failure to exhaust administrative remedies. See Dkt. No. 32. Plaintiff opposes defendants' motion. See Dkt. No. 34.

On November 7, 2019, plaintiff filed a letter motion seeking to "withdraw the above-entitled action against Defendants pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) without prejudice, and to stop the order of fees from his prison account, any future payments mailed to the Court for Civil Case 9:18-CV-01412-GTS-CFH be returned to Collins Correctional Facility to inmate Derrick Teague 16A2967." Dkt. No. 37. Plaintiff advised the Court that he is "not capable of continuing to prosecute this case alone. I don't have funds for copies, I don't have access to computers & typewriters, I don't have the funds for a lawyer. Please dismiss 9:18-CV-1412 as soon as possible." Id. at 1-2. Defendants filed a response to this letter motion indicating that they would stipulate to dismissal of the action. Dkt. No. 38. On November 15, 2019, plaintiff filed a "reply" to his letter motion. Dkt. No. 39. Therein, plaintiff "request[ed] an Amended Commitment stating 'Do NOT Collect & STOP payments of the filing fee.'" Dkt. No. 39.

On November 27, 2019, the Court issued a Decision & Order denying plaintiff's request for a refund of that portion of the filing fee already paid and for a cessation of the withdrawals of the remainder of the filing fee. Dkt. No. 40. The Court also stayed the case for thirty days to allow plaintiff to inform the Court whether he wished to proceed with the action. Id. On December 4, 2019, plaintiff advised the Court that he wished to proceed with the action. Dkt. No. 41. On December 5, 2019, the Court issued a text order indicating that the case would remain open and that the pending motion for summary judgment would be addressed in due course. Dkt. No. 42. On December 11, 2019, without permission of the Court, plaintiff filed a further response in opposition to the motion for summary judgment. Dkt. No. 43. As plaintiff filed this further submission without leave of the Court and well after the time for submissions relating to the motion for summary judgment were complete,[5] the undersigned has not considered the filing and recommends that it be deemed STRICKEN from the record.

## II. Discussion

### A. Legal Standard

**\*3** "A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 138 of 170

Teague v. Mullen, Not Reported in Fed. Supp. (2019)

Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining a summary judgment motion, "[f]actual disputes that are irrelevant or unnecessary will not be counted." Liberty Lobby, 477 U.S. at 247, 106 S.Ct. 2505. The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. "Mere conclusory statements or reliance on the pleadings, ... will not suffice, ..." Celtoex, 477 U.S. at 324, 106 S. Ct. 2548. The court must look to the substantive law to identify which facts are material. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). The Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law ....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Exhaustion

Defendants contend that their motion for summary judgment must be granted because plaintiff failed to fully and properly exhaust his administrative remedies before filing suit. See Dkt. No. 32-1 ("Def. Mem. of Law") at 7-8. In response, plaintiff claims that "CORC has 30 days from receipt of

appeal in which to render a decision. They failed to do so. This rendered the grievance opaque to me." Dkt. No. 34 at 1.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

**\*4** Administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). See N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.1, 701.5. First, the inmate must file a complaint with an inmate grievance program clerk within twenty-one days of the alleged incident. Id. § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). As previously stated by Magistrate Judge Peebles:

> It is worth noting that ... where an inmate complains of harassment or other misconduct by corrections officers

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 139 of 170

Teaque v. Mullen, Not Reported in Fed. Supp. (2019)

or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" Id. at § 701.8(a). [S]ection 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. Id. at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." Id. at § 701.8(b).

Eleby v. Smith, et al., No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2016), report-recommendation adopted by 2017 WL 979040 (N.D.N.Y. Marc 13, 2017). [6]

Each step of the IGP process requires that a decision be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Specifically, with a harassment grievance, the superintendent of the facility "will render a decision on the grievance" within twenty-five calendar days of receipt. Id. at § 701.8(f). Should the superintendent fail to respond within the twenty-five day time frame, "the [inmate] may appeal his/her grievance to CORC" which can be done by "filing a notice of decision to appeal [ ] with the inmate grievance clerk." Id. at § 701.8(g). When the inmate receives the superintendent's response and "wishes to appeal the superintendent's response to CORC, he/she must file a notice of decision to appeal [ ] with the inmate grievance clerk within seven calendar days of receipt of that response." Id. at § 701.8(h). If the IGRC and/or superintendent fail to timely respond, an inmate may appeal "to the next step." Id. at § 701.6(g)(1)(b)(ii)(2); see also Eleby, 2017 WL 986123, at *4; Smith v. Kelly, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal ... can—and must—be appealed to the next level, including CORC, to complete the grievance process.") (citing 7 N.Y.C.R.R. § 701.6(g)).

Although the Supreme Court of the United States has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). In Ross v. Blake, the Supreme Court held in that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S. Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Although Ross

eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. Id. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

**\*5** Generally, if it is found that the inmate has not exhausted all available administrative remedies, his or her case should be dismissed without prejudice. See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc., 560 F.3d 118, 124 (2d Cir. 2009) (citation omitted). Since "[f]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw. If the time permitted for pursuing administrative remedies has not expired, a prisoner ... can cure the defect by exhausting [the available remedies] and reinstating his suit." Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2003) (amended 2004) (quoting Snider v. Melindez, 199 F.3d 108, 111-12 (2d Cir. 1999)).

**1. Did Plaintiff Exhaust Administrative Remedies?**

It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions." Peoples v. Beldock, 212 F. Supp.2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) report-recommendation adopted by 2011 WL 4478921 (N.D.N.Y. Sept. 26, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the

inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).

The record in the case before the Court demonstrates that plaintiff completed only the first step of the grievance process before commencing this lawsuit. Plaintiff filed his grievance regarding the events giving rise to this action on October 22, 2018. See Dkt. No. 34; Tapia Decl. at ¶ 10. As plaintiff's grievance qualified as a harassment grievance, it was forwarded to the superintendent for further investigation. See Taplia Decl. at ¶ 11. Plaintiff commenced this action on December 4, 2018, forty-three days after filing his grievance with the IGRC. See Compl.; Dkt. No. 32-2 at ¶ 4; Def. Mem. of Law at 7. The superintendent denied plaintiff's grievance on February 20, 2019 (approximately seventy-eight days after plaintiff initiated this action). See id. at ¶ 11. Plaintiff signed his appeal of the superintendent's determination on March 5, 2019, and his appeal was mailed from the grievance clerk at Mid-State to CORC on March 11, 2019. Id. at ¶ 13. CORC received the appeal of plaintiff's grievance on March 18, 2019, and responded to plaintiff in a letter dated April 25, 2019. See Dkt. No. 34; Seguin Decl. at ¶ 10. To the Court's knowledge, as of June 21, 2019, CORC had not made a final determination regarding plaintiff's grievance.

"If a prisoner has failed to properly follow each of the applicable steps before commencing litigation, he has failed to exhaust his administrative remedies." Scott v. Uhler, No. 9:16-CV-403 (TJM/CFH), 2019 WL 5197139, at *5 (N.D.N.Y. July 31, 2019), report-recommendation adopted by 2019 WL 4667495 (N.D.N.Y. Sept. 25, 2019); see also Ford v. Smith, No. 9:12-CV-1109 (TJM/TWD), 2014 WL 652933, at *3 (N.D.N.Y. Jan. 16, 2014) (citing Woodford, 548 U.S. at 81, 93, 126 S.Ct. 2378). Because plaintiff commenced this action before receiving a response from the superintendent of Mid-State regarding his grievance, plaintiff did not fully exhaust his administrative remedies before commencing this action. See Jones v. Bock, 549 U.S. 199, 215-16, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (noting that, because failure to exhaust is an affirmative defense, the plaintiff is not obligated to plead facts demonstrating that he complied with the exhaustion requirement; however, where the plaintiff does plead facts showing his failure to exhaust his administrative remedies before commencing his federal lawsuit, the complaint may be dismissed for failure to state a claim); see also Shepherd v. Lempke, No. 9:10-CV-1524, 2017 WL 1187859 (N.D.N.Y. Mar. 30, 2017) ("[I]t is well-established that "post-exhaustion amendment of the complaint does not cure an exhaustion defect existing at the time the action was commenced[.]")

(quoting Guillory v. Haywood, 2015 WL 268933, at *11 (N.D.N.Y. Jan. 25, 2015)) (collecting cases).

### 2. Availability of Administrative Remedies

**\*6** Plaintiff does not appear to argue that he exhausted his administrative remedies before commencing this lawsuit; instead, he contends that administrative remedies were unavailable to him because the superintendent and CORC's failures to timely render a decision "rendered the grievance [o]paque." Dkt. No. 34. Defendants "acknowledge that the Superintendent's decision was issued beyond the twenty-five calendar days set forth in 7 N.Y.C.R.R. § 701.8 (f)[,]" but point out that plaintiff "had the option of filing his appeal to CORC" since he had not received a response from the superintendent within the twenty-five day time frame. Def. Mem. of Law at 9.

Courts within the Second Circuit, including within this District, appear split over whether a delay in a response during the IGP process constitutes "unavailability" excusing a plaintiff's failure to exhaust his administrative remedies before commencing suit. Compare Fox v. Lee, No. 9:15-CV-0390 (TJM/CFH), 2018 WL 8576600, at *7 (N.D.N.Y. Dec. 18, 2018) (concluding that CORC's approximate four-month delay in responding to the plaintiff's appeal did not render the grievance process unavailable) and Berkley v. Ware, No. 9:16-CV-1326 (LEK/CFH), 2018 WL 3736791, at *6 (N.D.N.Y. July 6, 2018) report-recommendation adopted by 2018 WL 3730172 (N.D.N.Y. Aug. 6, 2018) (concluding "that CORC's approximately five month delay in rendering a decision did not excuse plaintiff from the exhaustion requirement.") with Rodriguez v. Reppert, No. 14-CV-671 (RJA/MJR), 2016 WL 11483439, at *1 (W.D.N.Y. Sept. 28, 2016), report-recommendation adopted by 2016 WL 6993383 (W.D.N.Y. Nov. 30, 2016) (concluding that because CORC failed to respond within the 30-day time frame set by regulation, administrative remedies were unavailable to the plaintiff and dismissal for failure to exhaust was not appropriate) and High v. Switz, No. 9:17-CV-1067 (LEK/DJS), 2018 WL 3736794, at *5 (N.D.N.Y. July 9, 2018), report-recommendation adopted by High v. PA Switz, 2018 WL 3730175 (N.D.N.Y. Aug. 6, 2018) (concluding that administrative remedies were unavailable to the plaintiff after CORC's nearly year-long delay because "there is no direction on any action a[n] [inmate] may take if he does not receive a response from CORC"; thus, dismissal for failure to exhaust was not appropriate).

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 141 of 170

Teaque v. Mullen, Not Reported in Fed. Supp. (2019)

To the extent plaintiff argues administrative remedies were unavailable to him at the time he commenced this action, the undersigned disagrees. As stated above, plaintiff's grievance was forwarded to the superintendent on an expedited basis [7] due to the "harassment" nature of the grievance. See Tapia Decl. at ¶ 11. Plaintiff initiated the within action on December 4, 2018, approximately forty-three days after filing his October 22, 2018 grievance, but before receiving the superintendent's response. See Compl.; Am. Compl. at 1, 6, 14. As set out in Section 701.8, the superintendent has twenty-five calendar days to render a decision on the grievance. See 7 N.Y.C.R.R. § 701.8(f). If, however, the superintendent does not render a decision within twenty-five calendar days, the inmate "may appeal his/her grievance to CORC." Id. at § 701.8(g). Many courts in this District have held that where the inmate does not receive a timely response, an inmate must appeal the next step or make efforts to track their grievance. Indeed, several courts in this district have determined that fact that the superintendent did not render a decision within the statutory twenty-five calendar days generally does not excuse a plaintiff's failure to exhaust. Courts within this Circuit have found this principle applicable regardless of whether the delay was from the IGRP, superintendent, or CORC. See, e.g., Heyliger v. Gebler, 624 F. App'x. 780, 782 (2d Cir. 2015) (summary order) ("[I]f at any step of the grievance process[ ] an inmate did not receive a response within the specified time frame, he was nonetheless permitted to appeal to the next step ... [W]hen [the plaintiff] did not receive a [ ] response from the IGRC, appeal to the superintendent was still an available administrative remedy."); Cohen v. Welch, 9:16-CV-00593 (FJS/TWD), 2017 WL 3311244, at *5 (N.D.N.Y. July 11, 2017), report-recommendation adopted by, 2017 WL 3309713, at *6 (N.D.N.Y. Aug. 2, 2017) ("[E]ven if Plaintiff did not receive a timely response from the IGRP, he was required to complete steps two and three of the IGP."). In Berkley, for example, this Court determined that, where the plaintiff commenced his federal action before receiving a response from CORC, "CORC's approximately five-month delay in rendering a decision did not excuse plaintiff from the exhaustion requirement." Berkley, 2018 WL 3736791, at *6. The Berkley Court noted that the plaintiff had not mentioned the unavailability of the grievance process in his appeal to CORC and did not write to either the IGRC or CORC to check on his appeal before filing the lawsuit. Id.

 *7 Whether the delay rendered administrative remedies to the inmate unavailable is a fact-and case-specific determination. However, in assessing availability, this District

and others within in this Circuit have considered the length of the delay and the inmate's attempts to reach out to CORC (or the relevant level of the IGP process). See High, 2018 WL 3736794, at *5 (noting that "the Second Circuit did not and has not decided the precise issue raised on this Motion—a claim of failure to exhaust where the plaintiff had taken all steps he could to fulfill the last step of the appeal process; where CORC had neglected to respond, not just during the thirty day time limit, but for a period of numerous months thereafter; where CORC had further neglected to respond when Plaintiff wrote to CORC regarding the status of his appeal; and where CORC had only ultimately decided the appeal a year later, after the present Motion to Dismiss had been filed," and concluding that, although the regulations explained that an inmate should appeal to the next step in the event he does not receive a response, because regulations did not specify what the inmate should do if he does not receive a timely response from CORC, administrative remedies were unavailable to the inmate); see also Gizewski v. N.Y. State Dep't of Corrections and Community Supervision, 692 F. App'x 668, 670 (2d Cir. 2017) (summary order) (noting that, where a clerical error caused one-year delay in superintendent's response to the inmate's grievance, administrative remedies were available as the inmate did not exhaust prior to commencing a lawsuit); Berkley, 2018 WL 3736791, at *6; Hayes v. Dahkle, No. 9:16-CV-1368 (TJM/CFH), 2018 WL 7356343, at *9 (N.D.N.Y. Dec. 11, 2018) (finding that CORC's delay did not excuse the exhaustion requirement where "there is no indication in the record that plaintiff wrote to CORC regarding the status of his appeal and CORC further neglected to respond); cf. Henderson v. Annucci, No. 14-CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) (finding that a two-year delay in CORC response rendered administrative remedies unavailable to the inmate plaintiff).

Here, the record indicates that plaintiff waited for the superintendent's decision before appealing to CORC. There is no evidence in plaintiff's Amended Complaint or his Reply to defendants' Motion for Summary Judgment indicating that he wrote the superintendent to inquire as to the status of his grievance or that he was attempting to appeal directly to CORC. See Am. Compl.; Dkt. No. 34; Fox, 2018 WL 8576600, at *7 (concluding that administrative remedies were available to the plaintiff, despite a four-month CORC delay where there was no evidence that the plaintiff "wrote to the Eastern IGRC or CORC inquiring as to the status of his appeals...." and because NYCRR § 701.5(d)(3)(1) provides, "[i]f a grievant does not receive a copy of the written notice

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 142 of 170

Teaque v. Mullen, Not Reported in Fed. Supp. (2019)

of receipt within 45 days of filing an appeal [to CORC], the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC" as does DOCCS Directive 4040). The superintendent rendered a decision regarding plaintiff's grievance on February 20, 2019, approximately ninety-six days beyond the prescribed twenty-five day time frame. See Tapia Decl. at 11. Between November 16, 2018, and the time this Motion for Summary Judgment was fully briefed, plaintiff made no attempt to appeal his grievance to CORC nor did he attempt to inquire as to status of the superintendent's determination. As noted above, in his Amended Complaint, plaintiff makes clear that he did not fully exhaust his administrative remedies as he addresses the grievance as "pending[,]" and "being investigated by Superintendent of Mid-State Correctional Facility[.]" Am. Compl. at 5-6. Therefore, the record before the Court demonstrates that plaintiff was waiting for the superintendent to make a determination on his grievance before appealing to CORC, and filed this suit before receiving a response.

Further, plaintiff commenced this action before receiving a response from either the superintendent or CORC. Although the superintendent's delay in rendering a decision – forty-three days as of the day plaintiff filed suit – was not brief, plaintiff's failure to check with the superintendent as to the status of his grievance or appeal and his subsequent failure to appeal to CORC before commencing this lawsuit, leads the undersigned to conclude that administrative remedies were available to him. See Scott, 2019 WL 5197139, at *6 (finding that the plaintiff failed to show administrative remedies were unavailable "[c]onsidering the totality of the circumstances, [including the plaintiff's] failure to check with CORC as to the status of his appeal prior to commencing this action, and the relatively short delay in receiving a response from CORC."); Fox, 2018 WL 8576600, at *7 (holding that four-month delay between appeal and CORC response did not render administrative remedies unavailable where the plaintiff did not attempt to contact the IGP or CORC to check the status of his appeal); Arce v. Keane, No. 01 Civ. 2648 (BSJ), 2004 WL 439428, at *2 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance."); cf. High, 2016 WL 3039687, at *10 (explaining that the relatively long CORC delay excused the plaintiff from the exhaustion requirement).

*8 Significantly, the undersigned must consider the availability of remedies at the time the inmate commenced the action. See Lewis v. Hanson, 9:16-CV-804 (MAD/TWD),

2017 WL 4326084, at *3 (N.D.N.Y. Sept. 28, 2017) (emphasis added) ("Even if the Court were to find that administrative remedies became unavailable ... there are no allegations that administrative remedies were unavailable at the time that [the p]laintiff commenced this action."); see also Pacheco v. Zurlo, No. 09-CV-1330, 2011 WL 1103102, at *3 (N.D.N.Y. Feb. 8, 2011). At the time plaintiff initiated this action, his grievance was "pending," and he had "[f]orwarded [the grievance] to the superintendent for investigation." Am. Compl. at 5-7. As discussed above, plaintiff could have inquired into the status of his grievance with the superintendent or appealed his grievance to CORC directly while still complying with the IGP. Plaintiff's admission that his grievance was pending and being investigated demonstrates that administrative remedies were available at the time he commenced this action.

Thus, under the totality of the circumstances here, the undersigned finds that administrative remedies were available to plaintiff as: (1) plaintiff did not mention unavailability of the grievance process in his appeal to CORC; (2) plaintiff did not write to the superintendent to check on the status, nor appeal to CORC before filing his federal lawsuit; and (3) the superintendent's delay was fairly brief at the time plaintiff commenced his federal lawsuit. Accordingly, as the undersigned concludes that plaintiff failed to exhaust his administrative remedies and that administrative remedies were available to him, it is recommended that defendants' motion be granted. [8] See Berry, 366 F.3d at 87 (holding that dismissal without prejudice is appropriate where "a prisoner who brings suit without having exhausted these remedies can cure the defect by simply exhausting them and then reinstituting his suit.").

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 32) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's Amended Complaint (Dkt. No. 27) be **DISMISSED** in its entirety **without prejudice**; and it is

**RECOMMENDED**, that plaintiff's filing in further support of his response in opposition to the motion for summary judgment, dkt. no. 43, be deemed **STRICKEN** from the

record as it was filed without leave of the Court and far beyond the deadline for submissions; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 626(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72. [9]

**\*9 IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 8589277

---

**Footnotes**

1       This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

2       Throughout this Report-Recommendation and Order, references to page numbers in items that appear on the docket refer to the pagination of the header numbers generated by CM/ECF, not the page numbers used by the parties in the individual documents.

3       The Complaint is undated.

4       The Supplemental Complaint is dated December 18, 2018. Dkt. No. 11. After plaintiff filed the "Supplemental Complaint," Court combined the Complaint and Supplemental Complaint to be considered the original Complaint in this action. See Dkt. No. 1.

5       Plaintiff's deadline to file a response to defendants' motion for summary judgment was July 29, 2019, and plaintiff was advised of this deadline by the Court. Dkt. No. 33. Plaintiff timely filed a response in opposition on July 10, 2019, dkt. no. 34, and the undersigned reviewed that filing in rendering the instant Report-Recommendation & Order.

6       All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

7       The IGP Supervisor at Mid-State, Christopher Tapia, indicated in his Declaration that plaintiff's grievance was forwarded to the superintendent for immediate investigation because it was a harassment grievance; however, his Declaration does not specify the date on which date plaintiff's grievance was forwarded to the superintendent. See Tapia Decl. at ¶ 11

8       As the undersigned concludes that plaintiff has failed to exhaust his administrative remedies prior to commencing suit and that administrative remedies were available to him, the undersigned declines to reach the merits of the plaintiff's claims.

9       If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that

prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**End of Document**                                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1415212
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eric WALKER, Plaintiff,
v.
R. BALL, Captain, Washington Correctional Facility,
A. Rodriguez, Acting Director, NYS DOCCS Appeals
Unit, St. Johns, Correction Officer, Washington
Correctional Facility, and Wm. Noonan, Sergeant,
Washington Correctional Facility, Defendants.

Civ. No. 9:16-CV-437 (DNH/DJS)
|
Signed 02/16/2018

**Attorneys and Law Firms**

ERIC WALKER, 15-A-2625, Green Haven Correctional
Facility, P.O. Box 4000, Stormville, New York 12582, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of the
State of New York, OF COUNSEL: NICOLE E. HAIMSON,
ESQ., Assistant Attorney General, The Capitol Albany, New
York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

 **\*1** *Pro se* Plaintiff Eric Walker brought this action, pursuant
to 42 U.S.C. § 1983, alleging his constitutional rights were
violated while an inmate at Washington Correctional Facility.
The Amended Complaint asserts claims for excessive force,
retaliation, and the violation of his due process rights
regarding a prison disciplinary hearing and subsequent
appeal. *See generally* Dkt. No. 11, Am. Compl. Presently
pending is Defendants' Motion for Summary Judgment which
was filed on July 19, 2017. Dkt. No. 50. To date, Plaintiff has
filed no response to that motion. For the reasons that follow,
it is recommended this case be **dismissed** pursuant to Fed. R.
Civ. P. 41 based on Plaintiff's failure to prosecute or, in the
alternative, that Defendants' Motion be **granted**.

**I. DISMISSAL UNDER FED. R. CIV. P. 41**

As noted above, Defendants' Motion for Summary Judgment
was filed on July 19, 2017. The motion papers included a
certificate of service indicating it was served on Plaintiff that
same day. Dkt. No. 50-15. On July 20, 2017, the Clerk of
the Court provided an additional notice to Plaintiff regarding
the filing of the motion. Dkt. No. 51. That notice advised
Plaintiff that his response was due on or before August 21,
2017 and informed Plaintiff of the consequences that could
occur should he fail to respond to the Motion. *Id.* That notice
was returned as undeliverable to the address on record with
the Court. Dkt. No. 53.

Having received no response to Defendants' Motion, on
October 31, 2017, the Court issued an Order directing Plaintiff
to provide the Court and opposing counsel with confirmation,
in writing, of his present address, inform of his intentions with
regard to the pending Motion for Summary Judgment, and
explain why he did not respond to such Motion within the
time allotted. Dkt. No. 54. That Order was served at Plaintiff's
address of record at Green Haven Correctional Facility and
at an address in Newburgh, New York. The Order mailed to
Green Haven Correctional Facility was again returned with
the notation that Plaintiff was "No Longer Here." Dkt. No. 57.
Following receipt of a status report from Defendants' counsel,
the October 31, 2017 Order was re-served upon Plaintiff at a
second address in Newburgh, New York. *Id.* No mail sent to
the Newburgh addresses was returned as undeliverable, but
Plaintiff did not respond to the Order.

To date, the Court has not received a response by Plaintiff
to the Defendants' Motion nor any notification that he
has changed his address. In this District, all litigants have
an ongoing obligation to keep their address information
updated with both the Court and adversaries. N.D.N.Y.L.R.
10.1(c)(2) ("**All attorneys of record and pro se litigants
must immediately notify the Court of any change of
address**." (emphasis in original)). A party's failure to provide
such information is grounds for dismissal. N.D.N.Y.L.R.
41.2(b). As then-District Judge Pooler has observed:

> It is neither feasible nor legally
> required that the clerks of the district
> courts undertake independently to
> maintain current addresses on all
> parties to pending actions. It is
> incumbent upon litigants to inform
> the clerk of address changes, for
> it is manifest that communications

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 146 of 170

Walker v. Ball, Not Reported in Fed. Supp. (2018)

between the clerk and the parties or their counsel will be conducted principally by mail. In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries. Address changes normally would be reflected by those inquiries if made in writing.

**\*2** *Dansby v. Albany Cnty. Corr. Facility Staff*, 1996 WL 172699, at \*1 (N.D.N.Y. Apr. 10, 1996) (citations omitted). Indeed, courts in the Northern District of New York have dismissed lawsuits brought by pro se plaintiffs for failure to provide a current address. *See Rivera v. Goord*, 1999 WL 33117155 (N.D.N.Y. Sept. 14, 1999); *Fenza v. Conklin*, 177 F.R.D. 126 (N.D.N.Y. 1988); *Morgan v. Dardiz*, 177 F.R.D. 125 (N.D.N.Y. 1998); *Williams v. Faulkner*, 1998 WL 278288 (N.D.N.Y. May 20, 1998).

Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute an action, or to comply with the procedural rules or orders of the court. Fed. R. Civ. P. 41(b); *see Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962). This power to dismiss may be exercised when necessary to achieve orderly and expeditious disposition of cases. *See Freeman v. Lundrigan*, 1996 WL 481534, at \*1 (N.D.N.Y. Aug. 22, 1996). The correctness of a dismissal pursuant to Rule 41(b) is determined in light of five factors: (1) whether plaintiff's failure to prosecute or to comply with the court's orders or procedural rules caused a delay of significant duration; (2) whether plaintiff was on notice that failure to prosecute or to comply would result in dismissal; (3) whether the defendant is likely to be prejudiced by further delay; (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard; and (5) whether the judge has adequately considered a sanction less drastic than dismissal. *Lewis v. Rawson*, 564 F.3d 569, 576 (2d Cir. 2009); *Lucas v. Miles*, 84 F.3d 532, 534-35 (2d Cir. 1996). In making use of this test, "[n]o one factor is dispositive, and ultimately we must review the dismissal in light of the record as a whole." *United States ex rel. Drake v. Norden Sys., Inc.*, 375 F.3d 248, 254 (2d Cir. 2004).

The Court has not had any communication from Plaintiff since May 2017, Dkt. No. 46, and has no means by which to effectively communicate with him. Plaintiff's failure to provide an updated address or to oppose a dispositive motion evidences his apparent abandonment of this case and evinces an intent to not prosecute this action. The Court finds that this period of noncompliance with the requirement that he notify the Clerk's Office and Defendants of his current address weighs in favor of dismissal. Moreover, the Court finds that Plaintiff was afforded proper notice of his obligation to advise the Court and counsel of his address and the consequences of his failure to comply. Any further warnings to Plaintiff would naturally fall on deaf ears as we have no way of contacting him. The Court also finds that Defendants are likely to be prejudiced by further delay in the proceedings, which may well affect witnesses' memories, the ability to locate witnesses, and the preservation of evidence. With regard to the fourth factor, under the circumstances, the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this case and weighs in favor of the dismissal of this action.

**\*3** Lastly, the Court has carefully considered sanctions less drastic than dismissal. Without the ability to communicate with Plaintiff, however, there is no meaningful way to procure his "reappearance" to actively prosecute this action. Moreover, simply waiting for him to comply with his obligations has not been, and is not likely to be, fruitful, since he has failed to do so for some months now. As a result, the Court finds that the fifth factor also weighs in favor of dismissal.

In sum, in light of the fact that Plaintiff cannot be located or communicated with at his address of record, and given his failure to comply with his obligation to advise the Court and counsel of any change in his address, I recommend that this action be dismissed.

## II. DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

In the alternative, the Court also recommends that the Motion for Summary Judgment be granted. For the reasons set forth below, there are no disputed questions of material fact and Defendants are entitled to judgment as a matter of law on Plaintiff's claims.

### A. Standard of Review

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 147 of 170

Walker v. Ball, Not Reported in Fed. Supp. (2018)

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir. 1994). The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine dispute as to material facts. *F.D.I.C. v. Giammettei,* 34 F.3d at 54 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (alteration and emphasis in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999). And, any ambiguities and inferences drawn from the facts must also be viewed in the light most favorable to the non-moving party. *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir. 1995).

When a motion for summary judgment is unopposed, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3); *see also* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion.").

This District's Local Rules provide that "[t]he Court shall deem admitted any facts set forth in the [moving party's] Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Local Rule 7.1(a)(3) further requires that the non-movant shall file a Statement of Material Facts which mirrors the movant's statement in matching numbered paragraphs and which sets forth a specific reference to the record where the material fact is alleged to arise. *Id.* The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot*, 2002 WL 368534, at *2 (N.D.N.Y. Mar.

1, 2002) (citing, *inter alia*, *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.*, 2001 WL 237218, at *1 (N.D.N.Y. Mar. 9, 2001)).

**B. Factual Background**

**\*4** On December 2, 2015, while an inmate at Washington Correctional Facility, Plaintiff was issued an inmate misbehavior report by Defendant Sergeant Noonan. Dkt. No. 50-7, Ball Decl. at ¶ 21. The misbehavior report charged Plaintiff with attempted assault on staff, violent conduct and failure to obey a direct order. Ball Decl., Ex. A at p. 16. The report alleged, in part, that when Defendant Noonan attempted to address Plaintiff, Plaintiff attempted to strike Noonan in the face. *Id.* Plaintiff denies this claim and instead claims that Noonan and Defendant Corrections Officer St. Johns subjected him to an unjustified assault on December 2, 2015. Dkt. No. 11, Am. Compl. at p. 5.

After the misbehavior report was issued Plaintiff was transferred to a Special Housing Unit. Ball Decl, Ex. A at p. 16. He received a copy of the misbehavior report on December 5 $^{th}$ . Ball Decl. at ¶ 10; Dkt. No. 50-11, Pl.'s Dep. at pp. 142-43. Plaintiff was given the opportunity to select an employee assistant to help him prepare for his hearing. Ball Decl. at ¶ 12 & Ex. A at p. 11. He met with his assistant and indicated he did not wish to call any witnesses at the hearing. *Id.* at ¶ 13 & Ex. A at p. 12. During the hearing Plaintiff initially stated he did not wish to call any witnesses, but later requested the testimony of inmate Devon Williams. *Id.* at ¶ 14 & Ex. B at pp. 1, 9-10. Inmate Williams refused to testify. Ball Decl. at ¶ 15 & Ex. A at p. 15. Defendants Noonan and St. Johns both testified. *Id.* at Ex. B. Plaintiff was given the opportunity to question each witness. *Id.*

At the conclusion of the hearing, Defendant Noonan read his determination finding Plaintiff guilty of the charges into the record. Ball Decl., Ex. B at pp. 10-11. Plaintiff also received a written disposition. Ball Decl. at ¶ 29. Plaintiff then filed an administrative appeal of Ball's disciplinary determination to New York State Department of Corrections and Community Supervision's ("DOCCS") Central Office. Dkt. No. 50-13, Rodriguez Decl. at ¶ 9. That appeal was reviewed and affirmed. *Id.* at ¶ 10.

Plaintiff filed no administrative grievance regarding the events that took place on December 2, 2015. Am. Compl., ¶ 4(b); Dkt. No. 50-4, Bellamy Decl. at ¶ 15.

## C. Analysis of the Defendants' Motion

### 1. Failure to Exhaust Administrative Remedies

Defendants Noonan and St. Johns seek summary judgment solely on the ground that Plaintiff failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a) which provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

There is no question that Plaintiff did not exhaust his claims against these defendants. The record shows that no grievances were filed by Plaintiff concerning any events on December 2, 2015. Bellamy Decl. at ¶ 15. Indeed, Plaintiff's Amended Complaint conceded his failure to exhaust. Am. Compl. at ¶ 4(b).

Exhaustion under this statute is mandatory. *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016). The failure to exhaust will be excused only if there was not truly an "available" means by which to exhaust the claim. *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). Once Defendants have established the existence of a viable exhaustion procedure the burden shifts to Plaintiff to establish that resort to the established grievance procedure was actually not available to him within the meaning of *Ross*. *Gilpin v. Jones*, 2017 WL 6558658, at *4 (W.D. Wash. Dec. 1, 2017), *report and recommendation adopted*, 2017 WL 6558182 (W.D. Wash. Dec. 22, 2017); *Washington v. Rounds*, 2016 WL 7015666, at *5 (D. Md. Nov. 30, 2016) (citing cases). In support of summary judgment, defendants have offered evidence of DOCCS' inmate grievance policies and procedures. Bellamy Decl. at ¶¶ 5-8 & 10. They have also offered evidence to show that at the time of the events in question, "Washington [Correctional Facility] had a fully functioning inmate grievance process available." *Id.* at ¶

12. This satisfies Defendants' burden of establishing that administrative remedies were available to Plaintiff.

**\*5** *Ross* recognized three circumstances under which the ability to exhaust might not be available to an inmate. Inasmuch as he has not responded to the motion, Plaintiff has not met his burden of establishing that any of the exceptions apply. Moreover, an independent review of the record shows that none of the exceptions applies here.

First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross v. Blake*, 136 S. Ct. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* While Plaintiff did not file any grievances regarding the alleged misconduct of Noonan and St. Johns, Bellamy Decl. at ¶ 15, he did file grievances regarding other issues. *Id.* at Ex. A. This shows that Plaintiff did not view the filing of grievances as a dead end. It also demonstrates that he clearly understood DOCCS' inmate grievance policy and could navigate it when he wished to pursue a grievance. As such, the first two exceptions identified under *Ross* are not applicable here. *Gonzalez v. Coburn*, 2017 WL 6512859, at *6 (W.D.N.Y. Dec. 20, 2017) ("Plaintiff's decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was neither a dead-end nor so opaque that Plaintiff could not avail himself of it.").

Third, a remedy is unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 S. Ct. at 1860. The Amended Complaint makes no allegation that Plaintiff's ability to file a grievance was in any way interfered with and the record supports no such inference. Plaintiff was able to fully process an appeal of his Superintendent's Hearing through the appropriate administrative channels. Dkt. No. 11-2, Supplement to Am. Compl. at p. 6; Rodriguez Decl., Ex. A. He also fully participated in the filing of unrelated grievances. Bellamy Decl., Ex. A. These factors strongly suggest there was no impediment to Plaintiff's ability to grieve these claims. During his deposition Plaintiff made only conclusory assertions that the grievance may not have been filed because of his "feeling at the time" that his mail was being tampered

Case 9:25-cv-00153-DNH-ML  Document 53   Filed 05/05/26   Page 149 of 170

Walker v. Ball, Not Reported in Fed. Supp. (2018)

with. Pl.'s Dep. at p. 132. Such a lone conclusory claim is not a sufficient basis from which the Court can conclude that the grievance procedures were not available to Plaintiff. *Aviles v. Tucker*, 2016 WL 4619120, at \*4 (S.D.N.Y. Sept. 1, 2016).

Accordingly, given Plaintiff's conceded failure to exhaust the available administrative remedies available to him through DOCCS' grievance program his claims against Defendants Noonan and St. John should be dismissed.

### 2. Claims Related to Plaintiff's Disciplinary Hearing

The remaining claims relate to the Defendant Ball's conduct of Plaintiff's disciplinary hearing and Defendant Rodriguez' subsequent affirmance of Ball's decision. Plaintiff alleges that these Defendants violated his right to Due Process. For the reasons which follow, Defendants are entitled to summary judgment.

**\*6** In the context of an inmate disciplinary proceeding due process requires that the inmate be: (1) afforded advance written notice of the charges against him; (2) provided a written statement supporting the disposition and reasons for the disciplinary action taken; (3) permitted to call witnesses and present documentary evidence; (4) entitled to a fair and impartial hearing officer; and (5) found guilty only if the disposition is supported by at least "some evidence." *Wolff v. McDonnell*, 418 U.S. 539, 563–64 (1974); *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (citing cases). Additionally because Plaintiff was confined to a special housing unit prior to his disciplinary hearing he was also entitled to an employee assistant. *Clark v. Gardner*, 256 F. Supp. 3d 154, 170 (N.D.N.Y. 2017). The record here establishes that all of these due process requirements were complied with in Plaintiff's case. Summary judgment, therefore, is appropriate.

As to a number of these requirements, the record clearly establishes that they were satisfied and Plaintiff makes no argument to the contrary. Plaintiff received notice of the misbehavior report on December 5, 2015. Ball Decl., Ex. A at p. 2. The hearing was not held until December 9, 2015. Ball Decl., Ex. B at p. 1. Plaintiff was given the opportunity to select an employee assistant before the hearing. Ball Decl., Ex. A at p. 11. He meet with that assistant on December 7th. *Id.* at p. 12. At that time he indicated that he did not wish to call any witnesses on his behalf. *Id.*; Ball Decl., Ex. B at p.1. At the hearing, he did then request to call one witness,

an inmate named Devon Williams. *Id.* at pp. 9-10. [1] At the conclusion of the hearing Plaintiff received a written copy of the disposition and reasons for it from Defendant Ball. Ball Decl., Ex. A at pp. 4-5.

Due process also requires that an inmate have a fair and impartial hearing officer. "An impartial hearing officer is one who 'does not prejudge the evidence' or an inmate's guilt." *Sowell v. Bullis*, 2016 WL 1696454, at \*13 (N.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, 2016 WL 1700410 (N.D.N.Y. Apr. 27, 2016). Here, it appears that Plaintiff's sole objection is that Ball should not have served as the hearing officer because he had knowledge of the underlying events which under a DOCCS regulation made it inappropriate to act as the hearing officer. While Plaintiff cites 7 N.Y.C.R.R. § 253.1(b) in support of this argument, see Supplement to Am. Compl. at p. 1, it appears that the provision actually applicable to Plaintiff's claim is 7 N.Y.C.R.R. § 254.1. That regulation provides: "The following persons shall not be appointed to conduct the proceeding: a person who actually witnessed the incident; a person who was directly involved in the incident; the review officer who reviewed the misbehavior report, or a person who has investigated the incident."

At the outset "a violation of state procedural law does not necessarily mean that the federal due process clause has been violated." *Shabazz v. Bezio*, 669 Fed.Appx. 592, 593 (2d Cir. 2016) (citing *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003)). More importantly, the only apparent involvement of Ball to which Plaintiff complains is Ball "asking if I gave someone an inmate [sic] my DIN number." Supplement to Am. Compl. at p. 1. Ball denies having this interaction with Plaintiff, Ball Decl. at ¶ 34, but it in any event would not establish involvement or an investigatory role on Ball's part sufficient to run afoul of either Section 254.1 or constitutional due process. A review of the hearing transcript also reveals no evidence of bias on Bell's part. *See generally* Bell Decl., Ex. B.

**\*7** On the issue of the sufficiency of the evidence, the Second Circuit looks to "whether there was 'reliable evidence' of the inmate's guilt." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004). Here, Ball based his finding of guilt on the testimony of St. Johns and Noonan whom he found to be credible witnesses, the recitation of events in the misbehavior report, and the injuries suffered (and not suffered) by Plaintiff. Ball Decl. at ¶¶ 21-27. Noonan's testimony was consistent with the facts set forth in the misbehavior report. This

evidence was sufficient for the guilty determination rendered in this proceeding. *Kotler v. Daby*, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (citing cases) (finding "some evidence" standard satisfied when hearing testimony was consistent with misbehavior report). Plaintiff objects that Ball improperly relied on St. Johns' testimony because, despite being a witness to the underlying conduct, St. Johns did not separately endorse the misbehavior report. Am. Compl. at p. 1. However, the regulation on which Plaintiff relies for this argument 7 N.Y.C.R.R. § 251–3.1(b)

> requires an endorsement of other DOCS employees present at the incident only *where appropriate* [and] has consistently been construed as containing what is in essence a materiality requirement. As a result, in order for there to have been a violation of Section 251–3.1(b), an inmate must show that the failure to endorse the misbehavior report caused him prejudice. There can be no such prejudice where the employees who failed to endorse the report either (1) testified at the hearing or (2) had their testimony waived by the inmate.

*Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482–83 (N.D.N.Y. 2009) (emphasis added). Given that St. Johns testified at the hearing and Plaintiff was afforded the opportunity to question him, there is simply no basis for establishing a violation of due process from his arguable failure to comply with a state regulation. *Shabazz v. Bezio*, 669 Fed.Appx. at 593.

Rodriguez' sole involvement was to review a staff report of Ball's disciplinary determination. Rodriguez Decl. at ¶¶ 9-11. When the underlying hearing fully comports with due process, there can be no liability on the part of the individual who reviewed the disciplinary appeal. *See*, *e.g.*, *Lopez v. Whitmore*, 2015 WL 4394604, at *11 (N.D.N.Y. July 16, 2015) (dismissing due process claim against DSH Prack "[b]ecause his only involvement in the plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process"); *Cole v. New York State DOCCS*, 2016 WL 5394752, at *28 (N.D.N.Y. Aug. 25, 2016) (no due process violation by appeal officer when there is no basis to conclude that hearing was conducted in a

manner that failed to comport with due process); *Wesolowski v. Harvey*, 784 F. Supp. 2d 231, 234 (W.D.N.Y. 2011) (finding no constitutional claim against supervisor where no underlying constitutional violation occurred); *Alston v. Bendheim*, 672 F. Supp. 2d 378, 388 (S.D.N.Y. 2009) ("The failure to state a claim for an underlying constitutional violation forecloses supervisory liability."). For the reasons outlined above, Plaintiff's hearing fully complied with the requirements of due process and so Rodriguez is also entitled to summary judgment.

### 3. Qualified Immunity

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Lewis v. Cowan*, 165 F.3d 154, 166 (2d Cir. 1999).

**\*8** In this case Plaintiff raises specific objections to only two aspects of the process required by *Wolff*—the impartiality of the hearing officer and the sufficiency of the evidence. Both objections relate primarily to Plaintiff's view that the disciplinary proceedings were conducted in violation of state procedural requirements. Supplement to Am. Compl. at pp. 8-12. There is no clearly established law that the failure to comply with a state regulation constitutes a due process violation. On the contrary "[n]either federal nor state officials lose their immunity by violating the clear command of a statute or regulation—of federal or of state law—unless that statute or regulation provides the basis for the cause of action sued upon." *Jamison v. Fischer*, 617 Fed.Appx. 25, 28 (2d Cir. 2015) (quoting *Davis v. Scherer*, 468 U.S. 183, 194 n. 12 (1984)). That is not the case in the context of an inmate disciplinary proceedings. *Id.*

Additionally, for the reasons set forth above, the disciplinary determination was supported by sufficient evidence. At the very least, however, qualified immunity is appropriate as to that claim because "neither this circuit nor the Supreme Court has clearly defined standards for determining what constitutes "some evidence" in the context of prison

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 151 of 170

Walker v. Ball, Not Reported in Fed. Supp. (2018)

disciplinary hearings; rather, decisions have addressed the problem piecemeal, focusing on the discrete problems raised by the facts of particular cases." Sira v. Morton, 380 F.3d 57, 81 (2d Cir. 2004).

Accordingly, Defendants Ball and Rodriguez are also entitled to summary judgment on the ground of qualified immunity.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the case be **DISMISSED** under FED. R. CIV. P. 41; and it is further

**RECOMMENDED** Defendants' Motion for Summary Judgment (Dkt. No. 50) be **GRANTED**; and it is further

**RECOMMENDED**, that the Amended Complaint be **DISMISSED** in its entirety; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action. The Report-Recommendation shall be served upon Plaintiff at each of the following three addresses:

Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582

75 Benkard Ave.
Apt. 2
Newburgh, New York 12550

20 Pierce Road
Apt. # 60
Newburgh, New York 12550

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS [2] WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in Fed. Supp., 2018 WL 1415212

---

**Footnotes**

1    Inmate Williams refused to testify. Ball Decl., Ex. A at p. 15. The Amended Complaint makes no allegation that Williams' failure to testify prejudiced Plaintiff or was otherwise unconstitutional.

2    If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**2018 WL 1406632**
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eric WALKER also known as Eric Qwasim Z
Walker also known as Eric Z Q Walker, Plaintiff,
v.
R. BALL, Captain, Washington Correctional Facility;
A. Rodriguez, Acting Director, NYS DOCCS Appeals
Unit; St. Johns, Correction Officer, Washington
Correctional Facility; and Wm Noonan, Sergeant,
Washington Correctional Facility, Defendants.

9:16-CV-437 (DNH/DJS)
|
Signed 03/20/2018

**Attorneys and Law Firms**

ERIC WALKER also known as ERIC QWASIM Z WALKER
also known as ERIC Z Q WALKER 15-A-2625 Last known
address Green Haven Correctional Facility P.O. Box 4000
Stormville, NY 12582, Plaintiff pro se.

HON. ERIC T. SCHNEIDERMAN OF COUNSEL: NICOLE
E. HAIMSON, ESQ. Ass't Attorney General, Attorney
General for the State of New York The Capitol Albany, NY
12224, Attorney for Defendants.

**DECISION and ORDER**

DAVID N. HURD, UNITED STATES DISTRICT JUDGE

 **\*1** Pro se plaintiff Eric Walker, *also known as* Eric Qwasim
Z Walker, *also known as* Eric Z Q Walker, brought this civil
rights action pursuant to 42 U.S.C. § 1983. On February

16, 2018, the Honorable Daniel J. Stewart, United States
Magistrate Judge, advised by Report-Recommendation that
plaintiff's amended complaint be dismissed in its entirety
pursuant to Federal Rule of Civil Procedure 41 based on
plaintiff's failure to prosecute this action, or in the alternative,
that defendants' unopposed motion for summary judgment be
granted. No objections to the Report-Recommendation were
filed. The Report-Recommendation mailed to plaintiff's last
known address was returned as undeliverable. To date, no
response to defendants' motion for summary judgment has
been received nor any notification that plaintiff changed his
address. The court's last communication from plaintiff was in
May 2017.

Based upon a careful review of the Report-Recommendation,
the Report-Recommendation is accepted in whole. See 28
U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. This action is DISMISSED pursuant to Federal Rule of
Civil Procedure 41 for failure to prosecute; and

2. Defendants' motion for summary judgment is DENIED as
moot.

The Clerk is directed to enter judgment accordingly and close
the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1406632

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1585947
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Craig WASHINGTON and Norka Washington, Plaintiffs,

v.

The CITY OF NEW YORK, Sgt, Thomas Kehrli,
Lt. Orsky, Deputy Insp. Salvatore Comodo, Sgt.
Donald McMaster, Deputy Chief Joellen Kunkel,
Capt. Edward Edwards, Lt. James Scully, Sgt. Robert
Dowd, Capt. Pablo Martinez, Lt. Sean Jordan, Sgt.
Thomas Rice, Det. Denis O'Sullivan, Chief Charles
Campisi, Capt. Kenneth Donovan, Capt. Edward
Thompson, And P.O.s John and Jane the N.Y.P.D.
individually and in their Official capacities (the names
of John and Jane the N.Y .P.D. being Fictitious, as
the true names are Presently unknown), Defendants.

No. 05 Civ. 8884(LAP).
|
June 5, 2009.

**Opinion**

LORETTA A. PRESKA, District Judge.

**\*1** Plaintiffs Craig and Norka Washington bring this action pursuant to 42 U.S.C. § 1983 ("Section 1983") and 42 U.S.C. § 1981 ("Section 1981") alleging discrimination, false arrest, malicious prosecution, and malicious abuse of process in connection with criminal and disciplinary proceedings initiated against Mr. Washington in the summer of 2004. Mr. Washington further alleges illegal employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the New York Human Rights Law ("NYHRL"), Executive law § 296 et seq., and the Administrative Code of New York. Defendants now move for summary judgment on all claims. For the reasons below, the motion is granted with respect to all claims other than Mrs. Washington's claim of false arrest.

I. *BACKGROUND*

A. *The July 10, 2004 Incident*
Mr. Washington began working as a detective for the New York Police Department ("NYPD") in 1985. (Plaintiffs' 56.1

Statement of Material Facts in Dispute, ("Pl. 56.1 Stmt."), ¶ 2.) On July 10, 2004, non-party Iris Suarez telephoned the NYPD Internal Affairs Bureau ("IAB") and reported that Mr. Washington, who Suarez described as her "boyfriend", had assaulted her. (*See id.* at ¶ 6; Declaration of Isaac Klepfish in Support of Mo tion of Defendants for Summary Judgment, sworn to July 11, 2008 ("Klepfish Decl.") Ex. L ¶¶ 2, 4.). Because the alleged misconduct involved a police officer, Defendant Captain Edward Edwards, along with members of the Bronx Investigations Unit, interviewed Suarez. (Pl. 56.1 Stmt. at ¶¶ 10-11; Klepfish Decl. Ex. L ¶ 4.) Suarez said that two days earlier, a verbal dispute with Mr. Washington culminated in a physical altercation in which he threw her on the ground and stomped on her left calf, causing bruising. (Klepfish Decl. Ex. L ¶ 4.) [1] Mr. Washington admits that he met with Suarez on the day of the alleged assault, but denies her other allegations. (Pl. 56.1 Stmt ¶¶ 12-14.)

After Suarez's interview, Deputy Chief Joellen Kunkel suspended Mr. Washington from active duty. (Pl. 56.1 Stmt. ¶ 15.) At the time of his suspension, Mr. Washington surrendered his firearms, one of which he was later found to have kept in an unsecure location within a cardboard box in his automobile. (*Id.* at ¶ 17; Klepfish Decl. Exs. L ¶ 6, Z at 3). [2]

B. *The July 20, 2004 Incident*
On July 17, 2004, Mr. Washington filed a complaint with the NYPD alleging that Suarez was harassing him. (Affirmation of Counsel Walker G. Harman, Jr. in Opposition to Summary Judgment, sworn to August 22, 2008 ("Harman Aff."), Ex. A, Deposition of Craig Washington, taken February 7, 2008, ("C. Washington Dep."), 44:4-46:12.) Three days later, on July 20, 2004, Mr. and Mrs. Washington returned home to find Suarez waiting for them. (Klepfish Decl. Ex. O.) The Washingtons called 911, and two police officers soon arrived on the scene, followed by Defendant Sergeant Thomas McMaster. (*Id.*) Defendants contend, and Plaintiffs deny, that McMaster ordered Mr. Washington to accompany him to the police station to be interviewed but Mr. Washington angrily refused to comply. [3] (Pl. 56.1 Stmt. ¶ 20.)

i. *Mrs. Washington's Alleged Detention*
**\*2** Mr. Washington subsequently drove Mrs. Washington and their two-year-old son to the police station, where they remained for approximately eight hours. (Klepfish Decl. Ex. B., Deposition of Norka Washington, taken February 7,

2008, ("N. Washington Dep."), 6:13-7-8, 23:5-6; 26:18-27:1.) Mrs. Washington testified that she and her son were held in a separate room and although she repeatedly asked to leave, Sergeant McMaster and other officers yelled at her and refused to let her go. (N. Washington Dep., 4:21-5:19, 26:15-27:7.) Several officers interviewed Mrs. Washington for approximately one hour about the afternoon incident with Suarez. (*Id.* 6:1-7:24; 20:15-16.) Mrs. Washington and her son left when Mr. Washington's interview had been completed. (*Id.* 23:9-13.)

ii. *Suarez's Allegations and Washington's Arrest*
Defendant Captain Pablo Martinez and members of the Bronx Investigations Unit also questioned Suarez at the station house on July 20, 2004. (Pl. 56.1 Stmt., ¶ 21.) Suarez said she had been romantically involved with Mr. Washington and that he had lived with her family in June of 2004. (*See Id.* ¶ 25; Klepfish Decl. Ex. O, ¶ 4.) Suarez stated that her nine-year-old daughter, Alexis Wray, told Suarez that morning that Mr. Washington had sexually molested her when he stayed with them. (Pl. 56.1 Stmt. ¶ 22.) Specifically, Suarez said Alexis told her that Mr. Washington had touched her vagina while she slept. (*Id.* ¶ 23.)

Because of the serious nature of Suarez's allegations of sexual abuse, further investigation of the matter was referred to IAB and the Bronx Special Victims Squad ("SVU"). (*Id.* ¶ 24.) When interviewed by IAB and SVU, Suarez again asserted that Mr. Washington had sexually assaulted her daughter. (*Id.* ¶ 26.) IAB, SVU, and the Bronx County Assistant District Attorney's ("DA's") Office then scheduled a joint interview of Suarez and her daughter Alexis at the Montefiore Hospital on July 21, 2004. (*Id.* ¶¶ 27-31.) They also arranged for Alexis to be medically examined by Dr. Olga Jimenez. (*Id.* SI 29.) Both During the joint interview and when questioned by Dr. Jimenez, Alexis said Mr. Washington had lived with her mother and that during that time he had entered her bedroom and pretended to tuck her in while instead inserting his finger in her vagina. (Kerhli Dep. 57:14-22; Pl. 56.1 Stmt. ¶ 31.)

After the joint interview and medical examination, the Bronx District Attorney and the Head of IAB authorized Mr. Washington's arrest. (Pl. 56.1 Stmt. ¶ 32.)

C. *Procedural Background*

i. *Criminal Proceedings*

Mr. Washington was arrested on July 21, 2004 and charged with Sexual Abuse in the First Degree and Endangering the Welfare of a Child. (*Id.* ¶ 34.) He was also charged with Assault in the Third Degree and Harassment in the Second Degree in connection with the July 10, 2004 incident. (*Id.* ¶ 35.)

On August 19, 2004, Bronx Assistant District Attorney Michael O'Sullivan sought a grand jury indictment on the sexual misconduct charges. (*Id.* ¶ 40.) At the hearing, Mr. Washington's attorney introduced numerous taped messages Suarez had left on Mr. Washington's cell phone. (*Id.* ¶ 41.) In these recordings, Suarez variously asked for money, insulted and said she would contact Mrs. Washington, and threatened to fabricate charges against Mr. Washington. (*See* Klepfish Decl. Ex. Z at 4-5; Pl. 56.1 Stmt. ¶ 40.) Plaintiffs admit that neither IAB investigator Kehrli nor the DA knew about these tapes before Washington's attorney presented them to the grand jury. (Pl. 56.1 Stmt. ¶ 41.)

**\*3** On August 20, 2004, the grand jury voted no true bill on the sexual misconduct charges, which the DA's Office then dropped. (*Id.* ¶ 42.) The DA's Office dropped the remaining assault charges relating to the July 10, 2004 incident shortly thereafter. (*Id.* ¶ 43.)

ii. *NYPD Disciplinary Proceedings*
Mr. Washington was resuspended on or about the time he was arrested on the sexual misconduct and assault charges described above. [4] (*Id.* ¶ 37.) Two days after his arrest, the NYPD issued a set of Departmental Charges and Specifications charging him with (1) sexual assault on a nine-year old girl and (2) being discourteous to a superior officer in connection with the July 20, 2004 incident. (*Id.* ¶ 38.)

In mid-November of 2004, two months after the DA's Office dropped all criminal charges, the NYPD issued a second set of Departmental Charges and Specifications against Mr. Washington alleging that: (1) in June of 2004, he tried to give his firearm to Suarez, and said "you are ruining my life anyway, so kill me", (2) on July 8 of 2004, he had pushed or thrown Suarez down the stairs, (3) he pushed or threw Suarez in front of her young children, and (4) on July 10, 2004, he failed properly to safeguard his firearm. (Pl. 56.1 Stmt. ¶ 49; Klepfish Decl. Ex. Z at 2.)

On February 4, 2005, non-party David Green, the NYPD advocate, determined that he would not prosecute the sexual

misconduct and assault charges because IAB investigators, the DA's Office, and the advocate's office found them to be "unsubstantiated." (*See* Klepfish Decl. Ex. Z at 2, 8; Pl. 56.1 Stmt. ¶ 50, Harman Aff. Ex. C, Deposition of Thomas Kehrli, taken March 4, 2008, ("Kehrli Dep."), 94:17-95:6.) At a May 24, 2005 hearing on all Charges and Specifications against Mr. Washington before non-party John Grappone, Assistant Deputy Commissioner of Trials, Green formally moved to dismiss the assault and sexual misconduct charges. (*See* Pl. 56.1 Stmt. ¶ 52; Klepfish Decl. Ex. Z at 2-3.) Mr. Washington then pleaded guilty to the charge of improperly safeguarding his firearm, (*See* Pl. 56.1 Stmt. ¶ 53; Klepfish Decl. Ex. Z at 3), and the parties proceeded to trial on the remaining charge of discourteous conduct to a superior officer (asserted in the first set of Charges and Specifications issued in July).

Grappone issued a decision on August 23, 2005 dismissing the sexual misconduct and assault charges and finding Mr. Washington guilty of the firearm charge and of discourteous conduct. (Pl. 56.1 Stmt. ¶ 55; Klepfish Decl. Ex. Z at 1, 3.) Grappone recommended that Mr. Washington forfeit the forty-four days he previously served on suspension. (Pl. 56.1 Stmt. ¶ 56; Klepfish Decl. Ex. Z at 19.) NYPD Commissioner Raymond Kelley adopted Grappone's recommendation on September 23, 2005. (Pl. 56.1 Stmt. ¶ 57; Klepfish Decl. Ex. Z at 19.)

Mr. Washington remained on modified assignment until he filed for retirement on November 30, 2005. (C. Washington Dep. 72:16-19.) He alleges that because he retired while on modified assignment, his pension was reduced. (Second Amended Complaint ("Compl.") ¶ 40.)

### iii. *Mr. Washington's EEOC Charges*

 **\*4** On January 20, 2004, nearly six months prior to the July 10, 2004 incident, Mr. Washington filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Sergeant Kevin O'Konnor the NYPD discriminated against him because he is African American by refusing to allow Mr. Washington to be promoted to a different unit. (Pl. 56.1 Stmt. ¶¶ 63-64.) Mr. Washington named none of the Defendants in the instant action in his 2004 EEOC filing. (*Id.* ¶ 65.)

More than a year later on April 25, 2005, Mr. Washington filed another charge of discrimination with the EEOC alleging that several of the Defendants unlawfully retaliated against him by filing criminal and departmental charges against him. [5]

(Klepfish Decl. Ex. DD; *see also* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp.Mem.") at 5.)

### iv. *The Instant Suit*

Plaintiffs initiated this action on October 19, 2005, and now bring nine claims against the City of New York and individual officers who were allegedly involved in Mr. Washington's arrest and the attendant disciplinary proceedings. In Counts I, II, and IV, both Plaintiffs assert claims under Section 1983 for general deprivation of federal rights, false arrest, and malicious abuse of process. Count V alleges that the City of New York's "customs, policies, usages, practices, and procedures" violated their constitutional rights. (Compl.¶ 75.) Mr. Washington alone asserts Count III alleging malicious prosecution in violation of Section 1983, Counts VI, VIII, and IX alleging retaliation in violation of Title VII, the NYHRL and the Administrative Code, and Count VII alleging racially motivated deprivation of his rights in violation of Section 1981.

## II. *DISCUSSION*

### A. *Summary Judgment Standard*

Defendants are entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [they are] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. Proc. 56(c)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Overton v. New York. State Div. of Military and Naval Affairs,* 373 F.3d 83, 89 (2d Cir.2004).

In assessing whether summary judgment is proper, the Court construes the evidence in the light most favorable to the non-moving party. *Lucente v. IBM Corp.,* 310 F.3d 243, 253 (2d Cir.2002). As movants, Defendants bear the initial burden of providing the basis for the motion and identifying the evidentiary materials, if any, supporting their position. *See Grady v. Affiliated Central, Inc.,* 130 F.3d 553, 559 (2d Cir.1997.) Plaintiffs must then "come forward with specific facts showing that there is a genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e). Mere speculation and conjecture will not suffice. *See Niagara Mohawk Power Corp. v. Jones Chemical Inc.,* 315 F.3d 171, 175 (2d Cir.2002).

### B. *Analysis*

### i. *Mr. Washington's Claims*

**\*5** Mr. Washington makes virtually no effort to preserve any of his claims other than his retaliation claim. [6] Therefore, Defendants' motion will be granted with respect to his false arrest, malicious prosecution, abuse of process, and discrimination claims so long as they have met their threshold burden of production. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 241 (2d Cir.2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.")

### a. *False Arrest*

Mr. Washington cannot prevail on his false arrest claim if Defendants show they had probable cause to arrest him. *See DevenPeck v. Alford,* 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); *Jaegly v. Couch,* 439 F.3d 149, 151-54 (2d Cir.2004) (probable cause is an absolute defense to a false arrest claim under Section 1983); *see also Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir.2003) (same). An officer has probable cause to arrest when "he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Jaegly,* 439 F.3d at 152 (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996).

Here, Defendants have produced ample undisputed evidence demonstrating probable cause for Mr. Washington's arrest on charges of assault and sexual misconduct based not only on IAB and DA interviews with Suarez but also on an interview and medical examination of her daughter, who said that Mr. Washington had molested her. (*See* Kehrli Dep. 51:7-22, 52:10-53:11, 56:5-58:16; Klepfish Decl. Ex. O). The fact that these charges were later dropped does not negate the existence of probable cause at the time of the arrest, particularly given that, as Mr. Washington concedes, neither the DA nor IAB knew about the exculpatory cell phone tapes before they were played to the grand jury. *See Smith v. Ortiz,* 2006 U.S. Dist. LEXIS 34153, *12, 2006 WL 1458404 (S.D.N.Y.2006)

(subsequent acquittal does not negate validity of arrest); (Pl. 56.1 Stmt. ¶ 41).

Furthermore, even if the Defendant Officers lacked probable cause to arrest Mr. Washington, they are entitled to qualified immunity if they had "arguable probable cause to arrest" him. *Guerrero v. Scarazzini,* No. 06-5016-cv, 2008 U.S.App. LEXIS 8785, at *4, 2008 WL 1817245 (2d Cir. Feb. 23, 2008). Defendants had arguable probable cause if (i) it was objectively reasonable to believe there was probable cause to arrest Mr. Washington or (ii) officers of reasonable competence could disagree as to whether the probable cause test was met. *Id.* Here, Plaintiff does not contest that the IAB and DA interviews gave probable cause, much less arguable probable cause, to arrest Mr. Washington. Accordingly, Defendants' motion for summary judgment is granted with respect to Mr. Washington's false arrest claim.

### b. *Malicious Prosecution*

**\*6** Mr. Washington's malicious prosecution claim must also fail. It is well-settled that the existence of probable cause supporting an arrest "precludes plaintiffs from establishing a malicious prosecution claim unless they can point to facts uncovered after the arrest that negated that probable cause by making apparent the 'groundless nature of the charges.' " *Rodriguez v. City of New York,* 535 F.Supp.2d 436, 443 (S.D.N.Y.2008) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996). As discussed above, Defendants have supplied uncontested evidence of probable cause supporting Mr. Washington's arrest. Furthermore, Plaintiff does not deny that the DA dropped the sexual misconduct charges upon hearing the tapes calling Suarez's credibility into question and the assault charges stemming from Suarez's July 10 allegations shortly thereafter. (Pl. 56.1 Stmt. ¶¶ 42-43.) Defendant's motion for summary judgment with respect to Mr. Washington's malicious prosecution claim is therefore granted.

### c. *Malicious Abuse of Process*

Mr. Washington asserts that his arrest and abortive prosecution constitute malicious abuse of process in violation of Section 1983. To establish such a claim, he must show that the Defendants "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). Here, Defendants have introduced evidence

that Mr. Washington was arrested and charged pursuant to an investigation into serious allegations against him by civilian non-parties. Mr. Washington has provided neither facts nor argument beyond the general and conclusory allegations in his Complaint to support his claim that Defendants arrested him without justification to achieve an illegitimate objective. (*See* Compl. ¶¶ 67-70.) Accordingly, this claim fails as a matter of law. *See Mohawk Power,* 315 F.3d 171, 175 (2d Cir.2002) (conclusory assertions do not create an issue of fact for trial).

#### d. *Discrimination*

Defendants are also entitled to summary judgment on Mr. Washington's direct race discrimination claims under Section 1981 and Title VII because he has not established a *prima facie* case of discrimination and, even if he had, they have introduced non-discriminatory reasons for the allegedly discriminatory behavior which Mr. Washington has not shown to be pretextual. To establish a *prima facie* case of employment discrimination, Mr. Washington must show that (i) he is a member of a protected class, (ii) he was qualified for his position, (iii) he suffered an adverse employment action, and (iv) the circumstances of the adverse action "give rise to an inference of discrimination." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000). Should he succeed, the burden shifts to the Defendants to "to articulate a legitimate, non-discriminatory reason for the adverse action." *Id.* If Defendants meet this burden, they are entitled to summary judgment unless Mr. Washington can show that the Defendants' non-discriminatory explanation is merely a pretext for discrimination. *Mario v. P & C Food Mkts.,* 313 F.3d 758, 767 (2d Cir.2002); *Cedeno v. N.Y. City Transit Auth.,* No. 01-9049, 2002 U.S.App. LEXIS 23106, at *3 (2d Cir. November 5, 2002); *see also Bickerstaff v. Vassar College,* 354 F.Supp.2d 276, 280n.2 (2d Cir.2004) (noting that Title VII and Section 1981 claims "are analyzed under the same framework").

 **\*7** Here, Mr. Washington has not shown circumstances giving rise to an inference of discrimination. To the contrary, he flatly concedes that "none of the defendants in this action ever said something to [him] which evidenced animus against [his] race." (Pl. 56.1 Stmt. ¶ 67.) Mr. Washington has offered nothing other than speculation that Defendants' actions were motivated by race-based animus and he has made no serious response to Defendants extensive argument in favor of summary judgment on this point. (*See* Memorandum of Law of City Defendants in Support of Their Motion for Summary Judgment, ("Def.Mem."), at 13-18.); *see also Sharif v. Buck,* No. 04-5789-cv, 2005 U.S.App. LEXIS

22363, \*3, 2005 WL 2650070 (2d Cir. Oct. 17, 2005) (no inference of discrimination where plaintiff offered only conclusory allegations to support claim); *Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir.2000) (dismissing Section 1983 and Section 1981 claims for inadequate allegations of discriminatory intent).

Furthermore, Mr. Washington has made no attempt to show that the Defendants' non-discriminatory reasons for taking disciplinary action, namely the serious allegations Suarez, a non-party, leveled against him, his admitted failure to properly safeguard his firearm on July 10, 2004, and the finding that he was disrespectful to a superior officer on July 20, 2004, were pretextual. (*See* Def. Mem. at 16-18.) Accordingly, Mr. Washington's direct discrimination claims under Title VII and Section 1981 fail as a matter of law.

#### e. *Retaliation*

Mr. Washington actively opposes the instant motion only with respect to his retaliation claim under Title VII and the NYHRL. To establish a *prima facie* case of retaliation, he must show that (1) he was engaged in a protected activity, (2) Defendants knew of the activity, (3) he suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action. *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996) (citing *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988).[7] As with the direct discrimination claims, should Mr. Washington establish a *prima facie* case of retaliation, the burden shifts to Defendants to provide a legitimate, nondiscriminatory reason for their actions, which he must then show to be pretextual. *Thomas v. S.E.A.L. Security, Inc.,* NO. 04 Civ. 10248, 2007 U.S. Dist. LEXIS 63841, \*38, 2007 WL 2446264 (S.D.N.Y. August 30, 2007).

Mr. Washington has not established a *prima facie* case because he has proffered no evidence showing a causal connection between his protected activity and the allegedly retaliatory conduct. He contends that Defendants effectuated his arrest and initiated disciplinary proceedings against him in retaliation for his January 20, 2004 and April 25, 2005 EEOC filings. He argues that the temporal proximity between these filings and his arrest and suspension, standing alone, constitutes sufficient circumstantial evidence to support an inference of causation. (Opp.Mem.7.)

**\*8** This contention is untenable. While courts may infer a causal link in the absence of direct evidence of discrimination where the alleged retaliation occurred shortly after a plaintiff engaged in protected activity, too much time elapsed between Mr. Washington's January 20, 2004 filing and his suspension following Suarez's initial assault complaint in mid-July to warrant such an inference here. *See Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir.1990) (dismissing retaliation claim on summary judgment where there was a three-month lapse between the protected activity and the alleged retaliation); *Lewis v. Snow,* No. 01 Civ. 7785, 2003 WL 22077457, at \*8 (S.D.N.Y. Sept.8, 2003) (same). Indeed, Mr. Washington cites only cases in which the adverse action occurred within two to three months of participation in a protected activity. *See Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001) (twenty-day time lapse); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (less than two-month time lapse); *Parrish v. Sollecito,* 258 F.Supp.2d 264, 269 (S.D.N.Y.2003) (one to three month lapse); *Santos v. Costco Wholesale, Inc.,* 271 F.Supp.2d 565, 575 (S.D.N.Y.2003) (three-month lapse). Here, however, there is an almost six-month gap between Mr. Washington's initial EEOC filing and his suspension and subsequent arrest.

Mr. Washington's temporal proximity argument with respect to his April 25, 2005 EEOC Charge is even more tenuous. He contends that a causal link may be inferred between the April filing and the decision to keep him on modified assignment until he retired. (Opp. Mem. at 7-8.) However, mere continuation of an adverse employment condition initiated long before the protected activity in question does not, without more, logically support an inference that the protected activity prompted retaliation. *See Chamberlain v. Principi,* No. 06-1291-cv, 2007 U.S.App. LEXIS 21829, at \*6, 2007 WL 2692339 (2d Cir. Sept. 12, 2007) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.") (quoting *Slattery v. Swiss Reinsurance Am.,* 248 F.3d 87, 95 (2d Cir.2001)). Here, Mr. Washington was placed on modified assignment more than six months before he filed the April 25,2005 EEOC charge, and there is simply no support for Mr. Washington's conclusion that he continued to be on modified assignment after that time due to retaliation for that filing. [8] Nor, as Defendants observe, is there any evidence that Mr. Washington ever asked to be removed from modified assignment before he retired. (Reply Memorandum of Law of City Defendants in Support of Their Motion for Summary Judgment ("Reply Mem."), at 6.)

Finally, even if Mr. Washington had established a *prima facie* case of retaliation, he has not shown that Defendants' proffered non-discriminatory reasons for his arrest and the disciplinary actions taken against him, already discussed in connection with his direct discrimination claims, are pretextual. (*See* Part II(B) (i)(d).) In this regard, Mr. Washington simply asserts that the IAB did an inadequate investigation of Suarez's allegations before disciplining him. [9] (Opp. Mem. at 9.) However, he does not provide even a conclusory argument as to how the supposedly inadequate investigation was prompted by either of Mr. Washington's EEOC charges, the first of which, as he concedes, named none of the Defendants in this action. (*See* Pl. 56.1 Stmt. ¶ 65.) Accordingly, Mr. Washington's retaliation claim fails as a matter of law.

### ii. *Mrs. Washington's claims*

**\*9** Mrs. Washington asserts claims under Section 1983 for false arrest and malicious abuse of process stemming from her alleged detention at the police station immediately following the Washingtons' July 20, 2004 encounter with Suarez. The parties agree that the fundamental question with respect to the false arrest claim is whether Mrs. Washington was taken into custody in violation of her Fourth Amendment right to be free from unreasonable seizure. (Def. Mem. at 23; Opp. Mem. at 11-12.) Resolution of this issue requires determination of "whether a reasonable person in [Mrs. Washington's] position would have understood [her]self to be subjected to the restraints comparable to those associated with a formal arrest." *Hicks v. City of Buffalo,* No. 03-6119, 2004 WL 2616750, at \*2 (2d Cir. Nov.18, 2004) (quoting *United States v. Newton,* 369 F.3d 659, 671 (2d Cir.2004)).

Defendants argue that Mrs. Washington was never taken into custody because she voluntarily accompanied her husband to the station. (Def. Mem. 23; N. Washington Dep., 6:13-7:11). They also rely on Defendant Dowd's deposition testimony that "Mrs. Washington was not under arrest" and "could leave at any time." (Def. Mem. 23; Klepfish Decl. Ex. F, Deposition of Robert Dowd, taken March 8, 2008 ("Dowd Dep."), 43:19-22.) Defendants posit that Mrs. Washington chose to remain at the station until her husband's interview had been completed because she is legally blind and did not want to drive herself home. (Def. Mem. at 23.)

Mrs. Washington does not dispute that she came to the station house with her husband rather than in a police car. However,

she asserts that she was then inexplicably placed in a room alone with her two-year-old son and told not to leave. (N. Washington Dep. 5:10-13). She repeatedly asked to go home, but Defendant McMaster yelled at her and told her to "stay there until I come get you." (*Id.* 5:12-13.) All told, she remained at the station house for more than eight hours. (*Id.* 6:13-7:8, 23:5-6; 26:18-27:7; Opp. Mem. at 3.)

Viewing the evidence in the light most favorable to Mrs. Washington, there is a material factual dispute as to whether a reasonable person in her position would have felt compelled by the authorities to remain in the station house under the circumstances as she describes them. Although Defendants present a compelling argument that she voluntarily awaited her husband's release, her testimony indicates otherwise. Should a jury find her account credible, it might conclude that a reasonable person in Mrs. Washington's position would have felt herself to be restrained in a fashion similar to a formal arrest. Accordingly, Defendants' motion for summary judgment on Mrs. Washington's false arrest claim is denied.

Mrs. Washington also asserts a malicious abuse of process claim. (Compl.¶¶ 67-70.) This claim fails because she has identified no "regularly issued legal process" used against her to obtain any sort of illegitimate collateral objective. *Cook, 41 F.3d at 80.*

### iii. *Joint Municipal Liability Claim*

 **\*10**  Both Plaintiffs assert that under *Monell v. Dep't of Soc. Servs. ., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978),* the City of New York is vicariously liable for the alleged civil rights violations because of the City's unconstitutional "customs, policies, usages, practices, procedures, and rules." (Compl.¶ 73.) However, as Defendants correctly observe, Plaintiffs have not identified any improper action taken against them as a result of an unlawful municipal policy or practice. Accordingly, Defendants' motion is granted with respect to this claim and the City of New York is therefore dismissed from the action. *See Hicks,* 2004 WL 2616750 at \*1 (affirming summary judgment dismissal of *Monell* claim

"[b]ecause the record is here bereft of any unconstitutional custom or practice on the part of the City.")

### iv. *Joint "Deprivation of Federal Civil Rights"*

Although Defendants seek dismissal of all claims, neither party provides substantive argument regarding the "Deprivation of Federal Civil Rights" claim asserted in Count I of the Complaint. (Compl.¶¶ 43-48.) This ill-defined claim alleges generally that Defendants violated Plaintiffs' rights under the "First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution" in violation of Section 1983. (*Id.* ¶ 49.) Such general allegations, without supporting facts other than a clause incorporating an entire complaint by reference, are insufficient to withstand even a motion to dismiss because they do not give "fair notice of what the cl aim is and the grounds upon which it rests." *Sforza v. City of New York,* No. 07cv6122(DLC), 2009 WL 857496, at \*12 (S.D.N.Y. March 31, 2009) (quoting *Liebowitz v. Cornell University,* 445 F.3d 586, 591 (2d Cir.2006). Accordingly, this claim is dismissed. *See Diodati v. City of Little Falls,* No. 6:04-cv-446 (FJS/DEP), 2007 WL 189130 (N.D.N.Y. Jan. 22, 2007) (granting summary judgment dismissing general deprivation of federal rights claim where parties provided no substantive argument regarding the cause of action.)

### III. *CONCLUSION*

For the foregoing reasons, Defendants' motion for summary judgment [dkt. No. 31] is GRANTED with respect to all claims asserted by Mr. Washington and Mrs. Washington's malicious abuse of process and municipal liability claims. The motion is DENIED with respect to Mrs. Washington's claim of false arrest in violation of Section 1983.

Counsel shall confer and inform the Court by letter no later than June 20 how they propose to proceed.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1585947

---

**Footnotes**

1    In their Rule 56.1 statement, Plaintiffs admit that Suarez called IAB to complain about Mr. Washington, (16), but deny that Suarez made an assault allegation on the grounds that "Defendants cite no admissible evidence to support this claim", (¶ 12). However, while Plaintiffs object to the Court's consideration of some police

reports detailing the incident, (Klepfish Decl. Exs. G, H), and to consideration of photographs of Suarez's injured leg, (Klepfish Decl. Ex. K), on the grounds that these materials have not been authenticated, they do not object to Captain Edwards' report, dated July 10, 2004, (Klepfish Decl. Ex. L), which includes a summary of Suarez's statements to IAB investigators and her allegations of assault. (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, ("Opp.Mem.") at 13-14.) Furthermore, the police reports are adequately authenticated by the deposition testimony of Defendant Thomas Kehrli, an IAB investigator, who said they were among materials he compiled in his case folder. (*See* Supplemental Declaration of Isaac Klepfish in Support of City Defendants' Motion for Summary Judgment, sworn to Sept. 16, 2008, ("Klepfish Reply Decl."), Ex. HH., Deposition of Thomas Kehrli, taken March 4, 2008, 12:14-13:20.) To the extent that Plaintiffs raise a hearsay objection, the purportedly objectionable material would undoubtedly be admitted at trial as public or business records, and in any event need not be considered for the truth of Suarez's statements but rather to show that she made them. *See Spanierman Gallery v. Merrit,* No. 00-cv5712 (LTS)(THK), 2003 U.S. Dist. LEXIS 22141, at *18-19, 2003 WL 22909160 (S.D.N.Y. Dec. 9, 2003).

2 Here, and in multiple instances throughout their Rule 56.1 Statement, Plaintiffs respond to Defendant's summation of the relevant facts by saying "Admit, but deny to the extent the statement cites to inadmissible evidence." *See, e.g.,* ¶¶ 15, 17, 28-30, 32, 38-39, 49-53, 55-56. The Court declines Plaintiffs' invitation to identify for them the factual statements to which they object. Where this occurs, the statement provided by Defendants is taken as true because Plaintiffs initial response in each instance is "Admit." Furthermore, the documents proffered by Defendant to each statement challenged in this fashion would undoubtedly be admissible at trial as public records or business records.

Here, for example, Plaintiffs apparently object to consideration of Klepfish Decl. Exhibit Z, a Disciplinary Decision by Assistant Deputy Commissioner of Trials John Grappone dated August 23, 2005, for lack of authentication. (Pl. 56.1 Stmt. ¶ 17; Affirmation of Counsel Walker G. Harman, Jr. in Opposition to Summary Judgment, sworn to August 22, 2008, ("Harman Aff."), ¶ 5.) This document would be admissible at trial under Fed.R.Evid. 803(8)(C) as a public record, for which "the proponent is usually not required to establish ... admissibility through foundation testimony." Jack B. Weinstein & Margaret A Berger, Weinstein's Federal Evidence, § 803.10[2] (2d ed.2009). Furthermore, the document is self-authenticating under Fed.R.Evid. 902(1) as it bears the official seal of the NYPD and the signatures of both Grappone and Police Commissioner Raymond Kelly. *See CA, Inc. v. Simple, Inc.,* No. 02 Civ. 2748(DRH)(MLO), 2009 U.S. Dist. LEXIS 25241, at *263 (E.D.N.Y. March 5, 2009).

3 As discussed in Part I(C)(ii) below, Mr. Washington was subsequently found guilty of being discourteous to Sergeant McMaster in connection with this incident. (Klepfish Decl. Ex. Z, at 17-18.)

4 In all, Mr. Washington was suspended for forty-four days in connection with the July 10 and 20, 2004 incidents, after which he was placed on modified assignment (making him ineligible for overtime work and pay). (*See* C. Washington Dep., 71:1-72:10.)

5 The Second Amended Complaint incorrectly alleges that Washington filed this charge on July 22, 2005. (*Compare* Second Amended Complaint ¶ 41 *with* Opp. Mem. at 5.)

Oddly, Mr. Washington objects to the Court's consideration of his April 25 EEOC complaint while at the same time, as discussed below, his assertion of unlawful retaliation claim hinges on it. (*See* Harman Decl. ¶ 5.) In any event, Mr. Washington's April 2005 EEOC charge would be admissible at trial as a party admission. Fed.R.Evid. 801(d)(2).

6 Indeed, as Defendants observe, the Conclusion of Plaintiffs' brief in opposition to the instant motion asserts only that:

"there is sufficient evidence raising triable issues as to whether the disciplinary charges brought against Plaintiff Craig Washington in November 2004 were brought in retaliation for his January 2004 EEOC Charge, whether the refusal to restore Plaintiff Craig Washington to full-duty was carried out in retaliation for Plaintiff Craig Washington's April 2005 EEOC Charge, and whether Plaintiff Norka Washington was detained without the requisite probable cause or reasonable suspicion, pursuant to the Fourth Amendment."

(Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, ("Opp.Mem.") at 14-15.

7      The same standard applies to Mr. Washington's NYHRL claims "because New York courts rely on federal law when determining claims under the New York Human Rights law." *Reed,* 95 F.3d 1170, 1177 (citations omitted)

8      In this regard, I note that Mr. Washington has not even alleged that any Defendants knew about either of his EEOC Complaints or even that he ever sought to be taken off of modified assignment.

9      Notably Mr. Washington does not address Defendants' observation that Mr. Washington pleaded guilty to having failed properly to secure his firearm and was found guilty after an evidentiary hearing of being discourteous to Sergeant McMaster. (Def.Mem.22.)

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 162 of 170

Webb v. Fessette, Not Reported in Fed. Supp. (2025)

KeyCite Red Flag

Report and Recommendation Rejected by   Webb v. Fessette,   N.D.N.Y., September 23, 2025

2025 WL 1859012
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael WEBB, Plaintiff,
v.
Eric M. FESSETTE, et al., Defendants.

9:23-cv-1577 (ECC/TWD)
|
Signed January 22, 2025

**Attorneys and Law Firms**

MICHAEL WEBB, Plaintiff, pro se, 90-A-4906, Franklin Correctional Facility, P.O. Box 10, Malone, NY 12953.

OLIVIA R. COX, ESQ., NEW YORK STATE ATTORNEY GENERAL, Attorneys for Defendants, NYS Office of The Attorney General, The Capitol, Albany, NY 12224.

## REPORT-RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

### I. INTRODUCTION

**\*1** This matter has been referred for a report and recommendation by the Hon. Elizabeth C. Coombe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Michael Webb ("Plaintiff"), an incarcerated individual in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983. *See generally*, Dkt. No. 1.[1] Currently before the Court is the Defendants' motion for summary judgment. Dkt. No. 17. For the reasons set forth below, the undersigned recommends the Defendants' motion be granted.

### II. BACKGROUND

Plaintiff filed a complaint containing allegations of wrongdoing that occurred while he was incarcerated at Clinton Correctional Facility ("Clinton CF"), along with

a motion to proceed *in forma pauperis*. *See generally*, Dkt. Nos. 1-3. By order dated January 23, 2024, the Hon. Mae A. D'Agostino, United States District Judge, found Plaintiff's Eighth Amendment excessive force and failure to intervene claims against "defendants John Doe #1, John Doe #2, Fessette, Bell, Fittin, Mullady, and Minckler" were sufficient to survive initial review. Dkt. No. 7 at 10. Counsel subsequently appeared on behalf of Defendants Bell, Fessette, Fittin, Minckler, and Mullady (the "named defendants"). *See* Dkt. No. 13.

On March 26, 2024, the named defendants filed a motion for summary judgment, alleging Plaintiff failed to exhaust his administrative remedies before commencing this action. *See generally*, Dkt. No. 17. Plaintiff filed two letter motions requesting an extension of time to respond to the defendants' motion, Dkt. Nos. 21, 24, which the undersigned granted, Dkt. Nos. 22, 25. Plaintiff also filed a third letter request seeking court assistance to address an alleged medical issue and his lost property, Dkt. No. 26, and on May 9, 2024, out of an abundance of solicitude, the undersigned directed the Clerk to send Plaintiff copies of his complaint and the defendants' motion, and extended the deadline to file a response, Dkt. No. 27. Plaintiff has not filed a response in opposition to the defendants' motion.[2]

### III. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**\*2** If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.' " *Jeffreys*, 426 F.3d at 554 (alteration and emphasis in original) (quoting *Anderson*, 477 U.S. at 252). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks and citation omitted).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

## IV. ANALYSIS

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds, Ross v. Blake*, 578 U.S. 632 (2016).

Further, "the PLRA exhaustion requirement requires proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). In order to properly exhaust his administrative remedies, an inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford*, 548 U.S. at 81). DOCCS has a well-established inmate grievance process, set forth in 7 N.Y.C.R.R. § 701 *et seq*.

**\*3** First, a grievance is submitted to the facility's Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the incident. 7 N.Y.C.R.R. §§ 701.5(a)(1), 701.3(b), 701.5(b). The policy provides for a period to informally resolve the grievance, and thereafter to proceed through the various steps in the appeal process. *Id*. § 701.5(b)-(d). However, a more expedited procedure applies to "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate." *Id*. § 701.2(e); *see id*. § 701.58. Such a grievance is given a calendar number and recorded with all other grievances but is forwarded directly to the facility superintendent. *Id*. § 701.8(b). The superintendent then has twenty-five days to investigate and render a written response. *Id*. § 701.8(f). If the superintendent fails to render a decision within said time period, or rules against the incarcerated individual, the grievant may appeal to the Central Office Review Committee ("CORC"). *Id*. § 701.8(g). CORC has thirty days to review each appeal and render a decision. *Id*. § 701.5(d)(3). Exhaustion of the grievance procedure only occurs after CORC has rendered its decision. *Torres v. Carry*, 672 F. Supp. 2d 338, 344 (S.D.N.Y. 2009).

Because non-exhaustion is an affirmative defense, the defendant bears the burden of showing that an incarcerated

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 164 of 170

Webb v. Fessette, Not Reported in Fed. Supp. (2025)

individual has failed to satisfy the exhaustion requirements. *Jones*, 549 U.S. at 216. "Whether the plaintiff has exhausted his administrative remedies is a question of law .... Thus, an inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment in lieu of an answer." *Jenkins v. Short*, No. 9:19-CV-1352 (GTS/TWD), 2020 WL 9264842, at *5 (N.D.N.Y. Nov. 17, 2020) (citing *Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999)) (additional citations omitted), *report and recommendation adopted*, 2021 WL 958512 (N.D.N.Y. Mar. 15, 2021).

Here, the alleged deprivation of Plaintiff's constitutional rights by the named defendants at Clinton CF occurred on May 5, 2021. *See* Dkt. No. 1 at 4. Plaintiff was housed at Clinton CF from February 28, 2019, until June 22, 2021. Dkt. No. 17-8 at 4; Dkt. No. 17-9 at 3. Plaintiff filed a grievance at Clinton CF regarding the May 5, 2021, incident, dated May 17, 2021, which was received by Clinton CF's IGP office on May 24, 2021, designated a "code 28," and assigned Grievance No. "CL-0508-21." Dkt. No. 17-10 at 2; *see also* Dkt. No. 17-8 at 4-5.

On June 3, 2021, the Clinton CF IGRC dismissed and closed Grievance No. CL-0508-21. Dkt. No. 17-10 at 5; *see also* Dkt. No. 17-8 at 4-5. Plaintiff appealed the IGRC's response. *See* Dkt. No. 17-10 at 6. Pursuant to DOCCS Directive 4040, Inmate Grievance Program ("IGP") Supervisor C. Gregory reviewed Plaintiff's request to appeal the grievance and determined "this grievance should not have been Dismissed and Closed. Due to the allegations contained in the grievance ... grievance CL-0508-21 will be forwarded to the Superintendent level for an investigation and response." Dkt. No. 17-10 at 4. On June 24, 2021, Plaintiff was transferred to Woodbourne Correctional Facility ("Woodbourne CF"). Dkt. No. 17-8 at 5; Dkt. No. 17-9 at 3.

On August 18, 2021, Clinton CF Superintendent E. Bell issued a decision denying Plaintiff's grievance, which was forwarded to Plaintiff at Woodbourne CF. Dkt. No. 17-10 at 7; Dkt. No. 17-8 at 5. In a letter to the Clinton IGP Supervisor dated September 8, 2021, Plaintiff "advised that since August 24, 2021," he had been "placing my Grievance appeal #CL-0508-21 in the mailbox here at the Woodbourne Correctional Facility only to have it returned to be days later." Dkt. No. 17-11 at 1. The letter was received by Clinton CF on September 14, 2021. *Id*. In a letter dated September 14, 2021, Clinton IGP Supervisor Gregory advised Plaintiff under "Directive #4040, section 701.6, (h)(2)," a grievant transferred to another facility "must mail the signed

appeal form back to the IGP supervisor at the facility where the grievance was filed. Therefore, you need to send your grievance appeal directly to the IGP office at Clinton C.F." Dkt. No. 17-12 at 1.

**\*4** A Woodbourne CF legal mail log indicates Plaintiff signed for receipt of a letter from the Clinton CF IGP Supervisor on September 27, 2021. Dkt. No. 17-7 at 1; Dkt. No. 17-5 at 2-3. However, "Plaintiff never sent an appeal of grievance CL-0508-21 to the IGP Office at Clinton CF to be sent to CORC." Dkt. No. 17-8 at 5. A search of CORC records, conducted March 22, 2024, reveals no appeal of the Superintendent's denial of Plaintiff's grievance was ever received, despite Plaintiff's appeals of other facility-level grievance determinations. Dkt. No. 17-3 at 4-5; Dkt. No. 17-4 at 1-4.

Therefore, the undersigned finds Plaintiff failed to exhaust his administrative remedies prior to commencing the instant action. *See*, *e.g.*, *Bennett v. Fletcher*, No. 9:17-CV-0849 (GTS/CFH), 2020 WL 872491, at *7 (N.D.N.Y. Jan. 16, 2020) (" 'It is well-established that an inmate who does not appeal to CORC has failed to exhaust his administrative remedies.' ") (quoting *Omaro v. Annucci*, 68 F. Supp. 3d 359, 364 (W.D.N.Y. 2014), *report and recommendation adopted*, 2020 WL 871156 (N.D.N.Y. Feb. 21, 2020)). Accordingly, the Court recommends the named defendants' motion for summary judgment be granted. *See*, *e.g.*, *Jenkins*, 2020 WL 9264842, at *7 (recommending granting the defendants' motion for summary judgment, where there was "no genuine issue of material fact that Plaintiff failed to exhaust his administrative remedies," and dismissal of the complaint *with prejudice*, explaining "dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust.") (citing *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004)).

Finally, with regard to Plaintiff's claims against the John Doe defendants, the undersigned recommends dismissal due to: (1) Plaintiff's failure to comply with Judge D'Agostino's order to "take reasonable steps to ascertain the identities of the 'Doe' defendants," Dkt. No. 7 at 11, under FED. R. CIV. P. 16(f); (2) Plaintiff's failure to prosecute under FED. R. CIV. P. 41(b) and N.D.N.Y. L.R. 41.2(a); and (3) Plaintiff's failure to serve the complaint on the Doe defendants within 90 days, as required by FED. R. CIV. P. 4(m). *See*, *e.g.*, *Davis v. Doe*, No. 9:16-CV-0994 (MAD/DJS), 2017 WL 8640829,

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 165 of 170

Webb v. Fessette, Not Reported in Fed. Supp. (2025)

at \*5 (N.D.N.Y. Dec. 29, 2017), *report and recommendation adopted*, 2018 WL 1582230 (N.D.N.Y. Mar. 27, 2018). [3]

**V. CONCLUSION**
Accordingly, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 17) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's Eighth Amendment excessive force and failure to intervene claims against the named defendants be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED**, that Plaintiff's claims against Defendant Joe Doe #1 and John Doe #2 be **DISMISSED** *sua sponte*; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the

unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. [4] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**\*5 IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2025 WL 1859012

---

**Footnotes**

1    Citations to the parties' submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system. Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

2    This matter was reassigned to Hon. Judge Coombe by text order dated January 15, 2015. Dkt. No. 29.

3    The undersigned further notes even if the John Doe defendants had been properly named, dismissal of the claims against those defendants would be proper due to plaintiff's failure to exhaust his administrative remedies.

4    If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2711067
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael WEBB, Plaintiff,
v.
Eric M. FESSETTE, et al., Defendants.

9:23-cv-1577 (ECC/TWD)
|
Signed September 23, 2025

**Attorneys and Law Firms**

Michael Webb, Plaintiff, pro se.

Olivia R. Cox, Asst. Att'y Gen., for Named State Defendants.

### MEMORANDUM-DECISION AND ORDER

Elizabeth C. Coombe, United States District Judge:

## I. INTRODUCTION

**\*1** Plaintiff Michael Webb commenced this civil rights action asserting claims under 42 U.S.C. § 1983 arising out of his incarceration at Clinton Correctional Facility (C.F.). Dkt. No. 1. On March 26, 2024, the named Defendants filed a pre-answer motion for summary judgment seeking dismissal of Plaintiff's claims based on his failure to exhaust available administrative remedies as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a). Dkt. No. 17. This matter was assigned to United States Magistrate Judge Thérèse Wiley Dancks who issued a Report-Recommendation and Order on January 22, 2025, recommending that Defendants' unopposed motion for summary judgment be granted and that the John Doe Defendants be dismissed sua sponte. Dkt. No. 30. Plaintiff filed an objection to the Report-Recommendation on April 18, 2025. Dkt. No. 37.

## II. STANDARD OF REVIEW

This Court reviews de novo those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the specific portions of the [report-recommendation] that the objector asserts are erroneous and provides a basis for

this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (internal quotation marks omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal ...." *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920 at \*2 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies Under the PLRA

Magistrate Judge Dancks recommended granting summary judgment to the Defendants on exhaustion grounds. Dkt. No. 30 at 5-8. Specifically, Magistrate Judge Dancks found that because Plaintiff never sent an appeal of grievance CL-0508-21 to the IGP Office at Clinton C.F. to be sent to CORC, he failed to exhaust his administrative remedies. *Id.* at 7-8. Plaintiff objects to Magistrate Judge Danck's conclusion that he failed to exhaust his administrative remedies. Plaintiff contends that Woodbourne C.F. officers were "deliberately attempting to intercept, or delay" Plaintiff's grievance appeal. Dkt. No. 37.

In light of Plaintiff's objection, the Court reviews this issue de novo and, after careful consideration, declines to adopt Magistrate Judge Dancks' recommendation granting summary judgment on the basis of exhaustion. [1] Magistrate Judge Dancks properly set forth the legal standard for exhaustion of administrative remedies in her report-recommendation. Dkt. No. 30 at 5-6. In addition to those standards, the Court further notes that although the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 578 U.S. 632, 642 (2016). Specifically, the exhaustion requirement contained in § 1997e(a) "hinges on the 'availability' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* (citing 42 U.S.C. § 1997e(a)) (alterations in original). In *Ross*, the Supreme Court identified three circumstances in which a court may find administrative remedies are not "available" for PLRA purposes, holding:

Case 9:25-cv-00153-DNH-ML    Document 53    Filed 05/05/26    Page 167 of 170

**\*2** [A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates .... Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use .... And finally, ... when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Id*. at 643-44. In these situations, exhaustion is not required. Further, the Second Circuit has observed "the three circumstances discussed in Ross do not appear to be exhaustive ...." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 124 n.2 (2d Cir. 2016).

Because the failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of showing that an incarcerated individual has failed to satisfy the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Then the plaintiff must establish the administrative review process was unavailable to him under *Ross*. *See id.* "While the burden of production may shift to a plaintiff when a court considers whether the grievance process was unavailable, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *Hudson v. Kirkey*, No. 9:20-cv-0581 (LEK/DJS), 2021 WL 1966721, at \*3 (N.D.N.Y. May 17, 2021) (citing *Coleman v. Nolan*, No. 9:15-cv-0040, 2018 WL 4732778, at \*4 (N.D.N.Y. Oct. 2, 2018)) (alteration in original). "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affs.*, 201 F.3d 94, 97 (2d Cir. 2000) (citations omitted).

Here, the record is, at best, incomplete as to the availability of Plaintiff's administrative remedies following the alleged May 5, 2021 incident. There is no dispute that Plaintiff filed an initial grievance concerning the underlying incident at Clinton C.F. in May 2021. Dkt. Nos. 17-10 at 2; 17-8 at

4-5. Plaintiff was subsequently transferred to Woodbourne C.F. on June 27, 2021. Dkt. Nos. 17-8 at 5; 17-9 at 3. On August 18, 2021, the Clinton C.F. Superintendent issued a decision denying Plaintiff's grievance, which was forwarded to Plaintiff at Woodbourne C.F. Dkt. Nos. 17-10 at 7; 17-8 at 5. On September 8, 2021, Plaintiff sent a letter to the Clinton IGP Supervisor, with the subject heading "Correspondence Department blatantly refuses to mail out grievance appeal address [sic] to Clinton I.G.R.C. Supervisor." Dkt. No. 17-10 at 26. In the letter, Plaintiff advised:

**\*3** ... I have been placing my grievance appeal ... in the mailbox here at the Woodbourne Correctional Facility only to have it returned to me days later. Today is the fourth time the I.G.R.C. or inmate correspondence program has returned this grievance appeal to me, therefore, I'm respectfully requesting an exception to the time limit ... to preserve my rights to due process.

*Id*. The Clinton IGP Supervisor responded to Plaintiff in a September 14, 2021 letter, explaining that if Plaintiff wished to appeal, he "must mail the signed appeal form back to the IGP [S]upervisor at the facility where the grievance was filed. Therefore, you need to send your grievance appeal directly to the IGP office at Clinton C.F." Dkt. No. 17-12. A Woodbourne C.F. legal mail log indicates Plaintiff signed for receipt of a letter from the Clinton C.F. IGP Supervisor on September 27, 2021. Dkt. Nos. 17-7 at 1; 17-5 at 2-3. CORC records indicate that no appeal of the Clinton C.F. Superintendent's denial of Plaintiff's grievance was ever received. Dkt. Nos. 17-3 at 4-5; 17-4 at 1-4.

The Court agrees with Magistrate Judge Dancks' determination that Plaintiff failed to exhaust his administrative remedies. The documents submitted by Defendants in support of their motion, including Clinton IGP records and CORC records, reveal that no appeal was received by CORC. *See* 7 N.Y.C.R.R. § 701.5(d); *see also, e.g., Shabazz v. Bailey*, No. 9:20-cv-0057 (LEK/TWD), 2023 WL 5779533, at \*5 (N.D.N.Y. June 28, 2023) ("Plaintiff's failure to appeal [his] grievance ... to CORC means Plaintiff failed to properly exhaust his administrative remedies before

filing this action."), *report and recommendation adopted*, 2023 WL 5622049 (N.D.N.Y. Aug. 31, 2023).

However, Plaintiff's failure to appeal his grievance to CORC does not end the exhaustion inquiry. As explained above, an inmate's failure to properly exhaust administrative remedies does not preclude an action under § 1983 where prison officials thwart his efforts to utilize the grievance process, thus rendering it unavailable to him. *See generally, Ross*, 578 U.S. at 643-44. Here, the Court finds that a question of fact exists as to whether DOCCS' grievance process was fully available to the Plaintiff. Plaintiff maintains that prison officials at Woodbourne C.F. deliberately interfered with his ability to appeal to CORC by interfering with his mail. To be sure, courts in this circuit have consistently found inmates' general claims that grievances were lost or destroyed insufficient to excuse the PLRA's exhaustion requirement. *See, e.g., Rosado v. Fessetto*, No. 9:09-cv-0067 (DNH/ATB), 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) (collecting cases), *report and recommendation adopted*, No. 9:09-CV-67, 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010); *Rodriguez v. Cross*, No. 9:15-cv-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017). However, in this case Plaintiff's September 8, 2021 letter corroborates his present contention, noting that on four separate occasions he placed his grievance appeal addressed to the "Clinton I.G.R.C. Supervisor" in the Woodbourne C.F. mailbox, only for the appeal to be returned to him, unmailed, days later.

In support of their motion, Defendants have submitted the affidavit of Megan Nolan, an Office Assistant at Woodbourne C.F. who is "familiar with the mailroom procedure in regard to receiving, logging, and dispatching mail to incarcerated individuals at Woodbourne C.F." Dkt. No. 17-5 at 1. However, Ms. Nolan's affidavit does not in any way address Plaintiff's contention regarding the handling of Plaintiff's appeals by Woodbourne C.F. It is also unclear how the Clinton IGP Supervisor's response directing Plaintiff to mail his appeal to the IGP Supervisor at the facility where the grievance was filed (which the record suggests Plaintiff was already doing) provided Plaintiff with any remedy to the situation. The response did not expressly grant Plaintiff an extension of time to appeal, nor does it squarely address the issue Plaintiff raised concerning Woodbourne C.F.'s alleged interference with his mail. On these facts, the Court concludes that this case is distinguishable from those allegations which have

been found inadequate to excuse non-compliance with IGP requirements, particularly at this early stage in the litigation.

**\*4** "Because Plaintiff has not yet had an opportunity to conduct discovery to support his exhaustion theory, the Court finds Defendants' request for summary judgment premature." *Johnson v. Owens*, No. 9:20-cv-0982 (LEK/CFH), 2022 WL 958127, at *4 (N.D.N.Y. Mar. 30, 2022) (collecting cases); *see Murray v. Noeth*, No. 6:19-cv-6342, 2022 WL 4467691, at *5 (W.D.N.Y. Sept. 26, 2022) ("[A]t this stage of the proceedings and with no discovery having been conducted, it would not be appropriate to resolve [the exhaustion] issue just based on the papers."); *see also Croney v. Russell*, No. 9:23-cv-1188 (DNH/PJE), 2025 WL 1089520, at *3 (N.D.N.Y. Feb. 25, 2025) ("Summary judgment is a 'drastic device' and 'should not be granted when there are major factual contentions in dispute[,] ... particularly ... when, as here, one party has yet to exercise its opportunities for pretrial discovery.' ") (alterations in original) (quoting *Nat'l Life Ins. Co. v. Solomon*, 529 F.2d 59, 61 (2d Cir. 1975)), *report-recommendation adopted*, 2025 WL 854718 (N.D.N.Y. Mar. 19, 2025).

In the alternative to summary judgment, Defendants request an evidentiary hearing on the issue of exhaustion pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011). Dkt. No. 17-13 at 10. However, "doing so here without the benefit of discovery would not be the most efficient manner in which to resolve the factual disputes presented here." *Croney v. Medbury*, No. 9:23-cv-1449 (DNH/DJS), 2024 WL 5294279, at *4 (N.D.N.Y. Nov. 12, 2024), *report-recommendation adopted*, 2024 WL 4986160 (N.D.N.Y. Dec. 5, 2024).[2] Accordingly, Defendants' motion for summary judgment is denied with leave to renew upon the completion of discovery.

**B. Dismissal of John Doe Defendants**

Magistrate Judge Dancks recommended sua sponte dismissal of the John Doe Defendants due to (1) Plaintiff's failure to comply with Judge D'Agostino's order to "take reasonable steps to ascertain the identities of the 'Doe' defendants" under Fed. R. Civ. P. 16(f); (2) Plaintiff's failure to prosecute under Fed. R. Civ. P. 41(b) and N.D.N.Y.L.R. 41.2(a); and (3) Plaintiff's failure to serve the Complaint on the Doe defendants within 90 days, as required by Fed. R. Civ. P. 4(m). Dkt. No. 30 at 8-9. Magistrate Judge Dancks further noted that dismissal of the Doe Defendants was proper in light of her finding that Plaintiff failed to exhaust his administrative remedies. *Id*. at 9 n. 3. Plaintiff objects to the dismissal of

the John Doe Defendants, identifying his pre-litigation efforts to obtain the identity of these Defendants via FOIL requests, as well as his March 14, 2024 letter to the Court seeking assistance identifying the Doe Defendants. Dkt. No. 37 at 1-2.

In light of Plaintiff's objections, the Court reviews this issue de novo and, upon careful consideration, declines to adopt Magistrate Judge Dancks' recommendation to sua sponte dismiss the Doe Defendants at this juncture. Plaintiff commenced this action on December 15, 2023 by the filing of a Complaint. Dkt. No. 1. Upon initial review pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), the Court issued a Decision and Order on January 23, 2024 ordering that Plaintiff's Eighth Amendment excessive force and failure-to-intervene claims against the Doe Defendants, among others, survived review and require a response. Dkt. No. 7. In its decision, the Court ordered that Plaintiff take reasonable steps to ascertain the identities of the "Doe" Defendants and when identified, seek to amend the Complaint to add these individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a). *Id.* at 11. The Court further warned Plaintiff of the consequences of his failure to timely pursue amendment. As previously noted, Plaintiff subsequently wrote to the Court on approximately March 14, 2024, seeking assistance identifying the Doe Defendants and explaining his efforts to date. Dkt. Nos. 15, 16. Defendants' pre-answer motion for summary judgment was filed on March 26, 2024. Dkt. No. 17. The following day, the Court issued a Text Order denying Plaintiff's request for assistance identifying the Doe Defendants as premature. Dkt. No. 20. The Court explained that

> **\*5** [i]n the event this action survives the pending motion, counsel will be directed to answer the complaint, after which time a Mandatory Pretrial Discovery and Scheduling Order shall issue, which will require counsel to provide documentation to assist with identifying the "Doe" defendants to the extent such information is available.

*Id.*

As previously set forth, the Court declines to dismiss Plaintiff's Complaint at this juncture for failure to exhaust his administrative remedies. Plaintiff is otherwise entitled to the benefit of at least some discovery to identify the unknown Defendants before dismissal would be appropriate. *See Brown v. Doe*, No. 96-cv-1222, 1999 WL 893070, at \*2 (S.D.N.Y. Oct. 18, 1999) (deferring defendants' motion to dismiss until they have provided the requisite discovery information and materials to the pro se prisoner litigant on the grounds that "[p]laintiffs, especially pro se incarcerated plaintiffs should be given an opportunity to identify ... unknown defendants through discovery").

## IV. CONCLUSION
**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Dancks' Report-Recommendation, Dkt. No. 30, is **REJECTED**, and it is further

**ORDERED** that Defendants' motion for summary judgment, Dkt. No. 17, is **DENIED with leave to renew**, and it is further

**ORDERED** that the case be referred to Magistrate Judge Dancks to reset Defendants' answer deadline and for general pretrial management; and it is further

**ORDERED** that, at such time as discovery on the exhaustion issue has been completed, Defendants may file a renewed motion for summary judgment and/or request permission to hold an exhaustion hearing; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2711067

## Footnotes

1    Plaintiff failed to respond to Defendants' motion for summary judgment. Plaintiff's failure to oppose Defendants' motion results in the admission of properly supported facts, however the Court must still ensure those facts show Defendant is entitled to judgment as a matter of law. *See Jackson v. Federal Express,* 766 F.3d 189, 194 (2d Cir. 2014) (a non-response to a summary judgment motion does not risk default because the district court must ensure that each statement of material fact is supported by the record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed) (citing *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242-46 (2d Cir. 2004) (even when a motion for summary judgment is not opposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law)).

2    The Supreme Court recently held that "parties are entitled to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim protected by the Seventh Amendment." *Perttu v. Richards*, 605 U.S. 460, 479 (2025). At this juncture, it does not appear the exhaustion question is intertwined with Plaintiff's Eighth Amendment excessive force and failure to intervene claims at issue and, therefore, an evidentiary hearing before the Court may be appropriate after discovery.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.